Charles B. Gibbons
Christopher A. Amar
Victoria B. Kush
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219
Telephone:     (412) 562-8800
Facsimile:     (412) 562-1041

Mark J. MacDougall
Kristine L. Sendek-Smith
James E. Sherry
Lauren B. Kerwin
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave. NW
Washington, DC 20036
Telephone:     (202) 887-4000
Facsimile:     (202) 887-4288

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALUMINIUM BAHRAIN B.S.C, | Case No. 2:08-cv-299-DWA |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| ALCOA INC., ALCOA WORLD ALUMINA LLC, WILLIAM RICE, and VICTOR DAHDALEH, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## FIRST AMENDED COMPLAINT

For its Amended Complaint, Plaintiff Aluminium Bahrain B.S.C. ("Plaintiff" or "Alba") alleges as follows:

## NATURE OF THE CASE

This action arises from a criminal scheme perpetrated by Defendants Alcoa Inc. ("Alcoa"), Alcoa's subsidiary Alcoa World Alumina LLC ("Alcoa World Alumina"), senior Alcoa executive

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

1  William Rice, and Alcoa's agent Victor Dahdaleh to defraud Plaintiff Aluminium Bahrain, B.S.C.

2  ("Alba") of hundreds of millions of dollars through a conspiracy of illegal bribery and other criminal

3  acts.

4  Alba is one of the world's largest aluminum smelters and is principally owned by Bahrain

5  Mumtalakat Holding Co., B.S.C. ("Mumtalakat"), a holding company for the Government of Bahrain.

6  Defendants were involved in the supply of alumina – the key ingredient in aluminum and one of

7  Alcoa's chief commercial products – to Alba for nearly twenty years.  Through their conspiracy, which

8  was conceived, directed, controlled, and coordinated in and from the United States by senior

9  executives of Alcoa and Alcoa World Alumina, including Rice, Defendants bribed former senior

10  officials of Alba and the Government of Bahrain to induce Alba to (a) guarantee that the alumina

11  supply contract was awarded to Alcoa's subsidiary, (b) overpay for alumina and, (c) cede an equity

12  stake in Alba to Alcoa.  To facilitate and conceal the fraud against Alba, Defendants funneled these

13  overpayments and *quid pro quo* bribes through a series of offshore shell companies owned by Alcoa's

14  agent, Dahdaleh, and ultimately controlled and operated by Defendants for the purpose of effectuating

15  the fraud against Alba.  Defendants' conspiracy succeeded in exacting hundreds of millions of dollars

16  in overpayments from Alba and deprived Alba of the honest services of one or more of its officers,

17  directors, or employees.  Among other things, Alba seeks damages in excess of $1 billion, including

18  punitive damages, for this massive, outrageous fraud.

19
20  **JURISDICTION AND VENUE**

21  1.      There are two sources of subject matter jurisdiction in this Court:

22      a.      The parties' citizenship is completely diverse and the amount in controversy

23  exceeds $75,000, exclusive of interest and costs.  28 U.S.C. § 1332.

24      b.      A substantial part of this action arises under the laws of the United States.  28

25  U.S.C. §§ 1331 and 1337.

26  2.      There are two sources of venue in this Court:

27      a.      A substantial part of the events or omissions giving rise to the action occurred in

28  this district.  28 U.S.C. § 1391(a)(2).

First Amended Complaint

b.      Defendants Alcoa and Alcoa World Alumina have their principal places of business in Pennsylvania at 201 Isabella Street, Pittsburgh, Pennsylvania 15212.  28 U.S.C. § 1391(a)(3).

### THE PARTIES

3.      Plaintiff Alba is a company organized under the laws of the Kingdom of Bahrain, with its principal place of business at P.O. Box 570, 150, Hawar Avenue, Asker 951, Kingdom of Bahrain.

4.      Alba's majority shareholder is Mumtalakat, which holds a 69.38% interest in the company and is entirely owned by the Government of Bahrain.  SABIC Investments Company holds a 20.62% interest, and the remaining 10% of Alba's shares are publicly owned and traded.

5.      Defendant Alcoa is a corporation organized under the laws of the State of Pennsylvania.

6.      Defendant Alcoa World Alumina is a majority-owned subsidiary of Alcoa.  Alcoa World Alumina is a corporation organized under the laws of the State of Delaware.  Alcoa World Alumina was formerly known as Alcoa Alumina & Chemicals, LLC.

7.      Defendant William Rice was Vice President of Marketing of Alcoa World Alumina from approximately 2001 through December 2006 and subsequently served as Vice President of Mining of Alcoa World Alumina and Chemicals ("AWAC").  Rice is a U.S. citizen.  His last known address is 2008 Hidden Cove Lane, Knoxville, Tennessee 37922.

8.      Defendant Victor Dahdaleh was the agent of Defendants Alcoa and Alcoa World Alumina.  Dahdaleh is a Canadian citizen.  His last known address is 28 Eaton Place, London, United Kingdom, SW 1X 8AF.

9.      Dahdaleh has had regular, continuous, and ongoing contacts with this jurisdiction through his actions on behalf of, and business relationships with, the other Defendants.

### NON-PARTY ENTITIES AFFILIATED WITH ALCOA

10.      AWAC is Alcoa's vehicle for its investments, operations and participation in the alumina business.  AWAC is an unincorporated joint venture of Alcoa and Alumina Limited, an Australian company formerly known as Western Mining Corporation Holdings Limited with securities registered with the United States Securities and Exchange Commission and traded on the New York Stock Exchange.

3

11.     The AWAC Strategic Council directs AWAC's operations.  Upon information and belief, the AWAC Strategic Council included U.S. citizens who managed Alcoa's worldwide alumina refineries from the United States and knew Defendant Dahdaleh and approved the terms of his engagement.  Alcoa appoints a majority of the AWAC Strategic Council, including the Chair.  Alcoa is also AWAC's "industrial leader" and manages both AWAC and the "Enterprise Companies" through which AWAC operates.

12.     The AWAC Enterprise Companies include Alcoa's subsidiaries, Alcoa World Alumina and Alcoa of Australia Limited ("Alcoa of Australia"), each of which is owned 60 percent by Alcoa and 40 percent by Alumina Limited.  The Enterprise Companies follow the direction of the Strategic Council as directed, in turn, by Alcoa.

13.     Throughout the scheme described in the First Amended Complaint, Defendants Alcoa and Alcoa World Alumina controlled and directed the actions of Alcoa of Australia with respect to contract negotiations with and alumina supply to Alba and with respect to Alcoa of Australia's relationship and dealings with Dahdaleh.

### NON-PARTY ENTITIES AFFILIATED WITH DAHDALEH

14.     In order to facilitate and conceal their scheme to defraud Alba, the Defendants funneled the payments received from Alba, and the *quid pro quo* bribes paid to senior officials of Alba and the Government of Bahrain, through a series of overseas shell companies ultimately beneficially owned by or otherwise affiliated with Dahdaleh and controlled and operated by Defendants in furtherance of their fraudulent conspiracy.

15.     The Dahdaleh-owned shell companies employed at various times in connection with the fraud on Alba included:

a.     Alumet Limited, a company incorporated in the British Virgin Islands;

b.     Kwinalum Trading Pte Limited ("Kwinalum"), a wholly-owned subsidiary of Alumet Limited registered in Singapore;

c.     Alumet Asia Pte Limited ("Alumet Asia"), the successor company to Kwinalum, also a wholly-owned subsidiary of Alumet Limited registered in Singapore;

d.     Three separate companies named AA Alumina and Chemicals, incorporated in

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

First Amended Complaint

1  Switzerland and referred to herein as AAAC-1, AAAC-2, and AAAC-3 (see infra ¶¶ 86-87, 108-09);

2  and

3          e.      United Legal Engineering Consultants Limited, incorporated in Jersey (Channel

4  Islands).

5          16.     None of the Dahdaleh-owned shell companies ever provided any material or legitimate

6  services to Alba or Defendants.  Instead, they were employed by Defendants for the sole purpose of

7  enabling and concealing their conspiracy to defraud Alba.

8                                    **FACTUAL ALLEGATIONS**

9          17.     Alba is one of the world's largest aluminum smelters, fulfilling essentially all the

10  demand of industry in the Kingdom of Bahrain.

11          18.     The principal raw input for aluminum is alumina, which gives rise to 80% of Alba's raw

12  material costs.  Other significant inputs include carbon (a blend of petroleum coke and pitch) and

13  aluminum fluoride.

14          19.     Alcoa and its subsidiaries were for many decades Alba's principal suppliers of alumina.

15          20.     Alcoa's alumina supply agreements with Plaintiff were overseen and negotiated by

16  Alcoa's subsidiary, Alcoa World Alumina (see supra ¶ 6).  The alumina itself was supplied by Alcoa's

17  subsidiary, Alcoa of Australia.

18          21.     Between 1969 and 1989, Alcoa supplied Alba with alumina for its smelting operations

19  without any involvement by Dahdaleh or the Dahdaleh-owned shell companies.  In 1990, however,

20  Alcoa and Alcoa World Alumina inserted Dahdaleh into their contractual relationship with Alba.  As

21  detailed herein, there was no legitimate business reason for Dahdaleh's involvement.  Instead, Alcoa,

22  Alcoa World Alumina, and senior executives of those companies, including Rice, used Dahdaleh and

23  the Dahdaleh-owned shell companies for the sole purpose of facilitating and concealing their massive

24  fraud on Alba.

25          22.     For nearly twenty years, between 1990 and 2009, Defendants defrauded Alba by bribing

26  officials of Alba and the Government of Bahrain, who in turn (a) caused Alba to ensure that Alcoa

27  retained substantially all of Alba's alumina market share, (b) caused Alba to pay inflated prices for

28  alumina and (c) attempted to cause Alba to cede a substantial portion of its equity to Alcoa.

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

First Amended Complaint

23.     As part of Defendants' conspiracy to defraud Alba, Defendants funneled the payments received from Alba, and the *quid pro quo* bribes paid to officials of Alba and the Government of Bahrain, through a series of overseas shell companies that were controlled and beneficially owned by Dahdaleh and ultimately directed and operated by Defendants in furtherance of their fraudulent conspiracy.

24.     Throughout the conspiracy, Defendants falsely represented to Alba that the Dahdaleh-owned shell companies were legitimate businesses that were controlled by, affiliated with, and authorized to act on behalf of Alcoa and its subsidiaries.

25.     Contrary to these false representations, the Dahdaleh-owned shell companies served no legitimate business purpose.  Instead, they were created and operated by Defendants for the sole purpose of facilitating Defendants' receipt and distribution of the overpayments that were fraudulently exacted from Alba and the Defendants' *quid pro quo* payment of bribes to senior officials of Alba and the Government of Bahrain.

26.     This fraudulent scheme was carried out in at least three distinct ways during the period of the conspiracy.

a.     Between  1990 and 2004, Alcoa, through its subsidiary Alcoa of Australia, contracted with Dahdaleh-owned entities to pay Dahdaleh millions of dollars in "commissions."  The cost of these "commissions" was passed on to Alba in the form of inflated alumina prices under supply contracts between Alba and Alcoa.  Dahdaleh performed no material or legitimate services to earn these "commissions," which were instead part of Dahdaleh's compensation for facilitating bribes to the senior officials of Alba and the Government of Bahrain who induced Alba to enter into these economically disadvantageous contracts.

b.     Between 1993 and 2009, Alcoa assigned portions or all of its supply contracts with Alba to Dahdaleh-owned shell companies.  Pursuant to these assignments, Alcoa, through its subsidiary Alcoa of Australia, sold alumina to the Dahdaleh-owned entities, which then re-sold the same alumina to Alba at higher prices.  Defendants distributed the overpayments fraudulently exacted from Alba among themselves and used portions of the overpayments to pay *quid pro quo* bribes to the senior officials of Alba and the Government of Bahrain who induced Alba to enter into these

First Amended Complaint

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

1   economically disadvantageous contracts.

