Charles B. Gibbons
Christopher A. Amar
Victoria B. Kush
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219
Telephone:     (412) 562-8800
Facsimile:     (412) 562-1041

Mark J. MacDougall
Kristine L. Sendek-Smith
James E. Sherry
Lauren B. Kerwin
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave. NW
Washington, DC 20036
Telephone:     (202) 887-4000
Facsimile:     (202) 887-4288

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ALUMINIUM BAHRAIN B.S.C., <br><br>             Plaintiff, <br><br>      v. <br><br> ALCOA INC., ALCOA WORLD ALUMINA LLC, WILLIAM RICE, and VICTOR DAHDALEH, <br><br>             Defendants. | Case No. 2:08-cv-299-DWA <br><br><br> **PLAINTIFF ALUMINIUM BAHRAIN B.S.C.'S  RICO CASE STATEMENT** |

Plaintiff Aluminium Bahrain B.S.C. ("Plaintiff" or "Alba"), by and through its undersigned attorneys, submits this RICO Case Statement pursuant to the Court's Orders dated February 29, 2008 and November 8, 2011.  This Case Statement fully incorporates by reference all allegations contained in Plaintiff's First Amended Complaint filed on November 28, 2011 (the "Complaint").

1

## INTRODUCTION

This case arises out of a sophisticated, two-decade scheme of criminal fraud and bribery that was conceived, orchestrated, and directed by Defendants Alcoa, Alcoa World Alumina, and senior U.S. executives of those companies, including Defendant Rice, in and from the United States.  The intended and principal beneficiary of this fraudulent scheme was Alcoa, which reaped well in excess of $400 million in illegal profits obtained by systematically and deliberately overcharging Alba for the alumina that Alba purchased from Alcoa and its subsidiaries.  Portions of Alcoa's illegal profits were further distributed among the other defendants and participants in the fraudulent scheme and were used to pay *quid pro quo* bribes to the senior executives of Alba and the Government of Bahrain, who caused Alba to enter into the economically disadvantageous contracts with Alcoa.

In order to facilitate and conceal their criminal scheme, Defendants Alcoa, Alcoa World Alumina, and senior U.S. executives of those companies, including Rice, enlisted the assistance of Defendant Dahdaleh, who had no prior involvement in the alumina supply business and who added no legitimate economic value to the transactions in which he was involved.  In furtherance of the criminal scheme, Dahdaleh established a series of offshore shell companies, none of which had any prior experience in the alumina supply business and none of which added any legitimate economic value to the transactions in which they were involved.  However, Alcoa and the other participants in the fraud convinced Alba that the shell companies were actually subsidiaries and affiliates of Alcoa.  They accomplished this deception by falsely identifying the shell companies as Alcoa subsidiaries or affiliates in communications with Alba, instructing Alba to negotiate with employees of the shell companies, authorizing the shell companies to use Alcoa's logo in

correspondence with and on invoices issued to Alba, and identifying Dahdaleh as part of Alcoa's team during negotiations relating to Defendants' attempt to obtain control of Alba.

The true purpose and role of these shell companies in the Defendants' criminal scheme was to purchase alumina from Alcoa at market rates and then re-sell the very same alumina to Alba at inflated prices. The offshore shell companies were also used by the Defendants as a vehicle for funneling the *quid pro quo* bribes to senior executives of Alba and the Government of Bahrain, and, upon information and belief, for distributing the illegal proceeds of this criminal scheme among the Defendants and other participants in the fraud. The sole reason for the involvement of Dahdaleh and his offshore shell companies was thus to conceal the fact that Defendants Alcoa, Alcoa World Alumina, and the senior U.S. executives of those companies, including Rice, were criminally defrauding a contract partner of hundreds of millions of dollars, over the course of 20 years, by bribing senior Alba executives and officials of the Government of Bahrain.

**1.      State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b), (c) and/or (d).**

Defendants Alcoa Inc. ("Alcoa"), Alcoa World Alumina LLC ("Alcoa World Alumina"), William Rice and Victor Dahdaleh perpetrated a fraud against Plaintiff through a conspiracy of bribery and other criminal acts in violation of 18 U.S.C. §§ 1962(c) and (d).

**2.      List each defendant and state the alleged misconduct and basis of liability of each defendant.**

The defendants are Alcoa, Alcoa World Alumina, Rice and Dahdaleh. Defendants, each of whom are members of the association-in-fact enterprise or the alternative enterprise alleged in

the Complaint, did knowingly, willfully and unlawfully conduct or participate in, directly or indirectly, the affairs of the enterprises through a pattern of racketeering in violation of 18 U.S.C. § 1962(c) for the common and continuing purpose of defrauding Plaintiff.[1]  Defendants likewise conspired to violate 18 U.S.C. § 1952(c) and 18 U.S.C. § 1962(c).  Defendants' liability under the RICO statute arises out of their participation in a scheme that started at least as early as 1990 and continued through a date not earlier than September 2009.

**The Bribery Scheme**

Defendants defrauded Alba through a scheme of bribery and other illegal acts that was controlled and directed by Alcoa, Alcoa World Alumina, and senior executives of those companies, including Rice, from and in the United States.  Defendants were all involved in the supply of alumina to Alba, which is one of the world's largest aluminum smelters and is principally owned by the Government of Bahrain.  In furtherance of their scheme, Defendants bribed one or more former senior officials of Alba and the Government of Bahrain to (a) ensure that Alcoa's subsidiary retained Alba's lucrative and nearly exclusive business, (b) induce Alba to pay excessive prices for the supply of alumina, and (c) attempt to induce Alba to cede a controlling interest in Alba to Defendant Alcoa.

Defendants Alcoa and Alcoa World Alumina, with the assistance of Defendants Dahdaleh and Rice, funneled the bribes through a series of shell companies owned by Dahdaleh but controlled in practice by all Defendants.  The shell companies included (1) Alumet Limited, (2) Kwinalum Trading Pte Limited ("Kwinalum"), a wholly-owned subsidiary of Alumet Limited, (3) Alumet Asia Pte Limited ("Alumet Asia," formerly Kwinalum), and (4) three separate Swiss companies bearing the same name, AA Alumina and Chemicals, and referred to herein as AAAC-

---

[1] Plaintiff has alleged alternative enterprises.  See Complaint ¶¶ 166-67.

4

1, AAAC-2, and AAAC-3 (collectively, the "AAAC Companies").  Defendant Dahdaleh then transferred payments to other shell companies and ultimately to the appropriate senior officials of the Government of Bahrain and Alba on behalf of Defendants Alcoa and Alcoa World Alumina.

The bribes and other proceeds of the scheme were transferred among the Defendants pursuant to a series of secret contracts that provided for (a) payment of unlawful "commissions" to Dahdaleh based on sales to Alba, for which Dahdaleh performed no material or legitimate services and/or (b) the sale of alumina by Alcoa's subsidiary to Dahdaleh-owned shell companies, with the knowledge and intent that the alumina would be re-sold to Alba at inflated prices.  The Defendants thereby exacted hundreds of millions of dollars in overpayment from Alba as a result of their pattern of bribery, negotiation of secret parallel contracts, and deliberate pattern of concealment and subterfuge regarding the nature of the Dahdaleh-owned shell companies.  All Defendants profited by the fraudulent scheme.

Throughout their scheme to defraud Alba, all of the Defendants concealed the illegal payments to former senior officials of Alba and the Government of Bahrain, as well as their parallel negotiations for the sale of alumina.  The Defendants also deceived Alba regarding the true nature of the Dahdaleh-owned shell companies.  Rice and the other Defendants falsely identified the shell companies as Alcoa subsidiaries or affiliates in communications with Alba, instructed Alba to negotiate with employees of the shell companies, authorized the shell companies to use Alcoa's logo in correspondence with and on invoices issued to Alba, and identified Dahdaleh as part of Alcoa's team during negotiations relating to Defendants' attempt to obtain control of Alba.

**Origins of the Alcoa Bribery Scheme**

By way of background, Alcoa first introduced Dahdaleh and his shell companies into the longstanding relationship between Alcoa's subsidiary (Alcoa of Australia) and Alba in 1990.  In 1990, Alcoa's subsidiary entered into a ten-year contract with Alba (the "1990 Contract") that was later extended by two amendments and ultimately expired in December 2004.  The 1990 Contract had two measures for the price of alumina that took effect beginning in 1992.  For approximately 60% of the supply, the price was set by a formula (the "Formula Tonnage").  For the remaining 40% (the "Market Tonnage"), the parties negotiated the price.

Under the 1990 Contract, Defendants utilized two mechanisms for transferring bribe payments and overcharging Alba for alumina.  First, between 1990 and 2004, Alcoa, through its subsidiary, paid Dahdaleh an estimated $13.5 million in unearned "commissions."  The commissions were described in a series of "Agency Agreements" between Alumet Limited and Alcoa's subsidiary, wherein Dahdaleh was identified as the "agent."  Dahdaleh did not provide any material or legitimate services under the Agency Agreements, and the "commissions" served no legitimate business purpose.  Rather, portions of the "commissions" were transferred to senior officials of Alba and the Government of Bahrain in the form of bribes.  The individuals who received Defendants' bribes induced Alba to continue dealing with Alcoa and to overpay for alumina.  The alumina prices under the 1990 included the cost of Dahdaleh's "commissions" and were otherwise inflated, thereby increasing Alcoa's profits.

Second, beginning in 1993 and in order to increase the profits of their fraud, Defendants caused the Market Tonnage (and later, the entire supply contract) to be assigned to shell companies owned by Dahdaleh.  From 1993 to 1995, Alcoa's subsidiary assigned the responsibility for the supply of Market Tonnage to Kwinalum (the "1993 Assignment").  Upon

information and belief, Dahdaleh (through Kwinalum) and Alcoa (through its subsidiary) entered

into a secret agreement to provide for the sale of alumina between the parties.  Kwinalum then

resold the same alumina to Alba at higher prices, despite not adding any value.  The agreements

between Alcoa and Dahdaleh were unknown to Alba and were purposely concealed from Alba by

Defendants because the secret agreements revealed significant details regarding the fraudulent

scheme, including that Alba was being overcharged for alumina and that the Dahdaleh-owned

shell companies were not, in fact, Alcoa subsidiaries.

## Scope of the Bribery Scheme

There was no legitimate business reason for the assignment to Kwinalum or any

subsequent assignments, and none of the shell companies added any value to or provided any

material services in furtherance of the alumina supply.  The shell entities never took possession

of the alumina, as evidenced by the bills of lading showing that alumina continued to be shipped

by Alcoa to Alba.  The shell companies were not legitimate business enterprises and lacked

experience or history in the alumina supply business.  For example, Kwinalum was incorporated

less than four weeks prior to sending its first invoice to Alba.  The assignments were part of

Defendants' scheme to profit by paying bribes to senior officials of Alba and the Government of

Bahrain and by overcharging Alba for alumina.  All Defendants profited by the involvement of

the Dahdaleh-owned shell companies and by Alba's overpayments.

In 1996, the 1990 Contract was amended (the "1996 Amendment") to provide that

between 1997 and 2000, Alcoa's subsidiary would assign the Market Tonnage to "a company

associated with" Alcoa's subsidiary.  *See* Ex. 1 (1996 Amendment).  In reality, the Market

Tonnage was assigned to Alumet Asia, a Dahdaleh-owned shell company (formerly Kwinalum).

On the same date that the 1996 Amendment was signed, September 19, 1996, Dahdaleh (through

one of his shell companies) and Alcoa (through its subsidiary) entered into a secret contract (the "1996 Sales Agreement") to provide for the sale of alumina, which Alumet Asia then resold to Alba at higher prices despite not adding any value.  An executive of Alcoa World Alumina signed both contracts, and Alcoa and Alcoa World Alumina knew and intended that the alumina would be resold to Alba at higher prices.  The 1996 Amendment also extended the contract for another year, obviating the need for Alba to conduct a proper tender and guaranteeing that Defendants would continue to benefit from a contractual arrangement with Plaintiff.  All Defendants profited by the involvement of the Dahdaleh-owned shell companies and by Alba's overpayments.

The 1990 Contract was extended through 2003 on or about August 14, 2001 (the "2001 Extension") and for one additional year in 2003 (the "2003 Extension").  Between 2002 and 2004, Alcoa's subsidiary assigned the alumina supply contract to two AAAC Companies (AAAC-1 and AAAC-2).  Pursuant to another secret contract (the "2002 Distribution Agreement"), Defendants arranged for Dahdaleh-owned shell companies to purchase alumina from Alcoa's subsidiary and re-sell that alumina to Alba at a substantially higher price, despite not adding any value and not providing any material service in furtherance of the alumina supply.  Neither AAAC-1 nor AAAC-2 had any prior experience or history in the alumina supply business.  AAAC-1 was incorporated two weeks prior to sending its first invoice to Alba, and AAAC-2 was incorporated five days prior to sending its first invoice.  Under the terms of the secret 2002 Distribution Agreement, Alcoa authorized its subsidiary to permit Dahdaleh-owned shell companies to use Alcoa's logo and trademarks, including on stationery, in advertising, or at their place of business.  This arrangement furthered the deception that the shell companies were actually Alcoa subsidiaries or affiliates.

Defendant Rice played an active role in negotiating the 2001 Extension.  The 2001 Extension also obviated the need for Alba to conduct a proper tender for another two years and guaranteed that Defendants would continue to benefit from a contractual arrangement with Plaintiff.  A final, one-year extension of the 1990 Contract was agreed to on or about September 17, 2003.  Upon information and belief, the Dahdaleh-owned shell companies, in addition to paying Alcoa for the alumina resold to Alba, distributed a substantial portion of Alba's overpayments to Alcoa.

