# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALUMINIUM BAHRAIN B.S.C.,

                        Plaintiff,

          vs.

ALCOA INC., ALCOA WORLD ALUMINA
LLC, WILLIAM RICE and VICTOR
DAHDALEH,

                    Defendants.

2:08-CV-00299 (DWA)

**JOINT MEMORANDUM OF LAW OF DEFENDANTS ALCOA INC. AND ALCOA WORLD ALUMINA LLC IN SUPPORT OF THEIR JOINT MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................ iii

PRELIMINARY STATEMENT ...................................................... 1

STATEMENT OF FACTS .......................................................... 4

    A.    The 1990 Alumina Supply Agreement ...................................... 5

    B.    The 1993 Assignment ................................................... 6

    C.    The 1996 Assignment and Extension ..................................... 8

    D.    The 2001 Extension ................................................... 10

    E.    The 2003 Extension ................................................... 13

    F.    Joint Venture Negotiations (For a Venture Never Created) ..................... 14

    G.    The 2005 Supply Agreement ............................................ 15

APPLICABLE LEGAL STANDARD ................................................ 17

ARGUMENT .................................................................. 18

I.    Alba's RICO Claims Should Be Dismissed (Claim 1). ........................... 18

    A.    Applying RICO to the Facts Alleged Here Would Be an
        Extraterritorial Application of the Statute in Violation of <u>Morrison</u>
        <u>v. National Australia Bank, Ltd.</u> ...................................... 18

        1.    The Alleged Enterprises Are Foreign. ........................... 20

        2.    The Alleged Racketeering Activity and Its Harm Are
            Foreign. ................................................ 22

    B.    Alba Has Not Alleged Particularized Facts About Alcoa
        Defendants' Purported Involvement in this Enterprise or Its
        Alleged Racketeering Activity ......................................... 26

II.    Alba's Complaint Should Be Dismissed in Its Entirety for Failing to Plead
    Fraud Adequately (Claim 3). ............................................ 27

    A.    Alba Does Not Plead an Actionable Omission, Because It Does
        Not Establish that Defendants Had Any Duty to Speak. ..................... 29

i

**Page**

B.  Alba Does Not Plead an Actionable Misstatement with Particularity..............................................................................29

C.  Alba Does Not Plead Scienter with Particularity.......................................31

D.  Alba Fails Adequately to Allege Justifiable Reliance. ............................32

E.  Alba Fails Adequately to Allege "Loss Causation"..................................33

III.  Alba's Conspiracy Claims Should Be Dismissed (Claim 2 and Claim 4)...........34

Conclusion ..................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Alvarez v. Ins. Co. of N. Am.,
   No. 06-4326, 2006 WL 3702641 (E.D. Pa. Dec. 12, 2006).......................................... 29

Bell Atlantic Corp. v. Twombly,
   127 S. Ct. 1955 (2007) ................................................................................................17

Beverly Hills Design Studio (N.Y.) Inc. v. Morris,
   No. 88 Civ. 5886 (LLS), 1989 WL 85867 (S.D.N.Y. July 26, 1989).........................17

Buck v. Hampton Twp. School Dist.,
   452 F.3d 256 (3d Cir. 2006)..........................................................................................6

Cedeño v. Intech Group, Inc.,
   No. 10-3861, 2012 WL 205960 (2d. Cir. Jan. 25, 2012) .......................................19, 25

Cedeño v. Intech Group, Inc.,
   733 F. Supp. 2d 471 (S.D.N.Y. Aug. 25, 2010), aff'd, No. 10–3861, 2012 WL
   205960 (2d. Cir. Jan. 25, 2012)  ...........................................................................19, 25, 26

Centrue Bank v. Golf Discount of St. Louis, Inc.,
   No. 4:10CV16, 2010 WL 4178942 (E.D. Mo. Oct. 20, 2010) ...................................26

CGC Holding Co., LLC, et al. v. Hutchens, et al.,
   No. 11-CV-01012-RBJ-KLM, 2011 WL 5320988 (D. Colo. Nov. 1, 2011)..............19

Cooper v. Broadspire Servs., Inc.,
   No. Civ. A 04-5289, 2005 WL 1712390 (E.D. Pa. July 20, 2005).............................4

Craftmatic Sec. Litig. v. Kraftsow,
   890 F.2d 628 (3d Cir. 1989).........................................................................................3

Debbs v. Chrysler Corp.,
   810 A.2d 137 (Pa. Super. Ct. 2002) ............................................................................33

Duran v. Equifirst Corp.,
   No. 2:09-CV-03856, 2010 WL 936199 (D. N.J. Mar. 12, 2010) ................................6

Emery v. Third Nat. Bank of Pittsburgh,
   314 Pa. 544 (Pa. 1934) ................................................................................................3

European Cmty. v. RJR Nabisco, Inc.,
   No. 02-CV-5771, 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011).......................19, 22, 26

Healey Alt. Inv. P'ship v. Royal Bank of Canada,
   Civil No. 10-1567, 2011 WL 4455447 (D. N.J. Sept. 23, 2011) ..................................4

In re Am. Investors Life Ins. Co. Annuity Mktg. and Sales Practices Litig.,
   No. 04-3799, 2006 WL 1531152 (E.D. Pa. June 2, 2006)............................................28

In re Burlington Coat Factory Sec. Litig.,
   114 F.3d 1410 (3d Cir. 1997)........................................................................................4

In re Le-Nature's, Inc.,
   No. 9-1445, 2011 WL 2112533 (W.D. Pa. May 26, 2011) ..............................2, 18, 19

In re Marta Group, Inc.,
   47 B.R. 220 (Bankr. E.D. Pa. 1985) ...........................................................................30

In re Toyota Motor Corp.,
   785 F. Supp. 2d 883 (C.D. Cal. 2011) ....................................................................19, 22

Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.,
   7 A.3d 278 (Pa. Super. Ct. 2010).................................................................................28

Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,
   46 F.3d 258 (3d Cir. 1995).............................................................................................2

Johnson v. Hyundai Motor Am.,
   698 A.2d 631 (Pa. Super. Ct. 1997).............................................................................29

Kashner v. Geisinger Clinic,
   638 A.2d 980 (Pa. Super. Ct. 1994)...............................................................................5

Kolar v. Preferred Real Estate Invs., Inc.,
   361 F. App'x. 354 (3d Cir. 2010) .................................................................................34

Lorenz v. CSX Corp.,
   1 F.3d 1406 (3d Cir. 1993).............................................................................................4

Lum v. Bank of Am.,
   361 F.3d 217 (3d Cir. 2004)..........................................................................................17

Majer v. Sonex Research, Inc.,
   541 F. Supp. 2d 693 (E.D. Pa. 2008) ..........................................................................32

McKeeman v. Corestates Bank, N.A.,
   751 A.2d 655 (Pa. Super. Ct. 2000).............................................................................35

Morales v. Superior Living Prods., LLC,
   No. 09-3933, 2010 WL 4249815 (3d Cir. Oct. 28, 2010)............................................28

iv

Morrison v. National Australia Bank, Ltd.,
    130 S. Ct. 2869 (2010)................................................................................1, 2, 18

Nat'l Org. for Women, Inc. v. Scheidler,
    114 S. Ct. 798 (1994)........................................................................................2

Norex Petroleum Ltd. v. Access Indus., Inc.,
    631 F.3d 29 (2d Cir. 2010)........................................................................ passim

Norex Petroleum Ltd. v. Access Indus., Inc.,
    540 F. Supp. 2d 438 (S.D.N.Y. 2007).............................................................21

Peerless Wall & Window Coverings, Inc. v. Synchronics, Inc.,
    85 F. Supp. 2d 519 (W.D. Pa. 2000)...............................................................29

Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,
    742 F.2d 786 (3d Cir. 1984)............................................................................17

Shapiro v. UJB Fin. Corp.,
    964 F.2d 272 (3d Cir. 1992)..............................................................3, 28, 33

United States v. Philip Morris USA, Inc.,
    783 F. Supp. 2d 23 (D. D.C. 2011) ...............................................19, 24, 25

Warminster Equities, LLC v. Warminster Commerce, LLC,
    No. 10-520, 2010 WL 5185004 (E.D. Pa. Dec. 21, 2010)..........................29

Weaver v. Mobile Diagnostech, Inc.,
    Civil Action No. 02-1719, 2007 WL 1830712 (W.D. Pa. Aug. 28, 2007)...................2

Weiner v. Quaker Oats Co.,
    129 F.3d 310 (3d Cir. 1997)..............................................................................3

**Statutes & Rules**

18 U.S.C. § 1962.............................................................................................17

Fed. R. Civ. P. 9(b) ..............................................................................3, 6, 16, 17

Defendants Alcoa Inc. ("Alcoa") and Alcoa World Alumina LLC ("AWA") (collectively, "Alcoa Defendants") hereby respectfully submit this joint memorandum in support of their motion to dismiss the amended complaint filed on November 28, 2011 (the "Amended Complaint") by Plaintiff Aluminium Bahrain B.S.C. ("Alba").

