## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALUMINIUM BAHRAIN B.S.C.,<br><br>                          Plaintiff,<br><br>        vs.<br><br>ALCOA, INC., ALCOA WORLD ALUMINA LLC, WILLIAM RICE and VICTOR DAHDALEH,<br><br>                    Defendants. | 2:08-CV-00299 (DWA) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT WILLIAM RICE'S MOTION TO DISMISS
## THE FIRST AMENDED COMPLAINT OF ALUMINIUM BAHRAIN B.S.C.

## <u>TABLE OF CONTENTS</u>

I.     ALBA'S RICO CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL ................. 1

     A.     The Association-in-Fact Enterprises Conducted Their Activities Overseas.......... 2

     B.     The Focus of the Enterprises Was Overseas ................................................................. 6

     C.     The Critical Members of the Enterprises Were Foreign and Overseas ................. 7

II.    ALBA'S CLAIMS FAIL TO SATISFY THE PLEADING REQUIREMENTS OF
     RULES 12(b)(6) AND 9(b) ................................................................................................... 9

     A.     Pleading Requirements ....................................................................................................... 9

     B.     Alba's RICO Claims Fail Under Rules 12(b)(6) and 9(b) .............................. 14

           1.   "Conduct" Element.................................................................................................... 15

           2.   Racketeering Activity Element ............................................................................ 17

                a.   Mail Fraud ................................................................................................. 17

                b.   Wire Fraud ................................................................................................. 18

                      i.   Use of the Term "Associated Company".................................. 19

                      ii.  Alleged Representation That AAAC Was a Subsidiary
                           of Alcoa.................................................................................... 20

                c.   Transport and Receipt of Fraudulently Taken Property .................... 22

                d.   FCPA Allegations ..................................................................................... 23

                e.   Travel Act Allegations ............................................................................ 25

     C.     Alba's Common Law Fraud Claim Fails under Rules 12(b)(6) and 9(b)........... 26

           1.   Allegation of an Omission ................................................................................ 26

           2.   Allegations of Misleading Statements ............................................................ 27

     D.     Alba's Conspiracy Claims Fail Under Rules 12(b)(6) and 9(b) .......................... 29

III.   ALBA'S FAC SHOULD BE DISMISSED WITH PREJUDICE ................................... 31

IV.   CONCLUSION...................................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Adams v. NVR Homes, Inc.*,
 193 F.R.D. 243 (D. Md. 2000)...................................................................................18, 22

*American Centennial Ins. Co. v. Seguros La Republica, S.A.*,
 No. 91-cv-1235, 1996 WL 304436 (S.D.N.Y. June 5, 1996).................................20

*Ashcroft v. Iqbal*,
 129 S. Ct. 1937 (2009)..................................................................................10, 11, 14, 32

*Bailey v. Pennsylvania Dep't of Corrections*,
 No. 2:10-cv-1039, 2011 WL 6937473 (W.D. Pa. Nov. 29, 2011) ........................20

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007)................................................................................................ passim

*Boyle v. United States*,
 556 U.S. 938, 129 S. Ct. 2237 (2009)....................................................................19

*Cedeño v. Intech Group, Inc.*,
 733 F. Supp. 2d 471 (S.D.N.Y. 2010) *aff'd, Cedeño v. Castillo*,
 No. 10-cv-3861, 2012 WL 205960 (2d Cir. Jan. 25, 2012)..........................2, 3, 5, 32

*CGC Holding Co. v. Hutchens*,
 No. 11-cv-01012, 2011 WL 5320988 (D. Colo. Nov. 1, 2011)...............................6

*Dennis v. DeJong*,
 No. 10-cv-06789, 2011 WL 4732810 (E.D. Pa. Sept. 30, 2011)...........................30

*Duquesne Light Co. v. Westinghouse Elec. Corp.*,
 66 F.3d 604 (3d Cir. 1995)....................................................................................27

*Environmental Tectonics v. W.S. Kirkpatrick, Inc.*,
 847 F.2d 1052 (3d Cir. 1988).................................................................................23

*European Community v. RJR Nabisco, Inc.*,
 No. 02-cv-5771, 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011)....................................7

*Fernander v. Amanze*,
 No. 02-cv-603, 2007 WL 4083769 (E.D. Pa. Nov. 15, 2007)................................27

*Fox's Foods v. Kmart Corp.*,
 870 F. Supp. 599 (M.D.PA. 1994).........................................................................28

*Frederico v. Home Depot*,
  507 F.3d 188 (3d Cir. 2007)................................................................10

*General Refractories Co. v. Fireman's Fund Ins. Co.*,
  337 F.3d 297 (3d Cir. 2003)................................................................30

*Government of Dominican Republic v. AES Corp.*,
  466 F.Supp.2d 680 (E.D.Va. 2006) .....................................................23

*Grose v. Procter & Gamble Paper Prods.*,
  866 A.2d 437 (Pa. Super. Ct. 2005).....................................................30

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004)................................................................28

*Hirsch v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995).................................................................20

*In re Crude Oil Commodity Litig.*,
  No. 06-cv-6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) .......................19, 27

*In re Insurance Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)................................................................15

*In re Le-Nature's, Inc. v. Krones, Inc.*,
  No. 9-MC-162, 2011 WL 2112533 (W.D. Pa. May 26, 2011).....................1, 2, 11

*In re Livent Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001)...................................................20

*In re Rockefeller Ctr. Props, Inc. Sec. Litig.*,
  311 F.3d 198 (3d Cir. 2002)................................................................10

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006)................................................................31

*J.D. Marshall Int'l, Inc. v. Redstart, Inc.*,
  935 F.2d 815 (7th Cir. 1991) .................................................................1

*Liggon-Redding v. Cong. Title*,
  229 Fed. App'x. 105 (3d Cir. 2007) .....................................................14

*Lum v. Bank of America*,
  361 F.3d 217 (3d Cir. 2004)........................................................ passim

*Maywalt v. Parker & Parsley Petroleum Co.*,
  808 F. Supp. 1037 (S.D.N.Y. 1992)......................................................20

*McCarthy v. Luzerne County*,
No. 3:11-cv-0096, 2011 WL 2607174 (M.D. Pa. July 1, 2011) ............................................27

*McCullough v. Zimmer, Inc.*,
No. 08-cv-1123, 2009 WL 775402 (W.D. Pa. Mar. 18, 2009) ................................................32

*Morrison v. Nat'l Austl. Bank Ltd.*,
130 S. Ct. 2869 (2010) ........................................................................................... passim

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
540 F. Supp. 2d 438 (S.D.N.Y. 2007) ...............................................................................4, 32

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
631 F.3d 29 (2d Cir. 2010) ............................................................................1, 2, 3, 4

*Occupational Urgent Care Health Sys., Inc. v. Sutro & Co.*,
711 F. Supp. 1016 (E.D. Cal. 1989) .................................................................................17

*Palm Beach County Environmental Coalition v. Florida*,
651 F. Supp. 2d 1328 (S.D. Fla. 2009) ............................................................................24

*Rapoport v. Asia Elecs. Holding Co.*,
88 F. Supp. 2d 179 (S.D.N.Y. 2000) ................................................................................18

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) ...........................................................................................15, 16

*Ross v. Foremost Insurance Co.*,
998 A.2d 648 (Pa. Super. Ct. 2010) ................................................................................26

*Salahuddin v. Jones*,
992 F.2d 447 (2d Cir. 1993) ............................................................................................20

*Salinas v. United States*,
522 U.S. 52 (1997) ..............................................................................................30

*Schnell v. Bank of New York Mellon*,
No. 11-cv-601, 2011 WL 5865966 (E.D. Pa. Nov. 22, 2011) ...................................26, 30, 31

*Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*,
742 F.2d 786 (3d Cir. 1984) ...........................................................................................10

*Smith v. Berg*,
247 F.3d 532 (3d Cir. 2001) ......................................................................................29, 30

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir.), *amended by* 275 F.3d 1187 (9th Cir. 2001) ....................................20

iv

*Strickland v. Univ. of Scranton*,
  700 A.2d 979 (Pa. Super. Ct. 1997) ................................................30

*Sunquest Info. Systems v. Dean Witter Reynolds*,
  40 F. Supp. 2d 644 (W.D. Pa. 1999) ...............................................27

*Thompson Coal Co. v. Pike Coal Co.*,
  488 Pa. 198, 412 A.2d 466 (1979) ...................................................30

*United States v. Antico*,
  275 F.3d 245 (3d Cir. 2001) .............................................................17

*United States v. Philip Morris USA, Inc.*,
  783 F. Supp. 2d 23 (D.D.C. 2011) .....................................................2

*United States v. Tashjian*,
  660 F.2d 829 (1st Cir. 1981) ............................................................23

*United States v. Wander*,
  601 F.2d 1251 (3d Cir. 1979) ...........................................................25

*United States v. Weiner*,
  755 F. Supp. 748 (E.D. Mich. 1991) ................................................23

*Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*,
  996 F.2d 1534 (3d Cir. 1993) .....................................................15, 16

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ..........................................................17

*Williams v. WMX Techs. Inc.*,
  112 F.3d 175 (5th Cir. 1997) ..............................................................1