2          c.      In 2003, Alcoa induced the Government of Bahrain to enter into a memorandum

3   of understanding ("MOU") for the sale of up to 26% of the Government of Bahrain's shares in Alba to

4   Defendant Alcoa or an Alcoa affiliate at a price that undervalued the Government's shares by hundreds

5   of millions of dollars.  The Government of Bahrain entered into the economically disadvantageous

6   MOU only because Defendants had bribed senior officials of Alba and the Government of Bahrain.

7          27.     Alcoa and Alcoa World Alumina, and senior executives of those companies, including

8   Rice, conceived, directed, and controlled these fraudulent schemes in and from the United States.

9          28.     Defendants acted individually and in concert to defraud Alba.  Alba has been directly

10   damaged by this conduct.

11          29.     Defendants' scheme to defraud Plaintiff began in or around 1990 but was not

12   discovered by Alba until 2007.

13          30.     Defendants' fraudulent concealment of their scheme, including by their use of the

14   Dahdaleh-owned corporate intermediaries, contributed to Alba's delayed discovery and made it

15   impossible for Alba to know the details of many of their unlawful acts.

16          31.     On February 27, 2008, Alba filed its initial Complaint in this matter, describing the

17   Defendants' fraudulent scheme.  Alba's Complaint directly resulted in criminal investigations into

18   Defendants' conduct by the United States Department of Justice and criminal authorities in several

19   other countries.  Those investigations have since resulted in criminal charges against key players in the

20   conspiracy, including Dahdaleh.

21          32.     On September 21, 2009, a year and a half after Alba filed its initial Complaint, Alcoa

22   terminated its contract with AAAC-3, the Dahdaleh-owned entity that was purchasing alumina from

23   Alcoa and re-selling the same alumina to Alba at inflated prices, effective December 31, 2009.  The

24   very next day, September 22, 2009, AAAC-3 terminated its contract with Alba.

25   **The Fraud to Induce Alba to Pay Excessive Negotiated Alumina Rates and Defendants'**
26   **Effort to Conceal Their Unlawful Activities Through Assignment Under the 1990 Contact**

27          33.     Alcoa supplied Alba with alumina through its subsidiary beginning in 1969.

28          34.     In 1990, for the first time in the 21-year history of its relationship with Alba, Alcoa

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

7

1   chose to introduce Dahdaleh into that relationship.

2        35.   There was no commercially legitimate reason for Dahdaleh's involvement in Alcoa's

3   contractual relationship with Alba, as Dahdaleh provided no material or legitimate services to either

4   party.  Rather, Alcoa brought Dahdaleh into the relationship as a means of ensuring that Alcoa always

5   had exclusivity over the alumina supply contract, overcharging Alba for alumina, and facilitating the

6   payment of *quid pro quo* bribes to officials of Alba and the Government of Bahrain.  Defendants

7   carried out this fraudulent scheme through the payment of unearned "commissions" to Dahdaleh-

8   owned shell companies, the cost of which was passed on to Alba, and through the assignment of

9   portions of Alcoa's interest in the alumina supply contracts to Dahdaleh-owned shell companies.

10        36.   Those assignments and commissions served no legitimate business purpose, but instead

11   were used as a means to secretly pay bribes as part of the scheme to defraud Alba.  In exchange for

12   Defendants' bribes, senior officials of Alba and the Government of Bahrain caused Alba to agree to

13   pay inflated prices for the alumina it purchased from Alcoa.  Those overpayments were received, in the

14   first instance, by the Dahdaleh-owned entities.  The Dahdaleh-owned entities then distributed the

15   proceeds of the fraud to (a) senior officials of Alba and the Government of Bahrain, and (b), upon

16   information and belief, Alcoa and the other participants in the conspiracy.  Alcoa also enjoyed

17   substantial commercial benefits and advantages by ensuring that Alcoa's subsidiary always won the

18   supply contract at above-market prices throughout the duration of the conspiracy.

19        37.   Alcoa and Alcoa World Alumina, and senior executives of those companies, including

20   Rice, conceived, directed, controlled, and coordinated the actions of Alcoa's agents, including

21   Dahdaleh, the Dahdaleh-owned entities, and Alcoa's subsidiary Alcoa of Australia, with respect to

22   these fraudulent commissions, assignments, and bribes, from the United States.

23   **1990-2004:  Payment of Fraudulent "Commissions" to Dahdeleh**

24        38.   In 1990, Alba and Alcoa, through its subsidiary Alcoa of Australia, entered into an

25   agreement (the "1990 Contract") under which Alba purchased alumina from Alcoa.  Originally for a

26   ten-year term, the contract was extended by three amendments, ultimately expiring in December 2004.

27        39.   Throughout the existence of the 1990 Contract and extensions thereto, Alcoa, through

28   its subsidiary, paid Dahdaleh millions of dollars in unearned "commissions."  These "commission"

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

First Amended Complaint

payments were described in a series of "Agency Agreements" between Alumet Limited, an entity owned by Dahdaleh, and Alcoa of Australia.  The Agency Agreements identify the Dahdaleh-owned Alumet Limited as the "agent" of Alcoa's subsidiary.

40.    Pursuant to the Agency Agreements, Defendant Dahdaleh and Alumet Limited received from Alcoa of Australia initially a per ton fee for shipments to Alba and subsequently a percentage of Alcoa's sales to Alba.  Between the years 1990 and 2004, Alcoa, through its subsidiary, paid Dahdaleh more than $13.5 million in these unearned and fraudulent "commissions."

41.    The cost of these commissions was passed on to Alba in the form of inflated alumina prices under the supply agreements with Alcoa's subsidiary.

42.    Dahdaleh and Alumet Limited did not provide any material or legitimate services under the Agency Agreements, and the "commission" payments served no legitimate business purpose. Instead, their purpose was to compensate Dahdaleh for the fraudulent and illegal services he provided by, *inter alia*, facilitating the payment of bribes to senior officials of Alba and the Government of Bahrain, distributing the proceeds of the fraudulent scheme to Defendants, and camouflaging the Defendants' fraud in the cloak of Dahdaleh's various corporate aliases.

### The 1993 Assignment

43.    The 1990 Contract had two measures of the price for alumina that took effect beginning in 1992.  For approximately 60% of the supply, the price was set by a formula.  For the remaining 40% (the "Market Tonnage"), the parties negotiated the price.

44.    Beginning in 1993, Defendants caused the Market Tonnage to be assigned to a company owned by Dahdaleh for the purpose of facilitating bribes that caused Alba to pay excessive prices for alumina.

45.    The assignment was negotiated in a meeting that took place in Singapore in or about 1992, at which Alcoa's representatives included a U.S. national.

46.    From 1993 through 1995, Defendants caused the supply responsibility for the Market Tonnage to be assigned from Alcoa's subsidiary to a Dahdaleh-owned company registered in Singapore called Kwinalum.

47.    Kwinalum was not a legitimate business enterprise and had no prior experience in the

First Amended Complaint

1  alumina supply business.  Instead, Kwinalum was incorporated on or about January 9, 1993, less than

2  four weeks prior to its first shipment to Alba.  The only reason for its involvement was to facilitate and

3  conceal the fraud on Alba.

4       48.  Kwinalum was controlled and beneficially owned by Dahdaleh:

5       a.  Kwinalum was a wholly owned subsidiary of Alumet Limited, the company that

6  Defendants had used since 1990 to facilitate the fraudulent "commissions" paid to Dahdaleh.

7  Dahdaleh owned Alumet Limited.

8       b.  All revenue from sales by Kwinalum was passed directly to Alumet Limited.

9       c.  Angela Hill signed invoices on behalf of Kwinalum.  Angela Hill was an officer

10  of Dadco Australia Pty Limited ("Dadco"), a company founded by Dahdaleh and Dahdaleh's brother

11  in Perth, Australia.  From approximately 1986 to 1990, Angela Hill served as alumina sales

12  administrator for Alcoa of Australia.

13       49.  Notwithstanding the assignment, Alcoa, through its subsidiary, remained the actual

14  source of the alumina.  Kwinalum simply resold the same alumina it purchased from Alcoa to Alba at

15  higher prices.

16       50.  There was no legitimate business reason for the assignment to Kwinalum.  Instead, the

17  assignment was part of a scheme to pay bribes to senior officials of Alba and the Government of

18  Bahrain, who then induced Alba to pay inflated prices for the Alcoa alumina – purchased through the

19  Kwinalum intermediary.  The assignment also aimed to avoid export taxes imposed by the Australian

20  government.

21       51.  To further the scheme, Alcoa, through its subsidiary, also paid unlawful commissions to

22  Dahdaleh, some of which were transferred to one or more former senior officials of Alba and the

23  Government of Bahrain.  Upon information and belief, Alcoa and Alcoa World Alumina directed

24  Alcoa of Australia to pay the unlawful commissions with the knowledge and intent that such payments

25  would be transferred on as bribes.

26       52.  In exchange for the bribes, officials induced Alba to pay excessive prices for alumina

27  and ensured that the contract with Alcoa's subsidiary remained exclusive and guaranteed.

28       53.  The 1993 Assignment substantially affected interstate commerce.  Pursuant to

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

10

instructions on the invoices from Kwinalum, Alba paid the invoices by wire transfer to Kwinalum accounts held at Royal Bank of Canada and Chase Manhattan Bank in New York, NY.

### The 1996 Assignment and Extension

54.     In 1996, the 1990 Contract was amended (the "1996 Amendment") to provide that Alcoa, through its subsidiary, would provide the Market Tonnage to Alba from 1997 through 2000. The 1996 Amendment, which was dated September 19, 1996, also extended the term of the 1990 Contract until December 31, 2000.

55.     Peter Burgess, Sales and Marketing Manager of Alcoa World Alumina in Pittsburgh, Pennsylvania, signed the 1996 Amendment on behalf of Alcoa of Australia.  Upon information and belief, he acted at the direction of Alcoa and Alcoa World Alumina.

56.     The pricing for the Market Tonnage was negotiated between Alcoa of Australia's Marketing Manager and a former officer of Alba.  On or about September 15, 1996, Alcoa of Australia's Marketing Manager sent an offer by fax to Alba, copying Peter Burgess in Pittsburgh and indicating that the offer was submitted by Alcoa World Alumina.

57.     The 1996 Amendment provided that Alcoa of Australia would assign the Market Tonnage to "a company associated with" Alcoa of Australia.

58.     As they had in the period 1993 to 1995, Defendants caused the Market Tonnage to be assigned to a company controlled by Dahdaleh for the purpose of facilitating bribes that caused Alba to pay excessive prices for the Market Tonnage.

59.     On the same date that the 1996 Amendment was signed, Alcoa, through its subsidiary, entered into a secret Sales Agreement with Dahdaleh-owned Alumet Limited that provided for the sale of 285,000 metric tons of alumina by Alcoa's subsidiary to Alumet Limited (the "1996 Sales Agreement").  Upon information and belief, Alumet Limited then sold the alumina to yet another Dahdaleh-owned entity, Alumet Asia, which in turn re-sold the very same alumina to Alba at prices significantly higher than the prices at which Alcoa originally sold the alumina to the Dahdaleh-owned entities.  Defendants overcharged Alba more than $102 million under the 1996 Amendment and the secret 1996 Sales Agreement.

60.     Upon information and belief, Alcoa's subsidiary's dealings with Alba, Dahdaleh, and

First Amended Complaint

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

the Dahdaleh-owned shell companies were overseen, directed, and ultimately controlled by Alcoa, Alcoa World Alumina, and senior executives of those companies in the United States, including Burgess.

61.     Peter Burgess of Alcoa World Alumina – who also signed the 1996 Amendment with Alba – signed the 1996 Sales Agreement on behalf of Alcoa's subsidiary, acting at the direction of Alcoa and Alcoa World Alumina in negotiating and signing the two contracts.

62.     Per the terms of the 1996 Amendment, Alcoa, through its subsidiary, represented to Alba that Alumet Asia was "a company associated with" Alcoa of Australia.  Upon information and belief, Alcoa and Alcoa World Alumina directed Alcoa's subsidiary to make this representation.