**The Fraudulent 2005 Contracts**

Finally, in 2004, Defendants induced Alba to enter into a new ten-year alumina supply agreement (the "2005 Contract") with a Dahdaleh-owned shell company, AA Alumina and Chemicals ("AAAC-3").  Defendants repeatedly represented and assured Alba that AAAC-3 was "an associate company" of Alcoa's subsidiary.  Around the same time, Defendants signed a secret 2005 Distribution Agreement and arranged for Dahdaleh-owned shell companies to purchase alumina from Alcoa's subsidiary and re-sell that alumina to Alba at a substantially higher price, while adding no value of any kind to the transaction.  Like AAAC-1 and AAAC-2, AAAC-3 did not have any experience or history in the alumina supply business and was incorporated less than two weeks before issuing its first invoice to Alba.  Under the terms of the secret 2005 Distribution Agreement, Alcoa authorized its subsidiary to permit Dahdaleh-owned shell companies to use Alcoa's logo and trademarks, including on stationery, in advertising, or at their place of business.  This arrangement furthered the deception that the shell companies were actually Alcoa subsidiaries or affiliates.  Defendant Rice negotiated the 2005 Contract and furthered the deception regarding AAAC-3.  All Defendants profited by the involvement of the Dahdaleh-owned shell companies and by Alba's overpayments.

Throughout the history of the 1990 and 2005 Contracts and negotiations, Defendants fostered the false impression that the Dahdaleh-owned shell companies with which Alba was induced to deal were subsidiaries of Alcoa. Defendants transferred bribe payments to senior officials of Alba and the Government of Bahrain to ensure that Alba continued to deal with Defendants and pay inflated prices for alumina.

In addition, in 2003 and 2004, Defendants attempted to acquire a stake in Alba at a depressed price. While negotiations, led by executives of Alcoa and Alcoa World Alumina, were underway, Defendants transferred bribe payments to senior officials of Alba and the Government of Bahrain to induce those officials to promote the transaction.

Specifically, each defendant's misconduct included, without limitation, the following acts:

**<u>Alcoa, Alcoa World Alumina, and Rice</u>**

1) Alcoa and Alcoa World Alumina and senior executives of those companies, including Rice, directed the activities of the RICO enterprise from the United States, orchestrated the entire scheme to defraud Alba, and ensured that they profited from that scheme by retaining Alba's business at inflated prices. Alcoa and Alcoa World Alumina employed Dahdaleh and his network of offshore shell companies to transfer bribe payments to senior officials of Alba and the Government of Bahrain in order to continue the fraud for Alcoa's benefit. Upon information and belief, the actions of Alcoa of Australia and employees of Alcoa and its subsidiaries were directed by Alcoa in Pittsburgh. This is evidenced by, among other things, the fact that Alcoa's majority-owned Australian subsidiary was an Alcoa World Alumina and Chemicals ("AWAC") Enterprise Company. The AWAC Enterprise Companies follow the direction of the AWAC Strategic Council, which in turn is directed by Alcoa. Alcoa appoints a majority of the AWAC Strategic Council, including the Chair, and is responsible for the day-to-day management of AWAC and the Enterprise Companies through which AWAC operates. *See* Compl. ¶¶ 10-12, 169.

2) Alcoa and Alcoa World Alumina inserted Dahdaleh into the relationship between Alcoa's subsidiary and Alba, despite the fact that there was no legitimate reason for Alcoa to deal with Dahdaleh and to use him and his shell companies as intermediaries in the alumina supply to Alba. The Dahdaleh-owned shell companies had no prior experience or history in the alumina supply business (and indeed were incorporated on the eve of issuing their first invoices to Alba) and performed no legitimate or material services in furtherance of the alumina supply. Alcoa's subsidiary continued to ship Alcoa alumina to Alba, while

the Dahdaleh-owned companies merely faxed invoices.  Alcoa, Alcoa World Alumina, and senior executives of those companies, including Rice, instead introduced Dahdaleh into the Alcoa-Alba relationship in order to transfer and conceal bribe payments to senior officials of Alba and the Government of Bahrain.  Alcoa thereby retained Alba's near-exclusive business and grossly overcharged Alba for alumina over a twenty-year period.

3) Peter Burgess, who was at the time the Sales and Marketing Manager of Alcoa World Alumina in Pittsburgh, signed the 1996 Amendment to the 1990 Contract with Alba (Ex. 1) and the secret 1996 Sales Agreement with Dahdaleh-owned Alumet Limited that provided for the sale of market tonnage to Alumet, with the knowledge and intent that it would be resold to Alba at higher prices.  Burgess acted at the direction of Alcoa and Alcoa World Alumina.

4) Defendant Rice, who was at the time Vice President of Marketing of Alcoa World Alumina, proposed the 2001 Extension to the 1990 Contract between Alba and Alcoa's subsidiary by letter on Alcoa World Alumina stationery sent from Pittsburgh on or about April 12, 2001.  Compl. ¶¶ 73-74.  That letter stated: "The intent is to continue the relationship we have had for the last 30 years."  Ex. 2.  That relationship was, of course, not the same because Alcoa had inserted Dahdaleh and the Dahdaleh-owned shell companies as intermediaries for no commercially legitimate reason.  Rice's initials also appear on each page of the secret 2002 Distribution Agreement with Alumet Limited and AA Alumina and Chemicals Limited, which provided for the sale of alumina to the Dahdaleh-owned shell companies with the knowledge and intent that the same alumina would be re-sold to Alba at substantially higher prices *and permitted Dahdaleh-owned shell companies to use Alcoa's logo.*  Compl. ¶¶ 75, 80-86.  The purpose of the secret 2002 Distribution Agreement was to funnel bribe payments from Alcoa, to Dahdaleh-owned shell companies, to officials of Alba and the Government of Bahrain, and to overcharge Alba for alumina so that all Defendants could profit fraudulently.  At all times, Rice acted in his capacity as an officer of Alcoa and Alcoa World Alumina.

5) During negotiations regarding the 2001 Extension, Rice furthered Alba's confusion regarding David Dabney.  Alba incorrectly believed that Dabney was an employee of Alcoa's subsidiary, as evidenced by a fax sent by Alba's purchasing manager to Defendant Rice in Pittsburgh, copying "Mr. David Dabney, Alcoa of Australia" and inviting Alcoa's proposal for alumina supply during 2002 and 2003.  Ex. 3.  In fact, Dabney was at the time an employee of Dadco, a business owned by Defendant Dahdaleh.  Compl. ¶¶ 78-79, 86.  When Rice replied to Alba's purchasing manager, he allowed this misconception to persist, stating only, "I understand you have talked to David Dabney today and he will have a response to you shortly. . . . we look forward to continuing our long term relationship."  Ex. 4.  At the time, Rice was acting in his capacity as a vice president of Alcoa World Alumina and was based in Pittsburgh.

6) Alcoa, Alcoa World Alumina, and employees of these companies based in Pittsburgh and New York directed the negotiations in 2003 and 2004 for the sale of a 26% equity share in Alba to Alcoa or "a controlled-affiliate of Alcoa."  Alcoa sought to purchase the shares at a depressed price and paid bribes, through Dahdaleh, to senior officials of Alba and the

Government of Bahrain so that those officials would promote the transaction and Defendants could gain control of Alba.

7) Alain Belda, then the CEO and Chairman of Alcoa, traveled from the United States to Bahrain in connection with the proposed equity sale and attended meetings there with Defendants Rice and Dahdaleh.  *See* Ex. 5.  Belda subsequently sent a letter from New York urging the Government of Bahrain to reconsider Alcoa's offer and emphasizing his belief that the top levels of the Bahraini Government wanted the deal completed.

8) ***In meetings to negotiate the share sale, Rice introduced Dahdaleh as a consultant or advisor to Alcoa and a member of Alcoa's team.***  In a meeting in London on or about January 20, 2004, Rice and Dahdaleh promoted an arrangement whereby AAAC would supply alumina to Alba in exchange for the 26% equity stake in Alba.  ***When representatives of the Government of Bahrain and consulting firm Roland Berger asked Rice whether AAAC was a part of Alcoa, Rice claimed that they had no right to ask this and stated that he refused to talk about the company.***  In a meeting in London on or about May 20, 2004, Rice and Dahdaleh maintained that Alba was taking the "wrong position" in the negotiations and stated repeatedly that the Defendants had access to the highest authorities in Bahrain and that those authorities wanted the transaction completed and would approve Alcoa's proposed price.  At all times, Rice acted in his capacity as an officer of Alcoa and Alcoa World Alumina.

9) Rice, acting at the direction of Alcoa and Alcoa World Alumina, played an essential role in facilitating the deception that led to the 2005 Contract.  ***In response to Alba's request for assurance that Alba was dealing with Alcoa's subsidiary, Rice sent a fax dated October 26, 2004 from Pittsburgh, on Alcoa World Alumina letterhead, that stated: "For the avoidance of doubt and any confusion, this letter confirms to you that, for commercial reasons, AA Alumina and Chemicals, an associate company and distributor of Alcoa of Australia Ltd., is fully and solely authorized to negotiate the present alumina supply agreement with Alba.  Mr. David Debney, an employee of AA Alumina and Chemicals, is authorized to negotiate and finalize this contract."***  Ex. 6.

10) In a subsequent fax sent from Pittsburgh on October 29, 2004, ***Rice again described AA Alumina and Chemicals as "our associated company"*** and continued to foster the false impression that Alcoa and AA Alumina and Chemicals were one and the same.  Rice stated: "We also share your view of the mutually beneficial relationship between Alba and Alcoa, and have every wish to continue. . . . We are hopeful you accept the original alumina supply offer prior to its expiration, so we can continue to be Alba's alumina supplier for the next 10 years."  Ex. 7.  These deceptions were intended to, and in fact did, induce Alba to believe that Alba was dealing with an Alcoa subsidiary, to continue dealing with Defendants, and to overpay for alumina.  At all times, Rice acted in his capacity as an officer of Alcoa and Alcoa World Alumina.

11) On or about October 31, 2004, during deliberations regarding the 2005 Contract, Abdulla Saif, Bahrain's Minister of Finance & National Economy, telephoned Rice in Pittsburgh to inquire about the status of AA Alumina & Chemicals.  ***Rice falsely represented to Saif***

***that AA Alumina & Chemicals was a subsidiary of Alcoa, thereby inducing Alba to sign the 2005 Contract.***

12) Rice's initials appear on each page of the secret 2005 Distribution Agreement between Alcoa's subsidiary and three Dahdaleh-owned shell companies that provided for the sale of alumina to the Dahdaleh-owned shell companies, which in turn sold the same alumina to Alba at substantially inflated prices despite providing no added value. ***Through the secret 2005 Distribution Agreement, Alcoa also authorized its subsidiary to permit Dahdaleh-owned shell companies to use Alcoa's logo and trademarks, including on stationery, in advertising, or at their place of business.*** At all times, Rice acted in his capacity as an officer of Alcoa and Alcoa World Alumina.

13) Rice traveled to Bahrain several times during his tenure as a vice president of Alcoa World Alumina to further the relationship between Alcoa and Alba. On at least one trip, Rice met with a former officer of Alba and official of the Government of Bahrain who was a recipient of a large portion of Defendants' bribes.

14) Upon information and belief, Alcoa and Alcoa World Alumina directed the Dahdaleh-owned shell companies to transfer bribes to senior officials of Alba and the Government of Bahrain in the form of bribes.

## Dahdaleh

1) Dahdaleh received illegitimate payments from Alcoa and transferred many of those payments, in the form of bribes, to senior officials of Alba and the Government of Bahrain from 1990 to at least 2005. Dahdaleh transferred tens of millions of dollars between 1999 and 2004 to an official of Alba and the Government of Bahrain, as well as more than $5 million between 2002 and 2005 to Bruce Hall, the former CEO of Alba. The bribe payments were intended to, and did in fact, induce the former officers of Alba and officials of the Government of Bahrain to ensure that Alcoa retained Alba's business at inflated prices, including by pressuring such officials to provide competing bid information to Dahdaleh. Upon information and belief, Dahdaleh made many more bribe payments that remain unknown to officials of Alba and the Government of Bahrain to ensure that Alcoa retained the alumina supply contract at inflated prices. The specific payments of which Alba is aware include the following:

| Date | Amount | Recipient |
|---|---|---|
| 2/2002 | $40,000.00 (cash) | Bruce Hall, Alba's former CEO |
| 3/2/2002 | $33,764.00 | Bruce Hall |
| 8/1/2002 | $63,973.53 | Bruce Hall |
| 10/7/2002 | $166,000.00 | Bruce Hall |
| 10/7/2002 | $480,000.00 | Bruce Hall |

| 10/7/2002 | $450,000.00 | Zamil Al Joweiser, former director of Alba |
| 1/21/2003 | $90,000.00 | Bruce Hall |
| 2/18/2003 | $200,000.00 | Bruce Hall |
| 2/28/2003 | $100,000.00 | Bruce Hall |
| 3/31/2003 | $200,000.00 | Bruce Hall |
| 3/31/2003 | $2,000,000.00 | Former officer of Alba and official of the Government of Bahrain |
| 5/13/2003 | $290,000.00 | Bruce Hall |
| 10/3/2003 | $170,708.00 | Bruce Hall |
| 10/3/2003 | $1,999,964.00 | Former officer of Alba and official of the Government of Bahrain |
| 3/1/2004 | £852,416.35 ($1,594,018.57)[2] | Bruce Hall |
| 5/26/2004 | $199,989.22 | Bruce Hall |
| 6/25/2004 | $1,999,980.00 | Former officer of Alba and official of the Government of Bahrain |
| 6/30/2004 | $286,080.00 | Bruce Hall |
| 7/30/2004 | $98,050.00 | Bruce Hall |
| 8/31/2004 | $45,260.00 | Bruce Hall |
| 9/13/2004 | $66,439.17 | Bruce Hall |
| 9/30/2004 | $41,789.05 | Bruce Hall |
| 12/17/2004 | $228,168.34 | Bruce Hall |
| 12/22/2004 | $228,168.23 | Bruce Hall |
| 9/9/2005 | $266,000.00 | Bruce Hall |
| 11/18/2005 | $266,000.00 | Bruce Hall |

2)   Dahdaleh created numerous shell companies that were used to funnel bribes from Alcoa to senior officials of Alba and the Government of Bahrain and to distribute the proceeds of Defendants' fraud among the Defendants.