## PRELIMINARY STATEMENT

In February 2008, after a purportedly "extensive" investigation (Alba's RICO Case Statement ("RCS") at 25), foreign plaintiff, Alba filed a RICO complaint ("2008 Complaint") alleging that foreign entities had bribed foreign officials to induce Alba to enter into unfavorable alumina supply agreements for foreign alumina, with foreign alumina suppliers, and to cede (in a never completed transaction) a portion of its equity at a discounted price.  The U.S. contacts alleged in the 2008 Complaint were few and plainly peripheral to the purported scheme.  As such, (putting aside the fact that it failed to plead adequately a RICO claim) the 2008 Complaint did not come close to alleging a domestic enterprise.

During the November 3, 2011 status conference, now faced with the prospect of having to plead around Morrison v. National Australia Bank, Ltd., 130 S. Ct. 2869, 2878 (2010), and its progeny, Alba's counsel promised to reengineer Alba's complaint in "a very broad detailed fashion" (11/3/11 Tr. at 23:1-2) that "will show . . . a domestic RICO enterprise that took place in [Pittsburgh]." (11/3/11 Tr. at 48:18-21.) Alba's Amended Complaint and RCS do not deliver on that promise.  Instead of adding detailed factual allegations that, if proven, would demonstrate that the alleged scheme to defraud Alba was domestic, Alba has engaged in transparent drafting designed to get this Court to conclude that its repackaged allegations satisfy the current legal standard.  But

using phrases like "secret parallel" agreements, referring repeatedly to Alcoa of Australia as "Alcoa's subsidiary", and repeating the conclusory (and wholly unsupported) mantra "conceived, directed, controlled, and coordinated in and from the United States by senior executives of Alcoa and Alcoa World Alumina, including Rice," cannot create what does not exist.   The 2008 Complaint went so far as to allege that Alba was itself an enterprise. That claim is now gone, for obvious reasons.[1]  Also gone are Alba's allegations that an enterprise consisting entirely of foreign companies owned by Dahdaleh existed.  Nor does Alba's decision not to identify the senior official of Alba and the Government of Bahrain who received millions of dollars in alleged bribes from foreign citizen and resident, Victor Dahdaleh ("Dahdaleh"), change the fact that Alba's amended allegations continue to complain about alleged fraud by foreign entities and individuals, that took place on foreign soil, and that injured a foreign plaintiff.  Indeed, what few new facts Alba alleges underscore that this is so.

In truth, Alba's pleadings are a strained attempt to force what are allegations of essentially foreign enterprises and foreign acts of racketeering into the paradigm set forth by Morrison and recognized by this Court in In re Le-Nature's, No. 9-1445, 2011 WL 2112533 (W.D. Pa. May 26, 2011).  Alba's pleadings allege RICO enterprises and racketeering activities that are overwhelmingly foreign.  They are

---

[1] The alleged victim of defendants' racketeering activity cannot also be the RICO enterprise.  Nat'l Org. for Women, Inc. v. Scheidler, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994); Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 266-67 (3d Cir. 1995); Weaver v. Mobile Diagnostech, Inc., Civil Action No. 02-1719, 2007 WL 1830712, at *10 n.35 (W.D. Pa. Aug. 28, 2007) (finding that the distinction between enterprise and victim in Jaguar Cars was a "fundamental element" of RICO, which "remains the law of this Circuit").

2

comprised largely of allegations about Bahraini, Australian, Swiss and Canadian entities
and individuals, who are accused of having bribed officials in Bahrain to induce those
Bahraini officials to enter into alumina supply agreements with Australian and Swiss
entities to defraud a Bahraini smelter.  Even accepting all of Alba's allegations as true,
not a single bribe, alleged to have occurred over a two-decade long period, was paid by
any of the participants in the enterprise from inside the United States, nor by any U.S.
participant in the alleged enterprises.  And while Alba describes more than a dozen
meetings that were allegedly in furtherance of the "scheme to defraud," all but one
alleged meeting occurred overseas.  (RCS at 12, 16, 21, 37-38 (detailing meetings in
Europe, Bahrain, Singapore and one in New York).)  Alba's mantra that Defendants
located in the United States directed and conceived of the purported scheme is
transparently conclusory and devoid of substantive detail.[2]  And, although Alba now
contends that the scheme began in 1990,[3] and that U.S.-based AWA was engaged in the
alleged unlawful activity beginning at that time, that is simply false; AWA did not even

---

[2] Tellingly, Alba makes the allegation that domestic entities directed the non-
domestic activities "upon information and belief" (see, e.g., Am. Compl. ¶¶ 60, 96, 106,
169, 177-80, 188, 212), which is insufficient to satisfy the Rule 9(b) pleading standard
required by RICO.  See Applicable Legal Standard, infra.  The Third Circuit requires
parties pleading upon information and belief to (1) "'delineate at least the nature and
scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to
plead with particularity'", Weiner v. Quaker Oats Co., 129 F.3d 310, 319 (3d Cir. 1997)
(quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 285 (3d Cir. 1992)), (2) "'allege that
the necessary information lies within [the opposing parties'] control,'" and (3) make
allegations that are "'accompanied by a statement of facts upon which the allegations are
based'".  Weiner, 129 F.3d at 319 (quoting Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d
628, 645 (3d Cir. 1989)).  Alba has not met these requirements with respect to any of its
information and belief pleadings.

[3] Elsewhere, without recognition of the inconsistency, Alba claims that the purported
scheme began in 1989.  (Compare Am. Compl. ¶ 21 with RCS at 51.)

3

exist until 1994.  (See Declaration of Nicole A. Stockey in Support of the Joint

Memorandum of Law of Defendants Alcoa Inc. and Alcoa World Alumina LLC in

Support of Their Joint Motion to Dismiss Plaintiff's Amended Complaint ("Stockey

Decl."), Ex. 1. (Certificate of Formation (establishing Alcoa Alumina & Chemicals,

L.L.C.) and Certificate of Amendment).)[4]

       In sum, the only U.S. activity that Alba says occurred over this purported

two-decade scheme is of the incidental variety that does not permit application of RICO.

Accordingly, Alcoa Defendants move to dismiss Alba's RICO claims (Section I), fraud

claims (Section II) and related conspiracy claims (Section III) on the grounds set forth

below.

## STATEMENT OF FACTS[5]

       According to Alba, Alcoa of Australia retained an agent and distributor to

pay bribes to officers of Alba and the Bahraini Government to secure Alba's purchase of

alumina at above-market prices.  During this purported scheme, Dahdaleh, as the agent

and distributor, allegedly paid millions in bribes, and Alba, in turn, overpaid for its

---

[4] In fact, Alba does not allege any U.S.-based activities prior to 1996.

[5] For the purposes of the motion to dismiss, Alcoa Defendants treat the RICO Case Statement as a part of the operative complaint.  See Cooper v. Broadspire Servs., Inc., No. Civ. A 04-5289, 2005 WL 1712390, at *1, n.1 (E.D. Pa. July 20, 2005) (citing Lorenz v. CSX Corp., 1 F.3d 1406, 1413 (3d Cir. 1993)).  Although Alba's allegations should be accepted as true for the purposes of this motion, this Court need not accept allegations that are directly contradicted by the documentary evidence attached to or explicitly relied on by the Amended Complaint.  See, e.g., Healey Alt. Inv. P'ship v. Royal Bank of Canada, Civil No. 10-1567, 2011 WL 4455447, at *5 (D. N.J. Sept. 23, 2011); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

alumina.  Alba also contends (without remotely adequate factual support) that Alcoa

Defendants conceived and directed this alleged scheme.

A.    **The 1990 Alumina Supply Agreement**

According to Alba, in 1990, after a 21-year relationship with Alba, Alcoa

Defendants introduced Dahdaleh into the Alba relationship as Alcoa's agent for no

commercially legitimate reason, but rather as a means of ensuring that Alcoa had

exclusivity over the alumina supply contract and facilitating the payment of bribes to

officials of Alba and the Government of Bahrain.  (Am. Compl. ¶¶ 34, 35.)  Alba alleges

that Alcoa of Australia (which Alba routinely describes as "Alcoa's subsidiary") entered

into an agreement with Dahdaleh which provided that he would get a commission for

alumina shipped to Alba.  (Id. ¶ 40.)[6]  At the time, Alcoa of Australia also entered into an

agreement with Alba (the "1990 Contract") pursuant to which Alba purchased alumina

from Alcoa of Australia.  The contract explicitly provided that "[d]uring the term of this

Agreement [Alcoa of Australia] or an agent or distributor nominated by [Alcoa of

Australia] (such agent or distributor to be agreed in writing by Alba) will sell and deliver

to Alba and Alba will purchase and accept from [Alcoa of Australia] or its agent or

distributor alumina for use at the Alba smelter . . . ."  (Stockey Decl. Ex. 2 (Supply

_____

[6] Alba, in a transparent effort to eliminate references to foreign countries and entities
and create the appearance of a domestic enterprise, diligently uses the phrases "Alcoa,
through its subsidiary" and "Alcoa's subsidiary" when referring to Alcoa of Australia.
But, the entity referenced is Alcoa of Australia, a company based in and incorporated in
Australia that is 60% owned by Alcoa and 40% owned by an authorized Australian
company.  (Am. Compl. ¶ 12.)  The fact that Alcoa is the majority owner of Alcoa of
Australia does not render its foreign subsidiary a U.S. company, absent allegations, of
which Alba makes none, that would justify piercing the corporate veil.  Pennsylvania
"courts will disregard the corporate entity only in limited circumstances".  Kashner v.
Geisinger Clinic, 638 A.2d 980, 984 (Pa. Super. Ct. 1994).