STATUTES

15 U.S.C. § 78dd-2(c)(1) ..........................................................................24

15 U.S.C. § 78dd-3 ...................................................................................25

15 U.S.C. § 78dd-3(f)(10) .........................................................................25

18 U.S.C. § 1952 ......................................................................................25

18 U.S.C. § 1961 ......................................................................................23

18 U.S.C. § 1962(c) ..................................................................................29

18 U.S.C. § 2314 ......................................................................................22

18 U.S.C. § 2315 ..............................................................................................................22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a)(1) .......................................................................................................11

Fed. R. Civ. P. 9(b) .....................................................................................................10, 32

Defendant William Rice respectfully submits the following points and authorities in support of his Motion to Dismiss the First Amended Complaint ("FAC") of Aluminium Bahrain B.S.C. ("Alba").  In over 100 pages full of repetition and unsupported supposition,[1] Alba's FAC and RICO Case Statement ("RICO Statement") assert a two-decade-long fraud involving corrupt payments, but in fact are devoid of any allegation that Mr. Rice offered, promised or gave anything of value to foreign officials, any uncontradicted and specific allegation that Mr. Rice knowingly misrepresented any material fact in order to further a fraud, or any specific allegation tying Mr. Rice to a related conspiracy.  Stripped of their conclusory allegations dressed as facts, the FAC as supplemented by the RICO Case Statement must be dismissed for failing to satisfy the requirements of Rules 12(b)(6) and 9(b).

## I.    ALBA'S RICO CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL

The Supreme Court recently held that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010).  Relying on that decision, this Court and others correctly have held that because the statute does not suggest Congressional intent to give RICO extraterritorial application, the statute has no extraterritorial reach.  *See, e.g.*, *In re Le-Nature's, Inc. v. Krones, Inc.*, No. 9-MC-162, 2011 WL 2112533, at *2 (W.D. Pa. May 26, 2011); *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010).  Since *Morrison*, this Court has held that the object of the statute is the RICO enterprise and that the operative question in determining the extraterritorial status of a RICO claim is whether the enterprise is domestic or foreign.  *In re Le-Nature's*, 2011

---

[1] "A complaint can be long-winded, even prolix, without pleading with particularity.  Indeed, such a garrulous style is not an uncommon mask for an absence of detail."  *See Williams v. WMX Techs. Inc.*, 112 F.3d 175, 178 (5th Cir. 1997); *see also J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991) ("Adding more warts to the hog still does not make it a dragon.") (internal citations omitted).

WL 2112533, at *3.  Based upon this reasoning, several courts have held that the statute does not apply to association-in-fact enterprises that are *predominantly* foreign in nature.  *See, e.g.*, *Norex*, 631 F.3d at 33; *United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 29 (D.D.C. 2011); *Cedeño v. Intech Group, Inc.*, 733 F. Supp. 2d 471, 473-74 (S.D.N.Y. 2010) *aff'd*, *Cedeño v. Castillo*, No. 10-cv-3861, 2012 WL 205960, at *1 (2d Cir. Jan. 25, 2012).  The law concerning how to determine the foreign or domestic nature of an association-in-fact enterprise, however, remains unsettled.  *See In re Le-Nature's*, 2011 WL 2112533, at *3 n.9 (acknowledging potential difficulty of determining whether association-in-fact enterprise is domestic).  Nevertheless, association-in-fact enterprises, such as the ones alleged by Alba, whose members are predominantly foreign, whose activities are conducted primarily through foreign members, and that have a singular focus and purpose to commit fraudulent acts overseas and against foreign entities, are necessarily extraterritorial.  Therefore, regardless of the test adopted, Alba's RICO claims should be dismissed.  Measured against any standard, they are extraterritorial.

A.      **The Association-in-Fact Enterprises Conducted Their Activities Overseas**

In analyzing the nature of an association-in-fact enterprise, the Second Circuit has focused on the location of conduct key to the enterprise's operations.  In *Norex*, the Second Circuit affirmed the dismissal of RICO claims involving an alleged scheme to take over portions of the Russian oil industry, reasoning that simply alleging some domestic conduct will not transform a predominantly extraterritorial RICO claim into a domestic one.  *Norex*, 631 F.3d at 33.  Relying on the intervening decision in *Morrison*, the Second Circuit stated that "the slim contacts with the United States" alleged by Norex were insufficient to overcome *Morrison's*

presumption against extraterritorial application.[2]  *Id.*  The allegations in this case are strikingly

similar to the allegations in *Norex*, and the dissimilarities in the two cases favor a finding that

Alba's RICO claims are extraterritorial.

| **Allegations by Norex** | **Allegations by Alba** |
|---|---|
| The object of defendants' conspiracy was to take over the Russian oil industry. | The object of the conspiracy was to defraud Alba, a company located in Bahrain, *see* FAC at 2, and for which a majority of the shares are owned by the government of Bahrain, *see* FAC at 3 ¶ 4. |
| The conspiracy involved numerous Americans who masterminded, operated, and directed the illegal conduct. | American companies masterminded the conspiracy and "controlled and directed" the actions of the association members, *see* FAC at 2, 4 ¶ 13. |
| The defendants committed *almost all* of the predicate acts of racketeering in the United States, including mail and wire fraud, Travel Act violations, and bribery of Russian officials. | The defendants' alleged mail and wire fraud, Travel Act violations, and violations of §§ 2314-15 had connections to the United States, but that alleged corrupt payments were made overseas.  *See* FAC at 4. |
| The defendants used money transferred through United States wires to bribe Russian officials. | There is no allegation that corrupt payments were made through United States wires.  Alba alleges that it was instructed to make payments for alumina to New York banks, *see* FAC at 13 ¶ 72(a)-(b), or United States accounts of foreign banks, *see* FAC at 18 ¶ 97(a)-(b). |

---

[2] The Second Circuit rejected the argument that if the underlying statute prohibiting the racketeering activity is extraterritorial in nature, a RICO action predicated on such violations should be given extraterritorial application.  *Norex*, 631 F.3d at 33; *Cedeño*, 2012 WL 205960, at *1.

| The defendants traveled between the United States and Russia in aid of the conspiracy. | Alcoa's CEO and other Alcoa employees traveled from the United States to Bahrain and London in connection with a proposal for a business alliance with Alba that ultimately did not come about.  *See* FAC at 21 ¶ 116; 23 ¶ 127(a)-(b). |
|---|---|
| One defendant attempted to extort Norex's CEO while the CEO was in San Francisco. | There is no allegation that acts of bribery occurred in the United States. |
| The alleged racketeering activity harmed U.S. investors and U.S. competitors. | The alleged fraud scheme harmed Alba's stockholders, the people of Bahrain, and unnamed Alcoa competitors whose nationality is not pleaded.  *See* RICO St. at 24. |

*Compare Norex Petroleum Ltd. v. Access Indus., Inc.*, 540 F. Supp. 2d 438, 439-46 (S.D.N.Y. 2007) (setting forth facts considered in *Norex*, 631 F.3d 29 (2d Cir. 2010)) *with* FAC.

Just as the domestic contacts in *Norex* were insufficient to overcome the presumption against extraterritorial application, so too are the alleged domestic contacts in this case. Although Alba alleges that two domestic entities and two United States citizens were members of the otherwise foreign association-in-fact enterprise,[3] Alba makes no allegations of specific conduct by any of them that go to the crux of this lawsuit, namely that the Dahdaleh companies made corrupt payments to foreign persons.  In fact, the FAC makes scarcely *any* allegations of specific conduct by these alleged domestic members, reverting instead to unsupported and conclusory allegations, for example, that Alcoa Inc. and AWA LLC "controlled and directed the actions of Alcoa of Australia with respect to contract negotiations and alumina supply to Alba."[4] FAC at 2 and 4.

---

[3] And that Alcoa Inc., AWA LLC, and Mr. Rice were members of the "alternative" enterprise.

[4] *See also, e.g.*, FAC at 22 ¶ 118; 25 ¶ 137 ("Upon information and belief, Dahdaleh . . . made . . . payments with the knowledge and at the direction of Alcoa, Alcoa World Alumina, and Rice.").

As Alba admits, Alcoa of Australia was a separate legal entity from Alcoa Inc., and it was Alcoa of Australia that contracted with and sold alumina initially to Alba and later to the foreign Dahdaleh companies. *See* FAC at 5 ¶ 20 ("The alumina itself was supplied by Alcoa's subsidiary, Alcoa of Australia."), at 6 ¶ 26(a)-(b) (acknowledging that Alcoa of Australia, not Alcoa Inc., contracted with the Dahdaleh companies), at 8 ¶ 38 (acknowledging that Alcoa of Australia, not Alcoa Inc., contracted with Alba). Finally, it was the foreign Dahdaleh companies that allegedly made the corrupt payments to foreigners from foreign locations. *See* FAC at 4 ¶ 15 (acknowledging that Alumet Limited was incorporated in the BVI, Kwinalum Trading and Alumet Asia were registered in Singapore, the AAAC entities were incorporated in Switzerland, and United Legal Engineering was incorporated in the Channel Islands), at 8 ¶ 36 ("The Dahdaleh-owned entities . . . distributed the proceeds of the fraud to . . . senior officials of Alba and the Government of Bahrain.").