63.     Alumet Asia was not a legitimate business enterprise and had no prior experience in the alumina supply business.  The only reason for this arrangement was to enable Alumet Asia to artificially mark up the price of the alumina sold to Alba by Alcoa's subsidiary and to facilitate the *quid pro quo* bribes paid to senior officials of Alba and the Government of Bahrain.

64.     Alumet Asia was controlled and beneficially owned by Dahdaleh:

        a.      Alumet Asia was a new name for Kwinalum, which had been assigned the Market Tonnage from 1993 through 1995 (see supra ¶ 46).

        b.      Angela Hill, an employee of the Dahdaleh-owned entity Dadco, signed invoices on behalf of Alumet Asia, as she had for its predecessor Kwinalum (see supra ¶ 48c).

        c.      Sandra Ainsworth from time to time signed invoices directed to Alba on behalf of Angela Hill.  Ainsworth was a former employee of Alcoa of Australia.  From June 1998 to December 2001, Ainsworth served as Administrative Manager of Alumet Asia.  Since 2001, Sandra Ainsworth has served as the Company Secretary of the Dahdaleh-owned entity Dadco (see supra ¶ 48c).  From in or about the month of December 2001 to April 2005, Ainsworth served as administrative and shipping manager of other Dahdaleh-owned shell companies (the AAAC companies, see infra ¶ 86-87, 100).

65.     Notwithstanding the assignment to Alumet Asia, Alcoa's subsidiary was, at all times, the actual source and seller of the alumina.  Alcoa's subsidiary sold the alumina to Alumet Limited (see supra ¶ 48a), which in turn sold it to Alumet Asia.  Alumet Asia then resold the alumina to Alba at

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

12

higher prices.  Alumet Asia's invoices to Alba contained Alcoa's logo.

66.  The 1996 Amendment, executed by Peter Burgess of Alcoa World Alumina, explicitly required that the identity of Alumet Asia be kept "absolutely confidential."

67.  Defendants represented to Alba that the assignment of Market Tonnage was necessary in order to avoid disclosure of Alcoa's prices to other customers and the Government of Australia.

68.  Defendants' explanation to Alba for the assignment was false.  There was no legitimate business reason for the assignment.  Alumet Asia existed solely as a front for the sales of alumina to Alba and a vehicle for defrauding Alba.

69.  To further the scheme, Alcoa's subsidiary also continued to pay unlawful commissions to Dahdaleh, some of which were transferred to one or more former senior officials of Alba and the Government of Bahrain.  Upon information and belief, Alcoa and Alcoa World Alumina directed Alcoa's subsidiary to pay the unlawful commissions with the knowledge and intent that such payments would be transferred on as bribes.

70.  In exchange for the bribes, officials induced Alba to pay excessive prices for alumina.

71.  Alumet Asia ceased activity on January 1, 2002, eleven days after the date of its final invoice to Plaintiff.

72.  Defendants' activities substantially affected interstate commerce:

a.  Pursuant to instructions on the invoices issued by Dahdaleh associates Ainsworth and Hill, Alba wired payments to Chase Manhattan Bank in New York, NY.  Some payments were for credit to accounts held at the Royal Bank of Canada in New York, NY (including account XXX-XX5613) for further credit to another account of Alumet Asia.

b.  Throughout 2000 and 2001, Alcoa World Alumina Australia issued to Alba invoices for formula tonnage under the 1990 Contract.  These invoices directed that payments be made to accounts for the benefit of Alcoa of Australia at ANZ Investment Bank and Chase Manhattan Bank in New York, NY.

### The 2001 Extension

73.  In 2001, Alba and Alcoa, through its subsidiaries Alcoa World Alumina and Alcoa of Australia, amended the 1990 Contract to extend its term through 2003 (the "2001 Extension").

13

First Amended Complaint

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

74.     The extension was proposed by Alcoa World Alumina through its officer, Rice, by an April 21, 2001 letter on Alcoa World Alumina stationery sent from Pittsburgh, Pennsylvania.  The letter refers to the 1990 Contract as "our present purchase agreement" and seeks "to continue the relationship we have had for 30 years."

75.     As with the prior assignments, Defendants structured the 2001 Extension to involve Dahdaleh-owned corporate intermediaries to facilitate the payment of bribes and the payment of excessive prices by Alba for alumina.

76.     Upon information and belief, Alcoa, Alcoa World Alumina, and senior executives of those companies, including Rice, knowingly directed the negotiation and signature of two contracts – one with Alba and the other with Dahdaleh – for the sale of the same quantity of alumina.

77.     Upon information and belief, as the 2001 Extension was being finalized by Alcoa of Australia and Alba, Defendants were also negotiating a secret parallel Distribution Agreement between Alcoa of Australia and two Dahdaleh-owned shell companies, Alumet Limited and AA Alumina and Chemicals Limited.

78.     Alba and Alcoa, through its subsidiary, entered into the 2001 Extension on or about August 14, 2001.  The 2001 Extension was signed on behalf of Alcoa of Australia by David Dabney, a U.S. citizen and former Alcoa employee.  Dabney was not actually an employee or representative of Alcoa of Australia but rather was employed by Dahdaleh-owned entities (see infra ¶ 86).

79.     Defendants Alcoa, Alcoa World Alumina, and senior executives of those companies, including Rice, knew of and intended Dabney's involvement in the negotiations with Alba, and fostered the false impression that Dabney was a legitimate representative of Alcoa of Australia.  For example, in an email to an employee of Alba dated August 15, 2001, Rice stated that David Dabney would supply pricing information to Alba and that "we look forward to continuing our long term relationship."

80.     On or about February 14, 2002, Alcoa, through its subsidiary, signed a secret parallel Distribution Agreement with the Dahdaleh-owned entities Alumet Limited and AA Alumina and Chemicals Limited that appointed the Dahdaleh-owned entities as Alcoa of Australia's sole distributor of alumina to Alba for 2002 through 2004 (the "2002 Distribution Agreement").  The 2002

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

14

Distribution Agreement was initialed by "WJR" – the initials of Defendant William Rice – on behalf of Alcoa of Australia.

81.     As with the other Dahdaleh-owned entities, AA Alumina and Chemicals was not a legitimate business enterprise and had no prior experience in the alumina supply business.  Indeed, no company named AA Alumina and Chemicals was incorporated in either Australia or Switzerland on the date of the 2001 Extension, signed by Dabney with the endorsement of Defendant Rice. Approximately four months after Dabney executed the 2001 Extension, AA Alumina and Chemicals was incorporated in Switzerland, with Dabney as President.  The only reason for the involvement of AA Alumina and Chemicals was to facilitate and conceal the fraud on Alba.  The name of the shell company – similar to Defendant Alcoa World Alumina's former name, Alcoa Alumina and Chemicals, LLC – was used, upon information and belief with the permission of Alcoa, to further the deception.

82.     Alcoa's subsidiary's dealings with Alba, Dahdaleh, and the Dahdaleh-owned entities were overseen, directed, and ultimately controlled by Alcoa, Alcoa World Alumina, and senior executives of those companies in the United States, including Rice.

83.     As under the prior assignments, the Dahdaleh-owned shell companies performed no material or legitimate services under the 2002 Distribution Agreement.  Alcoa, through its subsidiary, remained the only source of alumina under the 2001 Extension, and the Dahdaleh-owned shell companies never took title to or possession of the alumina.  Instead, they served simply as pass-through entities whose sole function was to mark up the price of the alumina re-sold to Alba and to facilitate the payment of *quid pro quo* bribes.  Defendants overcharged Alba by approximately $125 million under the 2001 Extension and the 2002 Distribution Agreement.

84.     The secret 2002 Distribution Agreement thus provided for the sale of 1,150,000 metric tons of alumina annually by Alcoa to Dahdaleh-owned shell companies at prices significantly lower than the prices paid by Alba for the very same alumina.

85.     Under the terms of the secret 2002 Distribution Agreement, Alcoa authorized its subsidiary to permit Dahdaleh-owned shell companies to use Alcoa's logo and trademarks, including on stationery, in advertising, or on its place of business.

86.     Under the 2001 Extension, Defendants continued to operate through Dahdaleh-owned

First Amended Complaint

shell companies and Dahdaleh associates:

a.  The extension was executed by Dahdaleh associate David Dabney, falsely purporting to act on behalf of Alcoa of Australia.

b.  Dabney was not, in fact, an officer or employee of Alcoa of Australia.

c.  Dabney was, in truth, an officer and shareholder of several Dahdaleh-owned entities that would subsequently supply alumina to Alba.  Dabney previously served as a director of three Alcoa-affiliated companies: Australian Fused Materials Pty. Ltd., a former joint venture partnership between Alcoa's subsidiary and two Japanese companies (1993 to 1996 and August-October 2004), ACAP Australia Pty. Ltd., a subsidiary of Alcoa of Australia (1994 to 1996), and Alcoa Chemie GmbH, a former subsidiary of Alcoa (1996 to 1998).  Dabney has served as director of three other Dahdaleh-owned entities.  Dabney is a natural born citizen of the United States who resides in Annapolis, Maryland.

d.  At the time Dabney executed the 2001 Extension, he was an employee of Dahdaleh-owned Dadco and its affiliate Dadco Alumina and Chemicals.  Dabney executed the 2001 Extension at the direction of Defendants.

e.  Dabney transmitted the executed extension to Alba by letter ("2001 Extension Letter").  The letterhead identified the sender as "AA Alumina and Chemicals" and bore the logo of Alcoa of Australia.  This deception, fostered by the Defendants, induced Alba to believe that Alba was dealing with Alcoa subsidiaries under the 2001 Extension.

f.  The address stated on the 2001 Extension Letter for AA Alumina and Chemicals (Level 20 Exchange Plaza, 2 The Esplanade, Perth, Western Australia, 6000, Australia) was the address of the Dahdaleh-owned entity, Dadco (see supra ¶ 48c).

g.  The extension provided that Alba would direct communications to Dabney via a confidential fax number (61 8 9202 1101) that was, in fact, the fax number of the Dahdaleh-owned entity, Dadco.

h.  AA Alumina and Chemicals was owned by Dahdaleh.  This was the first of three companies incorporated in Switzerland and controlled by Dahdaleh with the same name.  They are referred to here, in order of their creation, as AAAC-1, AAAC-2, and AAAC-3 (collectively

16

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

1    "AAAC Companies").

2            i.      AAAC-1 was incorporated on December 19, 2001.  Its name was then changed

3    twice: to CI Chemicals Industries SA (on March 20, 2002); and then to Dadco Property SA (on March

4    3, 2004).

5        87.     All invoices to Alba under the 2001 Extension were issued by AAAC-1, rather than by

6    Alcoa of Australia:

7            a.      AAAC-1 issued all invoices in its name to Alba from January 1, 2002 through

8    approximately March 20, 2002.

9            b.      The second AA Alumina & Chemicals SA ("AAAC-2") was incorporated on

10   March 15, 2002, at the same time as the renaming of AAAC-1 to CI Chemicals Industries SA.

11           c.      AAAC-2 issued all invoices in its name to Alba from March 20, 2002 through

12   the end of 2003.

13       88.     The invoices nonetheless sought to create the appearance that they were provided on

14   behalf of Alcoa and Alcoa of Australia, bearing the Alcoa trademark and identifying AA Alumina and

15   Chemicals as "an associate company" of Alcoa of Australia.

16       89.     Alcoa, through its subsidiary, instructed the Dahdaleh-owned shell companies to use

17   Alcoa's logo to create the false impression that Alcoa owned these companies (see supra ¶ 85, 86e).

18       90.     Defendants continued to conceal the role of Dahdaleh and his affiliated entities.  For

19   example, a March 3, 2002 email sent by the former CEO of Alba, a direct recipient of Defendants'

20   bribes, to Rice in anticipation of a visit by representatives of  Plaintiff to an operating facility of Alcoa

21   in Tennessee stated, "Just for proper form, I don't make Victor's activities on behalf of [another

22   recipient of Defendants' bribes], knowledgeable to the plant hence I have removed references to him

23   from your email before forwarding it to others."  In an email response on March 4, 2002, Rice stated

24   that the host of the Tennessee visit "is also not aware of Victor's role so we should not get into any

25   misunderstandings."  Upon information and belief, Rice composed and sent the email from the United

26   States.

27       91.     Alcoa, through its subsidiary, also continued to pay unlawful "commissions" to

28   Dahdaleh during this time period pursuant to their Agency Agreement.

First Amended Complaint

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

92.     Upon information and belief, Alcoa and Alcoa World Alumina directed Alcoa's subsidiary to pay the unlawful commissions with the knowledge and intent that such payments would be transferred on as bribes.