3)   Dahdaleh signed each secret agreement between Alcoa's subsidiary and the Dahdaleh-owned shell companies.  Dahdaleh benefited through the agreements for doing nothing more than facilitating bribe payments.  He provided no legitimate or material services,

---

[2] Using historical exchange rate of 1.87 USD:1 GBP.

never took legal title to the alumina, and added no value to the alumina supply that would justify the price mark-ups imposed by Defendants when reselling the alumina to Alba.

4) Dahdaleh acted as, and was held out to be, an authorized agent and representative of Alcoa during the share sale negotiations and fostered the false impression that his shell companies were Alcoa subsidiaries by using those shell companies to issue invoices and send correspondence to Alba that contained Alcoa's logo and indicated that Dahdaleh's shell companies were "associate" companies of Alcoa.

5) Dahdaleh, through his shell companies, issued artificially inflated invoices to Plaintiff and directed payment through banks located in the United States so that all Defendants could benefit from Plaintiff's overpayments.

**3.      List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.**

Additional wrongdoers who were not named as defendants include: (1) executives of Alcoa and Alcoa World Alumina located in the United States, including Peter Burgess, (2) the Dahdaleh-owned companies and their employees, officers and directors (including David Dabney, David Debney, Sandra Ainsworth, Angela Hill, and Eleanor O'Reilly), (3) one or more former senior officials of the Government of Bahrain, and (4) one or more former officers or former directors of Alba, including Bruce Hall (Alba's CEO from July 2001 through June 2005), Zamil Al Joweiser (a representative of Alba shareholder SABIC Investments Company to Alba's board of directors from the beginning of the scheme to 2000), and Yousuf Al Shirawi (Alba's Chairman from the beginning of the scheme until 1995).

**Executives of Alcoa and Alcoa World Alumina**

Alcoa and Alcoa World Alumina carried out the fraudulent scheme through senior executives located in Pittsburgh and New York, including Bill Rice, Peter Burgess, Alain Belda, and others.  As explained above, Burgess signed both the 1996 Amendment to the 1990 Contract with Alba and the secret 1996 Sales Agreement with Alumet Limited.  Burgess, therefore, knew that Dahdaleh-owned shell companies would resell Alcoa alumina to Alba at grossly inflated

prices despite providing no legitimate or material services and adding no value to the alumina. Former Alcoa CEO and Chairman Belda traveled from the United States to Bahrain to further the sale of Alba's shares at a depressed price. While in Bahrain, he attended meetings with Defendants Rice and Dahdaleh, and he subsequently sent a letter urging the Government of Bahrain to reconsider Alcoa's offer and emphasizing that the highest levels of authority in Bahrain (who had received bribes from Defendants) wanted the deal completed. Other Alcoa executives based in the United States also attended negotiations (along with Defendants Dahdaleh and Rice) in connection with the MOU, planned due diligence relating to the proposed share sale (often copying Dahdaleh on correspondence), and traveled within the United States and internationally in furtherance of the transaction.

Additionally, senior executives of AWAC and Alcoa subsidiaries were aware of Dahdaleh's involvement with Alcoa and dealt with Dahdaleh and his shell companies. For example, John Diederich (a U.S. national) and Paul Renouf represented Alcoa at a meeting held in Singapore in or about 1992, at which the participants conspired to assign part of the alumina supply contract to Kwinalum. George John Pizzey, who was employed by Alcoa of Australia, Alcoa, and Alcoa World Alumina and served as Chairman of the AWAC Strategic Council, collaborated with Dahdaleh in Bahrain. Bernt Reitan, former group president of Alcoa Primary Products, traveled to Bahrain in connection with the MOU and share sale negotiations and participated in meetings with Belda, Dahdaleh, and Rice. Reitan was also head of three Alcoa companies based in Norway that were linked, along with Dahdaleh, to the ownership of a vessel used to ship alumina to Alba. The alumina shipping contracts were used by the Defendants and Norwegian shipping company Klaveness as another mechanism to defraud Alba, whereby Alba was induced to overpay for alumina shipments as a result of bribes paid to senior officials of

Alba and the Government of Bahrain.  Upon information and belief, many other officers, directors, and employees of Alcoa, Alcoa World Alumina, and Alcoa subsidiaries were involved in the supply of alumina to Alba at inflated prices and in Alcoa's relationship with Dahdaleh and the Dahdaleh-owned shell companies.

## Employees of Dahdaleh-Owned Companies

The Dahdaleh-owned companies and their employees, including Dabney, Debney, Ainsworth, Hill, and O'Reilly, participated in Defendants' deception regarding the true identities of the companies with which Alba was induced to deal.  Together with Defendants, they created and fostered the false impression that the Dahdaleh-owned shell companies were actually Alcoa subsidiaries and affiliates, rather than conduits for bribes and price mark-ups, and negotiated economically disadvantageous contracts with Alba.

Specifically, each individual participated in the following acts:

- Hill's signature appears as witness to Dahdaleh's signature on the secret 1996 Sales Agreement between Alcoa's subsidiary and Alumet Limited, by which Alcoa's subsidiary sold alumina to Alumet Limited with the knowledge and intent that it would be resold to Alba at significantly higher prices.  Hill signed invoices issued to Alba on behalf of Kwinalum and Alumet Asia.  *See*, *e.g.*, Ex. 8.  The Alumet Asia invoices contained Alcoa's logo.  Upon information and belief, Hill was well aware that these entities were not Alcoa affiliates but were in fact shell companies that did not take possession of the alumina or add any value to Alba.  The invoices were inflated and caused Alba to transfer substantial payments to accounts held in the United States.

- Ainsworth proposed the 2003 Extension to the 1990 Contract by letter to Alba on or about July 8, 2003.  At the time, Ainsworth was the administrative and shipping manager of AAAC-2, but her letter sought to convey the false impression that it was sent on behalf of Alcoa.  The letter conspicuously bore the Alcoa trademarked logo and referred to "our excellent long term relationship for the last thirty years," whereas AAAC-2 was a shell company that had existed for less than sixteen months.  Ex. 9.  Ainsworth signed invoices that were issued to Alba on behalf of Alumet Asia and the AAAC Companies.  *See*, *e.g.*, Ex. 10.  The Alumet Asia invoices contained Alcoa's logo, and the AAAC invoices contained Alcoa's logo and a notation that "AA Alumina & Chemicals is an associate company of Alcoa of Australia Ltd."  Upon information and belief, Ainsworth was well aware that these entities were not Alcoa subsidiaries but were in fact shell companies that did not take possession of the alumina or add any value to Alba.  The invoices were

inflated and caused Alba to transfer substantial payments to accounts held in the United States.

- Dabney sent letters to Alba on or about September 4, 2000 identifying himself as the General Manager of the Perth office of AA Alumina & Chemicals (Ex. 11) and on or about August 15, 2001 attaching the 2001 Extension and containing an AAAC heading (Ex. 12). However, no company named AA Alumina & Chemicals existed until December 19, 2001. Dabney signed the 2001 Extension to the 1990 Contract with Alba on behalf of Alcoa's subsidiary. However, Dabney was employed by Dahdaleh-owned entities at the time, not by Alcoa. Six months later, Dabney initialed the secret 2002 Distribution Agreement for Alumet Limited and AAAC Limited, pursuant to which Alcoa's subsidiary sold alumina to Dahdaleh-owned shell companies with the knowledge and intent that the alumina would be resold to Alba at significantly higher prices. With the endorsement of Defendant Rice, Dabney became the point of contact for Alba employees regarding the 2001 Extension. Dabney communicated with Alba using letterhead that bore Alcoa's logo but identified the sender as "AA Alumina and Chemicals," leading Alba to believe that this new entity was a subsidiary of Alcoa.

- Debney signed the secret 2002 Distribution Agreement with Dahdaleh-owned shell companies on behalf of Alcoa's subsidiary. Debney also signed the secret 2005 Distribution Agreement between Alcoa's subsidiary and Dahdaleh-owned shell companies, this time on behalf of AA Alumina and Chemicals SA. Through these two contracts, unknown to Alba, Alcoa's subsidiary sold alumina to Dahdaleh-owned shell companies with the knowledge and intent that the alumina would be resold to Alba at significantly higher prices despite no value being added or legitimate or material services being provided. On or about September 26, 2004, Debney submitted a bid to Alba for the 2005 Contract, on behalf of "AA Alumina and Chemicals." Ex. 13. No company bearing the name "AA Alumina and Chemicals" was registered in Switzerland at that time, however. AAAC-1 and AAAC-2 had been renamed, and AAAC-3 was not incorporated until December 30, 2004. Compl. ¶¶ 109, 147. At the direction of Rice, Debney became Alba's point of contact for the 2005 Contract and helped to conceal the true nature of the Dahdaleh-owned shell company that became Alba's "supplier" under the 2005 Contract. Debney's bid created deliberate confusion regarding which company was submitting it. The bid contained an Alcoa logo, was sent from the "Alcoa Building," and stated that "AA Alumina & Chemicals is an associate company of Alcoa of Australia Limited." Debney's bid letter also indicated that the alumina would be supplied from Alcoa's refineries, referred to Alba as "our very important customer," and stated that "as we are your current supplier, we believe that you have full understanding of our product." When the parties agreed to revised terms for the 2005 Contract on or about November 25, 2004, the terms were on Alcoa letterhead, but Debney's signature block indicated that he was a representative of "AA Alumina & Chemicals." Ex. 14. Debney also sent a letter dated January 14, 2005 to a senior officer of Alba to thank him for Alba's decision to "continue our alumina supply contract" and the "business relationship formed over many years." The letter referred to Alcoa's capabilities and successes and explained why the 2005 Contract was advantageous to Alcoa, and it again contained the Alcoa trademark and listed a return address at the "Alcoa Building." Each misrepresentation furthered deceived Alba into believing that Alba was dealing with Alcoa subsidiaries. In truth,

Alba was paying shell companies for alumina that the shell companies had purchased from Alcoa at significantly lower prices.  The Dahdaleh-owned shell companies provided no material or legitimate services in connection with the alumina supply to Alba and never took legal title to the alumina; rather, they served merely as conduits for paying bribes to officials of Alba and the Government of Bahrain and for inflating the price of alumina sold to Alba.

- O'Reilly was employed by Alcoa's subsidiary from 1989 through at least 2001 as alumina sales administrator, alumina marketing coordinator, and alumina contract administration manager.  Between May 1991 and December 2001, O'Reilly signed invoices issued to Alba.  The invoices charged inflated prices for alumina as a result of the bribes that Defendants paid to senior officers of Alba and officials of the Government of Bahrain and the commissions paid to Dahdaleh.  Upon information and belief, O'Reilly had knowledge of the scheme to defraud Alba and the participants in that scheme.  By July 2005, if not earlier, O'Reilly had become an employee of Dadco Alumina and Chemicals, a Dahdaleh-owned company.

Moreover, Dabney, Debney, Ainsworth, and Hill were all former employees of Alcoa-

affiliated companies:

- Hill, who signed invoices on behalf of Kwinalum and Alumet Asia, was an officer of Dadco Australia Pty Limited ("Dadco"), a company founded by Dahdaleh and Dahdaleh's brother in Perth, Australia.  From approximately 1986 to 1990, Hill served as alumina sales administrator for Alcoa of Australia.

- Ainsworth also signed invoices on behalf of Alumet Asia and the AAAC Companies and corresponded with Alba employees regarding fulfillment of the contracts.  Ainsworth was a former employee of Alcoa of Australia.  From June 1998 to December 2001, Ainsworth served as Administrative Manager of Alumet Asia.  Beginning in 2001, Ainsworth served as the Company Secretary of the Dahdaleh-owned entity Dadco.  From in or about December 2001 to April 2005, Ainsworth served as administrative and shipping manager of the AAAC Companies.

- Dabney, who promoted and executed the 2001 Extension to the 1990 Contract, had previously served as a director of three Alcoa-affiliated companies: Australian Fused Materials Pty. Ltd., a former joint venture partnership between Alcoa's subsidiary and two Japanese companies (1993-1996 and August-October 2004), ACAP Australia Pty. Ltd., a subsidiary of Alcoa of Australia (1994-1996), and Alcoa Chemie GmbH, a former subsidiary of Alcoa (1996-1998).  Dabney was also employed by Dadco and its affiliate Dadco Alumina and Chemicals and served as a director of three other Dahdaleh-owned entities.

- Debney, who promoted and executed the 2005 Contract and signed the secret 2002 and 2005 Distribution Agreements, was previously employed by Alcoa of Australia as Administrative President (2000-2004), Manager of Alumina Sales and Marketing (1997-2000), and Technical Manager (1989-1997).  Beginning in 1997, Debney was Plaintiff's

lead contact at Alcoa of Australia.  Debney also served as a director of Australian Fused Materials Pty. Ltd., a former joint venture partnership between Alcoa's subsidiary and two Japanese companies, from approximately 2000 to 2003.  Notably, David Dabney and Defendant Rice had also served as directors of Australian Fused Materials Pty. Ltd. Debney served as an officer or director of three Dahdaleh-owned entities (AAAC-3, AA Alumina and Chemicals Limited in Guernsey, and Dadco Holding SA in Luxembourg).

These employees' affiliation with both Alcoa and the Dahdaleh-owned companies furthered Defendants' deception that the Dahdaleh-owned companies were Alcoa subsidiaries. Alba had become accustomed to dealing with these individuals at Alcoa of Australia and recognized them as affiliated with Alcoa.  Therefore, when they began acting on behalf of the Dahdaleh-owned entities instead, the fact that Alba was dealing with shell companies rather than Alcoa companies was concealed.  O'Reilly, the long-time employee of Alcoa's subsidiary, also eventually worked for Dadco.

## Former Senior Official of the Government of Bahrain and Alba

A former senior official of the Government of Bahrain and of Alba received tens of millions of dollars in bribe payments from Dahdaleh.  Certain payments coincided with significant events relating to the negotiation of the alumina supply contract or the memorandum of understanding ("MOU") for the sale of equity in Alba.  For example, on September 15, 2003, Alcoa and the Government of Bahrain signed the MOU, and on September 17, 2003, Alba agreed to the 2003 Extension to the 1990 Contract.  Approximately two weeks later, on October 3, 2003, the former senior official received a payment of $1,999,964.  In the first half of 2004, high-level meetings took place in London and Bahrain regarding the share sale as Defendants aimed to close the deal.  The former senior official received a payment of $1,999,980 on or about June 25, 2004 to induce the official to continue promoting the transaction and to include Alcoa or AA Alumina & Chemicals on the tender list for the 2005 Contract.