Agreement dated January 1, 1990 at § 2.2).)[7]  Alba alleges that between the years 1990 and 2004, Alcoa of Australia paid Dahdaleh more than $13.5 million in unearned and fraudulent commissions.  (Am. Compl. ¶ 40.)

       With respect to domestic activity in support of its alleged domestic enterprise, Alba summarily alleges: "Alcoa and Alcoa World Alumina, and senior executives of those companies, including Rice, conceived, directed, controlled, and coordinated the actions of Alcoa's agents, including Dahdaleh, the Dahdaleh-owned entities, and Alcoa's subsidiary Alcoa of Australia, with respect to these fraudulent commissions, assignments, and bribes, from the United States." (Id. ¶ 37.)  (As noted earlier, AWA did not even exist until 1994.)

### B.    The 1993 Assignment

       The 1990 Contract had two measures of pricing.  The pricing for approximately 60% of the supply was set by a formula and the remaining 40% (the "Market Tonnage") was negotiated by the parties.  (Id. ¶ 43.)  Alba alleges that beginning in 1993 "Defendants"[8] caused the Market Tonnage to be assigned to a company owned

---

[7] In its Amended Complaint and RICO Case Statement, Alba cites repeatedly and incorporates by reference the various agreements, including the 1990 Contract, among Alba, Alcoa of Australia and Dahdaleh entities including AAAC, as well as a number of communications between Alba and the employees of those entities.  (Am. Compl. Exs. 1-3; RCS Ex. 1).   We attach a number of these agreements to this motion in large part to show the obfuscation in which Alba has engaged in an effort to plead a domestic enterprise.  Buck v. Hampton Twp. School Dist., 452 F.3d 256, 260 (3d Cir. 2006) (citations omitted) (holding a court may consider documents attached to the complaint and may take judicial notice of items appearing in the record of the case).

[8] Alba attempts to obfuscate which defendants allegedly committed the acts by repeatedly referring to "Defendants" as a group. Such group pleading does not comply with the particularity standards of Rule 9(b).  See Duran v. Equifirst Corp.,

by Dahdaleh for the purpose of facilitating bribes that caused Alba to pay excessive prices for alumina.  (Id. ¶ 44.)  According to Alba, this assignment (the "1993 Assignment"), which was to Kwinalum, a Singaporean company owned by Dahdaleh, was negotiated at a meeting in 1992 in Singapore, and that "Alcoa's" representatives at this meeting included "a U.S. National" (identified in the RCS as John Diederich).  (Id. ¶¶ 44, 46.)  Alba also alleges that Kwinalum's revenue was passed to Alumet Ltd., an Australian company, pursuant to invoices signed by Angela Hill, who was employed by Dadco, a company incorporated in Australia.  (Id. ¶ 48.)  The source of the alumina sold by Kwinalum to Alba was Alcoa of Australia.  (Id. ¶ 49.)

Alba alleges that the 1993 Assignment was part of the scheme to bribe senior officials of Alba and the Government of Bahrain who then induced Alba to pay inflated prices for alumina (id. ¶ 50) and that, to further the scheme, Alcoa of Australia paid unlawful commissions to Dahdaleh some of which were transferred to pay those alleged bribes.  (Id. ¶ 51.)  According to Alba, the assignment also aimed to avoid export taxes imposed by the Australian government.  (Id. ¶ 50.)

With respect to U.S. activity in support of this phase of the alleged domestic enterprise Alba summarily alleges:  "Upon information and belief, Alcoa and Alcoa World Alumina directed Alcoa of Australia to pay the unlawful commissions with the knowledge and intent that such payments would be transferred on as bribes." (Id. ¶ 51.)  As for effect on interstate commerce, Alba alleges that pursuant to instruction on

---

No. 2:09-CV-03856, 2010 WL 936199, at *4 (D. N.J. Mar. 12, 2010).  It also is a transparent attempt to draw attention away from the foreign center of the alleged scheme.

Kwinalum's invoices, Alba paid invoices by wire to Kwinalum accounts held at Royal Bank of Canada and Chase Manhattan Bank in New York.  (Id. ¶ 53.)

>       C.       **The 1996 Assignment and Extension**

According to Alba, in 1996, the 1990 Contract was extended to 2000 and amended to provide that from 1997 through 2000 Alcoa of Australia would assign the Market Tonnage to "a company associated with" Alcoa of Australia (the "1996 Amendment").  (Id. ¶¶ 54, 57.)  Alba alleges that the 1996 Amendment was signed by Peter Burgess (of AWA in Pittsburgh) on behalf of Alcoa of Australia, and that the pricing for the Market Tonnage was negotiated by Alcoa of Australia and a former official of Alba.  (Id. ¶¶ 55, 56.)

According to Alba, the Market Tonnage was assigned in a "secret Sales Agreement" between Dahdaleh-owned, Australian company, Alumet, and Alcoa of Australia ("1996 Sales Agreement") (Stockey Decl. Ex. 3) (id. ¶ 59), which was signed by AWA's Peter Burgess on behalf of Alcoa of Australia.  (Id. ¶ 61.)  Alba alleges that Alumet Ltd. sold the alumina to Alumet Asia, another Dahdaleh-owned entity, which sold the alumina to Alba at significantly higher prices than the price Dahdaleh originally paid to Alcoa of Australia.  (Id. ¶ 59.)

Alba also alleges that Angela Hill and, at times, Sandra Ainsworth, both employees of Dahdaleh-owned Dadco in Australia, signed invoices for Alumet Asia which contained Alcoa's logo.  (Id. ¶¶ 64(b), 64(c), 65.)  Alba alleges that Hill and Ainsworth worked at Alcoa of Australia prior to going to work for Dahdaleh. (Id. ¶¶ 48(c), 64(c).)  Alcoa of Australia was the source of the alumina that Alba acquired from Alumet Asia.  (Id. ¶ 65.)  According to Alba, "Defendants" told Alba that the

assignment of Market Tonnage was necessary to avoid disclosure of Alcoa of Australia's prices.  (Id. ¶ 67.)

Notably, Alba admits that the Alcoa Defendants were engaged in the legitimate business of selling alumina (RCS at 47) and recognizes that there were legitimate business reasons for Alcoa of Australia's 1996 assignment.  With respect to the 1996 Assignment, Alba claims that Alcoa of Australia "represented to Alba that the assignment of Market Tonnage was necessary in order to avoid disclosure of Alcoa's prices".  (Am. Compl. ¶ 67.)  Alba does not allege any facts that would indicate these representations were false.

Alba alleges that Alcoa of Australia continued to pay unlawful commissions to Dahdaleh in connection with the 1996 Amendment, some of which were transferred to one or more former senior officials of Alba and the Government of Bahrain, in exchange for which these officials induced Alba to pay excessive prices for alumina.  (Id. ¶¶ 69, 70.)

With respect to U.S. activity in support of this phase of its alleged domestic enterprise Alba alleges that:

- Peter Burgess was copied on the "offer by fax" sent by Alcoa of Australia's Marketing Manager (from Australia) to Alba (id. ¶ 56);

- Peter Burgess signed the 1996 Amendment, "acting at the direction of Alcoa and Alcoa World Alumina in negotiating the two contracts" (id. ¶¶ 55, 61); and

- Upon information and belief, Alcoa of Australia's dealings with Alba, Dahdaleh, and Dahdaleh-owned shell companies "were overseen, directed and ultimately controlled by Alcoa, Alcoa World Alumina and senior executives of those companies in the United States, including Burgess". (Id. ¶ 60.)

9

With respect to the alleged enterprise's effect on interstate commerce, Alba alleges that pursuant to invoices issued by Dahdaleh's employees, Alba wired payments to accounts of Dahdaleh entities held at Chase Manhattan Bank and the Royal Bank of Canada in New York and that invoices issued by Alcoa World Alumina Australia directed Alba to make payments for Alcoa of Australia's benefit to accounts held at ANZ Investment Bank and Chase Manhattan Bank in New York.  (Id. ¶ 72.)

### D.   The 2001 Extension

According to Alba, in 2001, Alba and Alcoa of Australia amended the 1990 Contract to extend its term through 2003 ("2001 Extension").  (Id. ¶ 73.)  Alba alleges that Rice (who Alba says was an officer of AWA) proposed the extension by letter dated April 21, 2001, on Alcoa World Alumina stationary.  (Id. ¶ 74.)  Alba also alleges that David Dabney—a U.S. citizen and former employee of various subsidiaries of Alcoa and Alcoa of Australia (that are not implicated by these allegations), and an employee of Dahdaleh-owned Dadco and its affiliate AA Alumina & Chemicals ("AAAC")[9]—signed the extension on behalf of Alcoa of Australia.  (Id. ¶¶ 78, 86.)

Alba also alleges that Dabney transmitted the executed extension (from Australia) to Alba by letter which bore the logo of Alcoa of Australia (id. ¶ 86(e)), and that the 2001 Extension provided that Alba's communications were to be directed to

---

[9] Alba alleges that there are three separate companies—all owned by Dahdaleh—named AA Alumina & Chemicals.  (Am. Compl. ¶ 15(d).)  Alcoa Defendants follow Alba's convention in referring to these entities as AAAC-1, AAAC-2 and AAAC-3.  There are also entities named AA Alumina & Chemicals Limited and AA Alumina & Chemicals SA in Alba's allegations.  In instances where it is unclear from the pleadings which entity is referenced, AAAC is used.