Moreover, although the test used by the district court in *Cedeño v. Intech Group* was less clearly articulated, it held that use of United States banks was not sufficient to convert an otherwise foreign enterprise into a domestic enterprise. The court stated that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States," and concluded that the laundering of funds by moving them in and out of the United States was not sufficient to create a domestic RICO claim. *Cedeño*, 733 F. Supp. 2d at 473 (citing *Morrison*, 130 S. Ct. at 2884).[5] Alba's allegations that the proceeds of the alumina sales were deposited into United States banks are likewise insufficient. Accordingly, under a conduct-

---

[5] The Second Circuit affirmed the dismissal. *Cedeño*, 2012 WL 205960, at *1 (stating that whether focusing on the enterprise or the racketeering activity, the RICO claim was extraterritorial).

5

centered test, the key conduct of the enterprises alleged by Alba occurred predominantly

overseas, rendering Alba's RICO claims extraterritorial.

**B.      The Focus of the Enterprises Was Overseas**

In *CGC Holding Co. v. Hutchens*, No. 11-cv-01012, 2011 WL 5320988, at *14 (D. Colo.

Nov. 1, 2011), the court found that the primary focus of the RICO statute is on the pattern of

racketeering activity.  In holding that plaintiff's RICO claims were domestic claims, the court

reasoned that although the majority of the participants in the RICO scheme resided in Canada,

their racketeering activity was directed at and largely occurred within the United States, and the

goal of the RICO enterprise was to defraud domestic borrowers and a Colorado company.  *Id.*

The court emphasized that the conduct of the enterprise that occurred within the United States

(*e.g.*, issuing wire transfer instructions to a Colorado company, sending a realtor to Colorado to

inspect and issue favorable reports on real property to be used as collateral for fraudulent loans,

and using the wires and mail to negotiate the terms of the contract with the defrauded Colorado

plaintiff) was key to the operation's success.

In contrast to *CGC Holding*, although Alba has alleged the use of the mail and interstate

carriers and wires, the focus of the fraud scheme alleged was not on the United States or on

United States citizens or entities, or even *partially* directed at the United States.  Indeed, the

alleged enterprises had a myopic focus on gaining alumina contracts with and an equity interest

in one foreign entity, Alba.  Moreover, the enterprises allegedly accomplished their purposes

through corrupt payments paid solely to foreigners.  As for other victims, the harm alleged to the

government of Bahrain, SABIC (Alba's Saudi Arabian shareholder), and citizens of Bahrain all

occurred overseas.[6]  *See* RICO St. at 24.  Moreover, the FAC alleges that foreign entities sold the alumina and made the corrupt payments.  Accordingly, using a focus-of-the-enterprise test, Alba's RICO claims are demonstrably extraterritorial.  *See* FAC at 5 ¶ 20 (alumina supplied by Alcoa of Australia), at 6 ¶ 26(a)-(b) (Alcoa of Australia contracted with Dahdaleh companies for alumina distribution), at 8 ¶ 38 (Alcoa of Australia contracted with Alba to supply alumina); 8 ¶ 36 (Dahdaleh entities distributed proceeds).

C.      **The Critical Members of the Enterprises Were Foreign and Overseas**

Alba's RICO claims also fail when analyzing them under the "nerve center test" utilized by the Eastern District of New York in *European Community v. RJR Nabisco, Inc.*, No. 02-cv-5771, 2011 WL 843957, at *6-7 (E.D.N.Y. Mar. 8, 2011).  In *RJR Nabisco*, plaintiffs alleged that domestic companies named as RICO defendants used certain companies to sell their products and negotiated business agreements with individuals knowing that they were laundering narcotics proceeds.  In finding that the RICO enterprise was not domestic in nature, the court emphasized that plaintiffs failed to allege how defendants' involvement in these activities demonstrated that they organized, orchestrated, or planned other critical steps involved in the alleged global money laundering scheme.  2011 WL 843957, at *7.  The court reasoned that most of the "steps" alleged in the illegal scheme were carried out by foreign persons and entities, noting that the money laundering cycle of the scheme was directed by South American and European criminal organizations.  *Id.*  On these bases, the court concluded that the enterprise's "nerve center" was outside the United States.

---

[6] Alba also mentions potential harm to unidentified Alcoa competitors.  *See* RICO St. at 24. Their situs is not alleged.

Alba alleges at pages 32 and 33 of the FAC that the alleged association-in-fact enterprises consisted of some combination of the following:

- Canadian citizen Victor Dahdaleh, whose last known address was in London, *see* FAC at 3 ¶ 8, and whose foreign companies allegedly made corrupt payments to foreigners. The FAC does not allege that Mr. Dahdaleh was ever an employee, officer, or director of any Alcoa entity, and it is silent as to anything other than a contractual relationship between Mr. Dahdaleh's foreign companies and Alcoa of Australia.

- Several of Mr. Dahdaleh's foreign companies.

- Employees, officers and directors of the Dahdaleh companies, many for whom no citizenship is alleged,[7] but who conducted their alleged activities overseas where these companies were located.

- One or more former officers and directors of Alba and one or more former officials of the government of Bahrain, none of whom is alleged to be a United States citizen or resident.

- Alcoa of Australia, the Australian supplier of the alumina in question and the company that contracted with Alba and the Dahdaleh companies for the sale of alumina.

- Domestic entities Alcoa Inc. and AWA LLC and United States citizen William Rice, each of which Alba only *conclusorily* avers controlled the operations of Alcoa of Australia and the Dahdaleh companies.[8]  *See, e.g.*, FAC at 2;  RICO St. at 44-45, 50.

As set forth, the members of the enterprises were predominantly foreign persons and foreign entities.  More importantly, as in *RJR Nabisco*, the members that were the alleged backbone of the operation – because they allegedly sold the alumina, allegedly made the corrupt payments, and allegedly received the proceeds of the sales contracts – were *all* foreign.  Alba's allegations of involvement by domestic entities and their employees amount to little more than

---

[7] The FAC alleges that David Dabney is a United States citizen, but it indicates that Mr. Dabney was employed overseas while conducting activities on behalf of the Dahdaleh companies.  *See* FAC at 15-16 ¶ 86(a)-(f) (alleging that Mr. Dabney executed a 2001 contract extension on AAAC letterhead with an address in Perth, Australia).

[8] In the alternative, Alba asserts that the "enterprise includes as its members" a subset of these persons and entities – the four defendants and the Dahdaleh-controlled companies.  RICO St. at 44-45, 50.

conclusory statements that the alleged United States defendants, in some unexplained way, directed and controlled the alleged racketeering activity of others.[9]

In sum, Alba invites this Court to entertain otherwise extraterritorial RICO claims based upon bald assertions that domestic companies and/or United States citizens in some unexplained way controlled and directed the activities of the key participants in the alleged enterprises. Guided by Rule 9(b) and the RICO analyses conducted under Rule 12(b)(6) post-*Morrison*, this Court should reject the invitation. As the Supreme Court stated, the presumption against extraterritorial application of United States laws "would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 130 S. Ct. at 2884. The same would be true here if Alba's RICO claims were permitted to proceed simply because one of the entities conducting the activities of the RICO enterprise was partially owned by a United States parent.

## II. ALBA'S CLAIMS FAIL TO SATISFY THE PLEADING REQUIREMENTS OF RULES 12(b)(6) AND 9(b)

### A. Pleading Requirements

In order to survive a motion to dismiss, a complaint must state a "plausible" claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A "naked assertion" of conspiracy, for example, or "formulaic recitation of the elements . . . will not do." *Id.* at 555. Additionally,

---

[9] Alba alleges that Alcoa Inc. entered into a Memorandum of Understanding with Alba. *See* FAC at 7 ¶ 26(c). This allegation is a red herring. Alba was not bound by the terms of the Memorandum of Understanding for anything more than exploring the possibility of a strategic business alliance. Moreover, Alba could not have been damaged by the concepts contemplated therein, because the proposed business alliance never came to fruition. *See* FAC at 22 ¶ 123 (admitting that Alba declined to enter into the contemplated business alliance). Accordingly, discussions concerning the contemplated business alliance are irrelevant to Alba's claims. Given that this allegation was absent from Alba's original Complaint, filed two years before the final ruling in *Morrison*, it appears that Alba is attempting to use this new allegation to shore up its claims in light of the Supreme Court's decision. This attempt should fail.

courts are "not bound to accept as true a legal conclusion couched as a factual allegation," and when a complaint pleads facts that are "merely consistent with" a defendant's liability, "it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* at 555, 557 (internal citation omitted); *see Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-51 (2009) (stating that a claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

In addition, because each of Alba's causes of action sound in fraud, this Court also must assess whether the FAC and RICO Statement provide Mr. Rice proper notice concerning the "precise misconduct" of which he is accused.  *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007); *see* Fed. R. Civ. P. 9(b).  Proper notice requires allegations of date, place, time, and manner, or "alternative means of injecting precision and some measure of substantiation into [the] allegations of fraud."  *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984); *see also In re Rockefeller Ctr. Props, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002).