93.     Dahdaleh, in turn, made multiple payments, by means of cash wire transfers, during the pendency of the 2001 Extension to senior officials of Alba and the Government of Bahrain and to a member of Alba's board of directors.  Dahdaleh made the following payments, on or about the following dates, to the then-CEO of Alba: $40,000 in February 2002; $33,764 on March 2, 2002; $63,973.53 on August 1, 2002; $166,000 on October 7, 2002; $480,000 on October 7, 2002; $90,000 on January 21, 2003; $200,000 on February 18, 2003; $100,000 on February 28, 2003; $200,000 on March 31, 2003; and $290,000 on May 13, 2003.  Dahdaleh also paid $450,000 to a member of Alba's board of directors on or about October 7, 2002 and $2 million to an official of Alba and the Government of Bahrain on or about March 31, 2003.  Between 1999 and 2004, Dahdaleh transferred tens of millions of dollars to the official of Alba and the Government of Bahrain.

94.     These payments were bribes.  There was no commercially legitimate reason for Dahdaleh to make these cash payments to individual directors, officers, and other officials of Alba.

95.     In exchange for the bribes, officials induced Alba to pay excessive prices for Alcoa's alumina.

96.     Upon information and belief, Dahdaleh, as the agent of Alcoa and its subsidiaries, including Alcoa World Alumina and Alcoa of Australia, made these payments at the direction of Alcoa, Alcoa World Alumina, and senior executives of those companies in the United States, including Rice, who directly and indirectly benefitted from the inflated prices that Alba paid for alumina pursuant to this fraudulent scheme.

97.     Defendants' conduct substantially affected interstate commerce.

a.      Pursuant to the instructions on the first four invoices AAAC-1 issued, Alba executed several wire transfers to an account at the Royal Bank of Canada in New York, NY previously used in invoices by Alumet Asia (No. XXX-XX5613) for further credit to an account (XXX-919-9) of AA Alumina and Chemicals.

b.      Pursuant to the instructions on subsequent invoices, Alba executed wire

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

18

1   transfers (most exceeding $10 million each) to Deutsche Trust Company America and Bankers Trust

2   Company in New York, NY for the benefit of an account of AA Alumina and Chemicals at Royal

3   Bank of Canada.

### The 2003 Extension

98.   Defendants proposed a further extension of the 1990 Contract by letter dated July 8,
2003 sent by Sandra Ainsworth, a Dahdaleh employee.

99.   Alba agreed to the extension (the "2003 Extension") in a return letter to Ainsworth
dated September 17, 2003.  The 2003 Extension was to expire at the end of 2004.

100.   Defendants sought the extension to maintain the role of Dahdaleh-owned shell
companies and Dahdaleh associates.

a.   At the time Ainsworth sent the July 8, 2003 letter, she was the administrative
and shipping manager of AAAC-2 (see supra ¶ 87b, 87c) and company secretary of Dadco (see supra
¶ 48c).  She was also the former administrative manager of Alumet Asia (see supra ¶ 64) and a former
employee of Alcoa of Australia.

b.   The letter sought to convey the false impression that it was sent on behalf of
Alcoa.  The letter conspicuously bore the Alcoa trademarked logo and referred to "our excellent long
term relationship for the last thirty years," whereas AAAC-2 was a shell company that existed for less
than sixteen months.

c.   AAAC-2 continued to invoice Alba throughout the period of the 2003
Extension.

d.   AAAC-2 changed its name to "PA Asset Management SA" on September 16,
2004, yet continued to invoice Alba as AAAC-2 until the conclusion of the contract.

e.   The invoices bore the logo of Alcoa as well as the name and address of AA
Alumina and Chemicals.  Correspondence from Ainsworth to Alba regarding pricing also used the
Alcoa logo.

f.   Upon information and belief, Alcoa and Alcoa World Alumina instructed the
Dahdaleh-owned shell companies to use Alcoa's logo to create the false impression that the companies
were associated.

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

19

g.	This deception, fostered by the Defendants, induced Alba to believe that Alba was dealing with Alcoa subsidiaries under the 2003 Extension.

101.	During the period of the 2003 Extension, Alcoa, through its subsidiary, also continued to pay unlawful "commissions" to Dahdaleh pursuant to the Agency Agreement.

102.	Upon information and belief, Alcoa and Alcoa World Alumina directed Alcoa's subsidiary to pay the unlawful commissions with the knowledge and intent that such payments would be transferred on as bribes.

103.	Dahdaleh transferred the following amounts, on or about the following dates, to the then-CEO of Alba: $170,708 on October 3, 2003 (approximately two weeks after the 2003 Extension was signed); GB£ 852,416.35 on March 1, 2004; $199,989.22 on May 26, 2004; $286,080 on June 30, 2004; and $98,050 on July 30, 2004. Dahdaleh also paid bribes in the following amounts, on or about the following dates, to another senior executive of Alba who was also an official of the Government of Bahrain: $1,999,980 on June 25, 2004; and $1,999,964 on October 3, 2004 (see infra ¶ 117).

104.	These payments were bribes. They had no legitimate commercial purpose. Their purpose was to cause the bribed officials to induce Alba to award the alumina supply agreement to Defendants on terms economically disadvantageous to Alba.

105.	In exchange for the bribes, officials induced Alba to pay excessive prices for alumina.

106.	Upon information and belief, Dahdaleh, as the agent of Alcoa and its subsidiaries, including Alcoa World Alumina and Alcoa of Australia, made these payments at the direction and with the knowledge of Alcoa, Alcoa World Alumina, and Rice, who directly and indirectly benefitted from the inflated prices that Alba paid for alumina pursuant to this fraudulent scheme.

107.	Defendants' conduct had a substantial effect on interstate commerce as Alba made significant payments for alumina in response to the invoices it received.

**The Fraud to Continue to Secure Excessive Payments From Alba Through (A) Bribery and (B) Acquiring a Significant Stake in Alba at a Depressed Price or Threatening Alba with the Loss of its Alumina Supplies**

108.	In 2005, Alba entered into an agreement (the "2005 Contract") with yet a third entity known as AA Alumina & Chemicals SA ("AAAC-3") under which Alba continued to purchase

First Amended Complaint

1  alumina until 2009.

2      109.    AAAC-3 is controlled by Dahdaleh.  AAAC-3 was incorporated on December 30, 2004,

3  after AAAC-2 was renamed PA Asset Management SA.  AAAC-3 is registered at the same address as

4  the former headquarters of Alcoa Europe.

5      110.    Defendants defrauded Plaintiff into entering into the 2005 Contract on unfavorable

6  terms through a scheme either to acquire a controlling stake in Alba at a depressed price through

7  bribery or to extort an excessive price from Alba through bribery and the threat that Alcoa would cease

8  supplying Alba with alumina, threatening Alba's very existence.

9  **Defendants' Attempt To Acquire a Stake in Alba at a Depressed Price Through Bribery**

10     111.    On September 15, 2003, the Government of Bahrain and Alcoa signed a MOU for the

11 Government of Bahrain's sale of up to 26% of its shares in Alba to Alcoa or "a controlled-affiliate of

12 Alcoa," in exchange for one million tons of alumina per year in perpetuity at cost plus management

13 fees.

14     112.    It was anticipated that the Alba would then sell aluminum to Alcoa at the market price.

15     113.    Rice and Dahdaleh, among others, represented Alcoa throughout the negotiations.

16     114.    On or about December 11, 2003, Rice directed Dahdaleh to set up a conference call

17 with "the appropriate representatives from Bahrain" to plan due diligence in connection with the share

18 sale.

19     115.    Rice introduced Dahdaleh as an "advisor" or "consultant" to Alcoa during the

20 negotiations and identified Dahdaleh to officials of Alba and the Government of Bahrain as part of

21 Alcoa's team.

22     116.    Alain Belda, then the Chairman of the Board and Chief Executive Officer of Alcoa,

23 traveled from the United States to Bahrain in or about April 2004 for a site visit in connection with the

24 proposed sale of shares.  He was accompanied by Rice and Dahdaleh on that trip and in meetings that

25 took place in Bahrain during that visit.

26     117.    In order to further Alcoa's efforts to obtain an equity interest in Alba, Dahdaleh

27 transferred bribes in the following amounts, on or about the following dates, to the then-CEO of Alba:

28 $170,708 on October 3, 2003; GB£ 852,416.35 on March 1, 2004; $199,989.22 on May 26, 2004;

First Amended Complaint

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

$286,080 on June 30, 2004; and $98,050 on July 30, 2004.  Defendants also paid bribes in the following amounts, on or about the following dates, to another senior executive of Alba and official of the Government of Bahrain: $1,999,980 on June 25, 2004; and $1,999,964 on October 3, 2004 (see supra ¶ 103).

118.   Upon information and belief, Dahdaleh, as the agent of Alcoa and its subsidiaries, including Alcoa World Alumina and Alcoa of Australia, made these payments with the knowledge and at the direction of Alcoa, Alcoa World Alumina, and Rice.

119.   During a meeting in London that representatives of the Government of Bahrain and consulting firm Roland Berger attended and at which they expressed dissatisfaction with the terms offered by Alcoa, Rice and Dahdaleh maintained that Alba was taking the "wrong position."  Rice and Dahdaleh asserted that Defendants had access to the highest authorities in Bahrain and that those authorities wanted the transaction completed and would approve Alcoa's proposed price.

120.   In a letter dated April 26, 2004 to the Minister of Finance and National Economy of Bahrain, Belda (writing from Alcoa's office in New York) urged reconsideration of Alcoa's offer.  Belda stated that he had received the message from a recipient of Defendants' bribes that the highest levels of authority in Bahrain "would strongly like Alcoa to take an equity position in Alba and the proposal as outlined in the September 2003 Memorandum of Understanding was still the preferred structure."  Belda copied Rice and Dahdaleh on the letter and referred to the Minister's discussions with Rice and Dahdaleh in Paris.

121.   During April, May, and June 2004, Alcoa employees located in Pittsburgh, Pennsylvania corresponded extensively via electronic mail with Alba employees and third party consultants, often copying Dahdaleh, to plan a due diligence review of Alba's operations in preparation for the sale of Alba's shares.

122.   In negotiating the MOU, an officer of Alba who was a recipient of Defendants' bribes objected to including a term that would benefit Alba by providing that Alba could withdraw from the transaction.

123.   The Government of Bahrain withdrew from the transaction after concluding that it was not in the best interests of Alba or the Government for two reasons.  First, the terms of the transaction

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

First Amended Complaint

dramatically undervalued the Government of Bahrain's shares in Alba.  Alcoa valued the shares at $600 million, while the true value was really closer to $1 billion, according to an independent calculation performed by consulting firm Roland Berger.

124.   Second, the transaction would give Alcoa a substantial equity interest and voting rights in Alba but, in exchange, Alcoa only offered what was termed a "virtual contract" – *i.e.*, an intangible promise from Defendant Alcoa to supply alumina in perpetuity.

125.   Despite the inequity of Alcoa's offer, an official of Alba who was a recipient of Defendants' bribes pressured a Bahraini government official to consummate the transaction.

126.   Defendant Rice, who was co-chairman of the U.S.-Bahrain Free Trade Agreement Coalition, pressured a Bahraini government official, suggesting that if the proposed transaction was not approved, he might not be able to support the adoption of the free trade agreement.