Dahdaleh, as the agent of Alcoa and its subsidiaries, made many of these payments at times and under circumstances that directly advanced the unlawful interests of Alcoa, Alcoa World Alumina, and senior executives of those companies in the United States, including Rice. In exchange for the bribes, the former official ensured that Alba continued dealing with the Defendants and promoted the MOU and multiple economically disadvantageous contracts with Alcoa's subsidiary and the Dahdaleh-owned shell companies.  For example, during the negotiations for the 2005 Contract, members of Alba's board of directors expressed concern about dealing with AA Alumina & Chemicals and cautioned that Alba should seek more favorable terms than those offered by Alcoa/AA Alumina & Chemicals.  Because he stood to gain personally, the former official aggressively advocated and gave final approval for the 2005 Contract.

**Bruce Hall, Former CEO of Alba**

Bruce Hall, the CEO of Alba from July 2001 through June 2005, received more than $5 million in bribe payments from Alcoa through Dahdaleh.  Many of the payments coincided with significant events relating to the negotiation of the alumina supply contract or the MOU for the sale of equity in Alba.  For example, on September 15, 2003, Alcoa and the Government of Bahrain signed the MOU, and on September 17, 2003, Alba agreed to the 2003 Extension to the 1990 Contract.  Approximately two weeks later, on October 3, 2003, Hall received a payment of $170,708.  In the first half of 2004, high-level meetings took place in London and Bahrain regarding the share sale, and Defendants attempted to close the deal.  Hall received payments of £852,416.35 on March 1, 2004, $199,989.22 on May 26, 2004, and $286,080 on June 30, 2004. The March 1, 2004 transfer was paid by United Legal Engineering Consultants Limited, a shell company owned by Dahdaleh (*see* Ex. 15, United Legal Engineering shareholder information),

to an account for "Rosedale Equities Limited," a shell company that was beneficially owned by Hall. Dahdaleh had helped Hall to set up certain shell companies and accounts into which bribe payments would be transferred.

Alba sent tender invitations for the 2005 Contract on September 6, 2004. One week before, on August 31, 2004, Dahdaleh transferred $45,260 to a bank account owned by Hall, upon information and belief to ensure that Alcoa or AA Alumina & Chemicals was included on the tender list. One week after the tender invitations were sent, on September 13, 2004, Dahdaleh transferred $66,439.17 to a bank account owned by Hall. On or about September 30, 2004, the day after Alba opened the bid submitted on behalf of "AA Alumina and Chemicals," United Legal Engineering transferred $41,789 to an account owned by Hall. Hall signed AA Alumina & Chemicals' final offer on November 25, 2004. He received two transfers shortly thereafter from United Legal Engineering: $228,168.34 on or about December 17, 2004 and $228,168.23 on or about December 22, 2004. *See*, *e.g.*, Ex. 16 (sample wire transfers).

Upon information and belief, Dahdaleh, as the designated agent of Alcoa and subsidiaries, made many of these payments at the direction of Alcoa, Alcoa World Alumina, and senior executives of those companies in the United States, including Rice. In exchange for the bribes, Hall promoted the 2003 Extension, the MOU, and the 2005 Contract, all of which were economically disadvantageous to Alba. For example, during the negotiations for the 2005 Contract, members of Alba's board of directors expressed concern about dealing with AA Alumina & Chemicals and cautioned that Alba should seek more favorable terms than those offered by Alcoa/AA Alumina & Chemicals. Because he stood to gain personally (and because Rice had provided false information regarding the nature of AA Alumina & Chemicals), Hall vigorously advocated for concluding the 2005 Contract. Additionally, one other company bid on

the 2005 Contract.  In response to pressure from Dahdaleh, Hall provided Dahdaleh with information regarding the competing bid.

**Other Former Officials of Alba and the Government of Bahrain**

Zamil Al Joweiser, a former representative of SABIC to Alba's board of directors, participated in a meeting in Singapore with representatives of Alcoa in or about 1992 to arrange the 1993 Assignment of the Market Tonnage supply to Kwinalum.  *See* Compl. ¶ 45.  Joweiser also signed as a witness to the 1996 Amendment to the 1990 Contract, which allowed Alcoa to assign the Market Tonnage (Ex. 1).  Joweiser received a bribe payment from Dahdaleh in the amount of $450,000 on or about October 7, 2002 and, upon information and belief, received other bribes throughout the course of the scheme.

Yousuf Al Shirawi, Alba's Chairman from the beginning of the scheme until 1995, upon information and belief received bribe payments in connection with promoting the 1990 Contract and the 1993 Assignment.

Upon information and belief, Defendants made many more bribe payments that remain unknown to officials of Alba and the Government of Bahrain to ensure that Alcoa retained the alumina supply contract at inflated prices.  In exchange for the bribes, these individuals promoted contracts that were economically disadvantageous to Alba because of Defendants' fraud.

**4.      List the alleged victims and state how each victim was allegedly injured.**

Alba was the victim of Defendants' racketeering activities, conspiracies to defraud, fraudulent conduct and fraudulent concealment.  Defendants injured Alba by overcharging Alba more than $433 million for alumina over a twenty-year period, not including mark-ups between

1993 and 1995, compound interest on the losses, the opportunity cost associated with the disruption of supply in the third quarter of 2009, or the consequential damages resulting from the absence of a fair long-term contract.  Alba would not have agreed to pay these inflated prices but for the bribes that Defendants paid to senior officials of Alba and the Government of Bahrain. Moreover, Alba was deprived of the honest services of officials of Alba and the Government of Bahrain through Defendants' pattern of bribery.  Plaintiff's business was also injured by the oppressive terms included in the 2005 Contract, as alleged in paragraphs 144-145 of the Complaint.

Other victims of Defendants' fraudulent scheme are Plaintiff's shareholders – the Government of Bahrain and SABIC – who have also been injured as a result of the excessive prices charged to Plaintiff.

Finally, other potential suppliers of alumina have been injured by Defendants' conduct to the extent that Defendants' scheme to defraud Plaintiff through bribery precluded other suppliers from obtaining business from Plaintiff.

**5.**     **Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.  The description of the pattern of racketeering shall include the following information:**

**(a)**     **A list of alleged predicate acts and the specific statutes which were allegedly violated:**

Defendants engaged in numerous predicate acts including (1) illegal payments to foreign officials in violation of 15 U.S.C. §§ 78dd-2 and 78dd-3; (2) transport and receipt of stolen money in violation of 18 U.S.C. §§ 2314 and 2315; (3) travel in furtherance of a scheme to defraud in violation of 18 U.S.C. § 1952; and (4) mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

**(b)      The date of each predicate act, the participants in each predicate act, and the facts surrounding each predicate act:**

Defendants all participated in, and/or conspired to facilitate, the commission of the above-referenced predicate acts.

**Illegal Payments to Foreign Officials in Violation of 18 U.S.C. §§ 78dd-2 and 78dd-3**

Defendants violated 18 U.S.C. §§ 78dd-2 and 78dd-3 by paying bribes to former officials of the Government of Bahrain and Alba (an enterprise majority-owned by the Government of Bahrain), in order to (1) influence the officials to act in violation of their lawful duties as government officials and to direct business to Defendants Alcoa and Alcoa World Alumina without regard to the best interests of Alba, (2) secure an improper advantage over other potential suppliers of alumina for the purposes of obtaining and retaining business from Alba, and (3) induce the officials to use their influence with the Government of Bahrain and Alba for the purpose of affecting or influencing Alba's business dealings with Defendants Alcoa and Alcoa World Alumina, all to the detriment of Alba.  Defendant Dahdaleh, as the agent of Defendants Alcoa and Alcoa World Alumina, facilitated the payments of bribes to the officials on behalf of Defendants Alcoa and Alcoa World Alumina.  Defendant Rice was intimately involved in the fraudulent scheme and the misrepresentations to Alba regarding the nature and identity of the Dahdaleh-owned shell companies.

### *Secret Contracts and Shell Companies*

After decades of fraudulent concealment by the Defendants, Plaintiff discovered, as a result of an extensive and ongoing investigation, that Defendant Dahdaleh had acted as a "middle-man" in relation to Alba supply contracts since approximately 1990.  Although Alcoa's subsidiary had supplied alumina to Alba without incident and without Dahdaleh's involvement

25

since 1969, Alcoa and Alcoa World Alumina suddenly inserted Dahdaleh into the relationship

with Alba in or about 1990.  There was no legitimate reason for Alcoa and its affiliates to deal

with Dahdaleh and the multiple shell companies that he ultimately owned and to use these

entities as intermediaries.  Rather, Defendants' purpose in introducing Dahdaleh was to pay

bribes to senior officials of Alba and the Government of Bahrain in order to induce Alba to do

business with Alcoa and overpay for alumina.

Between 1990 and 2004, Defendants entered into secret contracts that appointed

Dahdaleh as the "agent" of Alcoa's subsidiary and provided for the payment of "commissions"

to Dahdaleh based on the volume of alumina sold to Alba or the total amount paid by Alba.

Dahdaleh provided no legitimate services in exchange for the "commissions."  Instead, upon

information and belief, Dahdaleh kept some of the payments for himself and transferred others to

senior officials of Alba and the Government of Bahrain in the form of bribes.

Seeking to increase their profits while continuing to pay *quid pro quo* bribes, from

January 1993 through September 2009 Defendants Alcoa and Alcoa World Alumina caused a

portion or all of the alumina supply contract with Alba to be assigned to Dahdaleh-owned shell

companies.  Besides serving as conduits for bribe payments and price mark-ups, the shell

companies did nothing more than fax invoices to Alba for alumina supplied by Alcoa.  The shell

companies never took title to or possession of the alumina or coordinated shipping, as evidenced

by bills of lading indicating that Alcoa continued to ship the alumina to Alba.  *See*, *e.g.*, Ex. 17

(representative bills of lading).  This arrangement was detailed in a series of secret contracts

between Dahdaleh (through his shell companies) and Alcoa (through its subsidiary) that provided

for the sale of alumina, with the knowledge and intent that the Dahdaleh-owned shell companies

would re-sell the alumina to Alba at a substantially higher price.

*Bribe Payments Identified to Date*

The payments of which Alba is aware include those in the following chart.  However, Defendants also paid tens of millions of dollars to the former officer of Alba and former official of the Government of Bahrain.  Upon information and belief, Defendants made multiple additional bribe payments to other officials of Alba and the Government of Bahrain beginning in 1990.

| Date | Amount | Recipient |
|------|--------|-----------|
| 2/2002 | $40,000.00 (cash) | Bruce Hall, Alba's former CEO |
| 3/2/2002 | $33,764.00 | Bruce Hall |
| 8/1/2002 | $63,973.53 | Bruce Hall |
| 10/7/2002 | $166,000.00 | Bruce Hall |
| 10/7/2002 | $480,000.00 | Bruce Hall |
| 10/7/2002 | $450,000.00 | Zamil Al Joweiser, former director of Alba |
| 1/21/2003 | $90,000.00 | Bruce Hall |
| 2/18/2003 | $200,000.00 | Bruce Hall |
| 2/28/2003 | $100,000.00 | Bruce Hall |
| 3/31/2003 | $200,000.00 | Bruce Hall |
| 3/31/2003 | $2,000,000.00 | Former officer of Alba and official of the Government of Bahrain |
| 5/13/2003 | $290,000.00 | Bruce Hall |
| 10/3/2003 | $170,708.00 | Bruce Hall |
| 10/3/2003 | $1,999,964.00 | Former officer of Alba and official of the Government of Bahrain |
| 3/1/2004 | £852,416.35 ($1,594,018.57)[3] | Bruce Hall |
| 5/26/2004 | $199,989.22 | Bruce Hall |
| 6/25/2004 | $1,999,980.00 | Former officer of Alba and official of the Government of Bahrain |
| 6/30/2004 | $286,080.00 | Bruce Hall |

---

[3] Using historical exchange rate of 1.87 USD:1 GBP.

| 7/30/2004 | $98,050.00 | Bruce Hall |
|-----------|-----------|------------|
| 8/31/2004 | $45,260.00 | Bruce Hall |
| 9/13/2004 | $66,439.17 | Bruce Hall |
| 9/30/2004 | $41,789.05 | Bruce Hall |
| 12/17/2004 | $228,168.34 | Bruce Hall |
| 12/22/2004 | $228,168.23 | Bruce Hall |
| 9/9/2005 | $266,000.00 | Bruce Hall |
| 11/18/2005 | $266,000.00 | Bruce Hall |

Alcoa transferred funds (through its subsidiary) to Dahdaleh so that some of that money would be paid to officials of the Government of Bahrain and Alba in the form of *quid pro quo* bribes. Dahdaleh, as the agent of Alcoa and its subsidiaries, made many of these payments at times and under circumstances that directly advanced the unlawful interests of Alcoa, Alcoa World Alumina, and senior executives of those companies in the United States, including Rice, for example at key points during the contract negotiations or MOU discussions, or immediately following the conclusion of a contract. Defendants paid the bribes to individuals who exercised the power to influence the decision-making process and ensure that Alba continued to deal with Defendants and overpay for alumina. Defendants intended for the payments to induce the officials to misuse their authority to direct business to Alcoa at inflated prices, and to obtain an improper advantage by practically eliminating competition for Alba's alumina supply.

Specifically, a particular former official of the Government of Bahrain and Alba was paid *quid pro quo* bribes because he wielded great influence in directing the activities of Alba. After the 1996 Amendment to the 1990 Contract had been signed, for example, an internal Alba memorandum dated December 2, 1996 stated that "it has been decided by [the former official] that Alba would sign a five-year contract with Alba and that Alcoa would assign the contract to a third party." The former official agreed to the 1996 Amendment, which was disadvantageous to

28

Alba, after he had received bribes from Defendants.  Upon information and belief, this individual
also ensured that Alba agreed to the contract extensions in 2001 and 2004 because he had
received *quid pro quo* bribes.