Dahdaleh employee Dabney at his fax number at Dahdaleh's Australian-based Dadco. (Id. ¶ 86(g).)

Alba alleges that the invoices sent by AAAC-1 and AAAC-2 (from Australia), which bore the Alcoa trademark and identified AAAC as an "associate company" of Alcoa of Australia, to Alba (in Bahrain) sought to create the appearance they were provided on behalf of Alcoa and Alcoa of Australia.  (Id. ¶ 88.)

Alba alleges that Alcoa of Australia paid unlawful commissions to Dahdaleh in connection with the 2001 Extension, with the intent that such payment would be transferred as bribes (id. ¶ 92), and that Dahdaleh, in turn, made multiple payments to senior officials of Alba and the Government of Bahrain as well as to a member of Alba's board of directors.  (Id. ¶ 93.)  Alba alleges that these foreign officials induced Alba to pay excessive prices for Alcoa of Australia's alumina.  (Id. ¶ 95.)

Alba also alleges that as the 2001 Extension was being finalized by Alcoa of Australia and Alba, "Defendants" were negotiating a "secret parallel" distribution agreement between Alcoa of Australia and two Dahdaleh-owned shell companies ("2002 Distribution Agreement") (Stockey Decl. Ex. 4) (Am. Compl. ¶ 77), which was executed on or about February 14, 2002 by Alcoa of Australia and Dahdaleh entities Alumet Limited and AA Alumina & Chemicals Limited and appointed the Dahdaleh entities as Alcoa of Australia's sole distributor of alumina for 2002 through 2004.  (Id. ¶ 80.)  Alba alleges that Rice "initialed" the 2002 Distribution Agreement.  (Id.)  Alcoa of Australia was the source of the alumina supplied under the 2001 Extension and 2002 Distribution Agreement.  (Id. ¶ 83.)  Alba alleges that AA Alumina & Chemicals Limited, which paid

prices significantly lower than those paid by Alba, provided no legitimate services.  (Id.
¶ 83.)

               With respect to U.S. activity to support this part of its claim that the
enterprise alleged is domestic, Alba alleges that:

- Upon information and belief, Alcoa, Alcoa World Alumina, and senior executives of those companies, including Rice, knowingly directed the negotiation and signature of two contracts (id. ¶ 76);

- Alcoa and Alcoa World Alumina knew of and intended Dabney's involvement in the negotiation of Alba and fostered the false impression that Dabney was a legitimate representative of Alcoa of Australia based on an email from Rice to Alba (id. ¶ 79);

- Rice proposed the 2001 Extension and initialed the 2002 Distribution Agreement (id. ¶¶ 74, 80);

- Upon information and belief, Dahdaleh used the Alcoa logo, with the permission of Alcoa, to further the deception that AAAC was associated with Alcoa of Australia (id. ¶ 81);

- Alcoa of Australia's dealings with Alba, Dahdaleh and the Dahdaleh-owned entities were overseen, directed and ultimately controlled by Alcoa, Alcoa World Alumina and senior executives of those companies in the United States, including Rice (id. ¶ 82); and

- Upon information and belief, Dahdaleh made payments to senior officials of Alba, the Government of Bahrain and to a number of Alba's board of directors at the direction of Alcoa, Alcoa World Alumina, and senior executives of those companies in the United States, including Rice. (Id. ¶ 96.)

               With respect to the allegations of substantial impact on interstate
commerce, Alba alleges that:

- Pursuant to the first four invoices issued by AAAC-1, Alba executed several wire transfers to an AAAC account at Royal Bank of Canada in New York.  (id. ¶ 97(a)); and

- Pursuant to subsequent invoices from Dahdaleh's entities, Alba executed wire transfers to Deutsche Trust Company and Bankers

Trust Company America in New York for the benefit of AAAC. (<u>Id.</u> ¶ 97(b).)

E.    **The 2003 Extension**

According to Alba, by letter dated July 8, 2003 which "conspicuously" bore the Alcoa logo and referred to "our excellent long term relationship for the last thirty years" (<u>id.</u> ¶ 100(b)), Dahdaleh employee (and foreign citizen and non-U.S. resident), Sandra Ainsworth proposed a further extension of the 1990 Contract.  (<u>Id.</u> ¶ 98.)  Alba agreed to the extension by return letter sent to Ainsworth.  (<u>Id.</u> ¶ 99.)  Dahdaleh's entity AAAC-2 continued to invoice Alba, and these invoices, and Ainsworth's correspondence regarding pricing bore the Alcoa logo.  (<u>Id.</u> ¶ 100.)  According to Alba, Alcoa of Australia continued to pay out unlawful commissions to Dahdaleh that Dahdaleh then "transferred" on to the then CEO of Alba and to another senior executive of Alba who was also an official of the Bahraini Government, who then induced Alba to pay excessive prices for alumina.  (<u>Id.</u> ¶¶ 103, 105.)

With respect to U.S. contacts in support of this phase of its alleged domestic enterprise, Alba alleges that:

- "Upon information and belief, Alcoa and Alcoa World Alumina directed [Alcoa of Australia] to pay the unlawful commissions with the knowledge and intent that such payments would be transferred on as bribes" (<u>id.</u> ¶ 102); and

- "Upon information and belief, Dahdaleh, as the agent of Alcoa and its subsidiaries, including Alcoa World Alumina and Alcoa of Australia, made these payments at the direction and with the knowledge of Alcoa, Alcoa World Alumina, and Rice, who directly and indirectly benefited from the inflated prices that Alba paid for alumina pursuant to this fraudulent scheme."  (<u>Id.</u> ¶ 106.)

13

With respect to the effect on interstate commerce, Alba alleges that "Defendants' conduct had a substantial effect on interstate commerce as Alba made significant payment for alumina in response to the invoices it received".  (Id. ¶ 107.)

**F.      Joint Venture Negotiations (For a Venture Never Created)**

According to Alba, in 2003 Alba and Alcoa entered into a Memorandum of Understanding ("MOU") for the sale of up to 26% of shares in Alba to Alcoa or a controlled affiliate of Alcoa in exchange for one million tons of alumina in perpetuity. Alba alleges that Rice and Dahdaleh (among others)[10] represented Alcoa throughout the negotiations (id. ¶ 113), that Dahdaleh was introduced and identified to officials of Alba and the Government as part of Alcoa's team (id. ¶ 115), and that Rice directed Dahdaleh to set up a conference call to plan due diligence.  (Id. ¶ 114.)  Alba also alleges that Alain Belda, then CEO and Chairman of the Board of Alcoa, traveled to Bahrain in 2004 in connection with the proposed MOU.  (Id. ¶ 116.)

Alba alleges that during 2003-2004 Dahdaleh transferred bribes to Alba's then CEO and to another senior executive of Alba and official of the Bahraini Government to further Alcoa's efforts to obtain a stake in Alba.  (Id. ¶ 117.)  Alba also alleges that during a meeting in London, in response to expressed dissatisfaction about terms offered by Alcoa, Rice and Dahdaleh said that Alba was taking the wrong position and that "Defendants" had access to the highest authorities in Bahrain who wanted the transaction completed.  (Id. ¶ 119.)  The transaction was never completed.  The

---

[10] Including former CEO of Alcoa, Alain Belda, and former group president of Alcoa Primary Products, Bernt Reitan.  (RCS at 15-16.)

Government of Bahrain withdrew from the transaction after concluding it was not in the best interests of Alba or the Government.  (Id. ¶ 123.)

With respect to U.S. activity in support of this phase of its alleged domestic enterprise, Alba alleges that:

- On April 26, 2004, Alain Belda sent a letter to a Bahraini Government official in which he said that he understood that the highest levels of authority in Bahrain were in favor of Alcoa taking an equity position in Alba (id. ¶ 120);

- In April, May and June 2004, Alcoa employees in Pittsburgh corresponded "extensively" via email with Alba employees and their consultants in connection with planning due diligence (id. ¶ 121); and

- Representatives of the Government of Bahrain visited New York from June 9, 2004 through June 11, 2004 to examine records.  (Id. ¶ 127.)

With respect to the alleged effect on interstate commerce, Alba alleges that representatives of both parties met in London at least five times and conducted investigative work in Bahrain and the United States.  (Id. ¶ 127.)

G.     **The 2005 Supply Agreement**

According to Alba, in September 2004, it published a tender for its 2005-2014 alumina requirements.  (Id. ¶ 130.)  Alba also alleges that one week after it published this tender, Dahdaleh transferred $66,439.17 to the bank account of the then-CEO of Alba, which followed a previous transfer of $45,260—on August 31, 2004.  (Id. ¶ 132.)  Alba alleges that on or about September 29, 2004, David Debney, a Dahdaleh employee, submitted a bid ("2005 Contract") from its offices in Switzerland (id. ¶ 147) on behalf of AAAC (id. ¶ 134), which was sent on AAAC letterhead (bearing the Alcoa mark).  Alba also alleges that the day after it opened this bid, United Legal Engineering

15

Consultants Limited, a Dahdaleh entity, transferred $41,789 to the bank account of Alba's then CEO.  (Id.  ¶ 136.)