Under the heightened standard announced in *Iqbal* and *Twombly*, the Supreme Court has directed that courts considering a motion to dismiss begin by stripping the complaint of allegations that "because they are no more than conclusions, are not entitled to the assumption of truth."  The Court could have been describing Alba's FAC and RICO Statement.  *Iqbal*, 129 S. Ct. at 1950.  They are replete with allegations that are conclusory, redundant, and pleaded only on *unsupported* information and belief, and that seek to lump all of the defendants together in one vague, collective course of conduct without specifically setting forth each defendant's separate role or activities.  *See, e.g.*, FAC at 6 ¶ 26(b) ("Defendants distributed the overpayments . . .

among themselves and used portions of the overpayments to pay *quid pro quo* bribes…"); FAC at 8 ¶ 36 (stating that the Dahdaleh entities distributed the proceeds of a fraud "upon information and belief, [to] Alcoa and the other participants in the conspiracy"); FAC at 7 ¶ 27 ("Alcoa and Alcoa World Alumina, and senior executives of those companies, including Rice, conceived, directed, and controlled these fraudulent schemes in and from the United States."). As directed by the Supreme Court, this Court safely may ignore these types of allegations, and, in accordance with Rule 9(b), must focus its attention on those allegations against Mr. Rice that are pleaded with particularity. *Iqbal*, 129 S. Ct. at 1950; *see In re Le-Nature's*, 2011 WL 2112533, at *1 (setting forth *Twombly* and *Iqbal* standards of review).

Following this dictate, in considering whether Alba has alleged facts demonstrating that Mr. Rice conducted the affairs of a RICO enterprise, the Court need only review the following allegations that Alba has made against Mr. Rice, as these are the only particular, non-conclusory assertions against him:[10]

- AWA LLC, through Mr. Rice, proposed an extension of the 1990 contract by an April 21, 2001 letter sent from Pittsburgh, Pennsylvania that refers to the contract as "our present purchase agreement" and seeks "to continue the relationship we have had for 30 years." FAC 14 ¶ 74.

- "[I]n an [August 15, 2001] email to an employee of Alba . . . Rice stated that David Dabney [an employee of the Dahdaleh companies] would supply pricing information to Alba and that 'we look forward to continuing our long term relationship.'" FAC at 14 ¶ 79; *see also* FAC at 33 ¶ 168(b) (stating "Rice involved David Dabney, a Dahdaleh associate, in the contract negotiation").

- " [A] March 3, 2002 email sent by the former CEO of Alba [an alleged recipient of corrupt payments] to Rice in anticipation of a visit by representatives of Plaintiff to an operating facility of Alcoa in Tennessee stated, 'Just for proper form, I don't make Victor's activities on behalf of [another alleged payment recipient], knowledgeable to

---

[10] Many of the allegations in this list are repeated throughout the FAC and RICO Statement. This list does not capture all of these instances of repetitious pleading, which violate Rule 8's requirement of a "short and plain statement." Fed. R. Civ. P. 8(a)(1).

the plant hence I have removed references to him from your email before forwarding it to others.'  In an email response on March 4, 2002, Rice stated that the host of the Tennessee visit 'is also not aware of Victor's role so we should not get into any misunderstandings.'"  FAC at 17 ¶ 90.

- "Rice and Dahdaleh, among others, represented Alcoa throughout the negotiations [concerning a contemplated, but unconsummated strategic alliance]."  FAC at 21 ¶ 113.  "On or about December 11, 2003, Rice directed Dahdaleh to set up a conference call with 'the appropriate representatives from Bahrain' to plan due diligence in connection with the [contemplated strategic alliance]."  FAC at 21 ¶ 114.  "Rice introduced Dahdaleh as an 'advisor' or 'consultant' to Alcoa during the negotiations and identified Dahdaleh to officials of Alba and the Government of Bahrain as part of Alcoa's team."  FAC at 21 ¶ 115; FAC at 33-34 ¶ 168(e).

- "[Alain Belda] was accompanied by Rice and Dahdaleh on [a] trip [to Bahrain in connection with a proposed strategic business alliance] and in meetings that took place in Bahrain during that visit."  FAC at 21 ¶ 116.  "Rice traveled to Bahrain several times during his tenure as a vice president of Alcoa World Alumina to further the relationship between Alcoa and Alba.  On at least one trip, Rice met with a former officer of Alba and official of the Government of Bahrain who was a recipient of a large portion of Defendants' bribes."  RICO St. at 13.  "In or about April 2004, Defendants Rice and Dahdaleh traveled to Paris and met with Abdulla Saif, Bahrain's Minister of Finance & National Economy, to further discuss the structure of the proposed [strategic alliance]."  RICO St. at 37.  "Alain Belda, Defendant Alcoa's former chairman and chief executive officer, along with Defendants Rice and Dahdaleh, also traveled from the United States to Bahrain from April 19, 2004 through April 20, 2004.  During this trip, Belda and Defendants Dahdaleh and Rice met with Abdulla Saif and discussed the proposed purchase of Alba's shares and Defendant Alcoa's desire to bring the negotiations to a close as quickly as possible."  *Id*.

- "During a meeting in London [attended by] representatives of the Government of Bahrain and consulting firm Roland Berger [] at which they expressed dissatisfaction with the terms offered by Alcoa, Rice and Dahdaleh maintained that Alba was taking the 'wrong position.'  Rice and Dahdaleh asserted that Defendants had access to the highest authorities in Bahrain and that those authorities wanted the transaction completed and would approve Alcoa's proposed price."  FAC at 22 ¶ 119.

- On April 26, 2004, Alain Belda "copied Rice and Dahdaleh on [a] letter [to the Minister of Finance and National Economy of Bahrain, urging reconsideration of Alcoa's offer to take an equity position in Alba] and referred to the Minister's discussions with Rice and Dahdaleh in Paris."  FAC 22 ¶ 120.

- "Defendant Rice, who was co-chairman of the U.S.-Bahrain Free Trade Agreement Coalition, pressured a Bahraini government official, suggesting that if the proposed transaction [involving a strategic business alliance] was not approved, he might not be able to support the adoption of the free trade agreement."  FAC 23 ¶ 126.

- "During negotiations for the 2005 Contract, Alba requested assurance from Rice that Alba was dealing with Alcoa's subsidiary.  Rice sent a fax dated October 26, 2004 from Pittsburgh, Pennsylvania that stated, '[f]or the avoidance of doubt and any confusion,' AAAC was '***an associate company and distributor***' of Alcoa of Australia and was 'fully and solely authorized to negotiate the present alumina supply agreement with Alba." FAC 25 ¶ 138 (emphasis added).  "In an October 29, 2004 facsimile sent from Pittsburgh, Pennsylvania to Alba's CEO Bruce Hall, Rice stated, 'However, should Alba decide not to accept this offer, it is understandable that you will need to find alternatives in order to supply Alba's long term alumina requirements.  I hope you can also appreciate this will dictate that we will direct the alumina, which we anticipate continuing to supply Alba, to other long term customers.'" FAC 25 ¶ 140.  "Rice . . . referred again to 'the offer which was submitted by our associated company, AA Alumina.'  Rice stated that Alcoa wished for 'the mutually beneficial relationship between Alba and Alcoa' to continue so that 'we can continue to be Alba's alumina supplier for the next 10 years.'  Rice also instructed Alba to communicate directly with Debney to conclude the contract negotiations." FAC at 27-28 ¶ 147(e); 34 ¶ 168(g).

- "Alcoa and Alcoa World Alumina and senior executives of those companies, including Rice, knowingly directed the negotiation and signature of two parallel contracts in 2001: the 2001 Extension with Alba and the secret 2001 Distribution Agreement with Alumet and AA Alumina and Chemicals.  The secret 2001 Distribution Agreement, which contained the initials of Defendant Rice, *see* FAC at 14-15 ¶ 80 (stating same), charged prices that were significantly lower than the prices paid by Alba." FAC 33 ¶ 168(c); *see* FAC at 34 ¶ 168(g) (same allegation concerning 2005 contracts); *see also* FAC at 30 ¶ 155 (stating Mr. Rice initialed the 2005 Distribution Agreement).

- "Alba incorrectly believed that Dabney was an employee of Alcoa's subsidiary, as evidenced by a fax sent by Alba's purchasing manager to Defendant Rice in Pittsburgh, copying 'Mr. David Dabney, Alcoa of Australia' and inviting Alcoa's proposal for alumina supply during 2002 and 2003 . . . . When Rice replied to Alba's purchasing manager, he allowed[11] this misconception to persist, stating only, 'I understand you have talked to David Dabney today and he will have a response to you shortly. . . . we look forward to continuing our long term relationship.'" RICO St. at 11.

- "In a meeting in London on or about January 20, 2004, Rice and Dahdaleh promoted an arrangement whereby AAAC would supply alumina to Alba in exchange for the 26% equity stake in Alba.  When representatives of the Government of Bahrain and consulting firm Roland Berger asked Rice whether AAAC was a part of Alcoa, Rice claimed that they had no right to ask this and stated that he refused to talk about the company." RICO St. at 12, 36-37.

---

[11] Although Alba claims Mr. Rice "allowed" this alleged misperception to persist, there is no factual allegation that supports this conclusion.