127.   Defendants' conduct substantially affected interstate commerce:

a.   Representatives of both parties met in London at least five times and conducted investigative work in Bahrain and the United States.

b.   Alcoa's team traveled from the United States to make site visits to Bahrain from April 14, 2004 through April 16, 2004 and from May 23, 2004 through May 25, 2004.  Alain Belda also traveled from Pittsburgh, Pennsylvania to Bahrain for a site visit in connection with the proposed sale of shares.

c.   Representatives of the Government of Bahrain visited New York from June 9, 2004 through June 11, 2004 to examine records.

128.   By providing that the shares could ultimately be acquired by either Alcoa or a controlled-affiliate of Alcoa, the MOU demonstrated that Alcoa had authority over the AWAC affiliated Enterprise Companies (see supra ¶¶ 10-12) sufficient to commit them to the purchase of the Alba shares.

## **The 2005 Contract**

129.   Upon termination of the MOU, Alba had only approximately three months to secure its alumina supply before the termination of the 1990 Contract on December 31, 2004.

130.   On September 6, 2004, Alba published its tender for alumina requirements during years

First Amended Complaint

1    2005-2014.

2    131.    Alba invited nine suppliers, including AAAC-2 and Dadco Alumina & Chemicals

3    Limited, to submit offers.  Although AAAC-2, a related Dahdaleh-owned shell company, ultimately

4    contracted with Alba, Dadco responded that it was unable to submit an offer because it did not have

5    access to sufficient alumina to meet Alba's demand.  Alba interchangeably referred to inviting AAAC-

6    2 and Alcoa's subsidiary to submit a bid.

7    132.    On or about September 13, 2004 – the week after Alba sent its tender invitations –

8    Dahdaleh transferred $66,439.17 to a bank account owned by the then-CEO of Alba.  A previous

9    transfer of $45,260 had been made on or about August 31, 2004.

10   133.    These payments were bribes.  They had no legitimate commercial purpose.  Their

11   purpose was to cause the bribed officials to induce Alba to award the alumina supply agreement to

12   Defendants on terms economically disadvantageous to Alba.

13   134.    On or about September 26, 2004, Dahdaleh associate David Debney [a person distinct

14   from David Dabney, the U.S. citizen, Dahdaleh employee, and former Alcoa employee] submitted a

15   bid on behalf of "AA Alumina and Chemicals."  See Exhibit 1.

16   135.    David Debney is an associate of both Alcoa and Dahdaleh.  From approximately 1989

17   to 2004, Debney was employed by Alcoa of Australia as Administrative President (2000-2004),

18   Manager of Alumina Sales and Marketing (1997-2000), and Technical Manager (1989-1997).

19   Beginning in 1997, Debney was Plaintiff's lead contact at Alcoa of Australia.  Debney also served as a

20   director of Australian Fused Materials Pty. Ltd., a former joint venture partnership between Alcoa's

21   subsidiary and two Japanese companies, from approximately 2000 to 2003.  David Dabney and

22   Defendant Rice had also served as directors of Australian Fused Materials Pty. Ltd. (see supra ¶ 86c).

23   In December 2004, Debney founded AAAC-3, for which he is the Administrative President and a

24   shareholder.  Since December 2004, Debney has also served as a Director of two Dahdaleh-owned

25   entities:  AA Alumina and Chemicals Limited (Guernsey) and Dadco Holding (Luxembourg) SA.

26   136.    On or about September 30, 2004, the day after Alba opened the bid submitted by

27   Debney, United Legal Engineering Consultants Limited, an entity beneficially owned by Dahdaleh,

28   transferred $41,789 to a bank account owned by the then-CEO of Alba.  This was another bribe.  Upon

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

24

First Amended Complaint

information and belief, Dahdaleh transferred these funds, which he had been paid by Alcoa, to ensure that the 2005 Contract was concluded despite its unfavorable terms.

137.    Upon information and belief, Alcoa, Alcoa World Alumina, and Rice directed Dahdaleh and the Dahdaleh-owned entities to pay these bribes in order to ensure that Alcoa, through its agents and subsidiaries, including the Dahdaleh-owned entities, would be awarded the contract.

138.    During negotiations for the 2005 Contract, Alba requested assurance from Rice that Alba was dealing with Alcoa's subsidiary.  Rice sent a fax dated October 26, 2004 from Pittsburgh, Pennsylvania that stated, "[f]or the avoidance of doubt and any confusion," AAAC was "an associate company and distributor" of Alcoa of Australia and was "fully and solely authorized to negotiate the present alumina supply agreement with Alba."  See Exhibit 2.  Such false representations and the bribes paid to senior officials of Alba and the Government of Bahrain induced Alba to enter into the 2005 Contract despite its excessive prices and commercially unreasonable terms.

139.    As the negotiation of the 2005 Contract moved forward, officers of Alba, officials of the Government of Bahrain, and another substantial Alba shareholder recommended that Plaintiff reject the proposal offered by "AA Alumina and Chemicals" as not being in the best interests of Alba.

140.    Defendants, through Rice, rejected efforts to further negotiate, instead threatening to redirect Alcoa's alumina supply to other customers.  In an October 29, 2004 facsimile sent from Pittsburgh, Pennsylvania to Alba's CEO Bruce Hall, Rice stated, "However, should Alba decide not to accept this offer, it is understandable that you will need to find alternatives in order to supply Alba's long term alumina requirements. I hope you can also appreciate this will dictate that we will direct the alumina, which we anticipate continuing to supply Alba, to other long term customers."  See Exhibit 3.

141.    An official of Alba directed that the company agree to Defendants' offer after receiving bribes from Defendants and did so because he stood to gain personally.

142.    Alba signed the 2005 Contract on June 8, 2005 with AAAC-3.  The term of the contract ran from January 1, 2005 to December 31, 2014.

143.    The price set by the 2005 Contract was excessive and Alba would not have agreed to it but for Defendants' unlawful acts.

a.    For the years 2005 through 2009, the 2005 Contract sets the price for 1.1 million

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

25

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

1   tons per year at 16.35% of the three month aluminum price traded at the London Metal Exchange

2   ("LME").  The price of an additional 500,000 tons is 10% of LME.  In addition, during the first five-

3   year period an additional premium price of $15.55 per ton was added to all shipments even though the

4   contract was FOB and therefore did not include shipping costs.  For the years 2010 through 2014, the

5   price for 1.1 million tons of alumina per year was set at 16.65% of LME, with an additional 500,000

6   tons set at 9.5% of LME.  The weighted average of these prices during each time period is

7   approximately 14.35% of LME, but when the $15.55 premium per ton is added, this figure, depending

8   on LME prices, increases the weighted 10 year average to almost 15% of LME.

9           b.      The price that Defendants secured through their acts of bribery and extortion

10  was excessive.  Traditionally, long term alumina contracts of a similar volume have traded between

11  11% and 13% of LME.  In 2005, the market price for a long-term alumina supply contact of a similar

12  volume was approximately 12.5%-13.5% of LME.

13          c.      Plaintiff paid through September 2009 significantly more than (a) the LME

14  percentage ratio price of alumina and (b) the prices contemplated in the secret 2005 Distribution

15  Agreement between Alcoa and AA Alumina and Chemicals (see infra ¶¶ 150-56).  Defendants'

16  unlawful overcharges to Alba amounted to between $25 million and $45 million per year (not

17  including the effect of unreasonable contract terms) more than the prices contemplated in the 2005

18  Distribution Agreement, for a total of nearly $192 million.

19          144.    The payment terms of the 2005 Contract were unreasonable, and Alba would not have

20  agreed to them but for Defendants' unlawful acts.

21          a.      Clause 3.3 of the 2005 Contract required payment by wire transfer within three

22  days of Alba's receipt of the invoice.  All previous contracts allowed for payment within thirty days

23  after the invoice was issued.

24          b.      This change to the contract terms caused significant harm to Alba amounting to

25  several million dollars and also caused problems maintaining sufficient working capital to meet its

26  business needs.

27          145.    The 2005 Contract introduced significant changes to the terms of the previous

28  agreements that were commercially detrimental to Alba and to which Alba would not have agreed but

26

1  for Defendants' unlawful acts.

2        a.      Clause 2.2 allowed zero tolerance in the amount of alumina Alba was required

3  to purchase under the 2005 Agreement.  In earlier contracts (1969 and 1984), Alba was granted a 10%

4  tolerance range, meaning that Alba could purchase 10% more or less alumina than the contracted

5  amount in any one year.  In the 1990 Agreement, there was a 5% tolerance range.  In the 2005

6  Contract, there was no tolerance range.  Alba was granted a 5% tolerance range in any one year but

7  was required to make up the difference in the following year.

8        b.      The "option to assign" clause, Clause 7.2, stated that neither party can withhold

9  consent to assignment to an "Affiliate."  The 2005 Contract contained no definition of the term

10 Affiliate.

11       c.      The 2005 Contract did not contain an option to extend the contract.  All former

12 agreements include an option to extend the contract for up to 10 years.

13       146.    As with the prior contracts and extensions, Defendants structured the supply

14 arrangement under the 2005 contract to involve Dahdaleh-owned intermediary companies, the sole

15 purpose of which was to mark up the price of the Alcoa alumina resold by those entities to Alba and to

16 facilitate the payment of bribes to senior officials of Alba and the Government of Bahrain.

17       147.    The Defendants and Debney sought to obscure the nature of the Dahdaleh-owned shell

18 company that was Alba's supplier under the 2005 Contract.

19       a.      Debney's bid dated September 29, 2004 indicated that Alcoa of Australia was

20 the entity submitting the bid, which was being sent from the "Alcoa Building" in Switzerland.  The bid

21 contained an Alcoa logo and stated that "AA Alumina & Chemicals is an associate company of Alcoa

22 of Australia Limited."  The bid did not specify which company was making the offer.  However,

23 Debney's letter indicated that the alumina would be supplied from Alcoa's refineries.  Debney also

24 stated "as we are your current supplier, we believe that you have full understanding of our product. . ."

25 Debney further stated "you are our very important customer. . ."  See Exhibit 1.

26       b.      No incorporated or registered company bearing the name "AA Alumina and

27 Chemicals" existed at the time.  AAAC-1 and AAAC-2 had been renamed, and AAAC-3 was not

28 incorporated until December 30, 2004 (see supra ¶ 109).

First Amended Complaint

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

c.      Throughout the contract negotiations, Defendants and "AA Alumina and Chemicals" falsely portrayed "AA Alumina and Chemicals" as an Alcoa affiliate company.

d.      During the contract negotiations, Alba requested assurance that it was dealing with Alcoa of Australia.  In response to this request, Defendant Rice stated in a fax dated October 26, 2004 and sent from Pittsburgh, Pennsylvania that "[f]or the avoidance of doubt and any confusion," AA Alumina and Chemicals is "an associate company and distributor" of Alcoa of Australia and that it is "fully and solely authorized to negotiate the present alumina supply agreement with Alba."  This fax was later referenced in the 2005 Contract and attached as an exhibit to the contract.  Defendant Rice further instructed Alba that Debney was "authorized to negotiate and finalize" the 2005 Contract.  See Exhibit 2.

e.      In a fax dated October 29, 2004 and sent from Pittsburgh, Pennsylvania, Rice responded to concerns raised by Alba about the 2005 Contract and referred again to "the offer which was submitted by our associated company, AA Alumina."  Rice stated that Alcoa wished for "the mutually beneficial relationship between Alba and Alcoa" to continue so that "we can continue to be Alba's alumina supplier for the next 10 years."  Rice also instructed Alba to communicate directly with Debney to conclude the contract negotiations.  See Exhibit 3.

f.      On or about November 26, 2004, Debney and Alba agreed to revised terms for the 2005 Contract.  The terms were on Alcoa letterhead, but Debney's signature block indicated that he was a representative of AA Alumina & Chemicals.  Upon information and belief, Alcoa, through its subsidiary, instructed the Dahdaleh entities to use Alcoa's trademarked logo to create the impression that Alcoa owned these companies (see infra ¶ 153).

g.      On or about January 9, 2005, an officer of Alba wrote to Rice to request that Alcoa guarantee AA Alumina & Chemicals' obligations under the 2005 Contract.  Alcoa never signed the guarantee that Alba provided.  Instead, Rice's October 26, 2004 fax, which represented that AA Alumina & Chemicals was an associate company of Alcoa and was fully authorized to finalize the contract, was incorporated as Schedule 3 to the 2005 Contract.

h.      On or about January 14, 2005, Debney wrote to a senior officer of Alba to thank him for Alba's decision to "continue our alumina supply contract" and the "business relationship

28

1   formed over many years." Throughout his letter, Debney sought to further the impression that AA

2   Alumina and Chemicals was a subsidiary of Alcoa, referring to Alcoa's capabilities and successes and

3   explaining why the 2005 Contract was advantageous to Alcoa. The letter contained the logos of both

4   Alcoa and AA Alumina and Chemicals, stated that "AA Alumina & Chemicals is an associate

5   company of Alcoa of Australia Limited," and listed a return address at the "Alcoa Building" in

6   Switzerland.

7   148.   This deception, fostered by the Defendants, induced Alba to believe that Alba was

8   dealing with an Alcoa subsidiary under the 2005 Contract.