### Bribes Paid for Contract Extensions and Proposed Share Sale

On September 15, 2003, Alcoa and the Government of Bahrain signed a MOU for the
sale of Bahrain's shares in Alba to Alcoa or "a controlled-affiliate of Alcoa."  On September 17,
2003, Alba agreed to the 2003 Extension to the 1990 Contract, which obviated the need for a
tender and permitted Defendants to continue overcharging Alba for alumina.  Approximately two
weeks later, on October 3, 2003, the former senior official received a payment of $1,999,964
from Dahdaleh.  Upon information and belief, this was a *quid pro quo* bribe paid in exchange for
the senior official's efforts to ensure that the MOU and the 2003 Extension were signed and that
the share sale negotiations progressed.  Dahdaleh also promised Hall a payment of $100,000 in
exchange for Hall's support of the 2003 Extension.  In the first half of 2004, as high level
meetings took place in London and Bahrain regarding the share sale and Defendants tried to
close the deal, the former senior official received a payment of $1,999,980 on or about June 25,
2004.  In exchange, the individual continued to exert his influence in an attempt to close the deal.
Despite the fact that the consultants at the firm Roland Berger, who were retained by the
Bahraini Ministry of Finance, concluded that the proposed transaction undervalued the shares by
at least $400 million, the official insisted that Alcoa take an equity position in Alba.

When the MOU was eventually terminated, Alba had only approximately three months to
secure its alumina supply before the termination of the 1990 Contract on December 31, 2004.
Despite queries from other officers and directors of Alba regarding when the tender for the 2005
Contract would be published, the former senior official delayed the tender process.  Upon

information and belief, he did so because he had received additional bribes from Defendants and, in exchange, would ensure that Alba continued to do business with the Defendants.

David Debney, acting at the direction of the Defendants, submitted a bid on behalf of "AA Alumina and Chemicals" on September 26, 2004.  However, in order to create confusion and conceal Defendants' fraudulent scheme, the bid included Alcoa's logo, indicated that AA Alumina and Chemicals "is an associate company of" Alcoa's subsidiary, and referred to the bidding company as Alba's "current supplier."  The unusual proposed arrangement, whereby Alba would deal directly with an "associate company" of Alcoa, and the unfavorable contract terms raised questions among other officers and directors of Alba.  For example, on or about October 11, 2004, an Alba board member wrote to the former senior official and recommended that Alba purchase a one-year requirement from Alcoa and renegotiate a more favorable long-term agreement later.  The senior official replied that Alcoa was not interested in changing the terms of its bid or considering a shorter supply period.  Another board member wrote to the senior official on or about October 25, 2004 to question why Alba would deal with the "associate company" rather than Alcoa, the direct producer.  Separately, prompted by the board members' inquiries, Hall raised the issue of the nature of AAAC with Defendant Rice.  Rice falsely represented that AAAC was an affiliate of Alcoa.  *See* Exs. 6-7.

The senior official ultimately dismissed the concerns raised by Alba board members and approved the bid on November 1, 2004.  In sum, during this time period, after Defendants paid *quid pro quo* bribes to the former senior official, AA Alumina and Chemicals was included on the tender list, was portrayed as an Alcoa subsidiary, and won Alba's business at substantially inflated prices, over the objections of certain Alba directors.

**Transport and Receipt of Stolen Money in Violation of 18 U.S.C. §§ 2314 and 2315**

In furtherance of their scheme to defraud Alba, Defendants caused hundreds of millions of dollars to be transported in interstate and foreign commerce in violation of 18 U.S.C. § 2314. Defendants also received hundreds of millions of dollars in funds that crossed U.S. boundaries. In each instance, the funds were stolen, unlawfully converted and/or taken by fraud from Alba through the issuance of invoices requiring funds to be routed through accounts held at banks located in the United States. The prices paid by Alba were excessive and artificially inflated and would not have otherwise been paid by Alba had Defendants not bribed senior officials of Alba and the Government of Bahrain.

Under the 1990 Contract and between 1990 and 2001, Alcoa's subsidiary issued invoices to Alba for Formula Tonnage alumina at an inflated price due to Dahdaleh's "commissions" and the bribes that Defendants paid. Alcoa's subsidiary caused Alba to pay those invoices by wire transfer to accounts held at Chase Manhattan Bank and ANZ Investment Bank in New York, NY. *See*, *e.g.*, Ex. 18 (representative invoices). Alba transferred more than $1.28 billion to Alcoa's subsidiary under the 1990 Contract.

### *Payment of Inflated Invoices – 1993-1995*

From January 1, 1993 through December 31, 1995, Kwinalum, a shell company owned by Defendant Dahdaleh, issued inflated invoices to Alba, on behalf of Defendants Alcoa and Alcoa World Alumina, seeking payment for the supply of Market Tonnage alumina under the 1990 Contract. The invoices were signed by Angela Hill, a director and company secretary of Dadco, another Dahdaleh-owned company. Through the issuance of these invoices, Defendants Alcoa, Alcoa World Alumina, and Dahdaleh caused Plaintiff to transport unlawfully converted funds in interstate and foreign commerce to accounts held at Royal Bank of Canada, New York

and Chase Manhattan Bank, New York.  *See*, *e.g.*, Ex. 19 (representative invoices).  Defendants were the ultimate recipients of these funds.  Upon information and belief, Defendants further caused some of the unlawfully converted funds to be transported in interstate and foreign commerce in the form of bribes paid to officers of Alba or officials of the Government of Bahrain.

### *Payment of Inflated Invoices – 1997-2001*

From approximately 1997 through 2001, Alumet Asia (formerly Kwinalum) issued inflated invoices to Alba, on behalf of Defendants Alcoa and Alcoa World Alumina, seeking payment for the supply of Market Tonnage alumina under the 1990 Contract.  Through the issuance of these invoices, Defendants Alcoa, Alcoa World Alumina, and Dahdaleh caused Alba to transport unlawfully converted funds in interstate and foreign commerce to accounts held at Royal Bank of Canada, New York and Chase Manhattan Bank, New York.  *See*, *e.g.*, Ex. 20 (representative invoices).  Defendants were the ultimate recipients of these funds.  Upon information and belief, Defendants further caused some of the unlawfully converted funds to be transported in interstate and foreign commerce in the form of bribes paid to officers of Alba or officials of the Government of Bahrain.

### *Payment of Inflated Invoices – 2002-2004*

From January 1, 2002 through the end of 2004, companies controlled by Defendant Dahdaleh and bearing the name "AA Alumina and Chemicals" issued inflated invoices to Alba, on behalf of Defendants Alcoa and Alcoa World Alumina, seeking payment for the supply of alumina under the 1990 Contract.  The first five invoices issued by AAAC-1 instructed Alba to transfer payment to the same account used by Alumet Asia.  Through the issuance of these invoices, Defendants caused Plaintiff to transport unlawfully converted funds in interstate and

foreign commerce to accounts held at Royal Bank of Canada, New York, Chase Manhattan Bank, New York, Deutsche Trust Company America, New York and Bankers Trust Company, New York.  *See*, *e.g.*, Ex. 21 (representative invoices and wire transfer instructions).  Defendants were the ultimate recipients of these funds.  Upon information and belief, Defendants further caused some of the unlawfully converted funds to be transported in interstate and foreign commerce in the form of bribes paid to officers of Alba or officials of the Government of Bahrain.

Representative payments that Defendants caused Alba to make include the following:

| Date | Amount |
|------|--------|
| 11/23/2003 | $10,451,515.56 |
| 12/25/2003 | $10,458,645.07 |
| 1/2/2004 | $9,283,025.04 |
| 1/18/2004 | $11,215,345.35 |
| 2/9/2004 | $10,690,494.10 |
| 2/25/2004 | $10,489.00 |
| 4/26/2004 | $28,562.55 |
| 5/5/2004 | $11,160,665.10 |
| 5/9/2004 | $11,180,217.90 |
| 6/6/2004 | $11,241,759.70 |
| 6/16/2004 | $11,717,002.90 |
| 7/17/2004 | $3,317.55 |
| 9/5/2004 | $12,040,937.20 |
| 9/27/2004 | $11,748,122.40 |
| 10/10/2004 | $12,192,645.24 |
| 11/7/2004 | $11,766,423.30 |
| 11/16/2004 | $11,648,031.92 |
| 12/21/2004 | US 11,827,602.20 |

### *Payment of Inflated Invoices – 2005-2009*

From January 1, 2005 through September 2009, AAAC-3 issued inflated invoices to Plaintiff, on behalf of Defendants Alcoa and Alcoa World Alumina, seeking payment for the supply of alumina under the 2005 Contract.  Through the issuance of these invoices, Defendants caused Plaintiff to transport unlawfully converted funds in interstate and foreign commerce to accounts held at Deutsche Trust Company America, New York.  *See*, *e.g.*, Ex. 22 (representative

invoice and wire transfer instruction).  Defendants were the ultimate recipients of these funds.

Upon information and belief, Defendants further caused some of the unlawfully converted funds

to be transported in interstate and foreign commerce in the form of bribes paid to officers of Alba

or officials of the Government of Bahrain.  Representative payments that Defendants caused

Alba to make include the following:

| Date | Amount |
| --- | --- |
| 1/11/2005 | $16,046,298.75 |
| 1/11/2005 | $16,936,637.53 |
| 1/28/2005 | $16,286,518.91 |
| 2/13/2005 | $15,944,821.86 |
| 2/22/2005 | $16,016,780.01 |
| 2/27/2005 | $16,326.80 |
| 3/2/2005 | $16,551.20 |
| 3/20/2005 | $16,836,137.36 |
| 3/22/2005 | $16,067.55 |
| 4/17/2005 | $17,673.20 |
| 5/4/2005 | $17,419,218.78 |
| 5/29/2005 | $14,400,955.32 |
| 5/30/2005 | $3,109,922.36 |
| 6/2/2005 | $17,555.05 |
| 6/13/2005 | $15,522,754.90 |
| 6/19/2005 | $15,523,145.05 |
| 6/27/2005 | $15,704,586.36 |
| 7/19/2005 | $15,532,417.38 |
| 7/21/2005 | $15,532,417.38 |
| 7/28/2005 | $15,569,952.15 |
| 8/8/2005 | $15,933,163.78 |
| 8/15/2005 | $15,883,296.55 |
| 9/6/2005 | $16,644,622.50 |
| 9/22/2005 | $16,404,130.70 |
| 10/4/2005 | $16,644,622.50 |
| 10/9/2005 | $16,353,680.00 |
| 10/26/2005 | $16,353,680.00 |
| 11/8/2005 | $16,340,812.70 |
| 12/1/2005 | $16,340,812.70 |
| 12/6/2005 | $17,986,647.35 |
| 12/7/2005 | $17,988,482.50 |
| 12/29/2005 | $17,761,260.52 |
| 1/3/2006 | $18,183,067.88 |
| 1/23/2006 | $19,583,959.25 |

34

| | |
|---|---|
| 2/5/2006 | $18,854,162.83 |
| 2/13/2006 | $16,008.05 |
| 2/26/2006 | $20,876,611.72 |
| 3/1/2006 | $20,433,942.93 |
| 3/9/2006 | $22,144,527.59 |
| 3/14/2006 | $16,952.40 |
| 4/2/2006 | $21,691,482.56 |
| 4/11/2006 | $21,383,548.75 |
| 5/2/2006 | $21,167,861.25 |
| 5/10/2006 | $21,400,129.70 |
| 5/22/2006 | $22,797,144.50 |
| 6/4/2006 | $22,797,144.50 |
| 6/14/2006 | $24,923,796.25 |
| 7/4/2006 | $24,825,124.85 |
| 7/11/2006 | $21,874,187.40 |
| 7/23/2006 | $21,801,996.90 |
| 7/30/2006 | $21,892,261.80 |
| 8/13/2006 | $22,209,353.15 |
| 8/26/2006 | $22,221,412.10 |
| 9/14/2006 | $21,800,351.25 |
| 9/17/2006 | $16,161.90 |
| 9/27/2006 | $21,800,351.25 |
| 10/15/2006 | $16,179.75 |
| 10/19/2006 | $21,229,848.14 |
| 11/5/2006 | $9,219.95 |
| 11/5/2006 | $22,533,545.26 |
| 11/19/2006 | $22,707,637.74 |
| 11/22/2006 | $22,788,296.19 |
| 11/29/2006 | $5,141.65 |
| 12/20/2006 | $22,734,275.30 |
| 1/8/2007 | $23,519,892.00 |
| 1/12/2007 | $24,498,910.60 |
| 1/12/2007 | $24,454,584.16 |
| 1/24/2007 | $23,762,562.19 |
| 1/31/2007 | $997.90 |
| 2/19/2007 | $24,146,872.96 |
| 2/26/2007 | $24,451,139.04 |
| 3/8/2007 | $23,938,042.14 |
| 3/25/2007 | $24,265,513.17 |
| 4/2/2007 | $23,719,555.01 |
| 4/17/2007 | $23,387,030.29 |
| 4/24/2007 | $24,057,013.04 |
| 5/10/2007 | $24,819,633.12 |
| 5/29/2007 | $24,631,910.08 |
| 6/3/2007 | $24,565,296.25 |

Upon information and belief, the Dahdaleh-owned shell companies further transferred the funds obtained from Alba to the Defendants, directly or indirectly, so that Defendants could share in the profits of their fraud.

**Travel in Furtherance of a Scheme to Defraud in Violation of 18 U.S.C. § 1952**

In furtherance of the scheme to defraud Plaintiff through the payment of bribes, Defendants traveled extensively in foreign and interstate commerce and used the facilities of foreign and interstate commerce in order to promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of Defendants' unlawful acts of bribery in violation of U.S. law, and in particular, the Foreign Corrupt Practices Act.