According to Alba, during the negotiation with AAAC-2 over the 2005 Contract, in response to an inquiry from Alba, Rice, by fax from Pittsburgh, advised that AAAC was an associate company and distributor of Alcoa of Australia and was authorized to negotiate the supply agreement with Alba.  (Id.  ¶ 138.)  Alba alleges that this representation and the bribes to officials of Alba and the Government of Bahrain induced Alba to enter into the 2005 Contract despite its excessive prices and commercially unreasonable terms.[11]  (Id. ¶¶ 139, 141.)

Alba also alleges that, unbeknownst to it, while it was negotiating the 2005 Contract with Debney, Alcoa of Australia and Dahdaleh entities Alumet and AA Alumina & Chemicals Limited and AA Alumina & Chemicals SA entered into a distribution agreement, which provided that these Dahdaleh entities were Alcoa of Australia's sole distributor of alumina to Alba.  (Id. ¶¶ 151-52.)[12]

With respect to U.S. activity in support of this phase of alleged domestic enterprise, Alba alleges that:

- "Upon information and belief, Alcoa, Alcoa World Alumina and Rice directed Dahdaleh and the Dahdaleh-owned entities to pay these bribes in order to ensure that Alcoa, through its agents and subsidiaries, including Dahdaleh-owned entities, would be awarded the contract" (id. ¶ 137);[13]

---

[11] Alba sets forth the alleged unfavorable terms in its Amended Complaint.  (Am. Compl. ¶¶ 143, 144.)

[12] The "secret" agreement is attached. (Stockey Decl. Ex. 5.)

[13] The contract was to be with Alcoa of Australia, not Alcoa.

- During negotiations over the 2005 contract between Debney and Alba, Rice sent a fax dated 10/26/04 from Pittsburgh which advised that AAAC was an associate company and distributor of Alcoa of Australia and was authorized to negotiate the 2005 contract (id. ¶ 138);

- On October 29, 2004, Rice sent a fax from Pittsburgh to Alba's Bruce Hall indicating that if Alba and AAAC did not reach agreement, Rice understood that Alba would find another supplier for its alumina (id. ¶ 140);

- On or about October 31, 2004, in a telephone call with Abdulla Saif, Bahrain's Minister of Finance & National Economy, Rice misrepresented the nature of Alcoa's relationship with AAAC (RCS at 12-13); and

- Defendants Alcoa, Alcoa World Alumina and Rice directed the negotiation of the parallel agreements.  (Am. Compl. ¶ 156.)

### APPLICABLE LEGAL STANDARD

Alba's RICO and common-law fraud claims are subject to the heightened pleading requirements set forth in Fed. R. Civ. P. 9(b), which require Alba to state with particularity the circumstances constituting fraud or mistake", Fed. R. Civ. P. 9(b), in order "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior".  Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).  While some of the RICO predicate acts Alba pleads are federal offenses that are not necessarily fraud-based (i.e., transport and receipt of stolen money and violations of the Travel Act), courts have held that technically "non-fraud" elements of a RICO claim must still satisfy Rule 9(b) where, as here, the basis of the alleged violation is fraud.  See Lum v. Bank of Am., 361 F.3d 217, 220 (3d Cir. 2004), abrogated on other grounds, Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007); Beverly Hills Design

Studio (N.Y.) Inc. v. Morris, No. 88 Civ. 5886 (LLS), 1989 WL 85867, at *6 (S.D.N.Y. July 26, 1989).

**ARGUMENT**

**I.     ALBA'S RICO CLAIMS SHOULD BE DISMISSED (CLAIM 1).**

To state a RICO violation, a complaint must allege that a "person" has utilized a "pattern of racketeering activity" or the proceeds thereof to infiltrate an interstate "enterprise" by (a) investing the income derived from the pattern of racketeering activity in the enterprise; (b) acquiring or maintaining an interest in the enterprise through a pattern of racketeering activity; (c) conducting the affairs of the enterprise through the pattern of racketeering activity; or (d) conspiring to commit any of the above acts.  18 U.S.C. § 1962.  Alba's RICO claim fails for two reasons.  First, RICO does not apply as a matter of law where, as here, the alleged "enterprise" is foreign: involving alleged racketeering activity almost entirely in Bahrain, Australia, Singapore, Switzerland and Great Britain, among almost exclusively foreign entities and persons, inflicting alleged harm on a Bahraini plaintiff, in Bahrain.  Second, even if, contrary to the legal standard, RICO did apply, Alba's RICO claim fails for the independent reason that Alba does not plead particularized facts about Alcoa Defendants' purported involvement in this enterprise or its alleged racketeering activity.

**A.     Applying RICO to the Facts Alleged Here Would Be an Extraterritorial Application of the Statute in Violation of Morrison v. National Australia Bank, Ltd.**

There is a longstanding presumption against the extraterritorial application of U.S. statutes, Morrison, 130 S. Ct. at 2877-78.  Since Morrison, seven courts have considered the extraterritorial application of RICO.  All (including this one) have

18

concluded it does not so apply.  Once a court has addressed a statute's territorial scope, it must next determine whether a particular enterprise is essentially foreign, in which case RICO does not apply, or essentially domestic, in which case it does.  In re Le-Nature's Inc., 2011 WL 2112533, at *3.  This analysis entails looking to whether the alleged misconduct "primarily involves foreign actors", "foreign acts" and foreign consequences.  Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29, 30-31 (2d Cir. 2010).

       Of the seven courts that have addressed this issue, five of them have then rejected the pleaded claims as impermissible extraterritorial applications of RICO.  Norex, 631 F.3d at 33; Cedeño v. Intech Group, Inc., 733 F. Supp. 2d 471, 474 (S.D.N.Y. Aug. 25, 2010), aff'd, No. 10–3861, 2012 WL 205960 (2d. Cir. Jan. 25, 2012); United States v. Philip Morris USA, Inc., 783 F. Supp. 2d 23, 29 (D. D.C. 2011); European Cmty. v. RJR Nabisco, Inc., No. 02-CV-5771, 2011 WL 843957, at *3-7 (E.D.N.Y. Mar. 8, 2011); In re Toyota Motor Corp., 785 F. Supp. 2d 883, 912–15 (C.D. Cal. 2011).  The other two found sufficient domestic focus to apply RICO where the question was raised.  However, both of these cases are clearly distinguishable from this case.  CGC Holding Co., LLC, et al. v. Hutchens, et al., No. 11-CV-01012-RBJ-KLM, 2011 WL 5320988, at *14 (D. Colo. Nov. 1, 2011) (finding Morrison did not preclude a RICO claim where plaintiffs alleged racketeering activity directed at and largely occurring within the U.S.); In re Le-Nature's Inc., 2011 WL 2112533, at *2-3 (finding that Morrison did not preclude a RICO claim where plaintiffs alleged, and defendants conceded, that defendants participated in a domestic RICO enterprise).

       Here, over the course of a 20-year period, the only specific U.S. contacts Alba alleges are of the incidental variety, like the occasional letter, fax and phone call.

These purported domestic contacts are not only dwarfed by the much greater number of events that Alba alleges occurred overseas, they are also clearly less important to the overall "scheme" Alba claims took place.  Under these circumstances, RICO does not apply as a matter of law because the alleged "enterprise" is foreign, and Alba's RICO claim should be dismissed.

### 1.    The Alleged Enterprises Are Foreign.

It is surely not sufficient for plaintiff to disregard its 2008 Complaint, in which Alba claimed that one of the RICO enterprises consisted of Alba alone, and simply assert now that the alleged enterprises are domestic.  The facts must support that conclusion, and they do not as the "RICO enterprises" at the core of Alba's allegations are (just as they were in the 2008 Complaint) comprised primarily of foreign actors and entities, buying and selling foreign products to and from foreign participants, and allegedly bribing foreign participants.

The foreign enterprises Alba alleges are beyond the scope of RICO.  In addition to Alcoa Defendants and Rice, the first enterprise Alba alleges is comprised of (1) Dahdaleh, a Canadian citizen residing in the United Kingdom; (2) Dahdaleh-owned companies:  Kwinalum, a Singapore company; Alumet Asia, a Singapore company; Alumet Limited, a British Virgin Islands company; Swiss Companies AAAC-1, AAAC-2, and AAAC-3, and AA Alumina & Chemicals Limited, a Guernsey company; (3) employees, officers and directors of those Dahdaleh-owned companies—Dabney, Debney, Hill and Ainsworth; (4) one or more former officers and former directors of Alba, including Bruce Hall, whom Alba alleges received more than $5 million dollars in bribes during his tenure as Alba CEO; (5) one or more former senior officials of the

Government of Bahrain (who, like Hall, are alleged to have received significant bribes from Dahdaleh); and (6) Alcoa of Australia, an Australian company. (Am. Compl. ¶ 166; RCS at 44-45.) Alba alleges an alternative enterprise comprised of Alcoa Defendants, Rice, Dahdaleh and the Dahdaleh-owned companies. (Am. Compl. ¶ 167; RCS at 45.)

Of the 15-plus individuals and entities that Alba claims comprise these enterprises, only four—Alcoa, AWA, Dabney and Rice—are U.S. corporations or citizens. One of them, Dabney, resided outside the United States and worked for foreign companies during the entire relevant time period. (RCS at 40.) And one of the two companies, AWA, is alleged to have participated in launching the two-decade scheme four years before it even existed. That there are U.S. persons and entities alleged to be in the enterprise does not change the fact that the enterprises are foreign. Their involvement is, at best, tangential to the alleged foreign-based conduct of foreign actors and entities who dominated and controlled the alleged enterprise. Norex, 631 F.3d at 30 (dismissing a RICO claim focused on foreign actors and foreign acts even though plaintiff alleged in its first amended complaint that one alternative enterprise was composed of entirely U.S. companies and individuals); Norex First Am. Compl. ¶¶ 17-20, 241, Norex Petroleum Ltd. v. Access Indus., Inc., 540 F. Supp. 2d 438 (S.D.N.Y. 2007) (See Stockey Decl. Ex. 6) [hereinafter "Norex Compl."].