- "Defendant Rice was at all times an agent of and an officer, director or employee of [Alcoa Inc. or AWA LLC] and acting on their behalf."  FAC 39 ¶ 187.

- "Separately, prompted by the board members' inquiries, Hall raised the issue of the nature of AAAC with Defendant Rice.  Rice falsely represented that AAAC was an affiliate of Alcoa."  RICO St. at 30 (citing Alba Exhs. 6-7).  (This allegation is false.  The word "affiliate" does not appear in the cited exhibits.  Instead, Mr. Rice referred to AAAC as "an associated company and distributor.")

- "On or about October 31, 2004, during deliberations regarding the 2005 Contract, Abdulla Saif, Bahrain's Minister of Finance & National Economy, telephoned Rice in Pittsburgh to inquire about the status of AA Alumina & Chemicals.  Rice falsely represented to Saif that AA Alumina & Chemicals was a subsidiary of Alcoa."  RICO St. 12-13.  (The veracity of this allegation is, at best, questionable, particularly given the falsehood attempted in the previous allegation.  It therefore may be disregarded by the Court.  This issue is addressed more fully in section II.B.2.b.)

These allegations are comprised of (1) demonstrably false allegations, (2) factually accurate statements made by Mr. Rice,[12] and (3) normal, innocuous business communications, business travel, and other business activities.  Alba's nonconclusory allegations entail the type of "generic," lawful business behavior that because it is as consistent with innocence as it is with guilt, fails to cross the line from assertions of "*possible*" misconduct to those of "*plausible*" misconduct.  *See Iqbal*, 129 S. Ct. at 1949-51.

**B.     Alba's RICO Claims Fail Under Rules 12(b)(6) and 9(b)**

To plead a violation of RICO, a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Liggon-Redding v. Cong. Title*, 229 Fed. App'x 105, 106 (3d Cir. 2007).  Alba fails to allege facts sufficient to establish the "conduct" element against Mr. Rice and fails to properly plead each of the racketeering activities on which it relies.

---

[12] One allegation – that Mr. Rice referred orally to AAAC as a subsidiary of Alcoa – is belied by the rest of the FAC.  Consequently, this Court may properly disregard it.  *See* section II.B.2.b, *infra*.

## 1.    "Conduct" Element

The "conduct" element of a RICO claim requires that a defendant "have some part in directing [the enterprise's] affairs." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370-71 (3d Cir. 2010) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)). "One is not liable . . . unless one has participated in the operation or management of the enterprise itself." *Id.* (citing *Reves*, 507 U.S. at 183). The Supreme Court has rejected the notion that "conduct" means merely "carry[ing] on" the affairs of an enterprise; rather, "conduct" means to "lead, run, manage, or direct." *Reves*, 507 U.S. at 177-79 ("'[T]o participate . . . in the conduct of . . . affairs'" has a "narrower" meaning than "'to participate in affairs.'"). Thus, "[m]ere association with an enterprise," even where one has provided services helpful to the goals of the enterprise, will not suffice to establish liability. *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 370-71; *Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.")

The Third Circuit has adopted an "operation or management" test for determining whether a person's activities satisfy the conduct element. *Peat*, 996 F.2d at 1538. "Under this test, not even action involving some degree of decisionmaking constitutes participation in the affairs of an enterprise." *Id.* at 1538-39 (holding that it is appropriate to apply the "operation or management" test on a motion to dismiss). A defendant "must knowingly engage in 'directing the enterprise's affairs' through a pattern of racketeering activity." *Id.* at 1539 (citing *Reves*, 507 U.S. at 179). If the complaint does not allege facts demonstrating a defendant's knowledge of the enterprise's unlawful purpose, the defendant cannot be guilty of conducting the enterprise's affairs merely on account of his services to it. Both the Supreme Court and the Third Circuit

have held that accounting firms and innocent service providers were not liable for conducting the affairs of a RICO enterprise, even in the face of allegations that the accountant was serving as the RICO enterprise's "*de facto* chief financial officer."[13]   *See Reves*, 507 U.S. at 185-86, 194; *Peat*, 996 F.2d at 1539-40 (rejecting RICO claim where services arguably were indispensable to enterprise) (citing *Reves*, 507 U.S. at 194 (Souter, J. dissenting)).

Notwithstanding that Mr. Rice was an employee of Alcoa Inc., rather than an outside service provider, the FAC does not allege that Mr. Rice (1) had a role in any decision to make corrupt payments, (2) participated in meetings for the purpose of orchestrating the alleged corrupt payments, (3) agreed with officials of Alba, the government of Bahrain, or any other person that such payments would be made, (4) participated in negotiations concerning the amount of the alleged corrupt payments, or (5) acted as a conduit for the transmission of the payments.   On these allegations, it is at least equally plausible that Mr. Rice was unaware of any RICO enterprise, particularly given that he did not inherit responsibilities related to the supply and distribution contracts at issue until some ten years after the alleged RICO enterprise was established.[14]   Not every employee of a company that allegedly is involved in a RICO enterprise, including an employee with the responsibilities of a mid-level department manager, is guilty of conducting the enterprise solely because he fulfilled his job responsibilities.   Yet, that is all that

---

[13] The *Peat, Marwick* court cited the dissent in *Reves* because it was the dissent that noted plaintiff's allegation that *Peat* was a *de facto* CFO.

[14] The FAC alleges that in 1990, Alcoa Inc. and AWA LLC "inserted" Mr. Dahdaleh into *their* contracts with Alba.  *See* FAC at 5 ¶ 21.  The FAC also alleges that Mr. Rice did not come into his role as Vice President of Sales and Marketing until 2001, *see* FAC at 3 ¶ 7 (alleging that Mr. Rice was Vice President of Marketing for AWA LLC "from approximately 2001 through December 2006"), more than 10 years after, as the FAC alleges, Mr. Dahdaleh became involved in the sale of Alcoa of Australia's alumina to Alba.  In addition, the FAC does not allege any involvement with Alba by Mr. Rice until April 2001.  *See* FAC at 14 ¶ 74 (alleging that in April 2001, Mr. Rice proposed an extension of the 1990 Contract).

Alba has alleged about Mr. Rice.

### 2.      Racketeering Activity Element

Alba also fails to properly plead each of the racketeering activities cited in the FAC, all

of which are based in fraud, and therefore must satisfy both Rules 12(b)(6) and 9(b).  *Vess v.*

*Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-05 (9th Cir. 2003) (holding that any claim

grounded in fraud, even where fraud is not an essential element of claim, must meet

particularity requirements of Rule 9(b)).  Accordingly, Alba fails to plead facts necessary to

establish a pattern of racketeering activity as to Mr. Rice.  *See, e.g.*, *Occupational Urgent Care*

*Health Sys., Inc. v. Sutro & Co.*, 711 F. Supp. 1016 (E.D. Cal. 1989) (dismissing RICO claim

for failure to properly allege facts establishing element of predicate act of securities fraud).

### a.      Mail Fraud

The elements of mail and wire fraud are (1) knowing and willful participation in a

scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) use of the mails or

interstate wire communications in furtherance of the scheme.  *United States v. Antico*, 275 F.3d

245, 261 (3d Cir. 2001).  Although Alba alleges mail fraud, it neglects to identify a single use of

the mail or use of an interstate carrier.  Instead, it speculates that defendants must have used

them, because the scheme pleaded by Alba supposedly could not have occurred otherwise.  *See*

FAC at 37 ¶ 177.  A claim of mail fraud that fails to allege even one particular mailing or use of

an interstate carrier necessarily fails Rule 9(b)'s particularity requirement.  In *Lum v. Bank of*

*America*, 361 F.3d 217, 224 (3d Cir. 2004), the Third Circuit found deficient under Rule 9(b) the

allegation that as a pattern of racketeering activity defendants mailed, on a monthly basis,

thousands of misleading credit card advertisements and other materials.  In holding that the

allegations were impermissibly conclusory, the Third Circuit emphasized that plaintiff's

generalized allegations failed to allege the date, time, or place of even one mailing.  *Id.*  Alba

pleads even less than did the *Lum* plaintiff.  To the extent Alba's RICO claims are based on use

of the mail or interstate carriers, the claims fail.

> **b.    Wire Fraud**

Alba's allegations of wire fraud fair no better.  Alba fails to allege specific,

uncontradicted facts demonstrating that Mr. Rice had knowledge of any unlawful conduct, *see*

section II.B.1., *supra*, much less that he devised or intended to devise a scheme or artifice to

defraud involving the advancement of corrupt payments to foreign persons, or the making of

false statements to Alba, or even that Mr. Rice had knowledge of any such schemes.  The

statements Mr. Rice allegedly transmitted using the wires do not fill the void.  Alba alleges (1)

that Mr. Rice faxed a letter in April 2001 to suggest an extension of the 1990 Contract, *see* FAC

14 ¶ 74; (2) that Mr. Rice sent a fax to Alba in October 2004 describing AAAC as "an associate

company and distributor," FAC 25 ¶ 138; (3) that Mr. Rice sent another October 2004 fax

describing AAAC as "our associated company," FAC at 28 ¶ 147(e); and (4) that in an October

2004 teleconference with Bahrain's Minister of Finance & National Economy, Mr. Rice

represented that AAAC was a subsidiary of Alcoa, *see* RICO St. at 39.  Allegations (1) through

(3) set forth true statements and conduct in pursuit of lawful business transactions that cannot

serve as the basis for a claim of fraud.  *See, e.g.*, *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243,

254 (D. Md. 2000) (dismissing fraud claim because factual assertions concerning legitimate

activities are insufficient to satisfy Rule 9(b) requirements).  Moreover, because the fourth

allegation is undermined by the remainder of the FAC, the Court should disregard it.  *Cf.*

*Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (dismissing claim

where documents purportedly supporting fraud claim contradict plaintiffs' allegations).