9   149.   On or about December 17, 2004, shortly after revised contract terms were signed,

10   United Legal Engineering Consultants Limited, an entity beneficially owned by Dahdaleh, transferred

11   $228,168.34 to a bank account owned by the-then CEO of Alba. On or about December 22, 2004, a

12   transfer of $228,168.23 was made. These payments were bribes.

13   150.   After the 2005 Contract had been signed, Defendants transferred $266,000 on or about

14   September 9, 2005 and another $266,000 on or about November 18, 2005 to a bank account owned by

15   the then-CEO of Alba. These payments were bribes.

16   **The Secret Alcoa Back-to-Back Contract**

17   151.   While the 2005 Contract was being negotiated, unknown to Alba, Defendants finalized

18   a Distribution Agreement between (a) Alcoa's subsidiary, on the one hand and (b) Alumet Limited,

19   AA Alumina and Chemicals Limited, and AA Alumina and Chemicals SA, on the other hand (the

20   "2005 Distribution Agreement").

21   152.   The parties signed the 2005 Distribution Agreement on January 1, 2005, appointing the

22   three Dahdaleh-owned companies as Alcoa's subsidiary's sole distributor of alumina to Alba for 2005

23   through 2014. However, the Dahdaleh-owned companies performed no material or legitimate services

24   under the 2005 Distribution Agreement and never took title to or possession of the alumina. They

25   simply resold the same alumina that they purchased from Alcoa to Alba at higher prices. Defendants

26   overcharged Alba by approximately $192 million under the 2005 Contract and the 2005 Distribution

27   Agreement.

28   153.   The secret 2005 Distribution Agreement provided for the sale of up to 1,780,000 metric

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

29

1    tons of alumina by Alcoa's subsidiary to Dahdaleh-owned shell companies at prices significantly lower

2    than the prices paid by Alba.

3        154.    The 2005 Distribution Agreement also provided that Alcoa's subsidiary could authorize

4    the Dahdaleh-owned shell companies to use Alcoa's logo and trademarks, including on stationery, in

5    advertising, or on its place of business.

6        155.    Each page of the 2005 Distribution Agreement was initialed by "WJR" – the initials of

7    Defendant Rice.

8        156.    Defendants Alcoa, Alcoa World Alumina, and Rice directed the negotiation of the

9    parallel agreements, the 2005 Contract and the 2005 Distribution Agreement.

10       157.    By negotiating secret parallel agreements with (a) Alba and (b) the Dahdaleh-owned

11   shell companies, the Defendants were able to conceal the bribes that Defendants were paying and the

12   artificially inflated prices that they were charging Alba for alumina.  The Defendants overcharged Alba

13   by approximately $420 million between 1997 to 2009 through the use of parallel contracts (see Table

14   below showing the estimated margin between the secret Alcoa-Dahdaleh contracts and the Alcoa-Alba

15   contracts, 1997-2009).  In total, Defendants succeeded in extracting more than $433 million, not

16   including the cost of capital losses, from Alba from 1990 to 2009 through the Defendants' unlawful

17   scheme.  Alba would not have paid that substantial sum in overcharges but for Defendants' payments

18   of bribes, directed by Alcoa, to senior officials of Alba and the Government of Bahrain.

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

First Amended Complaint

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

| Year | Price Paid by Alba | Estimated Price Paid by Dahdaleh | Margin |
|------|-------------------|----------------------------------|--------|
| 1997 | $41,979,392.00 | $21,502,230.42 | $20,477,161.58 |
| 1998 | $64,374,754.77 | $ 36,299,497.84 | $28,075,256.93 |
| 1999 | $30,333,524.29 | $ 16,145,418.23 | $14,188,106.06 |
| 2000 | $60,681,913.06 | $41,180,237.82 | $19,501,675.24 |
| 2001 | $58,359,779.60 | $38,510,525.06 | $19,849,254.54 |
| 2002 | $181,266,064.00 | $155,607,458.90 | $25,658,605.10 |
| 2003 | $177,270,720.00 | $150,578,968.03 | $26,691,751.97 |
| 2004 | $207,734,354.00 | $134,222,794.31 | $73,511,559.69 |
| 2005 | $431,415,880.00 | $392,462,359.45 | $38,953,520.55 |
| 2006 | $619,512,702.00 | $575,266,550.34 | $44,246,151.66 |
| 2007 | $665,138,201.00 | $619,905,974.47 | $45,232,226.53 |
| 2008 | $644,163,594.00 | $618,202,880.42 | $25,960,713.58 |
| 2009 | $400,808,848.00 | $363,332,783.47 | $37,476,064.53 |
| **Total** | | | **$419,822,047.96** |

158.    Defendants' fraud continued through September 2009, and Defendants persisted in the deception concerning Alcoa and the multiple Dahdaleh-owned shell companies.  The parallel contracts were cancelled within hours of each other.

159.    On October 24, 2011, the Serious Fraud Office of the United Kingdom unsealed criminal charges against Defendant Dahdaleh and caused Defendant Dahdaleh to be arrested. Dahdaleh was charged with corruption offenses under U.K. law, involving payments of bribes to officials of Alba.  In announcing these charges, the Serious Fraud Office stated that the alleged corrupt payments "were in connection with contracts with a U.S. company, Alcoa Inc., for supplies of alumina . . . ."

160.    On October 20, 2011, a former CEO of Alba was arrested in Sydney, Australia in response to an extradition request issued by the Government of the United Kingdom, on charges

First Amended Complaint

similar to those instituted against Defendant Dahdaleh by the Serious Fraud Office.

161.   Defendants' conduct significantly affected interstate commerce.

a.   Pursuant to AAAC-3's invoices under the 2005 Contract, Alba made wire transfers to Deutsche Trust Company America in New York, NY for credit to an account held at Royal Bank of Canada for the benefit of "AA Alumina and Chemicals."

b.   Alba paid more than $2.75 billion under the 2005 Contract, largely in installments of more than $15 million each.

**FIRST CLAIM**
**(Federal Civil RICO, 18 U.S.C. § 1962(c))**
**Defendants Alcoa, Alcoa World Alumina, Dahdaleh and Rice**

162.   Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

163.   Defendants violated RICO and Plaintiff was injured as a result.

164.   Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

165.   Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

166.   <u>The Enterprise</u>.  Defendants Alcoa, Alcoa World Alumina, Dahdaleh and Rice, together with (1) the Dahdaleh-owned companies, (2) one or more former officers and former directors of Alba, (3) one or more former senior officials of the Government of Bahrain, (4) employees, officers and directors of Dahdaleh-owned companies (including David Dabney, David Debney, Angela Hill, and Sandra Ainsworth), and (5) Alcoa of Australia, form an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.  There may also be other members of the enterprise who are unknown at this time.

167.   Alternatively, Defendants Alcoa, Alcoa World Alumina, Dahdaleh, and Rice, together

First Amended Complaint

with the Dahdaleh-owned shell companies, together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

168.   This association-in-fact enterprise, or the alternative enterprise, was predominantly domestic because its fraudulent activities were conceived, planned, orchestrated, directed, and controlled from the United States by Defendants Alcoa and Alcoa World Alumina, and senior executives of those companies, including Defendant Rice, for the benefit of Defendants Alcoa and Alcoa World Alumina, as evidenced by:

a.   Peter Burgess, then the Sales and Marketing Manger of Defendant Alcoa World Alumina in Pittsburgh, Pennsylvania, signed both the 1996 Amendment with Alba and the 1996 Sales Agreement with Alumet Limited, and he was copied on correspondence setting the pricing for Market Tonnage.  Burgess, therefore, knew that Alcoa of Australia had signed parallel contracts for the sale of alumina and that Alumet Asia would pay prices significantly lower than the prices paid by Alba.

b.   Defendant Rice proposed the 2001 Extension by a letter on Alcoa World Alumina stationery sent from Pittsburgh, Pennsylvania.  Rice involved David Dabney, a Dahdaleh associate, in the contract negotiation and created the false impression that Dabney was an employee of Alcoa of Australia.

c.   Alcoa and Alcoa World Alumina and senior executives of those companies, including Rice, knowingly directed the negotiation and signature of two parallel contracts in 2001: the 2001 Extension with Alba and the secret 2001 Distribution Agreement with Alumet and AA Alumina and Chemicals.  The secret 2001 Distribution Agreement, which contained the initials of Defendant Rice, charged prices that were significantly lower than the prices paid by Alba.

d.   The secret 2001 and 2005 Distribution Agreements provided for the use of Alcoa's trademarked logo by the Dahdaleh-owned shell companies.  Upon information and belief, Alcoa and Alcoa World Alumina and senior executives of those companies, including Rice, instructed the Dahdaleh-owned shell companies to use Alcoa's logo on invoices and correspondence to further the false impression that the Dahdaleh-owned shell companies were simply Alcoa associates, rather than unnecessary intermediaries and conduits for bribes.

e.   Alcoa and Alcoa World Alumina and senior executives of those companies,

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

First Amended Complaint

including Rice, sought to acquire a stake in Alba at an artificially depressed price in 2004. During the negotiations, Rice traveled to meetings in London where he described Dahdaleh as an "Alcoa team" member and advisor and asserted that Defendants had access to the highest authorities in Bahrain who would ensure that the MOU negotiations were concluded despite Alcoa's low price.

f. Employees of Alcoa and Alcoa World Alumina in Pittsburgh, Pennsylvania corresponded via electronic mail, often copying Dahdaleh, to plan a due diligence review of Alba's operations in connection with the proposed sale. Alcoa's team, including Chairman and CEO Alain Belda, traveled from the United States to Bahrain for site visits during due diligence.

g. During negotiations for the 2005 Contract, Alba requested assurance from Rice that Alba was dealing with Alcoa of Australia. Rice sent a fax dated October 26, 2004 from Pittsburgh, Pennsylvania that stated, "[f]or the avoidance of doubt and any confusion," AAAC was "an associate company and distributor" of Alcoa of Australia and was "fully and solely authorized to negotiate the present alumina supply agreement with Alba." In subsequent correspondence, Rice again described AAAC as "our associated company" and referred to the long-standing relationship between Alba and Alcoa that would continue. These false representations and the bribes paid to senior officials of Alba and the Government of Bahrain induced Alba to enter into the 2005 Contract despite its excessive prices and commercially unreasonable terms.

h. Rice, Alcoa, and Alcoa World Alumina knowingly directed the negotiation and signature of two parallel agreements in 2005: the 2005 Contract with Alba and the secret 2005 Distribution Agreement with three Dahdaleh-owned shell companies. By its terms, the secret 2005 Distribution Agreement, which contained the initials of Defendant Rice, charged prices that were significantly lower than the prices paid by Alba to AA Alumina and Chemicals for the very same alumina.