*Scheme by Alcoa and Dahdaleh to Gain Control of Alba*

As described above, Defendants Alcoa and Alcoa World Alumina, with the assistance of Defendants Dahdaleh and Rice, attempted to acquire a stake in Alba at a depressed price through bribery, in violation of the Foreign Corrupt Practices Act.  Defendants and their representatives made several trips in order to facilitate the promotion, management and carrying on of their scheme to influence and corrupt officials of Alba and the Government of Bahrain through a pattern of bribery.  Such travel included the following:

- In the months following the execution of the MOU in September 2003, several meetings took place in London so that the parties could further negotiate the proposed sale of Alba's shares.  At least five meetings were held in London, and Defendant Rice traveled from Pittsburgh to each meeting joining Defendant Dahdaleh as agents of Defendants Alcoa and Alcoa World Alumina.  ***Rice introduced Dahdaleh as an "advisor" or "consultant" to Alcoa and identified Dahdaleh to representatives of the Government of Bahrain as part of Alcoa's team.***

- At one meeting in London on or about January 20, 2004, Rice and Dahdaleh discussed an arrangement whereby AAAC would supply alumina to Alba in exchange for the 26%

equity stake in Alba. **When representatives of the Government of Bahrain and consulting firm Roland Berger asked Rice whether AAAC was a part of Alcoa, Rice claimed that they had no right to ask this and stated that he refused to talk about the company.**

- Another meeting took place in London on or about May 20, 2004. Defendants Rice and Dahdaleh, along with Alcoa representatives Stephen Jennings and Denis Demblowski, traveled to London to participate in the meeting. The three points on the agenda were: (1) the status of the structure of proposed transaction, (2) the completion of Alcoa's due diligence at Alba's facilities and (3) the initiation of the due diligence of the AWAC system by Bahrain's Ministry of Finance and National Economy. Ex. 23. At this meeting, Alcoa's representatives pressured the Government of Bahrain's representatives and requested that the issue of how to proceed with the structure of the proposed transaction be resolved as quickly as possible, as it had a strong impact on further expansion of Alba and Alba's continuous alumina supply. **Rice and Dahdaleh stated repeatedly that Defendants had access to the highest authorities in Bahrain and that those authorities wanted the transaction completed and would approve Alcoa's proposed price.**

- In or about April 2004, Defendants Rice and Dahdaleh traveled to Paris and met with Abdulla Saif, Bahrain's Minister of Finance & National Economy, to further discuss the structure of the proposed transaction.

- Representatives of Defendants Alcoa and Alcoa World Alumina made two trips from the United States to Bahrain for the purpose of conducting due diligence. The trips took place from April 14, 2004 through April 16, 2004 and May 23, 2004 through May 25, 2004. The May 2004 trip, which was organized by Defendant Alcoa's employee, Lawrence Castner, included the following representatives of Defendants Alcoa: John Black, Jacque Caissey, Steve Lindsay, Martin Richard, Antonio Saaverda, Conrad Scarboro, Jay Rateau, and John Lease.

- Alain Belda, Defendant Alcoa's former chairman and chief executive officer, along with Defendants Rice and Dahdaleh, also traveled from the United States to Bahrain from April 19, 2004 through April 20, 2004. During this trip, Belda and Defendants Dahdaleh and Rice met with Abdulla Saif and discussed the proposed purchase of Alba's shares and Defendant Alcoa's desire to bring the negotiations to a close as quickly as possible.

- A due diligence team comprised of representatives of Alba and the Government of Bahrain traveled to New York, where extensive meetings were held with officers of Alcoa, Alcoa World Alumina, and AWAC. The trip took place from June 6, 2004 through June 11, 2004. At least one of Defendant Alcoa's employees traveled from Pittsburgh to New York to participate in the due diligence meetings.

- Executives of Alcoa and Alcoa World Alumina, including Defendant Rice, traveled from the United States to Bahrain, Australia, the United Kingdom, and elsewhere to manage the twenty-year relationship with Alba and with Dahdaleh and the Dahdaleh-owned shell companies.

Finally, Defendant Dahdaleh traveled to Bahrain on numerous occasions between 1995 and 2005 to facilitate and promote the payment of bribes to senior officials of Alba and the Government of Bahrain in order to ensure that Alcoa's subsidiary maintained Alba's exclusive business at inflated rates.

## Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343

In furtherance of their scheme to defraud Alba and obtain money from Alba by means of false pretenses and misrepresentations, Defendants transmitted or received various documents and things by the U.S. mails or by private or commercial interstate carriers, or by wire communications in interstate or foreign commerce.

The acts of mail or wire fraud in furtherance of the scheme include, without limitation, the following:

- Upon information and belief, Defendants Alcoa and Alcoa World Alumina caused the 1996 Amendment to the 1990 Contract to be transmitted from Pittsburgh, Pennsylvania on or about September 19, 1996.  The 1996 Amendment was executed by Peter Burgess, an employee of Defendant Alcoa World Alumina, and claimed that Alcoa's subsidiary would assign the Market Tonnage to "a company associated with" Alcoa's subsidiary. Ex. 1.  In fact, Defendants assigned the Market Tonnage to Alumet Asia, a Dahdaleh-owned shell company that did nothing more than mark up the price of the alumina sold to Alba and funnel bribes to senior officials of Alba and the Government of Bahrain. Burgess acted at the direction of Alcoa and Alcoa World Alumina.

- On or about April 12, 2001, Defendant Rice, an officer of Defendant Alcoa World Alumina, faxed a letter from Pittsburgh to Alba, proposing another extension to the 1990 Contract.  Ex. 2.  The Defendants structured the 2001 Extension to involve shell companies as intermediaries to facilitate bribes and the payment of excessive alumina prices by Alba.  Upon information and belief, Rice acted at the direction of Alcoa and Alcoa World Alumina.

- In or about September 2003, Defendants transmitted drafts of the MOU by wire. Through the MOU and subsequent negotiations, Alcoa sought to acquire a share in Alba at a depressed price through Defendants' bribery of senior officials of Alba and the Government of Bahrain.

- Between September 2003 and June 2004 (including on or about April 1, 2004, April 5, 2004, May 5, 2004, May 12, 2004, and June 11, 2004), Defendants communicated by wire and/or U.S. mail with employees of Alba, or caused such communications to be transmitted by employees of Alcoa or Alcoa World Alumina, to facilitate due diligence meetings and negotiate the sale of Alba's shares, at a depressed price, pursuant to the MOU. Alcoa and Alcoa World Alumina caused their employees to copy Dahdaleh on such communications, furthering the impression that Dahdaleh was a legitimate part of Alcoa's team. *See*, *e.g.*, Exs. 24-25.

- On or about October 26, 2004, Defendant Rice sent a fax from Pittsburgh to Alba, assuring Alba that AA Alumina and Chemicals was "an associate company" of Alcoa's subsidiary. Ex. 6. In fact, AA Alumina and Chemicals was a Dahdaleh-owned shell company. This deception was crucial to persuading Alba to sign the 2005 Contract with AA Alumina and Chemicals. Rice acted in his capacity as a vice president of Alcoa World Alumina.

- In a subsequent fax sent from Pittsburgh on or about October 29, 2004, Rice again described AA Alumina and Chemicals as "our associated company" and continued to foster the false impression that Alcoa and AA Alumina and Chemicals were one and the same. Ex. 7. These deceptions were intended to and in fact did induce Alba to believe that Alba was dealing with an Alcoa subsidiary, to continue dealing with Defendants, and to overpay for alumina. Rice acted in his capacity as a vice president of Alcoa World Alumina.

- On or about October 31, 2004, during deliberations regarding the 2005 Contract, Abdulla Saif, Bahrain's Minister of Finance & National Economy, telephoned Rice in Pittsburgh to inquire about the status of AA Alumina & Chemicals. Rice falsely represented to Saif that AA Alumina & Chemicals was a subsidiary of Alcoa, thereby inducing Alba to sign the 2005 Contract.

Moreover, Defendants could not have carried out their scheme, which spanned multiple countries and U.S. states, without using the U.S. mails or wire communications. Many more instances of mail and wire fraud occurred as Defendants negotiated the terms of Dahdaleh's commissions and the secret contracts by which Dahdaleh-owned shell companies purchased alumina from Alcoa.

(c)     **The time, place and contents of each alleged misrepresentation, the identity of persons to whom and by whom the alleged misrepresentation was made and, if the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities are alleged, the "circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b):**

The time, place, and contents of the Defendants' misrepresentations, and the identities of persons by whom and to whom those misrepresentations were made, include, without limitation, the following:

- On or about September 19, 1996, Peter Burgess, an employee of Defendant Alcoa World Alumina, signed the 1996 Amendment to the 1990 Contract.  Burgess acted at the direction of Alcoa and Alcoa World Alumina.  Defendants represented to Alba in the 1996 Amendment that Alcoa's subsidiary would assign the Market Tonnage to "a company associated with" Alcoa's subsidiary.  Defendants assigned the Market Tonnage not to an Alcoa affiliate but to Alumet Asia, a Dahdaleh-owned shell company that did nothing more than mark up the price of the alumina sold to Alba and funnel bribes to senior officials of Alba and the Government of Bahrain.

- Dabney sent letters to Alba on or about September 4, 2000 identifying himself as the General Manager of the Perth office of AA Alumina & Chemicals (Ex. 11) and on or about August 15, 2001 attaching the 2001 Extension and containing an AAAC heading (Ex. 12).  However, no company named AA Alumina & Chemicals existed until December 19, 2001.  Upon information and belief, Dabney acted at the direction of the Defendants.

- During negotiations regarding the 2001 Extension, Defendant Rice furthered Alba's false belief regarding David Dabney.  Alba believed and was led to believe that Dabney was an employee of Alcoa's subsidiary, as evidenced by a fax sent by Alba's purchasing manager to Defendant Rice in Pittsburgh, copying "Mr. David Dabney, Alcoa of Australia" and inviting Alcoa's proposal for alumina supply during 2002 and 2003 (Ex. 3).  In fact, Dabney was at the time an employee of Dadco.  When Rice replied to Alba's purchasing manager, on or about August 15, 2001, he endorsed this false belief, stating only, "I understand you have talked to David Dabney today and he will have a response to you shortly. . . . we look forward to continuing our long term relationship."  Ex. 4.  Rice, at all times, acted at the direction of Alcoa and Alcoa World Alumina.

- Dahdaleh employee Sandra Ainsworth proposed the 2003 Extension to the 1990 Contract by letter to Alba on or about July 8, 2003 (Ex. 9).  At the time, Ainsworth was the administrative and shipping manager of AAAC-2, but her letter sought to convey the false impression that it was sent on behalf of Alcoa.  The letter conspicuously bore the Alcoa trademarked logo and referred to "our excellent long term relationship for the last thirty years," whereas AAAC-2 was a shell company that had existed for less than sixteen months.  Ainsworth acted at the direction of the Defendants.

- In meetings in London in the first half of 2004, Rice and Dahdaleh stated to representatives of Alba and the Government of Bahrain involved in the MOU negotiations that Dahdaleh was Alcoa's advisor or consultant and a member of Alcoa's team.  Rice and Dahdaleh proposed an arrangement whereby AAAC would supply alumina to Alba in exchange for the 26% equity stake in Alba.  When representatives of the Government of Bahrain and consulting firm Roland Berger asked Rice whether AAAC was a part of Alcoa, Rice claimed that they had no right to ask this and stated that he refused to talk about the company.  Rice and Dahdaleh, at all times, acted at the direction of Alcoa and Alcoa World Alumina.

- In or about July 2004, Defendants caused AA Alumina & Chemicals to change its address to the Alcoa Building in Switzerland, thereby furthering the false representation that the AAAC Companies were Alcoa subsidiaries.

- On or about September 26, 2004, David Debney submitted a bid to Alba for the 2005 Contract, on behalf of "AA Alumina and Chemicals."  Ex. 13.  No company bearing the name "AA Alumina and Chemicals" was registered in Switzerland at that time, however.  At the direction of Rice (*see* Exs. 6-7), Debney became Alba's point of contact for the 2005 Contract and helped to conceal the true nature of the Dahdaleh-owned shell company that became Alba's "supplier" under the 2005 Contract.  Debney's bid created deliberate confusion regarding which company was submitting it and suggested that the two companies were interchangeable.  With Rice's knowledge and consent, the bid was submitted on stationery bearing the Alcoa logo, was sent from the "Alcoa Building," and stated that "AA Alumina & Chemicals is an associate company of Alcoa of Australia Limited."  Debney's bid letter also indicated that the alumina would be supplied from Alcoa's refineries, referred to Alba as "our very important customer," and stated that "as we are your current supplier, we believe that you have full understanding of our product."  At all times, Debney acted at the direction of the Defendants, who had authorized the Dahdaleh-owned shell companies to use Alcoa's logo.

- In response to Alba's request for assurance that Alba was dealing with Alcoa's subsidiary when negotiating the 2005 Contract, Rice sent a fax dated October 26, 2004 from Pittsburgh, on Alcoa World Alumina letterhead, that stated: ***"For the avoidance of doubt and any confusion, this letter confirms to you that, for commercial reasons, AA Alumina and Chemicals, an associate company and distributor of Alcoa of Australia Ltd., is fully and solely authorized to negotiate the present alumina supply agreement with Alba.  Mr. David Debney, an employee of AA Alumina and Chemicals, is authorized to negotiate and finalize this contract."***  Ex. 6.  At the time, no company named AA Alumina and Chemicals existed in Switzerland, as AAAC-1 and AAAC-2 had changed their names and AAAC-3 was not incorporated until December 30, 2004.  AA Alumina and Chemicals was not "an associate company" of Alcoa but was a Dahdaleh-owned shell company that did nothing more than mark up the price of alumina sold to Alba and facilitate bribe payments to senior officials of Alba and the Government of Bahrain.  This misrepresentation was crucial in inducing Alba to sign the 2005 Contract with AA Alumina and Chemicals because it caused Alba to believe that Alba was dealing with an Alcoa subsidiary.  Independent consultants who evaluated the bids for the 2005

Contract also believed that AA Alumina & Chemicals was Alcoa.  Rice acted at the direction of Alcoa and Alcoa World Alumina.