Moreover, Alba's conclusory allegation that the alleged enterprise was "predominantly domestic because its fraudulent activities were conceived, planned, orchestrated, directed, and controlled from the United States" by Alcoa Defendants (Am. Compl. ¶ 168) is of no substantive consequence. For one thing, "general allegations that U.S. defendants 'masterminded, operated and directed' the illegal conduct" are

insufficient to establish RICO's applicability to a particular enterprise.  Norex, 540 F. Supp. 2d at 443-44, aff'd, 631 F.3d 29 (2d Cir. 2010).  It could not be otherwise, unless courts were entirely to abandon substance to the preference of form.  Indeed, courts have consistently held that an enterprise otherwise dominated by foreigners and foreign acts does not become domestic by virtue of an allegation that domestic defendants conceived of or directed the purported enterprise.  See, e.g., RJR Nabisco, 2011 WL 843957, at *3-7 (dismissing a claim by foreign plaintiffs alleging that domestic defendants "participated in the management of the [RICO] enterprise" because plaintiffs failed to plead facts that demonstrated "how Defendants organized, orchestrated, planned, or even participated in" some of the steps of the criminal scheme); In re Toyota Motor Corp., 785 F. Supp. 2d 883, 912-15 (C.D. Cal. 2011) (dismissing a claim by foreign plaintiffs that alleged a scheme that "originated, continued and was nurtured by the [U.S.-based defendants]").  Moreover, that this entire affair was originated and largely carried out overseas cannot be credibly challenged on the face of the complaint.  There is not even a single U.S.-based factual allegation relating to anything that took place before 1996, six years into the alleged scheme.

### 2.     The Alleged Racketeering Activity and Its Harm Are Foreign.

The "racketeering activity" that Alba alleges is also foreign and therefore beyond the scope of RICO.  Each of the RICO predicate acts Alba pleads is based on its allegations that defendants defrauded it into paying inflated prices for alumina and attempted to defraud it into ceding an equity stake in Alba by bribing Alba and/or Bahraini Government officials.  (Am. Compl. ¶¶ 176-199.)  The alleged wrongful acts are overwhelmingly foreign, and the alleged harm is entirely foreign.  As shown below,

every category of misconduct alleged—bribery, misrepresentations, wire transfers, and travel in furtherance of the scheme—is carried out abroad.

        <u>Bribery.</u>  Alba does not allege that a single bribe was made in the United States, or by or to a U.S. citizen.  Rather, Alba alleges that Dahdaleh paid 26 separate bribes to senior officials of Alba and the Bahraini Government.  (<u>Id.</u> ¶¶ 93-94, 103-104, 117, 132-33, 136, 149-50; RCS at 13.)  According to Alba, "Dahdaleh transferred tens of millions of dollars between 1999 and 2004 to an [unidentified] official of Alba and the Government of Bahrain, as well as more than $5 million between 2002 and 2005 to Bruce Hall, the former CEO of Alba".  (<u>Id.</u>)  All of these alleged bribes were made on foreign soil between foreign individuals.  Alba does not allege a single fact to tie any U.S. participant to the alleged bribery.  <u>Norex</u>, 631 F.3d at 31 (holding that RICO is inapplicable to a bribery scheme in which all bribes took place overseas).

        <u>Misrepresentations.</u>  Alba's allegations of "misrepresentations" about the relationship among Alcoa, Alcoa of Australia and the Dahdaleh entities are likewise centered on foreign behavior.  Alba alleges that employees of Alcoa and Alcoa World Alumina communicated a handful of times from the United States with individuals abroad.  Specifically, over the course of a purported nearly 20-year conspiracy, Alba alleges that misrepresentations were communicated from the United States in one contract,[14] three letters/faxes, one email and one phone call.[15]  (RCS at 40-42.)  This

---

[14] Alba alleges that the 1996 Amendment to the 1990 Contract, which was transmitted from the United States, represented that Alcoa of Australia would assign the Market Tonnage to "an associated company".  (RCS at 38, 40.)  Putting aside whether the statement was truly a misrepresentation (<u>see</u> Section II), the allegation is that the Sales and Marketing Manager of Alcoa World Alumina signed the 1996 Amendment with Alba "<u>on behalf of Alcoa of Australia</u>".  (Am. Compl. ¶ 55) (emphasis added).  Also, Alba

handful of U.S. contacts is subsumed in a 20-year litany of foreign activity, including hundreds of allegedly misleading foreign invoices, letters and bids from Australia and Switzerland, foreign contracts, and conversations around the world, that Alba alleges contained misrepresentations.  (Id.)  Indeed, the minimal U.S. communications Alba alleges here pale in comparison to the extensive domestic-based allegations at issue in Philip Morris, 783 F. Supp. 2d at 25, 29, that were held to be insufficient to justify application of RICO.  Id.

    Wire Transfers.  Alba's allegations of illegal wire transfers also fall outside RICO's ambit.  The allegations that Alcoa of Australia and Dahdaleh-owned entities caused Alba to make payments to U.S. banks (Am. Compl. ¶¶ 53, 72, 97, 161), are peripheral to the foreign misconduct alleged.  According to Alba, it, a foreign entity, at the instruction of other foreign entities, sent payments to still other foreign entities for alumina supplied by Alcoa of Australia, another foreign entity.  (RCS at 31-33.)  These allegations are far less compelling examples of domestic activity than the wire transfers in Norex, where payments deposited in the U.S. bank accounts of U.S. defendants were held insufficient to trigger RICO.  631 F.3d at 33; (Norex Compl. ¶ 62.)  Here, the U.S.

---

admits that this non-U.S. contract was negotiated between Alcoa of Australia (not Peter Burgess) and Alba.  (Id. ¶ 56.)

 [15] Alba alleges that William Rice sent three faxes and one email and was telephoned in Pittsburgh by Bahrain's Minister of Finance & National Economy.  (RCS at 11-13.)  Alba alleges that Rice communicated with Alba to extend the contracts in the early 2000s in ways that "furthered Alba's false belief".  (Id. at 40.)  Again, putting aside whether Rice's actions constitute misrepresentations, (see Section II), these contacts are minimal compared to the contemporaneous contacts Alba alleges it had with David Dabney (Australia) and with David Debney (Switzerland) regarding the same contracts.  (RCS at 18, 40.)  Again, these contracts were not U.S. contracts, nor on behalf of a U.S. entity.

bank accounts to which Alba clings are not the bank accounts of any Alcoa Defendants but rather of Dahdaleh, a foreigner, and of foreign companies.  (RCS at 48-49.)[16]

        <u>Travel.</u>  Alba's allegations of travel in furtherance of the purported scheme likewise belie Alba's claims of a domestic enterprise.  Alba cites travel to Bahrain, England, France and Singapore (<u>id.</u> at 12, 16, 20-21, 23, 29, 36-37, 41, 49).  It alleges that a due diligence team comprised of representatives of Alba and the Government of Bahrain traveled to New York on one occasion in connection with a transaction that never happened (<u>id.</u> at 37, 39).  None of the alleged misrepresentations is alleged to have occurred during this one trip to the United States.  (<u>See</u> <u>id.</u> at 40-42.)  These allegations pale in comparison to the allegations of multiple "visits made to the United States by [multiple employees of a foreign defendant], and [foreign defendant's] involvement with an experimental farm in North Carolina", which the court in <u>Philip Morris</u> found insufficient to support a RICO claim.  783 F. Supp. 2d at 29.  <u>Norex</u> similarly involved extensive travel to and from the United States that was found insufficient.  631 F.3d 29; (<u>Norex</u> Compl. ¶¶ 317-20.)  The rest of Alba's travel allegations concern either foreign members of the alleged enterprise traveling from foreign countries to other foreign

---

[16] <u>Cedeño v. Intech Group, Inc.</u> likewise found, on facts similar to those alleged here, that defendants' use of the wires to transfer money into and out of U.S. bank accounts did not create sufficient domestic contacts to warrant the application of RICO.  733 F. Supp. 2d 471.  As in <u>Norex</u>, the <u>Cedeño</u> Court found the use of U.S. bank accounts "too peripheral or problematic to support a RICO lawsuit" even where, unlike here, those bank accounts were owned by U.S. defendants.  <u>Id.</u> at 472.  It is also worth noting that the Second Circuit recently affirmed the dismissal of the Complaint in <u>Cedeño</u>, holding "[i]f an enterprise must be located in the United States for a private plaintiff to bring a domestic RICO claim, then Cedeño's complaint was rightfully dismissed as the enterprise he alleges is almost exclusively Venezuelan."  2012 WL 205960, at *1; <u>see also</u> <u>id.</u> at *2 (holding dismissal was, in the alternative, warranted because "Cedeño fails to allege that the domestic predicate acts proximately caused his injuries").

countries, or travel by U.S.-based employees <u>from</u> the U.S. to attend meetings with Alba abroad, which hardly supports a claim that alleged "racketeering activity" was U.S.-centric.  The domestic activity alleged here is precisely the sort of "peripheral" contact that courts have held does not justify the application of RICO.  <u>Cedeño</u>, 733 F. Supp. 2d at 473 ("The presumption against extraterritoriality 'would be a craven watchdog indeed if it retreated to its kennel whenever <u>some</u> domestic activity is involved'").