### i.     Use of the Term "Associated Company"

Alba makes much of Mr. Rice's use of the term "associated company," but fails to explain how the use of that term to describe Alcoa of Australia's distributor was fraudulent.  *In re Crude Oil Commodity Litig.*, No. 06-cv-6677, 2007 WL 1946553, at \*6 (S.D.N.Y. June 28, 2007) (allegations sounding in fraud must explain how statements were false or fraudulent).  As the Supreme Court has stated, "the concept of 'associat[ion]'" requires only "interpersonal relationships and a common interest."  *Boyle v. United States*, 556 U.S. 938, 129 S. Ct. 2237, 2244 (2009) (citing *Webster's Third New International Dictionary* and *Black's Law Dictionary*).  Mr. Rice's use of the term "associated" to describe Alcoa's distributor was accurate in that Alcoa of Australia and the Dahdaleh companies associated with one another under a common business interest in the sale of alumina.  The term "associated company" therefore was not false, fraudulent or imprecise.  In fact, even imprecise terminology is insufficient to establish the type of misrepresentation required for a fraud.  For example, in *Lum*, plaintiff alleged that use of the term "prime rate" misled borrowers into thinking they were receiving the lowest loan rates offered to the most credit-worthy applicants.  Plaintiff argued, therefore, that defendants had made material omissions by failing to disclose that some borrowers received even lower interest rates.  The Court disagreed, stating:

> It is . . . unreasonable to infer that defendants' use of the equivocal term "prime rate" was reasonably calculated to deceive . . . . Plaintiffs' claim boils down to a disagreement about the meaning of the term "prime rate."  This disagreement does not rise to the level of fraud; at most, it alleges a contract dispute.

*Lum*, 361 F.3d at 226.  On that basis, the Third Circuit upheld the dismissal of plaintiff's RICO claim for failure to properly plead mail fraud.  To the extent Alba's RICO claims are predicated on wire fraud, its RICO claims fail for the same reason.

19

ii.    **Alleged Representation That AAAC Was a Subsidiary of Alcoa**

Amidst a slew of allegations describing innocuous business activities, the Court is left with only *one* specific allegation against Mr. Rice that, if true, arguably could be characterized as a false representation.  This solitary allegation – that Mr. Rice represented AAAC to be a subsidiary of Alcoa – is belied by other aspects of the FAC, and therefore the Court should disregard it.  "[A] court need not feel constrained to accept as truth conflicting pleadings . . . . that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely."  *In re Livent Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001). [15]

Alba alleges that Mr. Rice represented to Minister Saif that AAAC was a subsidiary of Alcoa.  RICO St. at 12-13.  It is telling that in this allegation Alba did not place the word "subsidiary" in quotation marks.  Elsewhere in its FAC and RICO Statement, Alba used quotation marks to indicate use of the precise word quoted, but omitted quotation marks where not employing the precise terminology cited.  *Compare* FAC ¶¶ 57, 62, 88, 138, 145, 147(a), (d), (e) and (g), 168(g) (placing "associate," "associated" or "affiliate" in quotation marks) *with*

---

[15] Numerous other cases have reached similar conclusions.  *See, e.g.*, *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (sustaining dismissal where "attenuated allegations" were "contradicted both by more specific allegations in the complaint and by facts of which [the court] may take judicial notice"); *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) (dismissing claim based on "wholly conclusory and inconsistent allegations"); *Rapoport*, 88 F. Supp. 2d at 184 (dismissing claim where documents purportedly supporting fraud claim contradicted plaintiffs' allegations); *Am. Centennial Ins. Co. v. Seguros La Republica, S.A.*, No. 91-cv-1235, 1996 WL 304436, at *16 (S.D.N.Y. June 5, 1996) ("Allegations are not well pleaded if they are 'made indefinite or erroneous by other allegations in the same complaint.'") (internal citations omitted); *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037, 1046 (S.D.N.Y. 1992); *Bailey v. Pa. Dep't of Corr.*, No. 2:10-cv-1039, 2011 WL 6937473, at *2 (W.D. Pa. Nov. 29, 2011) (a "court need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit") (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended by* 275 F.3d 1187 (9th Cir. 2001)).

RICO St. at 30 (using term "affiliate" without quotation marks where actual document cited used term "associated company and distributor" instead).  Alba's decision not to use quotation marks in this allegation suggests that Mr. Saif interpreted Mr. Rice's alleged comments to mean that AAAC was a subsidiary, but that Mr. Rice did not actually use that precise term.

Nevertheless, any allegation that Mr. Rice used the term "subsidiary" is dubious.  First, Alba's RICO Statement asserts that Mr. Rice represented that AAAC was an Alcoa "affiliate," when in fact the cited documents plainly call AAAC an "associated company" and "distributor," *not* an "affiliate."  *Compare* RICO St. at 30 *with* RICO St. Exhs. 6 and 7.  Alba apparently believes the terms "associated," "affiliate," and "subsidiary" are legally synonymous and thus uses those words interchangeably, even though they have different meanings.  Second, Alba alleges two writings in which Mr. Rice used the term "associated company and distributor" and "associate company" in communications with Alba, but does not allege any writing where Mr. Rice used the term "subsidiary."  Taken as a whole, the FAC contradicts the notion that Mr. Rice intended to misrepresent the nature of AAAC.  Finally, the allegation that Mr. Rice used the term "subsidiary" in an oral statement incapable of corroboration appears invented.  This allegation did not appear in Alba's original complaint.  The allegation materialized only in connection with Alba's attempts to overcome *Morrison*, more than *seven years* after the supposed conversation occurred, when memories surely have faded.  For all of these reasons, this Court should disregard the allegation that Mr. Rice used the precise term "subsidiary" in his dealings with Alba.

If the Court disregards Mr. Rice's alleged use of the term "subsidiary," then Alba has failed to allege any particularized false representation that Mr. Rice transmitted over the wires. Mr. Rice's accurate business statements, appropriately made by an employee with his

responsibilities, do not suggest that Mr. Rice was involved in a scheme or artifice to defraud. *See Adams*, 193 F.R.D. at 254.

Finally, this singular allegation of purported misconduct – that Mr. Rice told a Bahraini official that AAAC was a subsidiary – has nothing to do with the crux of Alba's FAC – that corrupt payments were made to induce Alba to continue to purchase and overpay for Alcoa of Australia alumina and to induce the government of Bahrain to sell some of its shares in Alba. This allegation therefore cannot be a source of Alba's damages. Alba does not allege, for example, that as result of the purported deception, Alba thought it was receiving high quality Alcoa alumina only to find that the alumina originated elsewhere. *See* FAC at 5 ¶ 20 (stating that Alcoa of Australia supplied the alumina). To the contrary, Alba alleges that the alumina distributed by the Dahdaleh companies originated from Alcoa of Australia. Alba's core complaint is that its corrupted officials caused the company to overpay for alumina. Alba alleges that Mr. Dahdaleh's corrupt payments are what motivated these overpayments, not any purported deception by Mr. Rice regarding the ownership of the Dahdaleh companies. For all of these reasons, to the extent Alba's RICO claims rely on mail and wire fraud, they should be dismissed.

### c.       Transport and Receipt of Fraudulently Taken Property

Alba also cites as racketeering activity violations of 18 U.S.C. §§ 2314-15 involving the transport or receipt of fraudulently taken property. The elements of a "transport" violation are: (1) transporting or causing to be transported, (2) in interstate commerce, (3) of property valued at $5,000 or more, (4) with knowledge that it has been stolen, converted, or fraudulently taken from its rightful owner. *United States v. Weiner*, 755 F. Supp. 748, 752 (E.D. Mich. 1991). The elements of the "receipt" violation are: (1) receiving stolen goods, (2) valued at $5,000 or more,

(3) that moved in interstate commerce, and (4) with knowledge that the goods had been stolen, unlawfully converted, or taken. *United States v. Tashjian*, 660 F.2d 829, 839 (1st Cir. 1981).

Neither the FAC nor the RICO Statement state with any level of specificity when or how Mr. Rice allegedly transported or received fraudulently taken property or on what basis Mr. Rice had knowledge that the property was fraudulently taken. Thus, to the extent that Alba's RICO claims against Mr. Rice are based upon violations of 18 U.S.C. §§ 2314 and 2315, this Court should dismiss them.