169. Upon information and belief, the non-domestic activities of the enterprise, or the alternative enterprise, were carried out by the agents, employees, or subsidiaries of Defendants Alcoa and Alcoa World Alumina, including Defendant Dahdaleh, the Dahdaleh-owned shell companies, and Alcoa of Australia, at the direction and instruction of the domestic Defendants Alcoa and Alcoa World Alumina, and senior executives of those companies, including Defendant Rice, as evidenced by:

34

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

a.      Alcoa of Australia, the entity that contracted with Alba between 1990 and 2004 and with Dahdaleh-owned shell companies between 1990 and 2009, is a subsidiary of Alcoa.

b.      The Agency Agreements pursuant to which Dahdaleh-owned company Alumet Limited was paid unlawful commissions defined Alumet Limited as the "agent" of Alcoa of Australia.

c.      Under the 2001 Extension, all invoices to Alba were issued by AAAC-1 or AAAC-2 rather than Alcoa of Australia.  However, the invoices were marked with the Alcoa logo and identified the AAAC entities as "associate" companies of Alcoa of Australia.

d.      The 2003 Extension was proposed by letter by a Dadco employee, but the letter bore the Alcoa logo and referred to the long-term relationship between Alcoa of Australia and Alba.

e.      Under the 2003 Extension, AAAC-2 continued to issue invoices to Alba, but the invoices contained the Alcoa logo.

f.      Rice, and upon information and belief Alcoa and Alcoa World Alumina, induced Alba to believe that the Dahdaleh-owned shell companies were associated companies of Alcoa of Australia by instructing the Dahdaleh-owned shell companies to use Alcoa's logo, identifying the companies as associated companies, and instructing Alba to deal with Dahdaleh employees.

g.      Rice introduced Dahdaleh as Alcoa's consultant or advisor and described Dahdaleh as part of Alcoa's team during the 2004 MOU negotiations.  Rice had directed Dahdaleh to coordinate the appropriate individuals in Bahrain to begin the due diligence process for the share sale.

h.      Alcoa's former Chairman and CEO included Dahdaleh on correspondence regarding Alcoa's offer to purchase shares in Alba and visited Alba with Dahdaleh and Rice.

i.      The MOU provided that the shares in Alba could ultimately be acquired by Alcoa or an affiliate of Alcoa, demonstrating that Alcoa had authority over the AWAC Enterprise Companies sufficient to commit them to the purchase of the Alba shares.

j.      During the 2005 Contract negotiations, Rice assured Alba that AAAC was an associate company and distributor of Alcoa of Australia and instructed Alba to deal with Dahdaleh associate David Debney.  Debney corresponded with Alba on letterhead containing Alcoa's logo and repeatedly referred to the 2005 Contract as continuing the long-term relationship between Alba and Alcoa of Australia.

k.       Both Debney and Dabney, with whom Alba communicated at Alcoa's insistence, were former employees of Alcoa subsidiaries.  Hill, Ainsworth, and other employees of the Dahdaleh-owned entities who were involved in the contracts with Alba had also been employees of Alcoa subsidiaries.

170.    This enterprise, or the alternative enterprise, has engaged in, and its activities have affected, foreign and interstate commerce.

171.    Pattern of Racketeering Activity.  Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c).  The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

172.    Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below.  Defendants each committed at least two such acts or else aided and abetted such acts.

173.    The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission.  Further, the acts of racketeering by Defendants were continuous.  There was repeated conduct during a period of time beginning in 1990 and continuing through September 2009.

174.    The association-in-fact enterprise and the alternative enterprise, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity.  Rather, they existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of supplying alumina to Plaintiff and possibly other customers.  Defendants have had and do have legitimate business plans outside of the pattern of racketeering activity.

175.    Plaintiff specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

176.    Predicate Act: Use of Mails and Wires to Defraud Alba in Violation of 18 U.S.C. §§

First Amended Complaint

1341 and 1343 . Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Alba or to obtain money from Alba by means of false or fraudulent pretenses, representations or promises.  For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers, or received such therefrom.  Defendants also transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings, signs and signals.  The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.  These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

177.    Defendants carried out their scheme in different states and countries and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires.  In furtherance of their scheme alleged herein, Defendants Alcoa, Alcoa World Alumina, Dahdaleh and Rice communicated among themselves and with Plaintiff in furtherance of the scheme to defraud Plaintiff.  These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers.  Defendants also transmitted or caused the MOU to be transmitted by mail or wire in or about September 2003 and, upon information and belief, communications with unknown officers and directors of Alba during the course of the negotiations of the proposed sale of shares in 2003 and 2004.

178.    Specifically, Defendants Alcoa, Alcoa World Alumina, Dahdaleh and Rice used wire and/or U.S. mail or private or commercial carriers to extend the term of the 1990 Contract for the purpose of continuing their fraudulent scheme.  Defendants caused the September 1996 Addendum to be disseminated from Pittsburgh, Pennsylvania, which addendum was executed by Peter Burgess, an officer of Defendant Alcoa World Alumina.  On or about April 12, 2001, Defendant Rice, an officer of Defendant Alcoa World Alumina, faxed a letter from Pittsburgh, Pennsylvania to Plaintiff, which suggested another extension to the 1990 Contract.  Defendants communicated by wire and/or U.S. mail to facilitate due diligence visits and further negotiations relating to the sale of Alba's shares.  Upon information and belief, Defendants also communicated by wire and/or U.S. mail or private or

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

First Amended Complaint

1  commercial carriers to facilitate the payment of bribes to one or more officers of Plaintiff and one or

2  more senior government officials.

3  179.   In addition, in furtherance of their scheme, Defendants used wire and/or U.S. mail or

4  private or commercial carriers to induce Plaintiff to execute the 2005 Contract.  Upon information and

5  belief, Defendants also communicated by wire and/or U.S. mail or private or commercial carriers to

6  facilitate the payment of bribes to one or more officers of Plaintiff and one or more senior government

7  officials.

8  180.   Upon information and belief, Defendants communicated by wire and/or U.S. mail or

9  private or commercial carriers to facilitate the negotiation and execution of secret contracts whereby

10  Alcoa's subsidiary sold alumina to Dahdaleh-owned shell companies at prices substantially lower than

11  those paid by Alba for the same alumina.

12  181.   Defendants also caused Plaintiff to transmit millions of dollars in funds by wire to the

13  United States.

14  182.   Defendants' shared objective was and is to divert funds to their own benefit and to

15  facilitate the payment of bribes in an effort to defraud Alba.

16  183.   Plaintiff reasonably and justifiably relied upon Defendants' false representations, false

17  pretenses and deceptive communications, and Plaintiff has been damaged as a direct and proximate

18  result of Defendants' participation in such enterprise, as alleged herein.

19  184.   Predicate Act: Transport and Receipt of Stolen Money in Violation of 18 U.S.C. §§

20  2314 and 2315.  Defendants committed acts constituting indictable offenses under 18 U.S.C. § 2314 in

21  that having devised or intended to devise a scheme or artifice to defraud Alba or to obtain money from

22  Alba by means of false or fraudulent pretenses, representations or promises, Defendants transported or

23  caused to be transported in interstate or foreign commerce money having a value of $5000 or more,

24  which was stolen, converted or taken by fraud.  Defendants also committed acts constituting indictable

25  offenses under 18 U.S.C. § 2315 in that they received money in excess of $5000, which crossed a State

26  or United States boundary after being stolen, unlawfully converted or taken.  The acts of Defendants

27  set forth above were done willfully and with knowledge that the money was stolen, converted or taken

28  by fraud.  These acts were done intentionally and knowingly with the specific intent to advance

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

38

First Amended Complaint

1   Defendants' scheme or artifice.

2   185.   As part of their scheme as alleged herein, Defendants also facilitated the payment of

3   bribes to one or more senior officials of Plaintiff and the Government of Bahrain in order to secure

4   business from Plaintiff for the benefit of Defendants and at the expense of Plaintiff.

5   186.   <u>Predicate Act:  Illegal Payments to Foreign Officials in Violation of 15 U.S.C. § 78dd-</u>

6   <u>2.</u>  Defendants committed acts constituting indictable offenses under 15 U.S.C. §§ 78dd-2 in that,

7   having devised or intended to devise a scheme or artifice to defraud Alba or to obtain money from

8   Alba by means of false or fraudulent pretenses, representations or promises, Defendants bribed and

9   otherwise improperly influenced one or more senior officials of Plaintiff and the Government of

10  Bahrain.

11  187.   Defendants Alcoa and Alcoa World Alumina are each domestic concerns within the

12  meaning of 78dd-2(a).  Defendant Rice was at all times an agent of and an officer, director or

13  employee of one or both of these companies and acting on their behalf within the meaning of 78dd-

14  2(a).  Alcoa was at all relevant times a shareholder of Alcoa World Alumina.   In addition, Defendant

15  Dahdaleh acted as the agent of Alcoa and Alcoa World Alumina for purposes of making illegal

16  payments to, and improperly influencing, one or more senior officials of Plaintiff and the Government

17  of Bahrain.

18  188.   Upon information and belief, Defendants Alcoa, Alcoa World Alumina and Rice each

19  made use of the mails, wires and other means of interstate commerce corruptly in order to offer and

20  promise to pay bribes, kickbacks and other payments to one or more senior officials of Plaintiff and the

21  Government of Bahrain in order to further their scheme to defraud Alba.

22  189.   Improper payments were made to a foreign official within the meaning of § 78dd-

23  2(a)(1).  Defendants made these payments in order to (1) influence a senior government official to

24  agree to fraudulent transactions unfavorable to Alba, in violation of his duties as a government official,

25  (2) induce a senior government official to use his influence with the Government of Bahrain and with

26  Alba to affect or influence Bahrain's decisions with regard to Alba's activities, including the proposed

27  share sale, and (3) secure an improper business advantage for Defendants, for Alcoa of Australia, and

28  for the Dahdaleh-owned shell companies.   Defendants performed these illegal acts in order to assist

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

39

First Amended Complaint

Alcoa and Alcoa World Alumina in obtaining favorable and fraudulent alumina supply contracts from Alba and retaining their alumina supply business with Alba.

190.    Upon information and belief, Alcoa and Alcoa World Alumina also ensured that Dahdaleh, through the Dahdaleh-owned shell companies, would receive money improperly siphoned from Alba while knowing that a portion of such money would be given to a senior government official.

191.    Plaintiff has been damaged as a direct and proximate result of Defendants' illegal payments to one or more former senior officials of Plaintiff and the Government of Bahrain s.

192.    <u>Predicate Act: Illegal Payments to Foreign Officials in Violation of 15 U.S.C. § 78dd-3.</u> Defendants committed acts constituting indictable offenses under 15 U.S.C. §§ 78dd-3 in that, having devised or intended to devise a scheme or artifice to defraud Alba or to obtain money from Alba by means of false or fraudulent pretenses, representations or promises, Defendants bribed and otherwise improperly influenced one or more senior officials of Plaintiff and the Government of Bahrain.

193.    When Defendants Alcoa, Alcoa World Alumina and Rice committed the acts described herein, they were each persons within the meaning of 78dd-3(a).  Defendant Rice was at all times an agent of and an officer, director or employee of one or both of these companies and acting on their behalf within the meaning of 78dd-3(a), and Alcoa was at all relevant times a shareholder of Alcoa World Alumina.

194.    Defendants committed some or all of the acts described herein, while in the territory of the United States, through corrupt use of the mails, wires and other means of interstate commerce.

195.    Plaintiff has been damaged as a direct and proximate result of Defendants' illegal payments to government officials as alleged herein.