- In a subsequent fax sent from Pittsburgh on October 29, 2004, Rice again described AA Alumina and Chemicals as "our associated company" and continued to foster the false impression that Alcoa and AA Alumina and Chemicals were one and the same.  Rice stated: "We share your view of the mutually beneficial relationship between Alba and Alcoa, and have every wish to continue. . . . We are hopeful you accept the original alumina supply offer prior to its expiration, so we can continue to be Alba's alumina supplier for the next 10 years."  Ex. 7.  These deceptions were intended to and in fact did induce Alba to believe that Alba was dealing with an Alcoa subsidiary, to continue doing business with Defendants, and to overpay for alumina.  Rice acted at the direction of Alcoa and Alcoa World Alumina.

- On or about October 31, 2004, during deliberations regarding the 2005 Contract, Abdulla Saif, Bahrain's Minister of Finance & National Economy, telephoned Rice in Pittsburgh to inquire about the status of AA Alumina & Chemicals.  Rice falsely represented to Saif that AA Alumina & Chemicals was a subsidiary of Alcoa, thereby inducing Alba to sign the 2005 Contract.

- When the parties agreed to revised terms for the 2005 Contract on or about November 25, 2004, the terms were on Alcoa letterhead, but David Debney's signature block indicated that he was a representative of "AA Alumina & Chemicals."

- On or about January 14, 2005, Debney also sent a letter to an officer of Alba and official of the Government of Bahrain to thank him for Alba's decision to "continue our alumina supply contract" and the "business relationship formed over many years."  The letter referred to Alcoa's capabilities and successes and explained why the 2005 Contract was advantageous to Alcoa, and it again contained the Alcoa trademark and listed a return address at the "Alcoa Building" in Switzerland.  Each false statement furthered deceived Alba into believing that Alba was dealing with Alcoa subsidiaries.  Debney, at all times, acted at the direction of the Defendants, who had authorized the Dahdaleh-owned shell companies to use Alcoa's logo.

- Defendants directed and controlled the activities of the Dahdaleh-owned shell companies with respect to Alba.  Defendants falsely stated, many times over several years, that the shell companies were Alcoa subsidiaries by causing them to issue invoices and send correspondence to Alba that contained Alcoa's logo and/or indicated that the shell companies were "associate" companies of Alcoa.  Between 1997 and 2001, Alumet Asia issued invoices to Alba that contained Alcoa's logo.  Between 2002 and 2009, the three AAAC Companies issued hundreds of invoices to Alba that contained Alcoa's logo and a notation that "AA Alumina & Chemicals is an associate company of Alcoa of Australia Ltd."  AAAC invoiced Alba during the period between September 16, 2004 and December 30, 2004, when no company named AA Alumina & Chemicals was registered in Switzerland (as AAAC-1 and AAAC-2 had changed their names and AAAC-3 had not yet been incorporated).  Each invoice was inflated and caused Alba to transfer substantial payments to accounts held in the United States.

**(d)      Whether there has been a criminal conviction for violation of each predicate act and, if so, a description of each such act:**

Plaintiff is not aware of any criminal convictions for violations of the alleged predicate acts.  However, law enforcement agencies in the United States, the United Kingdom, Switzerland, and other countries have investigated the acts of the Defendants and the other members of the enterprise.  The criminal investigation by the Serious Fraud Office of the United Kingdom led to the arrest of Defendant Dahdaleh on October 24, 2011.  Dahdaleh was charged with corruption offenses under U.K. law involving payment of bribes to officials of Alba and the Government of Bahrain.  In announcing these charges, the Serious Fraud Office stated that the alleged corrupt payments "were in connection with contracts with a U.S. company, Alcoa Inc., for supplies of alumina."  On October 20, 2011, Hall was arrested in Australia in response to an extradition request issued by the Government of the United Kingdom, on charges similar to those instituted against Dahdaleh.  Hall was denied bail and remains in detention in Australia pending extradition to the United Kingdom.

**(e)      Whether civil litigation has resulted in a judgment in regard to each predicate act:**

Plaintiff is not aware of any civil litigation that has resulted in a judgment in regard to any of the alleged predicate acts.

**(f)      A description of how the predicate acts form a "pattern of racketeering activity":**

Defendants' predicate acts form a "pattern of racketeering activity" in that the acts are related to each other and were ongoing and continuous from 1990 through September 2009.  Each of the predicate acts had the same ultimate objective and result: defrauding Alba for the

43

benefit of Defendants.  The Defendants orchestrated the racketeering activities so that they could profit by their fraudulent retention of Alba's business and their inducing Alba to overpay for alumina.  Defendants engaged in repeated and continuous predicate acts of bribery, transport and receipt of stolen funds, travel in furtherance of their scheme, and mail and wire fraud, all in violation of federal law.  Each of these predicate acts involved the Defendants and the Dahdaleh-controlled companies, as well as a common victim, Alba.  The predicate acts were related and were necessary to carry out the Defendants' scheme to divert hundreds of millions of dollars to Defendants through bribery and overcharges on alumina.

Defendants' racketeering activities clearly constituted a pattern because they continued for nearly twenty years.  Additionally, under the 2005 Contract, Defendants continued to mislead Alba into believing that Alba was dealing with legitimate Alcoa subsidiaries, rather than shell companies owned by Dahdaleh, and continued to overcharge Alba for alumina.  A clear threat thus existed that Defendants' pattern of racketeering activity would have continued if Alba had not begun to suspect the wrongdoing and undertaken a comprehensive investigation of the alumina supply arrangements, which ultimately led to the commencement of civil claims against Alcoa, Rice, and the other Defendants.


6.     **State whether the alleged predicate acts referred to above relate to each other as part of a common plan, and, if so, describe in detail the alleged enterprise for each RICO claim.  A description of the enterprise shall include the following information:**

(a)     **The names of each and every individual, partnership, corporation, association, or other legal entity, which allegedly constitute the enterprise:**

The individuals and entities that are associated with the association-in-fact enterprise include (1) all Defendants (Alcoa, Alcoa World Alumina, Rice, and Dahdaleh), (2) the Dahdaleh-owned companies, including Kwinalum, Alumet Asia, Alumet Limited, AAAC-1, AAAC-2,

AAAC-3, and AAAC Limited, (3) employees, officers, and directors of the Dahdaleh-owned companies, including Dabney, Debney, Hill, and Ainsworth, (4) one or more former officers and former directors of Alba, including Hall, (5) one or more former senior officials of the Government of Bahrain, and (6) Alcoa of Australia.  The alternative enterprise includes as its members the four Defendants together with the Dahdaleh-owned companies.

> **(b)**      **A description of the structure, purpose, function and course of conduct of the enterprise:**

The association-in-fact enterprise was directed, and its fraudulent activities were conceived, planned, orchestrated, directed, and controlled, from the United States by Defendants Alcoa and Alcoa World Alumina and senior executives of those companies, including Defendant Rice.  The members of the enterprise were united by the common purpose of defrauding Alba and increasing Defendants' own profits through the sale of overpriced alumina and the payment of bribes to senior officials of Alba and the Government of Bahrain.  The association-in-fact enterprise engaged in the course of conduct and pattern of racketeering activity described in more detail in the responses to Questions 2 and 5.  That conduct included multiple acts of mail and wire fraud, transport and receipt of stolen money, illegal payments to foreign officials, and travel in furtherance of the scheme to defraud.  In short, the enterprise carried out its scheme by assigning portions or all of the alumina supply agreements with Alba to Dahdaleh-owned shell companies, negotiating secret parallel contracts that provided for the sale of alumina by Alcoa's subsidiary to the shell companies, reselling that alumina to Alba at inflated prices, and consistently fostering the false impression that Alba was dealing with Alcoa and Alcoa subsidiaries rather than Dahdaleh and the Dahdaleh-owned shell companies.

**(c)      Whether each defendant is an employee, officer or director of the alleged enterprise:**

The enterprise is an association-in-fact enterprise, such that no Defendant is a formal "employee, officer or director" of the enterprise.

**(d)      Whether each defendant is associated with the alleged enterprise:**

Each Defendant is associated with and a member of the association-in-fact enterprise, as described in Response 6(a) above.

**(e)      Whether it is alleged that each defendant is an individual or entity separate from the alleged enterprise, or that such defendant is the enterprise itself, or a member of the enterprise:**

Each Defendant is a member of the enterprise.

**(f)      If any defendant is alleged to be the enterprise itself, or a member of the enterprise, explain whether such defendant is a perpetrator, passive instrument, or victim of the alleged racketeering activity:**

Each defendant is a member of the enterprise and an active perpetrator of the racketeering activity.  All Defendants participated in the conspiracy to defraud Alba and committed predicate acts in furtherance of the scheme.

**7.      State and describe in detail whether it is alleged that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

The pattern of racketeering activity and the enterprises are separate.  In addition to overseeing and coordinating the commission of all of the predicate acts outlined above, the association-in-fact enterprise, and the alternative enterprise, also coordinated the supply of alumina from Defendant Alcoa's subsidiary to Alba pursuant to the 1990 and the 2005 Contracts.

46

Each enterprise has functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering.

**8.      Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.  Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

As described in Response No. 7, the daily activities of the association-in-fact enterprise and the alternative enterprise included some commercial activities relating to the supply and shipment of alumina to Alba, despite the fact that the members of the enterprise were associated for illegitimate reasons and won supply contracts using illegitimate means.  The activities of the enterprises also encompassed the commission of the above-outlined predicate acts.  This pattern of racketeering activities differs significantly from the other commercial activities of the enterprises.  The racketeering activity was focused on the objective of defrauding Alba through a scheme involving bribery, the transport and receipt of stolen funds, mail and wire fraud, and travel in furtherance of the scheme, as well as the ongoing concealment of such activity.  Nonetheless, Defendants, in their daily commercial activities, did deliver alumina to Alba under the terms of the contracts.

**9.      Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.**

The association-in-fact enterprise, or the alternative enterprise, received substantial benefits from the pattern of racketeering activity alleged in the Complaint.  The bribes that Defendants paid to senior officials of Alba and the Government of Bahrain reduced competition for Alba's alumina supply and ensured that Alcoa's subsidiary won and retained the highly profitable Alba contract for a period of nearly twenty years.  During that time period, Alba paid

more than $4.8 billion to the Defendants in connection with the alumina supply contracts.  The bribes, which were unknown to Alba, induced Alba to overpay for alumina by more than $433 million.  That sum was distributed among and used by the members of the association-in-fact enterprise.

**10.      Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

The activities of the enterprise were directed in and from the United States but crossed international borders and involved the supply of alumina via interstate and foreign commerce. During a twenty-year span, Defendants used the enterprise to extract overpayments for the supply of alumina and caused those payments to be transmitted through interstate and foreign commerce.  Defendants utilized interstate communications, including the U.S. mail and wires across state and national borders, to facilitate the pattern of racketeering.  Defendants' acts of bribery have also substantially impacted interstate and foreign commerce by precluding other potential suppliers from obtaining business from Alba.  Examples of instances in which the activities of the enterprise significantly affected interstate or foreign commerce include the following:

- Under the 1990 Contract and between 1990 and 2001, Alcoa's subsidiary issued invoices to Alba for Formula Tonnage alumina at an inflated price due to Dahdaleh's "commission" and the bribes that Defendants paid.  Alcoa's subsidiary caused Alba to pay those invoices by wire transfer to accounts held at Chase Manhattan Bank and ANZ Investment Bank in New York, NY.  (Ex. 18.)  Alba transferred more than $1.28 billion to Alcoa's subsidiary under the 1990 Contract.

- Under the 1993 Assignment, Kwinalum issued inflated invoices to Alba and caused Alba to pay those invoices by wire transfer to Kwinalum accounts held at Royal Bank of Canada and Chase Manhattan Bank in New York, NY.  (Ex. 19.)

- Under the 1996 Amendment, Alumet Asia issued inflated invoices to Alba and caused Alba to pay those invoices by wire transfer to Chase Manhattan Bank in New York, NY,

for credit to accounts held at the Royal Bank of Canada in New York, NY, for further credit to an account held by Alumet Asia.  (Ex. 20.)

- Under the 2001 Extension, AAAC-1 issued inflated invoices to Alba and caused Alba to pay those invoices by wire transfer to an account at the Royal Bank of Canada in New York, NY previously used in invoices by Alumet Asia, and to accounts at Deutsche Trust Company America and Bankers Trust Company in New York, NY for the benefit of "AA Alumina & Chemicals."  (Ex. 21.)

- Under the 2003 Extension, AAAC-2 issued inflated invoices to Alba and caused Alba to pay those invoices by wire transfer to an account at Deutsche Trust Company America in New York, NY for credit to an account held at the Royal Bank of Canada by "AA Alumina & Chemicals" – the same account used by AAAC-1 under the 2001 Extension. (Ex. 22.)

- In connection with the Defendants' attempt in 2003 and 2004 to acquire an equity stake in Alba at a depressed price, Alcoa and Alcoa World Alumina employees located in Pittsburgh corresponded extensively via electronic mail, telephone, and other means with Alba employees and third party consultants, often copying Dahdaleh, to plan a due diligence review of Alba's operations in preparation for the sale of Alba's shares.  *See*, *e.g.*, Exs. 24-25.  Dahdaleh, representatives of Alcoa, and representatives of Alba and the Government of Bahrain met in London at least five times and conducted investigative work in Bahrain and the United States.  Alcoa's team traveled from the United States to Bahrain from April 14, 2004 through April 16, 2004 and from May 23, 2004 through May 25, 2004.  One visit to Bahrain in April 2004 included Alba's then-CEO and Chairman, Alain Belda, and Defendants Rice and Dahdaleh.  Employees of Alcoa and Alcoa World Alumina planned for the acquisition in Pittsburgh and New York and engaged in interstate communications and travel in furtherance of the transaction.

- Rice traveled to Bahrain several times during his tenure as a vice president of Alcoa World Alumina to further the relationship between Alcoa and Alba.  On at least one trip, Rice met with a former officer of Alba and official of the Government of Bahrain who was a recipient of a large portion of Defendants' bribes.