      **B.**      **Alba Has Not Alleged Particularized Facts About Alcoa Defendants' Purported Involvement in this Enterprise or Its Alleged Racketeering Activity.**

Alba has likewise failed to allege facts rendering plausible its oft repeated, but entirely conclusory, claim that Alcoa Defendants "conceived", "planned", "orchestrated", "directed" and "controlled" the RICO enterprise, or even facts describing how they participated in some of the steps of the alleged scheme.  Alba has not alleged any facts to show that Alcoa Defendants engaged in any day-to-day decision-making regarding the operation of the contracts (all of which were between foreign entities).  In fact, Alba's allegations suggest that Alcoa Defendants had limited and inconsequential contact with the foreign agent of a foreign subsidiary who was at the center of this alleged scheme.  Alba has not alleged any facts to show that U.S.-based actors bribed any foreign officials or that domestic actors caused any of the foreign entities that conducted the business of the purported enterprises to take any actions whatsoever.  <u>See</u> <u>RJR Nabisco</u>, 2011 WL 843957, at *3-7 (finding conclusory allegations of control insufficient to establish a domestic RICO enterprise).[17]

---

[17] Under the standard set forth in <u>RJR Nabisco</u>, an enterprise is located where "the primary day-to-day decisions were made and implemented".  <u>Centrue Bank v. Golf</u>

Over the course of a nearly 20-year alleged scheme of overpayment involving the shipment of billions of dollars' worth of materials, the sum total of the acts Alba alleges took place in the United States are:  one trip, a handful of communications, and some incidental wire transfers.  The alleged acts reside in a sea of allegations involving conduct by foreign individuals at foreign entities taking place outside the United States.  Every single official that Alba alleges was bribed was foreign (RCS at 20-23), all of them acted in Bahrain (id. at 28-30), and none of the purported bribery took place in the United States.  Norex, 631 F.3d at 31 (dismissing a case involving similar allegations).  Alba's supply agreements were agreements with foreign entities, Alcoa of Australia and the Dahdaleh entities, which provided for the supply of Alcoa of Australia alumina created overseas, through foreign assignment or distributor agreements.  And, as Alba alleges, the result of this misconduct was that it (a foreign entity) overpaid hundreds of millions of dollars over the life of the agreements.  The harm of the alleged fraudulent scheme was therefore entirely foreign.[18]  RICO simply does not apply.

## II. ALBA'S COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY FOR FAILING TO PLEAD FRAUD ADEQUATELY (CLAIM 3).

To state a claim for fraud, plaintiff must plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it (reliance) to his damage.

_____

Discount of St. Louis, Inc., No. 4:10CV16, 2010 WL 4178942, at *3 (E.D. Mo. Oct. 20, 2010).

[18] Alba makes a passing reference to purported harm to "other potential suppliers". (RCS at 24.)  Alba does not allege these unidentified suppliers are domestic.

Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992); Ira G. Steffy & Son, Inc. v.

Citizens Bank of Pa., 7 A.3d 278, 289 (Pa. Super. Ct. 2010).  Plaintiffs must "plead with

particularity the circumstances of the alleged fraud", including the date, place and time of

the alleged events.  Morales v. Superior Living Prods., LLC, No. 09-3933, 2010 WL

4249815, at *1 (3d Cir. Oct. 28, 2010).  Finally, a description of the overarching

fraudulent scheme cannot substitute for detailed allegations about the underlying fraud

itself.  See In re Am. Investors Life Ins. Co. Annuity Mktg. and Sales Practices Litig.,

No. 04-3799, 2006 WL 1531152, at *10 (E.D. Pa. June 2, 2006).

Alba's Complaint alleges that the Defendants committed fraud in two

ways, both of which fail as a matter of law.  First, Alba alleges that the Defendants

"intentionally misled Plaintiff by failing to disclose that bribes were paid to one or more

senior officials of Plaintiff and the Government of Bahrain".  (Am. Compl. ¶ 212.)

Second, Alba alleges that the Defendants "intentionally misled Plaintiff by creating and

fostering the false impression that Dahdaleh-owned shell companies were Alcoa

subsidiaries".  (Id. ¶ 214.)  These allegations fail to state a claim for fraud because Alba

does not plead particular facts to establish any, let alone all, of the elements of fraud.[19]

---

[19] Alba's failure to plead fraud likewise dooms its RICO claim.  Each of the six
predicate acts Alba alleges sounds in fraud:  (i) mail fraud (Am. Compl. ¶¶ 176-83),
(ii) wire fraud (id.), (iii) transport and receipt of stolen money (id. ¶¶ 184-85), (iv-v) two
violations of the Foreign Corrupt Practices Acts ("FCPA") (id. ¶¶ 186-95), and
(vi) violation of the Travel Act (id. ¶¶ 196-99).  Alba alleges that having "devised or
intended to devise a scheme or artifice to defraud Alba or to obtain money from Alba by
means of false or fraudulent pretenses, representations or promises", the Defendants
committed mail and wire fraud (id. ¶ 176), transported or caused to be transported money
"stolen, converted or taken by fraud" (id. ¶ 184), paid bribes (id. ¶¶ 186, 192), and
traveled in furtherance of the scheme to defraud (id. ¶ 196).  Alba describes these
predicate acts as "fraudulent acts".  (Id. ¶ 213 ("Defendants' fraudulent acts include those
set forth in paragraphs . . . 166-201 above.").)

A.    **Alba Does Not Plead an Actionable Omission, Because It Does Not Establish that Defendants Had Any Duty to Speak.**

Where a plaintiff alleges fraud based on a nondisclosure, rather than an affirmative misrepresentation, it must show that the defendant had a duty to speak. Johnson v. Hyundai Motor Am., 698 A.2d 631, 637 (Pa. Super. Ct. 1997).  A duty to speak may arise (1) "from a confidential or fiduciary relationship" or (2) "from a partial disclosure that is misleading if additional information is withheld".  Alvarez v. Ins. Co. of N. Am., No. 06-4326, 2006 WL 3702641, at *2 (E.D. Pa. Dec. 12, 2006).  Alba has not alleged either.  First, Alba does not allege that Alba and Alcoa Defendants had a confidential or fiduciary relationship, nor could it.  Alba and Alcoa Defendants are commercial entities in the business of producing or processing alumina and its products.  Their relationship was arm's length and contractual.  Under Pennsylvania law, arm's-length contracting parties do not owe one another fiduciary duties, and therefore do not have a duty to speak.  See Peerless Wall & Window Coverings, Inc. v. Synchronics, Inc., 85 F. Supp. 2d 519, 532 (W.D. Pa. 2000); see also Warminster Equities, LLC v. Warminster Commerce, LLC, No. 10-520, 2010 WL 5185004, at *5 (E.D. Pa. Dec. 21, 2010).  Second, Alba does not allege that Alcoa Defendants made any partial disclosures regarding alleged payments to senior officials of Alba and the Government of Bahrain such that it was misled in light of additional information being withheld.  Alcoa Defendants cannot therefore be liable for a fraud arising out of alleged partial disclosures. Alvarez, 2006 WL 3702641, at *2.

B.    **Alba Does Not Plead an Actionable Misstatement with Particularity.**

Alba pleads that several statements by Alcoa Defendants were misleading or designed to obscure the relationship among Defendants, but these statements do not

29

state an actionable claim for fraud because they were not false or misleading.  Alba

alleges that "Defendants represented to Alba that the assignment of Market Tonnage [to a

Dahdaleh entity] was necessary in order to avoid disclosure of Alcoa's prices to other

customers and the Government of Australia" (Am. Compl. ¶ 67), but that "Defendants'

explanation to Alba for the assignment was false."  (Id. ¶ 68.)  Alba also alleges that

defendants and their employees made false and misleading statements concerning

Alcoa's and AWA's relationship with Dahdaleh-controlled entities by "instruct[ing] the

Dahdaleh-owned shell companies to use Alcoa's logo on invoices and correspondence to

further the false impression that the Dahdaleh-owned shell companies were simply Alcoa

associates, rather than unnecessary intermediaries and conduits for bribes".  (Id. ¶ 168.)

These representations, according to Plaintiff, "creat[ed] and foster[ed] the false

impression that Dahdaleh-owned shell companies were Alcoa subsidiaries" (id. ¶ 214)

and "induce[d] Plaintiff to overpay for alumina purchased from Defendants".  (Id. ¶ 215.)

    The problem with Alba's claim is that all of the purported misstatements

were in fact true and accurate statements of Alcoa of Australia's relationship with

AAAC.  Alba cannot complain that Alcoa Defendants represented that "AAAC was 'an

associate company and distributor' of Alcoa of Australia" or that AAAC was "'fully and

solely authorized to negotiate the present alumina supply agreement with Alba'" (id.

¶ 168(g)) because AAAC was associated with Alcoa of Australia, was Alcoa of

Australia's distributor and was "fully and solely authorized" to negotiate an alumina

supply agreement with Alba.  In re Marta Group, Inc., 47 B.R. 220, 224 (Bankr. E.D. Pa.