### d.    FCPA Allegations

Alba also bases its RICO claims on alleged violations of the Foreign Corrupt Practices Act ("FCPA"). A violation of the FCPA, however, is not within RICO's statutory definition of "racketeering activity." *Gov't of Dom. Rep. v. AES Corp.*, 466 F. Supp. 2d 680, 691 (E.D. Va. 2006) (holding that FCPA cannot serve as predicate act for RICO offense). Title 18 U.S.C. § 1961 contains an extensive list of violations that constitute racketeering activity. The FCPA is not one of them. RICO's long list of enumerated acts provides ample evidence that Congress did not intend for courts to consider unenumerated acts within the statutory definition of racketeering activity. Indeed, no Third Circuit court has expressly held that the FCPA is a racketeering activity under 18 U.S.C. § 1961.[16]  Alba's attempted use of the FCPA fails for this reason alone.

Alba's use of the FCPA also fails because, as set forth more fully in section II.B.1., *supra*, Alba has failed to allege any role played by Mr. Rice regarding alleged payments to foreign officials or even facts sufficient to demonstrate his knowledge of such a corrupt scheme.

---

[16] In *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052 (3d Cir. 1988), the court in *dicta* simply assumed, without analysis or discussion, that the FCPA was within the statutory definition of a racketeering activity.

Alba's attempt to cure this defect by lumping all of the defendants together in vague allegations of misconduct fails to apprise Mr. Rice how he supposedly involved himself in corrupt payments or how he was aware of the asserted unlawful activities.  *See, e.g.*, FAC at 22 ¶ 118 ("Upon information and belief, Dahdaleh . . . made these payments with the knowledge and at the direction of Alcoa, Alcoa World Alumina, and Rice.").  Thus, these allegations are insufficient to sustain Alba's RICO claims against Mr. Rice.

In addition, Alba's reliance on the FCPA is misplaced given that the only named bribe recipients – Bruce Hall, Zamil Al Joweiser, and Yousif Al Shirawi – are not alleged or demonstrated to be foreign officials within the meaning of the FCPA.  Although Alba alleges that officials of the government of Bahrain also received payments, because Alba does not identify these officials, these allegations fail to satisfy Rule 9(b) and must be disregarded.  *Cf. Palm Beach Cnty. Envtl. Coal. v. Florida*, 651 F. Supp. 2d 1328, 1349 (S.D. Fla. 2009) (rejecting RICO predicate act of bribery where plaintiffs failed to describe who bribed whom).

Finally, Alba's failure to identify the alleged foreign officials who received payments undermines the purposes of this Court's requirement to file a RICO Statement and permits improper avoidance of dismissal.  This is true because the FCPA provides an affirmative defense for a payment that "was lawful under the written laws and regulations of the foreign official's . . . country."  15 U.S.C. § 78dd-2(c)(1).  Without knowing the identities of the payment recipients, Mr. Rice is unable to assess whether the FCPA's affirmative defenses apply.  By hiding the identities of the payment recipients, Alba is improperly circumventing this motion to dismiss.

For all of these additional reasons, Alba's allegations of an FCPA violation should be disregarded entirely. [17]

### e.    Travel Act Allegations

There are three elements to a violation of the Travel Act, 18 U.S.C. § 1952: (1) interstate travel or use of an interstate or foreign facility, (2) with intent to promote an unlawful activity, and (3) an overt act in furtherance of the unlawful activity.  *United States v. Wander*, 601 F.2d 1251, 1258 (3d Cir. 1979).  The Travel Act defines "unlawful activity" as "extortion, bribery, or arson in violation of the laws of the State in which they are committed or the United States."  18 U.S.C. § 1952.  Alba fails to assert a Travel Act violation because its allegations concerning Mr. Rice's travels to Bahrain demonstrate nothing more than that Mr. Rice, in the ordinary course of his job responsibilities, participated in meetings with Alba and Bahrain officials concerning a business alliance that never came to fruition.  There is no allegation that after Mr. Rice traveled or used the facilities of interstate or foreign commerce, he discussed the making of corrupt payments or was involved in any way with such payments.  Alba's allegations amount to this:  Mr. Rice traveled overseas and used facilities in interstate or foreign commerce to arrange for and participate in business meetings.  Alba has failed to allege with any degree of particularity how Mr. Rice's conduct demonstrates a purpose or intent to, as Alba alleges, "promote, manage, and facilitate . . . a scheme to defraud Alba through bribery and improper influence."  FAC at 40-41 ¶ 196.  Like Alba's allegations of mail and wire fraud, *see* section II.B.2a-b. *supra,* Alba's allegations that Mr. Rice used the facilities of interstate and foreign commerce in order to

---

[17] To the extent that Alba relies on 15 U.S.C. § 78dd-3, that reliance is misplaced as to Mr. Rice.  *See* FAC at 40 ¶¶ 192-95.  Section 78dd-3 defines "person" as "any natural person *other than a national of the United States.*"  15 U.S.C. § 78dd-3(f)(10) (emphasis added).  Mr. Rice is a United States citizen.  FAC at 3 ¶ 7.  Section 78dd-3 therefore does not apply to him.  To the extent Alba's RICO claims rely upon § 78dd-3, they should be dismissed as to Mr. Rice.

promote or carry on unlawful activity are insufficient under *Twombly* and Rule 9(b). Consequently, to the extent Alba's claims against Mr. Rice rely upon violations of the Travel Act, this Court should dismiss them.

### C.     Alba's Common Law Fraud Claim Fails under Rules 12(b)(6) and 9(b)

In order to establish common law fraud under Pennsylvania law, Alba must prove (1) a representation, (2) that is material to the transaction at hand, (3) made with knowledge of its falsity or recklessness as to whether it was true or false, (4) with the intent of misleading another into relying on it, (5) justifiable reliance, and (6) that the resulting injury was proximately caused by the reliance. *Schnell v. Bank of New York Mellon*, No. 11-cv-601, 2011 WL 5865966, at *3 (E.D. Pa. Nov. 22, 2011); *Ross v. Foremost Ins. Co.*, 998 A.2d 648, 654 (Pa. Super. Ct. 2010). Alba appears to assert two common law frauds: one involving a failure to disclose that the Dahdaleh companies purportedly were making unlawful payments to foreigners, and one involving purportedly misleading statements suggesting that the Dahdaleh companies were subsidiaries of Alcoa Inc. *See* FAC at 43-44. Both fail under Rules 12(b)(6) and 9(b).

#### 1.     Allegation of an Omission

Alba's allegations that Mr. Rice omitted to inform Alba that the Dahdaleh companies purportedly were making corrupt payments are deficient under Rules 12(b)(6) and 9(b) first because Alba does not plead facts demonstrating that Mr. Rice had knowledge of any corrupt payments or acted recklessly with respect to such knowledge, or that Mr. Rice had any intent to mislead Alba into relying on such an omission. Alba's only assertions concerning Mr. Rice's knowledge and intent are the type of conclusory and "formulaic recitations" forbidden by *Twombly*. *Twombly*, 550 U.S. at 570.

26

Second, Alba has failed to plead the existence of any duty to disclose allegedly omitted information.  *See Fernander v. Amanze*, No. 02-cv-603, 2007 WL 4083769, at *4 (E.D. Pa. Nov. 15, 2007) ("one who fails to disclose material information prior to the consummation of a transaction commits common law fraud only when he is under a duty to do so"); *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 611-12 (3d Cir. 1995) ("mere silence is not sufficient in the absence of a duty to speak") (internal citation omitted).  A duty to disclose arises only where there is a confidential or fiduciary relationship between the parties.  *McCarthy v. Luzerne Cnty.*, No. 3:11-cv-0096, 2011 WL 2607174, at *4 (M.D. Pa. July 1, 2011) (noting that Pennsylvania common law requires a "confidential relationship" as a prerequisite to liability for omissions); *Sunquest Info. Sys. v. Dean Witter Reynolds*, 40 F. Supp. 2d 644, 656 (W.D. Pa. 1999) (same).  A typical business relationship is not a confidential relationship that gives rise to a duty of disclosure.  *Id*.  Alba has failed to allege a duty owed by Mr. Rice to Alba or special relationship between them.  Therefore, the Court should dismiss common law fraud claims premised on an omission as to Mr. Rice.

## 2. Allegations of Misleading Statements

With respect to the notion that Mr. Rice "foster[ed] the false impression" that the Dahdaleh companies were subsidiaries of Alcoa, Alba has failed to satisfy all six elements of a state fraud claim.  As detailed more fully above in section II.B.2.b., Alba asserts only three purportedly misleading statements by Mr. Rice, two of which are true statements on their face (*i.e.*, Mr. Rice's use of the term "associate company and distributor" to describe AAAC), and one that is rendered so dubious by other aspects of the pleadings (*i.e.*, that Mr. Rice once, in an unsubstantiated oral statement, called AAAC a subsidiary) that the Court properly may ignore it.  Accordingly, Alba has failed to allege facts that establish a misrepresentation.  *See In re Crude*

*Oil Commodity Litig.*, 2007 WL 1946553, at *6 (allegations sounding in fraud must explain why the statements were fraudulent). Alba also necessarily has failed to demonstrate Mr. Rice's knowledge that his statements were false or reckless as to their truth or falsity. Alba is required to plead scienter with particularity, and its bare assertions that Mr. Rice knew his statements to be false are insufficient. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) (finding that plaintiffs' assertions that defendants "knew" or "must have known" that statements were misleading were insufficient).