196.    <u>Predicate Act: Travel in Furtherance of Scheme to Defraud in Violation of 18 U.S.C. § 1952.</u>  Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1952 in that, having devised or intended to devise a scheme or artifice to defraud Alba or to obtain money from Alba by means of false or fraudulent pretenses, representations or promises, Defendants then traveled in foreign commerce and used facilities of foreign commerce in order to promote, manage and facilitate the continuation of their scheme.  Among other things, upon information and belief, in 2005, Defendant Rice, on behalf of himself and other Defendants, traveled to Bahrain with the intent to

First Amended Complaint

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

1   promote, manage and facilitate the Defendants' scheme to defraud Alba by inducing it to sell shares to

2   an Alcoa entity through bribery and improper influence of Bahraini government officials.  While in

3   Bahrain, Rice, on behalf of himself and the other Defendants, did in fact promote, manage and

4   facilitate the continuation of Defendants' scheme to defraud Alba by inducing it to sell shares to an

5   Alcoa entity through bribery and improper influence of one or more senior officials of Plaintiff and the

6   Government of Bahrain.  Other senior executives of Alcoa and Alcoa World Alumina did likewise.

7      197.    These acts were done intentionally and knowingly with the specific intent to advance

8   Defendants' scheme or artifice.

9      198.    Defendants' shared objective was to divert funds to their own benefit and to facilitate

10   the payment of bribes in an effort to defraud Alba.

11      199.    Plaintiff has been damaged as a direct and proximate result of Defendants' travel in

12   foreign commerce for purposes of promoting, managing and facilitating the continuation of their

13   scheme.

14      200.    <u>Continuity of Conduct</u>.  Defendants' violations of state and federal law as set forth

15   herein, each of which directly and proximately injured Plaintiff and other market participants,

16   constituted a continuous course of conduct spanning a period from approximately 1990 through

17   September 2009, which was intended to obtain money through false representations, fraud, deceit, and

18   other improper and unlawful means.  Therefore, said violations were a part of a pattern of racketeering

19   activity under 18 U.S.C. §§ 1961(1) and (5).

20      201.    Upon information and belief, Defendants have conducted and/or participated, directly

21   and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of

22   racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

23      202.    The unlawful actions of Defendants, and each of them, have directly, illegally, and

24   proximately caused and continue to cause injuries to Plaintiff in its business.  Plaintiff seeks an award

25   of damages in compensation for, among other things, the hundreds of millions of dollars that

26   Defendants stole from Plaintiff.

27      203.    Plaintiff accordingly seeks an award of three times the damages it sustained, and the

28   recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

First Amended Complaint

1

relief as authorized by statute.

2

### SECOND CLAIM
### (Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d))
### Defendants Alcoa, Alcoa World Alumina, Dahdaleh and Rice

3

4

204.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if

5

fully set forth herein.

6

205.    In violation of 18 U.S.C. § 1962(d), the Defendants Alcoa, Alcoa World Alumina,

7

Dahdaleh and Rice, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a

8

scheme which included the operation or management of a RICO enterprise through a pattern of

9

racketeering activity as alleged in paragraphs 162-203 above.

10

206.    The conspiracy commenced at least as early as 1990 and continued through September

11

2009.

12

207.    The conspiracy's purpose was to divert money from Alba to Defendants' own benefit

13

and to facilitate the payment of bribes in an effort to defraud Alba.

14

208.    Each Defendant committed at least one overt act in furtherance of such conspiracy.

15

These acts in furtherance of the conspiracy included misleading Plaintiff as to the true purpose of the

16

assignment of the market tonnage portion of the 1990 Contract, negotiating secret parallel contracts

17

that provided for sale of alumina to shell companies at prices substantially lower than those paid by

18

Alba for the same alumina, participating in negotiations for a proposed sale of up to 26% of Bahrain's

19

shares in Alba, traveling in foreign commerce to facilitate and manage the scheme to defraud Alba, and

20

facilitating the payment of bribes all as described above.

21

209.    Even if some of the Defendants did not agree to harm Plaintiff specifically, the purpose

22

of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to

23

Plaintiff was a reasonably foreseeable consequence of Defendants' actions.

24

210.    Plaintiff has been injured in its business and property by Defendants' conspiracy in

25

violation of 18 U.S.C. § 1962(d).  The unlawful actions of Defendants, and each of them, have directly,

26

illegally, and proximately caused injuries to Plaintiff in its business or property.  Plaintiff seeks an

27

award of damages in compensation for, among other things, the hundreds of millions of dollars that

28

Defendants stole from Plaintiff.  Plaintiff further seeks an award of three times the damages Plaintiff

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

42

sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

## THIRD CLAIM
### (Fraud)
### Defendants Alcoa, Alcoa World Alumina, Dahdaleh and Rice

211.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

212.    Defendants Alcoa, Alcoa World Alumina and Rice, upon information and belief, knowingly and intentionally misled Plaintiff by failing to disclose that bribes were paid to one or more senior officials of Plaintiff and the Government of Bahrain.

213.    Defendants intentionally concealed the bribes from Plaintiff  because they intended to mislead Plaintiff into relying upon the services of its senior officials and the senior officials of the Government of Bahrain to whom bribes had been paid.  Defendants, through their concealment of the bribes, further sought to induce Plaintiff to overpay for alumina purchased from Defendants and to cede a substantial portion of its equity to Defendant Alcoa.  Defendants' fraudulent acts include those set forth in paragraphs 93, 103, 117, 132, 136, 148-49, and 166-201 above.

214.    Defendants Alcoa, Alcoa World Alumina, Rice, and Dahdaleh also knowingly and intentionally misled Plaintiff by creating and fostering the false impression that Dahdaleh-owned shell companies were Alcoa subsidiaries and by secretly entering into contracts that provided for the sale of alumina by Alcoa's subsidiary to Dahdaleh at prices substantially lower than those paid by Alba for the same alumina.

215.    Defendants intentionally concealed the true identity of the shell companies and the existence of the secret parallel contracts from Plaintiff because Defendants sought to induce Plaintiff to overpay for alumina purchased from Defendants.  Defendants' fraudulent acts include those set forth in paragraphs 55-68, 74-90, 134-140, 147, 150-56, and 166-201 above.

216.    Defendants' failure to disclose the payment of bribes to one or more senior officials of Plaintiff and the Government of Bahrain was material because Plaintiff relied upon the honest services of its officials and those of the Government of Bahrain in the conduct of its business.  In addition, the one or more senior officials of Plaintiff and the Government of Bahrain who received bribes were in a

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

position to cause Plaintiff to agree to pay excessive prices for alumina purchased from Defendants as well as influence negotiations involving Alba's proposed sale of equity to Defendant Alcoa.  Indeed, many of the dates on which bribes were paid coincide with key periods when contracts were being negotiated or finalized.

217.    Defendants' failure to disclose the true identity of the shell companies and the existence of the secret parallel contracts was material because Plaintiff relied upon Defendants' assurances that Plaintiff was dealing with Alcoa or Alcoa subsidiaries under the 2005 Contract and the earlier assignments.  Plaintiff would not have agreed to the contracts, extensions, and assignments described above if Plaintiff had been aware that it was dealing with shell companies and overpaying for alumina because Defendants negotiated secret agreements among themselves to re-sell alumina to Plaintiff at artificially marked-up prices.

218.    Plaintiff justifiably relied upon Defendants' intentional concealment of the bribes in that Plaintiff continued to use the services of its senior officials and senior officials of the Government of Bahrain, including one or more such individuals who had received bribes.  Plaintiff did so in the justifiable belief that it was receiving honest services from its own senior officials and senior officials of the Government of Bahrain.

219.    Plaintiff justifiably relied upon Defendants' misrepresentations that the Dahdaleh-owned shell companies were Alcoa subsidiaries.  Plaintiff also justifiably relied upon Defendants' intentional concealment of the secret parallel contracts.  Plaintiff did so in the justifiable belief that Alcoa's subsidiary was dealing with Plaintiff honestly.

220.    Defendants conduct was willful, wanton, malicious, and oppressive.

221.    Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business or property.  These injuries include Plaintiff paying excessively high prices for alumina.  Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from Plaintiff. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

First Amended Complaint

## FOURTH CLAIM
### (Civil Conspiracy to Defraud)
### Defendants Alcoa, Alcoa World Alumina, Dahdaleh and Rice

222. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

223. Defendants, and each of them, combined and agreed with each other and/or others to defraud Plaintiff by failing to disclose that (a) bribes were paid to one or more senior officials of Plaintiff and the Government of Bahrain, (b) Defendants caused Alba to deal with shell companies rather than Alcoa subsidiaries, and (c) Defendants directed the execution of secret parallel contracts that provided for the sale of alumina to Dahdaleh at prices substantially lower than those paid by Alba for the same alumina, as alleged in paragraphs 211-221 above.

224. The conspiracy commenced at least as early as 1990.

225. Pursuant to their agreement(s), Defendants, and each of them, acted in concert to support their common purpose of defrauding Plaintiff in order to cause Plaintiff to overpay for alumina purchased from Defendants and to cede a substantial portion of its equity to Defendant Alcoa.

226. Each Defendant committed at least one overt act in furtherance of such conspiracy including misleading Plaintiff as to the true purpose of the assignment of the Market Tonnage portion of the 1990 Contract, participating in negotiations for a proposed sale of up to 26% of Bahrain's shares in Alba, participating in the negotiation and execution of secret parallel contracts, fostering the false impression that the Dahdaleh-owned shell companies were Alcoa subsidiaries, and concealing and facilitating the payment of bribes to one or more senior officials of Plaintiff and the Government of Bahrain all as described above.

227. Each Defendant acted with the common intent to defraud Plaintiff and understood that all other Defendants shared in that common purpose.

228. Defendants' conduct was willful, wanton, malicious, and oppressive.

229. Defendants' unlawful conspiracy has directly, legally, and proximately caused injuries to Plaintiff in its business and property. This injury includes Plaintiff paying excessively high prices for alumina. Plaintiff seeks an award of damages for, among other things, the millions of dollars that Defendants stole from Plaintiff, which occurred as a result of Defendants' conduct. Further, Plaintiff

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE, NW, WASHINGTON, DC 20036
(202) 887-4000

1   seeks the imposition of punitive damages sufficient to deter Defendants from committing such

2   unlawful conduct in the future.

3                         **Prayer for Relief**

4         WHEREFORE, Plaintiff respectfully requests that the Court:

5         A.      Award compensatory, consequential, exemplary and punitive damages to Plaintiff in an

6   amount to be determined at trial;

7         B.      Award attorneys' fees and costs to Plaintiff; and

8         C.      Grant to Plaintiff whatever other relief is just and proper.

9                         **Jury Trial Demand**

10         Plaintiffs demand trial by jury on issues so triable.

11   Dated:  November 28, 2011

12

13                                   Respectfully submitted,

14                                 s/ Mark J. MacDougall

15                                 Mark J. MacDougall (admitted *pro hac vice*)

16                                 D.C. Bar No. 398118

                                Kristine L. Sendek-Smith

17                                 James E. Sherry

                                Lauren B. Kerwin

18                                 AKIN GUMP STRAUSS HAUER & FELD LLP

19                                 1333 New Hampshire Ave. NW

                                Washington, DC 20036

20                                 Telephone:  (202) 887-4000

                                Facsimile:  (202) 887-4288

21                                 mmacdougall@akingump.com

22                                 Charles B. Gibbons

                                Christopher A. Amar

23                                 Victoria B. Kush

                                BUCHANAN INGERSOLL & ROONEY PC

24                                 One Oxford Centre

25                                 301 Grant Street, 20th Floor

                                Pittsburgh, PA  15219

26                                 Telephone: (412) 562-8800

                                Facsimile: (412) 562-1041

27                                 charles.gibbons@bipc.com

28                                 Attorneys for Plaintiff

Akin Gump Strauss Hauer & Feld LLP
1333 NEW HAMPSHIRE AVE. NW, WASHINGTON, DC 20036
(202) 887-4000

First Amended Complaint

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2011, I caused a true and correct copy of the foregoing First Amended Complaint to be filed with and served upon all counsel of record by the Court's electronic case filing system.

/s/ Mark J. MacDougall
Mark J. MacDougall (admitted *pro hac vice*)

First Amended Complaint

47