- Under the 2005 Contract, AAAC-3 issued inflated invoices to Alba and caused Alba to pay those invoices by wire transfer to Deutsche Trust Company America in New York, NY for credit to an account held at Royal Bank of Canada for the benefit of "AA Alumina & Chemicals."  (Ex. 22.)  Alba transferred more than $2.75 billion to that account under the 2005 Contract.

**11.    If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

      **(a)    The recipient of the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

**(b)     A description of the use or investment of such income.**

Plaintiff has not alleged a violation of 18 U.S.C. § 1962(a).

**12.     If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Plaintiff has not alleged a violation of 18 U.S.C. § 1962(b).

**13.     If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

**(a)     The identity of each person or entity who is employed by, or associated with, the enterprise:**

The individuals and entities that are associated with the association-in-fact enterprise include (1) all Defendants (Alcoa, Alcoa World Alumina, Rice, and Dahdaleh), (2) the Dahdaleh-owned companies, including Kwinalum, Alumet Asia, Alumet Limited, AAAC-1, AAAC-2, AAAC-3, and AAAC Limited, (3) employees, officers, and directors of the Dahdaleh-owned companies, including Dabney, Debney, Hill, and Ainsworth, (4) one or more former officers and former directors of Alba, including Hall, (5) one or more former senior officials of the Government of Bahrain, and (6) Alcoa of Australia, the majority-owned subsidiary of Defendant Alcoa.  The alternative enterprise includes as its members the four Defendants together with the Dahdaleh-owned companies.

**(b)     Whether the same entity is both the liable "person" and the "enterprise" under § 1962(c):**

Plaintiff has not alleged that any liable "person" is also the "enterprise" under § 1962(c).

**14.     If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

Defendants Alcoa, Alcoa World Alumina, Rice, and Dahdaleh knowingly and willfully agreed and conspired to facilitate a scheme that included the operation or management of an association-in-fact RICO enterprise through a pattern of racketeering activity that included multiple acts of mail and wire fraud, transport and receipt of stolen money, travel in furtherance of the scheme, and bribery of foreign government officials over a period of twenty years. The purpose of the conspiracy was to divert money from Alba to Defendants' own benefit by facilitating the payment of bribes, retaining Alba's lucrative and nearly exclusive business, overcharging Alba for alumina, and otherwise defrauding Alba. As described above and in the Complaint, each Defendant agreed to commit the predicate acts and knew that the acts were part of a pattern of racketeering activity conducted by their corrupt enterprise.

Beginning in approximately 1989, Defendants agreed that Dahdaleh would be inserted into the relationship between Alcoa's subsidiary and Alba. Alcoa and Alcoa World Alumina would treat Dahdaleh as their agent for purposes of transferring bribe payments to officials of Alba and the Government of Bahrain to ensure that Alba bought alumina from Alcoa at artificially inflated prices so that all Defendants could profit. The co-conspirators commemorated their relationship in a series of Agency Agreements that provided for "commission" payments to Dahdaleh. Upon information and belief, some of the "commissions" were transferred on as bribes and some were kept by Dahdaleh. Approximately three years later, the Defendants agreed to increase the profits of their scheme by assigning portions of the alumina supply contract between Alcoa's subsidiary and Alba to Dahdaleh-owned shell companies. The Defendants entered into secret contracts that provided for the sale of alumina by Alcoa's subsidiary to various shell companies, with the understanding that the shell companies

would do nothing more than re-sell the alumina to Alba at higher prices.  The Defendants shared in the profits and continued to funnel bribes to officials of Alba and the Government of Bahrain to ensure that the scheme could persist.  Defendants later agreed that the 2005 Contract would be negotiated by AAAC under the pretense that AAAC was an Alcoa subsidiary.

Each Defendant committed at least one overt act (and in fact multiple overt acts over the course of decades) in furtherance of the conspiracy.  Such acts included: (1) misleading Alba as to the true purpose of the assignment of the Market Tonnage portion of the 1990 Contract (Compl. ¶¶ 46-49, 62-65, 67-68, 81), (2) negotiating secret parallel contracts that provided for the sale of alumina to Dahdaleh-owned shell companies at prices substantially lower than those paid by Alba for the same alumina (Compl. ¶¶ 59, 80-81, 151-57), (3) misleading Alba into believing that the Dahdaleh-owned shell companies were legitimate businesses and subsidiaries of Alcoa (Compl. ¶¶ 57, 65, 74, 79, 85-90, 100, 134, 138-40, 147, 154), (4) participating in negotiations for a proposed sale of up to 26% of the Government of Bahrain's shares in Alba to Alcoa at a depressed price (Compl. ¶¶ 111-28), (5) traveling in interstate and foreign commerce to facilitate and manage the scheme to defraud Alba (Compl. ¶¶ 116, 119, 127, 196), and (6) facilitating the payment of bribes to senior officials of Alba and the Government of Bahrain to ensure that Alba continued to deal with Defendants and overpay for alumina (Compl. ¶¶ 93-96, 103-06, 117, 132-33, 136, 149-50).  *See also* Response No. 5, *supra*.

**15.     Describe the alleged injury to business or property.**

The fraudulent scheme perpetrated by the Defendants caused Alba to award Alcoa the alumina supply contracts and to overpay for alumina by more than $433 million over a span of nearly twenty years.  Defendants inflated the price of alumina sold to Alba to provide for

Dahdaleh's "commissions" and bribe payments to senior officials of Alba and the Government of Bahrain.  To increase Defendants' profits and Alba's injuries, Alcoa assigned portions or all of the alumina supply contracts to Dahdaleh-owned shell companies, and Defendants entered into secret parallel agreements whereby Alcoa sold alumina to the Dahdaleh-owned shell companies, which in turn re-sold the alumina to Alba at substantially higher prices despite adding no value. Throughout the scheme, Defendants falsely identified Dahdaleh as a legitimate agent of or consultant to Alcoa and the Dahdaleh-owned shell companies as affiliates or subsidiaries of Alcoa – all to induce Alba to overpay for alumina and continue doing business with the Defendants.

Defendants also deprived Alba of the honest services of certain officers of Alba and senior officials of the Government of Bahrain, to whom Defendants paid bribes in order to ensure that Alba continued to do business with Defendants on terms disadvantageous to Alba. Alba was also injured by oppressive terms in the 2005 Contract that were procured by Defendants' bribery, the disruption of supply in September 2009, and the absence of a fair long-term contract negotiated transparently and competitively.

**16.     Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

Defendants' acts in violation of the RICO statute directly caused Alba's injuries.  Alba would not have (1) continued to award its supply contracts without legitimate competition, or (2) paid the inflated prices for alumina, but for the bribes that Defendants paid to senior officials of Alba and the Government of Bahrain who induced Alba to continue dealing with Alcoa's subsidiary and the Dahdaleh-owned shell companies.  Alcoa inflated its alumina prices in order to pay for Dahdaleh's involvement in the relationship and the cost of the bribes and to increase

Alcoa's own profits.  The price increases were in the form of (a) secret commissions paid to

Dahdaleh that were incorporated into the contract price and thus passed on to Alba and (b)

assignments of portions or all of the alumina supply under the 1990 Contract and all of the 2005

Contract to Dahdaleh-owned shell companies that purchased alumina from Alcoa's subsidiary

and, pursuant to secret parallel contracts, resold the same alumina to Alba at substantially higher

prices despite not adding any value or providing any material services in furtherance of the

alumina supply.  The Dahdaleh-owned shell companies, in addition to paying Alcoa for the

alumina resold to Alba, caused a substantial portion of Alba's overpayments to be used for the

benefit of Alcoa.  Defendants' scheme to defraud Alba, carried out by the association-in-fact

enterprise or the alternative enterprise described in paragraphs 166 and 167 of the Complaint,

included the use of the wires and mails to negotiate the contracts with Alba and the secret

parallel contracts with Dahdaleh-owned shell companies, the payment of bribes to foreign

officials, and the receipt of stolen funds, all of which caused injury to Alba.

**17.     List the damages sustained for which each defendant is allegedly liable.**

All Defendants are jointly and severally liable for damages exceeding $1 billion.

Dahdaleh and the Dahdaleh-owned shell companies provided no material or legitimate services

to Alba.  Rather, Alcoa introduced Dahdaleh into the relationship with Alba as a means of

ensuring that Alcoa always had exclusivity over the alumina supply contract, overcharging Alba

for alumina, and facilitating the payment of *quid pro quo* bribes to officials of Alba and the

Government of Bahrain.  Defendants carried out this fraudulent scheme through the payment of

unearned "commissions" to Dahdaleh-owned shell companies, the cost of which was passed on

to Alba, and through the assignment of portions of Alcoa's interest in the alumina supply

contracts to Dahdaleh-owned shell companies.  Alba would not have agreed to pay the inflated

prices for alumina but for the bribes paid to officials by Alcoa, through its agent Dahdaleh.

Therefore, both the amount of Dahdaleh's commissions and the margin between (a) the price at

which Alcoa's subsidiary sold alumina to Dahdaleh-owned entities and (b) the inflated price at

which the Dahdaleh-owned entities re-sold that same alumina to Alba constitute damages to

Alba.  The tables below illustrate the estimated values of each element of Alba's damages

directly attributable to the fraudulent scheme.[4]

---

[4] The estimates are based on information regarding the volume of alumina that Alba purchased from Dahdaleh-owned shell companies and the pricing formulas set forth in the secret contracts between Alcoa's subsidiary and Dahdaleh.

**Table 1: Estimated Value of Commissions Paid to Dahdaleh, 1990-2004**

| Year | Commission |
|------|------------|
| 1990 | $1,439,240.00 |
| 1991 | $700,043.90 |
| 1992 | $939,303.50 |
| 1993 | $1,146,527.94 |
| 1994 | $492,146.20 |
| 1995 | $741,994.50 |
| 1996 | $1,343,616.06 |
| 1997 | $1,349,902.53 |
| 1998 | $1,249,553.88 |
| 1999 | $867,692.47 |
| 2000 | $1,342,039.41 |
| 2001 | $1,346,555.13 |
| 2002 | $226,582.58 |
| 2003 | $221,588.40 |
| 2004 | $259,667.94 |
| **Total** | **$13,666,454.44** |

**Table 2: Estimated Margin Between Secret Alcoa-Dahdaleh Contracts and Alba Contracts, 1997-2009**

| Year | Price Paid by Alba | Estimated Price Paid by Dahdaleh | Margin |
|---|---|---|---|
| 1997 | $41,979,392.00 | $21,502,230.42 | $20,477,161.58 |
| 1998 | $64,374,754.77 | $36,299,497.84 | $28,075,256.93 |
| 1999 | $30,333,524.29 | $16,145,418.23 | $14,188,106.06 |
| 2000 | $60,681,913.06 | $41,180,237.82 | $19,501,675.24 |
| 2001 | $58,359,779.60 | $38,510,525.06 | $19,849,254.54 |
| 2002 | $181,266,064.00 | $155,607,458.90 | $25,658,605.10 |
| 2003 | $177,270,720.00 | $150,578,968.03 | $26,691,751.97 |
| 2004 | $207,734,354.00 | $134,222,794.31 | $73,511,559.69 |
| 2005 | $431,415,880.00 | $392,462,359.45 | $38,953,520.55 |
| 2006 | $619,512,702.00 | $575,266,550.34 | $44,246,151.66 |
| 2007 | $665,138,201.00 | $619,905,974.47 | $45,232,226.53 |
| 2008 | $644,163,594.00 | $618,202,880.42 | $25,960,713.58 |
| 2009 | $400,808,848.00 | $363,332,783.47 | $37,476,064.53 |
| **Total** | | | **$419,822,047.96** |

The total loss to Alba – which does not include Alcoa's overcharges on Formula Tonnage, the margin on the 1993 to 1995 Market Tonnage assignment to Kwinalum, compound interest on the losses, the opportunity cost associated with the disruption of supply in the third quarter of 2009, or the consequential damages resulting from the absence of a fair long-term contract – amounts to more than $433 million.  Moreover, Alba is entitled to an award of treble damages, as the RICO statute provides that any person injured under RICO "shall recover threefold the

damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. 1964(c).  Finally, Alba also seeks punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future and attorneys' fees and costs associated with bringing this claim.

**18.** **List all other federal causes of action, if any, and provide the relevant statute numbers.**

Plaintiff has not alleged any other federal causes of action.

**19.** **List all pendent state claims, if any.**

Plaintiff has also alleged fraud and civil conspiracy to defraud.

**20.** **Provide any additional information that would be helpful to the court in processing the RICO claim.**

As described above and as summarized in paragraphs 168 and 169 of the Complaint in greater detail, the association-in-fact enterprise, or the alternative enterprise, was predominantly domestic because its fraudulent activities were conceived, planned, orchestrated, directed, and controlled from the United States by Defendants Alcoa and Alcoa World Alumina, and senior executives of those companies, including Defendant Rice, for the benefit of Defendants Alcoa and Alcoa World Alumina.  The non-domestic activities of the enterprise, or the alternative enterprise, were carried out by the agents, employees, or subsidiaries of Defendants Alcoa and Alcoa World Alumina, including Defendant Dahdaleh, the Dahdaleh-owned shell companies, and Alcoa of Australia, at the direction and instruction of and in collaboration with the domestic

Defendants Alcoa and Alcoa World Alumina, and senior executives of those companies,

including Defendant Rice.


Dated:  December 28, 2011

Respectfully submitted,



/s/ Mark J. MacDougall
Mark J. MacDougall (admitted *pro hac vice*)
D.C. Bar No. 398118
Kristine L. Sendek-Smith
James E. Sherry
Lauren B. Kerwin
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave. NW
Washington, DC 20036
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288
mmacdougall@akingump.com

Charles B. Gibbons
Christopher A. Amar
Victoria B. Kush
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA  15219
Telephone: (412) 562-8800
Facsimile: (412) 562-1041
charles.gibbons@bipc.com

 Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2011, I caused a true and correct copy of the foregoing RICO Case Statement to be filed with and served upon all counsel of record by the Court's electronic case filing system.

/s/ Lauren B. Kerwin
Lauren B. Kerwin (admitted *pro hac vice*)