1985) (a claim for common-law fraud cannot be based on statements that were true).

Indeed, Alba itself pleads that on February 14, 2002, Alcoa of Australia entered into an

agreement with Dahdaleh entities Alumet Ltd. and AA Alumina & Chemicals Limited which appointed those entities Alcoa of Australia's sole distributor of alumina to Alba. (Am. Compl. ¶ 80.)  Alba's further assertion that AAAC's use (at Rice's direction) of Alcoa's logo on invoices and correspondence is not actionable for the same reasons. Although Alba contends that the use of Alcoa's logo was intended to create the false impression that AAAC and other Dahdaleh-owned companies were Alcoa subsidiaries (Am. Compl. ¶ 214), it elsewhere concedes that Alcoa Defendants repeatedly informed Alba that AAAC and Dahdaleh were distributors or associates (id. ¶ 168(g)).  On the very invoices and correspondence Alba attaches as exhibits, it identifies AAAC signatories as AAAC employees, not employees of Alcoa or any Alcoa subsidiary.  (RCS Exs. 8, 9.)

Any insinuation that Alba was actually misled concerning who controlled the Dahdaleh entities is contradicted by Alba's own allegations.  Alba knew that some of its alumina supply came through Dahdaleh entities because Alba agreed to Alcoa of Australia's assignment of the Market Tonnage to those entities in the 1996 Amendment. The later letters and invoices from AAAC were sent by the same employees who managed the Market Tonnage pursuant to the 1996 Amendment, and payment was made to some of the same accounts.  Moreover, Alba had multiple interactions with Dahdaleh as Alcoa of Australia's agent, as well as with employees of the Dahdaleh entities.  (Am. Compl. ¶¶ 48, 64, 72.)  Any allegation that Alba was misled is simply not plausible.

C.    **Alba Does Not Plead Scienter with Particularity.**

Alba must also allege particular facts that show that defendants knew their statements about material facts were false and that they had an actual intent to deceive, manipulate or defraud.  The purported misrepresentations Alba cites could not have been

31

made with that intent because the statements were all true.  Likewise, Alba does not adequately allege scienter with respect to Alcoa Defendants' purported failure to disclose the bribery scheme between Dahdaleh and Alba officials and the Government of Bahrain, because Alba does not allege any particularized facts that indicate that Alcoa Defendants had knowledge of the purported bribery.  The only allegation that even suggests that Alcoa Defendants could have known of the alleged bribery scheme between Dahdaleh and Alba stems from the existence of distributor contracts that "provided for the sale of alumina . . . at prices substantially lower than those paid by Alba for the same alumina".  (Am. Compl. ¶ 214.)  This allegation does not give rise to any inference that Alcoa Defendants were participants in the fraudulent scheme.  <u>Majer v. Sonex Research, Inc.</u>, 541 F. Supp. 2d 693, 708 (E.D. Pa. 2008) ("[A]llegations that the defendants 'knew' or 'must have known' that statements were fraudulent are insufficient.").  Even if Alba proves that Alcoa Defendants sold alumina at "substantially lower" prices than the prices ultimately charged by Dahdaleh, Alba has not made any allegation that would justify the conclusion that Alcoa Defendants had the intent thereby to defraud Alba or benefit from Dahdaleh's alleged scheme.  Therefore, Alba has not pled facts sufficient to plead scienter, and Alba's fraud claim must be dismissed.

> **D.    Alba Fails Adequately to Allege Justifiable Reliance.**

Although Alba alleges that it "justifiably relied upon Defendants' misrepresentations that the Dahdaleh-owned shell companies were Alcoa subsidiaries" (Am. Compl. ¶ 219), this is nothing more than a conclusory allegation that is insufficient to support Alba's claim of fraud.  Alba has not, and cannot, plead justifiable reliance because whether Dahdaleh was a distributor or an officer of an Alcoa subsidiary was

plainly irrelevant to Alba's decision to enter into alumina contracts that allegedly charged "excessive prices" and contained "commercially unreasonable terms".  (Id. ¶ 168(g).) Indeed, Alba itself claims that it entered into contracts with Dahdaleh because of the alleged bribes he paid both Alba officers and officials from the Bahraini Government, not because Dahdaleh was or was not an officer of an Alcoa subsidiary.  Because a precise understanding of Alcoa Defendants' relationship with Dahdaleh was irrelevant to the decision, there could have been no reliance on the alleged representations in question. Emery v. Third Nat. Bank of Pittsburgh, 314 Pa. 544, 547-48 (Pa. 1934) (affirming the dismissal of a fraud claim where the misstatement did not induce plaintiff to enter into the agreement).[20]

### E.    Alba Fails Adequately to Allege "Loss Causation".

To state a claim for fraud, Alba must allege loss causation, which requires Alba to show that Alcoa Defendants' alleged misconduct was the direct and proximate cause of the losses claimed.  Debbs v. Chrysler Corp., 810 A.2d 137, 157 (Pa. Super. Ct. 2002).  Alba's Amended Complaint is bereft of such a link, as there is no connection between Alba's allegation that Alcoa Defendants were secretly using a foreign distributor

---

[20] Alba's allegations of justifiable reliance are also insufficient with respect to the years after Alba uncovered the alleged fraud, when Alba nevertheless contends Alcoa Defendants continued the scheme.  According to Alba's Amended Complaint, Alba discovered the alleged "scheme" in 2007.  (Am. Compl. ¶ 29.)  Yet Alba's Amended Complaint alleges that Alcoa Defendants defrauded the company even between 2007 and 2009 (id. ¶ 22), and the RCS alleges that Alba was overcharged tens of millions of dollars after it allegedly uncovered the bribery scheme.  Alba cannot justifiably rely on statements once it learned they were false.  Shapiro, 964 F.2d at 284 (holding "ignorance of its falsity" is an element of justifiable reliance).  Moreover, the fact that Alba did not immediately suspend its purchase of alumina once it allegedly uncovered the purported bribery scheme calls into doubt the entire premise of a fraud.

(as opposed to a foreign subsidiary) and the losses Alba purportedly suffered as a result

of Dahdaleh's alleged bribes.  Moreover, although Alba alleges that its alumina contracts

charged "excessive prices" and contained "commercially unreasonable terms" (Am.

Compl. ¶ 168(g)), it does not plead any particular facts that indicate what fair market

prices were during this period and identifies only one specific provision in only one of

the contracts (not signed by Alcoa Defendants) that was allegedly "commercially

unreasonable".[21]  Absent such details, Alba's allegations are insufficient.  If anything,

they suggest that Alba's reported losses stem from bribery, not statements about Alcoa

Defendants' relationship with Dahdaleh.

### III.   ALBA'S CONSPIRACY CLAIMS SHOULD BE DISMISSED (CLAIM 2 AND CLAIM 4).

Alba's RICO conspiracy claim and its civil conspiracy to defraud claim

should likewise be dismissed because Alba has failed properly to plead the underlying

RICO and fraud claims that are the subject of the alleged conspiracies.  In order to plead

a conspiracy to commit RICO or a civil conspiracy to defraud, Alba must properly plead

the underlying RICO or fraud claim.  Kolar v. Preferred Real Estate Invs., Inc., 361 F.

App'x. 354, 366 (3d Cir. 2010) (holding that a RICO conspiracy claim must fail if the

---

[21] Alba objects to a provision that "required payment by wire transfer within three days of Alba's receipt of the invoice" as opposed to the 30 days permitted under previous contracts.  (Id. ¶ 144)  Although Alba calls this provision "unreasonable" (id.), it does not plead any facts that suggest this provision is contrary to industry standards.  Nor does Alba give any explanation, beyond the fact that Alba failed on many occasions to comply with this provision, on which anyone could infer the provision was unreasonable.  Alba also pleads that two other provisions were "economically detrimental".  (Id. ¶ 145.)  Even assuming these provisions were detrimental to Alba—an allegation Alba does not elaborate on—the loss associated with agreeing to economically disadvantageous provisions is not the same as pleading particularized facts about losses arising from fraud.

underlying RICO claim is deficient); <u>McKeeman v. Corestates Bank, N.A.</u>, 751 A.2d

655, 660 (Pa. Super. Ct. 2000) (same).  Alba has not done so here, and therefore these

claims should be dismissed.

**Conclusion**

For the foregoing reasons, this Court should dismiss the Amended

Complaint in its entirety with prejudice.

Dated:  January 27, 2012

Respectfully submitted,
CRAVATH, SWAINE & MOORE LLP

by
   /s/ Julie A. North
_____
Evan R. Chesler
Julie A. North
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel:  (212) 474-1000
Fax:  (212) 474-3700

*Attorneys for Defendants Alcoa, Inc. and Alcoa*
*World Alumina LLC*

K&L Gates LLP

by

   /s/ Nicole A. Stockey
_____
David L. McClenahan (Pa. I.D. No. 01301)
Andrew R. Stanton (Pa. I.D. No. 93409)
Nicole A. Stockey (Pa. I.D. No. 306955)

K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
(412)-355-6500 (tel)
(412)-355-6501 (fax)

35

## CERTIFICATE OF SERVICE

I, Nicole A. Stockey, hereby certify that the foregoing Joint Memorandum in Support of Their Motion to Dismiss the Amended Complaint to was served upon all counsel of record by ECF filing this 27th day of January, 2012.

_____/s/ Nicole A. Stockey_____