Assuming for the sake of argument that Mr. Rice's statements were false, Alba has failed to allege facts establishing the materiality of those statements. The FAC does not allege facts sufficient to demonstrate that it was important to Alba to receive Alcoa of Australia's product directly from Alcoa of Australia, rather than from a distributor, or that Alba would not have purchased the alumina had it known that the alumina would be delivered by a distributor. *Fox's Foods v. Kmart Corp.*, 870 F. Supp. 599, 607 (M.D. Pa. 1994) ("A matter is material to the transaction when it is of such a character that it determines whether the transaction occurs."). Moreover, the FAC does not allege that Alcoa of Australia's use of a distributor somehow affected the quality of the underlying product. The FAC suggests that Alba received exactly the product for which it contracted. Accordingly, Alba has failed to demonstrate materiality.

Alba also has failed to allege facts that establish Mr. Rice's intent to mislead Alba and Alba's justifiable reliance, particularly given that Mr. Rice's use of the term "associated company" was not inaccurate. *See* section II.B.2.b.i, *supra*. Moreover, any reliance on a belief that AAAC was a subsidiary of Alcoa of Australia was not justified given that, as Alba acknowledges, Mr. Rice introduced Mr. Dahdaleh as an "advisor" or "consultant" to Alcoa during negotiations with Alba, and Mr. Rice stated in writing that AAAC was "an associate

company and *distributor*" of Alcoa of Australia.  FAC at 21 ¶ 115; at 25 ¶ 138; at 28 ¶ 147(d); at

33-34 ¶ 168(e) (emphasis added); *cf. Lum*, 361 F.3d at 227 (reasoning that plaintiffs could not

have been misled by term "prime rate," where some defendants disclosed in some

communications that borrowers should not assume that prime rate was lowest possible rate).  The

FAC does not allege that Mr. Rice ever described Mr. Dahdaleh as an employee or officer of

Alcoa, and the terms "advisor," "consultant" and "distributor" in fact suggest that Mr. Dahdaleh

was not.

Finally, Alba has not alleged a sufficient causal nexus between the damages alleged and

Mr. Rice's purportedly false statements.  The crux of Alba's complaint is that Alba's employees

abdicated their fiduciary duties to Alba and approved purportedly high-priced alumina contracts

because they were motivated by the receipt of corrupt payments.  Alba's allegations are unclear

as to how Alba's failure to realize that the Dahdaleh companies were distributors caused Alba to

pay more for alumina than it otherwise would have.  Because Alba has failed to demonstrate all

six elements of fraud, the Court should dismiss Alba's fraud claims.

### D.    Alba's Conspiracy Claims Fail Under Rules 12(b)(6) and 9(b)

Because a federal conspiracy to violate the RICO statute and a civil conspiracy under

Pennsylvania law share the common requirements of knowledge of the conspiracy and an

agreement to participate in it, the Court may analyze both of Alba's conspiracy claims together.

For purposes of both claims, Alba has failed to allege facts that establish Mr. Rice's knowledge

of and agreement to participate in the alleged conspiracy.

In order to establish a conspiracy to violate 18 U.S.C. § 1962(c), a defendant must

"knowingly [have] agree[d] to facilitate a scheme which includes the operation or management

of a RICO enterprise."  *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001).  In other words, the

29

defendant must have "adopt[ed] the goal of furthering or facilitating the criminal endeavor." *Id.* (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997)).

Similarly, Pennsylvania law requires the following elements for a civil conspiracy: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003); *Dennis v. DeJong*, No. 10-cv-06789, 2011 WL 4732810, at *54 (E.D. Pa. Sept. 30, 2011). A complaint also must allege facts demonstrating malice or intent to injure and the presence of an unlawful agreement between parties. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 472 (1979); *Strickland v. Univ. of Scranton*, 700 A.2d 979, 988 (Pa. Super. Ct. 1997). A complaint that "merely alleges in the most general terms that [defendants] conspired to injure [plaintiff] cannot survive a motion to dismiss." *Schnell*, 2011 WL 5865966, at *2 (citing *Grose v. Procter & Gamble Paper Prods.*, 866 A.2d 437, 440–41 (Pa. Super. Ct. 2005)); *see Strickland*, 700 A.2d at 988 (upholding dismissal of civil conspiracy claim where plaintiff failed to allege facts establishing the elements of conspiracy under Pennsylvania law).

In addition, under Pennsylvania law, the complainant must allege something more than mere communications between the supposed coconspirators in order to demonstrate an agreement. *See Dennis*, 2011 WL 4732810, at *50. In *Dennis*, for example, in dismissing a civil conspiracy claim, the court reasoned that allegations of telephone calls and conversations between the alleged coconspirators were not sufficient to demonstrate an agreement, since there was "no evidence, beyond conclusory allegations" of an agreement or intent to harm. *Id*. Similarly, in *Schnell*, the court held that plaintiff failed to provide facts showing an unlawful

30

agreement between a lender and the assignee of the loan, because the only "agreement" to which the complaint referred did not evidence any intent to injure. *Schnell*, 2011 WL 5865966, at *2.

Even assuming for the sake of argument that, as the FAC alleges, in 1990, Alcoa Inc. and AWA LLC entered into a conspiracy with Mr. Dahdaleh to make corrupt payments to foreigners, *see* FAC at 5 ¶ 21, at 45 ¶ 224, all that the FAC demonstrates as to Mr. Rice is that ten years later, as a result of a transfer to the Alumina Division and change in title to Vice President of Sales and Marketing, Mr. Rice inherited job responsibilities concerning Alcoa of Australia's alumina distribution contracts with Alba and the Dahdaleh companies.  FAC at 3 ¶ 7 (noting that Mr. Rice was a Vice President of Marketing from 2001 to 2006).  Alba does not allege that the commercial contracts in question contemplate the making of corrupt payments, and the FAC alleges no facts that demonstrate Mr. Rice was aware of, much less agreed to, the making of any corrupt payments.  A person cannot be guilty of a conspiracy to defraud based merely on his corporate position or his proximity to the fraud.  *Cf. In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 281-82 (3d Cir. 2006) (holding that "blanket" assertions of recklessness against "Directors as a group, based on their positions . . . must be disregarded").  Accordingly, Alba has failed to allege facts that demonstrate that Mr. Rice was aware of any agreement among Alcoa, AWA LLC and Mr. Dahdaleh regarding corrupt payments or that he ever joined that agreement.  Alba's allegations of conspiracy therefore fail under both federal and Pennsylvania law.

## III.   ALBA'S FAC SHOULD BE DISMISSED WITH PREJUDICE

Alba has had almost four years since filing its original complaint to investigate and perfect its claims against Mr. Rice.  It has amended its complaint and been given the opportunity to supplement its RICO claims with a RICO Statement.  Rather than curing the deficiencies in its pleadings, it simply added repetition upon repetition, without attention to the dictates of

*Twombly*, *Iqbal*, Rule 9(b), or even the required elements of the federal and state law claims alleged.  Having squandered the opportunities provided by the Court, and having held the defendants under an unjustified four-year cloud of suspicion, the Court should not grant Alba yet a fourth opportunity to improve its claims.  *See, e.g.*, *McCullough v. Zimmer, Inc.*, No. 08-cv-1123, 2009 WL 775402, at *14 (W.D. Pa. Mar. 18, 2009) (denying plaintiff an opportunity to file second amended complaint alleging RICO claims); *Cedeño*, 2012 WL 205960, at *2 (upholding dismissal with prejudice where plaintiff failed to provide any details as to how he might remedy deficient RICO claims); *Norex*, 540 F. Supp. 2d at 449 (dismissing RICO claims with prejudice, and finding that further opportunity to amend complaint would be futile).  The Court should dismiss Alba's entire FAC with prejudice.

## IV.    CONCLUSION

The only allegations that the Court may take into account in evaluating Mr. Rice's alleged conduct are as consistent with innocence as they are with guilt.  The allegations therefore fail to satisfy the requirements of *Twombly* and *Iqbal*.  *See Iqbal*, 129 S. Ct. at 1949-51 (noting that in *Twombly,* allegations of conspiracy did not cross threshold from possible to plausible given that well-pleaded facts could be explained by lawful behavior).  Assuming for the sake of argument that any RICO enterprise or conspiracy to defraud existed, Mr. Rice is a victim of it, not a participant.  Mr. Rice has been laboring for four years under the threadbare allegations that Alba levied against him merely so that Alba could bring its claims in a United States court.  For Mr. Rice to remain a defendant is as unwarranted under the applicable legal standards as it is unfair and unjust.  The Court should dismiss each and every claim Alba has made against him.

Respectfully submitted,

_____/s/ Richard L. Beizer___
Richard L. Beizer
Ashley N. Bailey (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

## <u>CERTIFICATE OF SERVICE</u>

I, Ashley N. Bailey, hereby certify that the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WILLIAM RICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT OF ALUMINIUM BAHRAIN B.S.C. was served upon counsel of record by ECF filing this 27th day of January, 2012.


/s/      Ashley N. Bailey