**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALUMINIUM BAHRAIN B.S.C.,         ) | |
|                                ) | |

ALUMINIUM BAHRAIN B.S.C.,                    )
                                             )
                     Plaintiff,              )
                                             )
          v.                                 )
                                             )        Case No. 2:08-cv-299-DWA
ALCOA, INC., ALCOA WORLD ALUMINA             )
LLC, WILLIAM RICE and VICTOR                 )
DAHDALEH,                                    )
                                             )
                     Defendants.             )
                                             )
                                             )

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO JOINT MOTION
BY DEFENDANTS ALCOA, INC. AND ALCOA WORLD ALUMINA LLC
TO DISMISS THE AMENDED COMPLAINT**

Dated:  March 1, 2012

Mark J. MacDougall
Kristine L. Sendek-Smith
James E. Sherry
Lauren B. Kerwin
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave. NW
Washington, DC 20036
(202) 887-4000

Charles B. Gibbons
Christopher A. Amar
Victoria B. Kush
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA  15219-1410
(412) 562-8800

*Counsel for Plaintiff Aluminium Bahrain B.S.C.*

i

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

THE FIRST AMENDED COMPLAINT AND RICO CASE STATEMENT ...................................2

LEGAL STANDARD ..........................................................................................................17

LEGAL ARGUMENT .........................................................................................................19

      I.      ALBA HAS PLED AN ACTIONABLE CIVIL RICO CLAIM AGAINST
            ALCOA AND ALCOA WORLD ALUMINA .......................................................19

            A.      Alba Has Pled a Domestic RICO Enterprise ..............................................20

            B.      Morrison Does Not Bar Extraterritorial Application of RICO .................27

            C.      Alba Has Pled the Involvement and Leadership of Alcoa and Alcoa
                 World Alumina With Sufficient Particularity...............................................28

            D.      Dismissal of the RICO Claims Prior to Discovery Is Premature..............29

      II.     ALBA HAS PLED AN ACTIONABLE COMMON LAW FRAUD
            CLAIM AGAINST ALCOA AND ALCOA WORLD ALUMINA ......................30

CONCLUSION...................................................................................................................35

# **TABLE OF AUTHORITIES**

CASES

*Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372 (S.D.N.Y. 2010) ..................................30

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .........................................................17, 22, 25

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).........................................17, 22, 25

*Brewer v. SmithKline Beacham Corp.*, 774 F. Supp. 2d 720 (E.D. Pa. 2011)..............................22

*Cedeno v. Castillo*, No. 10-3861-cv, 2012 WL 205960 (2d Cir. Jan. 25, 2012) ...........................21

*CGC Holding Co., LLC v. Hutchens*, No. 11-CV-01012, 2011 WL 5320988 ( D. Colo. Nov. 1, 2011)....................................................................................................21

*Christidis v. First Penn. Mortg. Trust*, 717 F.2d 96 (3d Cir. 1983)...............................................18

*Chuy v. Phil. Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979) ..............................................20

*CIT Group/Equipment Financing, Inc. v. Krones, Inc.*, No. 9-432, 2009 WL 3579037 (W.D. Pa. Sept. 16, 2009) ................................................................ *passim*

*Cont'l Mgmt. v. United States*, 527 F.2d 613 (Ct. Cl. 1975) ..........................................................31

*Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F. Supp. 2d 400 (W.D. Pa. 2002) ..............................................................................................................................3

*Ebasco Svcs. Inc. v. Pennsylvania Power & Light Co*, 402 F.Supp. 421 (E.D. Pa. 1975) ............................................................................................................................31

*European Cmty. v. RJR Nabisco, Inc.*, No. 02-CV-5771, 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011) ..........................................................................................21, 22

*Foman v. Davis*, 371 U.S. 178 (1962) ..........................................................................................31

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) .................................................17, 22, 25

*Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010)...............................................................................22

*In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517 (D.N.J. 2004) ...................................................3

*In re Le-Nature's, Inc.*, No. 9-MC-162, 2011 WL 2112533 (W.D. Pa. May 26, 2011) ...................................................................................................................... *passim*

*In re Lower Lake Erie Iron ore Antitrust Litig.*, 710 F. Supp. 152 (E.D. Pa. 1989).......................3

*In re McClellan Estate,* 365 Pa. 401 (1950) ..................................................................................33

*In re Meridian Sec. Litig.*, 772 F. Supp. 223 (E.D. Pa. 1991) ........................................................18

*In re Optimal U.S. Litig.*, --- F. Supp. ----, 2011 WL 1676067 (S.D.N.Y. 2011) ..........................30

*In re Toyota Motor Corp.*, 785 F. Supp. 2d 883 (C.D. Cal. 2011) .................................................21

*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) ...................................35

*Lefco v. United States*, 74 F.2d 66 (3d Cir. 1934) .........................................................................3

*Lorenz v. CSX Corp.*, 1 F.3d 1406 (3d Cir. 1993) .........................................................................18

*Majer v. Sonex Research, Inc.*, 541 F. Supp. 2d 693 (E.D. Pa. 2008)..........................................34

*Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010)........................................20, 21, 28

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29 (2d Cir. 2010) .........................21, 24, 25

*Pramer S.C.A. v. Abaplus Int'l Corp.*, 907 N.Y.S.2d 154 (N.Y. App. Div. 2010).........................31

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2010).....................................................2, 17

*Roman v. City of Reading*, 121 Fed. Appx. 955 (3d Cir. 2005) ....................................................30

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) .............................................................28

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3d Cir. 1984)..............18, 19

*Sorota v. Sosa*, --- F. Supp. 2d ---, 2012 WL 313530 (S.D. Fla. Jan 31, 2012).............................21

*Sun Microsystems, Inc. v. Versata Ents., Inc.*, 630 F., Supp. 2d 395 (D. Del. 2009) ....................19

*Twp. of Wayne v. Messercola*, 789 F.Supp. 1305 (D.N.J. 1992) ....................................................31

*United States v. Pasquantino*, 544 U.S. 349 (2005)........................................................................27

*United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23 (D.D.C. 2011) ...............................21

*VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007).......................................................31

STATUTES AND RULES

18 U.S.C.
    § 1341.................................................................................................................................28
    § 1343.................................................................................................................................28

Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2.......................................................................28

Travel Act, 18 U.S.C. § 1952 ........................................................................................................28

Federal Rule of Civil Procedure 9(b) ..................................................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) .................................................................17

**OTHER AUTHORITIES**

Restatement (Second) of Agency § 312 .....................................................................31

## <u>INTRODUCTION</u>

Between 1990 and 2009, Alcoa and Alcoa World Alumina (the "Alcoa Defendants"), both of which are domestic U.S. corporations, along with multiple senior U.S. executives of those companies, devised and perpetrated from the United States a massive fraud on Alba, a Bahraini aluminum smelter.  Those individuals and entities did so by bribing Alba's senior executives and officials of the Government of Bahrain, who in turn caused Alba to perpetuate a customer relationship with Alcoa for nearly two decades that led Alba into overpaying for Alcoa's alumina by nearly half a billion dollars.  This fraud was conceived, designed, and orchestrated in and from the United States by the Alcoa Defendants and their senior executives, including Defendant William Rice, for the principal benefit of Alcoa, which is headquartered at 201 Isabella Street in Pittsburgh, Pennsylvania.  For nearly twenty years, the Alcoa Defendants successfully concealed this domestically engineered fraud, and their own leadership of it, by funneling Alba's overpayments and *quid pro quo* bribes through a series of offshore shell companies owned by an agent they retained for precisely that purpose, Defendant Victor Dahdaleh, who was recently charged criminally for his role in the scheme.  The Alcoa Defendants and their senior executives thus deliberately used Dahdaleh and his offshore shell companies to execute their fraud on Alba and to conceal their own involvement in that fraud.

The Alcoa Defendants now seek to exploit the same shell-game of offshore and foreign entities that they used to defraud Alba and to conceal their misdeeds to foreclose any remedy in the courts of the United States for their unlawful behavior.  That will not work and should not work.  Dismissal would simply reward the Alcoa Defendants for hiding behind offshore shell companies to perpetrate and conceal a massive, home-cooked bribery scheme conceived, orchestrated, and directed in and from the United States.  It would also provide a roadmap for

other domestic companies and executives seeking to insulate themselves from civil liability for defrauding foreign business partners, and would leave the victims of those domestic frauds without redress to the courts of the United States.  Most importantly, dismissal would fly in the teeth of the settled rule that this Court must "accept all [of Alba's] factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  Alba's Amended Complaint and RICO Case Statement – which describe in detail how the fraud on Alba was led from the United States by the Alcoa Defendants and their senior executives – far exceed that threshold pleading requirement.  The Alcoa Defendants' motion to dismiss should therefore be denied.

## THE FIRST AMENDED COMPLAINT AND RICO CASE STATEMENT

Alba's First Amended Complaint and RICO Case Statement (hereinafter "the Pleadings") allege the following facts, which must be presumed true:

### 1.     *The Parties, their Relationship, and Alcoa's Scheme to Defraud Alba*

Plaintiff Alba, one of the world's largest aluminum smelters, is a company organized under the laws of Bahrain.  Alba's common stock is publicly traded in the London Stock Exchange, but the company is majority-owned by the Government of Bahrain.  AC ¶¶ 3, 17; RCS at 4.[1]  Since 1969, Alba has purchased alumina for its smelter operations from Defendant Alcoa – a domestic corporation organized under the laws of Pennsylvania and headquartered at 201 Isabella Street in Pittsburgh, Pennsylvania – and its subsidiaries.  AC ¶¶ 5-6, 19-21.  Alcoa's supply agreements with Alba were overseen and negotiated by its U.S. subsidiary, Defendant Alcoa World Alumina, and the alumina itself was supplied by a foreign subsidiary, Alcoa of

---

[1] "AC" and "RCS" refer to Alba's First Amended Complaint and RICO Case Statement.

Australia.  AC ¶ 20.  Alcoa is the majority owner of Alcoa of Australia and, along with Alcoa World Alumina, controls the operations of Alcoa of Australia directly and indirectly through the Alcoa World Alumina and Chemicals Strategic Council.  AC ¶¶ 11-13; RCS at 10.

Between 1969 and 1989, Alcoa supplied alumina to Alba directly and without use of any intermediary through its Australian subsidiary.  AC ¶ 21.  In 1990, however, Alcoa[2] injected Defendant Victor Dahdaleh into its contractual relationship with Alba, assigning portions or all of its supply contracts with Alba to Dahdaleh-owned offshore shell companies.  AC ¶ 21; RCS at 6, 10.  There is no commercially legitimate explanation for Dahdaleh's involvement.  AC ¶ 21; RCS at 10-11.  Instead, over the course of the fraudulent scheme described in the Pleadings, the Alcoa Defendants and their senior executives, including Rice, used Dahdaleh and his shell companies as tools for executing their scheme to: (a) retain Alba as a high-volume purchaser of alumina; (b) extract hundreds of millions of dollars in overpayments by bribing senior officials of Alba and the Government of Bahrain; and (c) conceal their own involvement in that scheme.  AC ¶¶ 14, 21-25; RCS at 1-5.  Throughout the conspiracy, the Defendants falsely told Alba that the shell companies – which existed solely to defraud Alba and conceal the involvement of the Alcoa Defendants and their senior executives – were legitimate businesses controlled by, affiliated with, and authorized to act on Alcoa's behalf.  *E.g.*, AC ¶¶ 24-25; RCS at 5.

As detailed in Alba's Pleadings, the defendants' fraudulent scheme was carried out in at least three distinct ways during the period of the conspiracy.  AC ¶ 26.  First, from 1990 to 2004,

---

[2] The Alcoa Defendants argue that Alcoa World Alumina could not have been involved in the conspiracy since 1990 because it did not exist as a legal entity until 1994.  But that is a matter of fact that cannot be resolved on a motion to dismiss.  And even if Alcoa World Alumina joined the conspiracy at some point after 1990, it would still be liable for the acts of its co-conspirators throughout the life of the conspiracy.  *See Lefco v. United States*, 74 F.2d 66, 68-69 (3d Cir. 1934); *Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F. Supp. 2d 400, 413-14 (W.D. Pa. 2002); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F.Supp. 152, 153-54 (E.D. Pa. 1989); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538-39 (D.N.J. 2004).

the Alcoa Defendants, through Alcoa's Australian subsidiary, contracted to pay Dahdaleh millions of dollars in "commissions," the cost of which was passed on to Alba in the form of inflated alumina prices.  AC ¶ 26(a); RCS at 6.  Dahdaleh performed no legitimate services for these "commissions," which were instead part of his compensation for conveying bribes to senior officials of Alba and the Government of Bahrain.  AC ¶ 26(a); RCS at 6.  Second, between 1993 and 2009, the Alcoa Defendants assigned portions or all of the supply contracts with Alba to Dahdaleh-owned shell companies.  AC ¶ 26(b); RCS at 6-7.  Pursuant to these assignments, Alcoa sold alumina to the Dadahleh companies, which then executed paper transfers of the same alumina to Alba at higher prices.  AC ¶ 26(b); RCS at 6-7, 14-15.  The Defendants distributed these overpayments among themselves and used portions of the overpayments to pay *quid pro quo* bribes to the senior officials of Alba and the Government of Bahrain, who in turn induced Alba to enter into these economically disadvantageous contracts.  AC ¶ 26(b); RCS at 4-5.  Third, in 2003, the Defendants induced the Government of Bahrain to enter into a memorandum of understanding ("MOU") for the sale of up to 26% of Bahrain's shares in Alba to Alcoa at a price that undervalued those shares by hundreds of millions of dollars.  AC ¶ 26(c); RCS at 10.  The Government of Bahrain entered into this economically disadvantageous MOU only because the defendants had bribed senior officials of Alba and the Government of Bahrain.  AC ¶ 26(c).  Although the acquisition was never consummated, one of the major purposes of this scheme was to ensure that Alcoa retained Alba's business into the future, and the Alcoa Defendants did, in fact, secure a further extension of their supply agreement with Alba by bribing officials of Alba and the Government of Bahrain.  AC ¶¶ 26(c), 110, 123, 149-50.

This scheme, in all of its iterations over the course of nearly two decades, was conceived, orchestrated, and directed in and from the United States by the Alcoa Defendants and senior U.S.

4

executives of those companies, including Rice.  AC ¶¶ 13, 14, 27, 37; RCS at 1-5, 10.  The

scheme was executed, in part, by the Alcoa Defendants' chosen agents, including Dahdaleh, the

Dahdaleh-owned entities, and Alcoa's Australian subsidiary.  These actors were all directed,

controlled, and coordinated in and from the United States by the Alcoa Defendants and senior

executives of those companies, including Rice.  AC ¶¶ 13, 14, 27, 37; RCS at 1-5, 10.

### 2. 1990-2004:  Payment of Fraudulent Commissions to Dahdaleh

In 1990, Alcoa, through its Australian subsidiary, entered into a ten-year alumina supply

contract with Alba (the "1990 Contract").  AC ¶ 38; RCS at 6.  The 1990 Contract was amended

once and extended twice, ultimately expiring in 2004.  AC ¶ 38; RCS at 6.  The price of alumina

under the contract was determined in two ways:  for approximately 60% of the contract tonnage,

the rate was set by formula; for the remaining 40% (the "Market Tonnage"), the rate was

negotiated by the parties.  AC ¶ 43; RCS at 6.

Throughout the existence of the 1990 Contract and extensions thereto, the Alcoa

Defendants paid Dahdaleh more than $13.5 million in unearned "commissions" pursuant to a

series of "Agency Agreements" between (a) Alumet Limited – one of Dahdaleh's shell

companies and the "agent" under these agreements – and (b) Alcoa of Australia, the "principal"

as defined under the Agency Agreements.  AC ¶¶ 39-40; RCS at 6.  Dahdaleh and Alumet, which

had no assets or operations apart from the scheme, provided no legitimate services in return for

these commissions, which were Dahdaleh's compensation for facilitating bribes to officials of

Alba and the Government of Bahrain and hiding the U.S. Defendants' fraud in the cloak of

Dahdaleh's corporate facades.  AC ¶ 42; RCS at 6.  The cost of these fraudulent "commissions"

was passed on to Alba in the form of inflated alumina prices.  AC ¶ 41; RCS at 6.

### 3.     The 1993 Assignment

In 1993, Alcoa caused the supply responsibility for the Market Tonnage portion of the

1990 Contract to be assigned to a Dahdaleh-owned shell company named Kwinalum.  AC ¶ 46;

RCS at 6-7.  Kwinalum was registered in Singapore, and the assignment was negotiated at a

meeting in Singapore in or about 1992, at which Alcoa was represented by John Diederich, a

U.S. national, and others.  AC ¶ 45; RCS at 16.  Kwinalum was not a legitimate business

enterprise and had no prior experience in the alumina supply business, but was instead

incorporated less than a month prior to the first shipment to Alba.  AC ¶ 47; RCS at 7.

Notwithstanding the assignment, Alcoa, through its subsidiary, remained the source of the

alumina sold to Alba.  AC ¶ 49.  In fact, Kwinalum never even took possession of or shipped the

alumina, as evidenced by bills of lading showing that the alumina continued to be shipped by

Alcoa to Alba.  RCS at 7, 14-15 & Ex. 17.  Kwinalum simply executed a paper transfer of the

same alumina it purchased from Alcoa to Alba at higher prices, which were paid to Kwinalum by

wire transfers to Kwinalum bank accounts in the United States and elsewhere.  AC ¶¶ 49, 53;

RCS at 31-32 & Ex. 19.  The only reason Alcoa injected this shell company into its contractual

relationship with Alba was to funnel bribes to officials of Alba and the Government of Bahrain,

distribute the hundreds of millions of dollars in overpayments fraudulently extracted from Alba

through those bribes, and conceal the involvement of the Alcoa Defendants and their senior

executives in that scheme.  AC ¶ 50; RCS at 2, 7.

### 4.     The 1996 Amendment and Extension

On September 19, 1996, the 1990 Contract was amended to provide that Alcoa, through

its subsidiary, would supply the Market Tonnage to Alba from 1997 through 2000, and to extend

the term of the 1990 Contract through December 31, 2000.  AC ¶ 54; RCS at 7-8 & Ex. 1.

Although the contracting entity on the 1996 amendment was nominally Alcoa of Australia, the Amendment was signed by Peter Burgess, the Sales and Marketing Manager of Defendant Alcoa World Alumina in Pittsburgh.  AC ¶ 55; RCS at 11 & Ex. 1  Burgess was also involved in negotiating the terms of the 1996 amendment, as shown by his receipt of a September 15, 1996 facsimile transmission from Alcoa of Australia to Alba stating the terms of the offer.  AC ¶ 56.

The 1996 amendment provided that Alcoa's subsidiary would assign the Market Tonnage to "a company associated with" the Alcoa subsidiary.  AC ¶ 57; RCS at 7 & Ex. 1.  On the same day that the 1996 Amendment was signed, Alcoa's subsidiary entered into a secret "Sales Agreement" with a Dahdaleh-owned shell company, Alumet Limited.  AC ¶ 59; RCS at 7-8.  Once again, although Alcoa of Australia was the nominal party to the sales agreement with Alumet, the agreement was negotiated and signed by Peter Burgess, a senior U.S. executive of Defendant Alcoa World Alumina.  AC ¶ 61; RCS at 8.  A senior U.S. executive of a domestic Alcoa subsidiary thus negotiated and signed both the 1996 amendment with Alba and the secret, parallel agreement with the Dahdaleh-owned offshore shell.  AC ¶¶ 20, 55, 61; RCS at 7-8, 11.

As with the 1993 assignment to Kwinalum, Alumet was not a legitimate business enterprise and had no prior experience in the alumina supply business.  AC ¶ 63.  Notwithstanding the assignment, Alcoa, through its subsidiary, remained the source of the alumina sold to Alba.  AC ¶ 65.  Alumet simply executed a paper transfer of the same alumina it purchased from Alcoa to Alba at higher prices, which were paid to Alumet by wire transfers to Alumet bank accounts in the United States and elsewhere.  AC ¶¶ 65, 72(a); RCS at 32, 48-50 & Ex. 20.  The only reason the Alcoa Defendants injected this Dahdaleh-owned shell company into its contractual relationship with Alba was to funnel bribes to officials of Alba and the Government of Bahrain, distribute the hundreds of millions of dollars in overpayments

fraudulently extracted from Alba through those bribes, and conceal the involvement of the Alcoa

Defendants and their senior executives in that scheme.. AC ¶ 63; RCS at 2.  The Alcoa

Defendants and their agents affirmatively misrepresented these facts to Alba, however, falsely

claiming that the assignment of the Market Tonnage was necessary in order to avoid disclosure

of Alcoa's prices to other customers and the Government of Australia.  AC ¶¶ 67-68.  The Alcoa

Defendants also fostered the false impression that Alumet was a legitimate company and affiliate

of Alcoa's Australian subsidiary by permitting Alumet to use its logo on invoices and

correspondence with Alba.  RCS at 17 & Ex. 8.

###### 5.    *The 2001 Extension*

In 2001, the 1990 Contract was amended again to extend its term through 2003.  AC ¶ 73;

RCS at 8.  This extension was proposed by the Alcoa Defendants through their senior officer,

Rice, by an April 12, 2001 letter on Alcoa World Alumina stationery sent from Pittsburgh,

Pennsylvania.  AC ¶ 74; RCS at 11 & Ex. 2.  Notably, the letter, signed by Rice on behalf of

Alcoa World Alumina, refers to the 1990 Contract as "*our* present purchase agreement" and

seeks "to continue the relationship *we* have had for 30 years," even though Alcoa of Australia is

the nominal party to the 1990 Contract.  AC ¶ 74; RCS at 11 & Ex. 2.

As with the prior assignments, the Defendants structured the 2001 extension to involve

Dahdaleh-owned shell companies to facilitate the payment of bribes and the receipt and

distribution of fraudulent overpayments by Alba.  AC ¶ 75; RCS at 8.  The 2001 extension was

signed on behalf of Alcoa's Australian subsidiary by David Dabney, a U.S. citizen and former

Alcoa employee.  AC ¶ 78.  At the time he signed the 2001 extension, however, Dabney was not

an employee or representative of Alcoa or its Australian subsidiary.  AC ¶¶ 78, 86(b)-(c); RCS at

11.  Instead, he was a shareholder and officer in various Dahdaleh-controlled enterprises.  AC ¶¶

78, 86(c); RCS at 11.  The Defendants knew of and intended Dabney's involvement in the

negotiations with Alba, however, and fostered the false impression that Dabney was a legitimate

representative of Alcoa's Australian subsidiary, as in an August 15, 2001 email from Rice to an

employee of Alba, which stated that Dabney would supply pricing information and that "we look

forward to continuing our long term relationship."  AC ¶ 79; RCS at 11 & Ex. 4.

On or about February 14, 2002, Alcoa's Australian subsidiary entered into a secret

parallel "Distribution Agreement" with the Dahdaleh-owned shell companies Alumet and AA

Alumina and Chemicals (AAAC-1), appointing the Dahdaleh-owned shells as Alcoa's sole

distributors of alumina to Alba for 2002 through 2004.  AC ¶ 80.  This secret, parallel integration

of the Dahdaleh entities, although nominally entered into by the Australian subsidiary, was

negotiated and directed by Rice, the U.S. executive of Alcoa World Alumina, as shown by the

fact that Rice initialed the agreement.  AC ¶¶ 20, 80; RCS at 11.

As with the prior assignments, AAAC-1 was not a legitimate business enterprise and had

no prior experience in the alumina supply business.  AC ¶ 81; RCS at 8.  In fact, AAAC-1 was

not even incorporated until four months *after* Dabney executed the 2001 extension.  AC ¶ 81;

RCS at 8.  Notwithstanding the secret assignment, Alcoa, through its subsidiary, remained the

source of the alumina sold to Alba.  AC ¶ 83; RCS at 26 & Ex. 17.  AAAC-1 simply executed a

paper transfer of the same alumina it purchased from Alcoa to Alba – at higher prices, which

were paid to AAAC-1 by wire transfers to bank accounts in the United States and elsewhere.  AC

¶¶ 83, 97; RCS at 32-33 & Ex. 21.  The only reason the Alcoa Defendants injected this

Dahdaleh-owned shell company into its contractual relationship with Alba was to funnel bribes

to officials of Alba and the Government of Bahrain, distribute the hundreds of millions of dollars

in overpayments fraudulently extracted from Alba through those bribes, and conceal the

involvement of the Alcoa Defendants and their senior executives in that scheme.  AC ¶¶ 81, 83; RCS at 2, 11.  Those bribes are specifically documented in a series of cash wire transfers to officials of Alba and the Government of Bahrain that are individually enumerated and identified in Alba's Pleadings.  AC ¶¶ 93-94; RCS at 13-14.

The Alcoa Defendants and their agents affirmatively misrepresented these facts to Alba, fostering the false impression that AAAC-1 was a legitimate business enterprise and an integral part of Alcoa and its Australian operations.  AC ¶¶ 86(e), 88-90; RCS at 40.  The 2002 "Distribution Agreement" specifically authorizes the Dahdaleh-owned shell company to use Aloca's logo and trademarks, including on stationery, in advertising, or on its place of business. AAAC-1 did, in fact, use Alcoa's logo and trademarks in a continuous stream of correspondence with Alba in order to foster the false impression that it was a legitimate business enterprise and a duly authorized affiliate of Alcoa.  AC ¶¶ 85, 86(e), 88-89; RCS at 40.  For example, Dabney transmitted the executed 2001 extension to Alba by a letter bearing the logo of Alcoa of Australia.  AC ¶ 86(e); RCS at 40 & Ex. 12.  The invoices that AAAC-1 sent to Alba bore the Alcoa trademark and explicitly identified AAAC-1 as "an associate company" of Alcoa's Australian subsidiary.  AC ¶ 88; RCS at 32-33 & Ex. 21.

The Defendants also continued to conceal the role of Dahdaleh and his companies from Alba officials who were unaware of the bribery scheme.  AC ¶ 90.  For example, on March 3, 2002, Bruce Hall, the former CEO of Alba and a direct recipient of Defendants' bribes, sent an email to Rice in anticipation of a visit by an Alba representative to an Alcoa facility in Tennessee, stating, ***"Just for proper form, I don't make Victor's activities on behalf of [another recipient of Defendants' bribes], knowledgeable to the plant hence I have removed references to him from your email before forwarding it to others."***  AC ¶ 90.  In an email response two

days later, apparently sent from the United States, Rice stated that the host of the Tennessee visit

***"is also not aware of Victor's role so we should not get into any misunderstandings."***  AC ¶ 90.

### 6.      The 2003 Extension

The Defendants proposed a further extension of the 1990 Contract by letter dated July 8,

2003.  AC ¶ 98; RCS at 17 & Ex. 9.  That letter was sent by Sandra Ainsworth, who was

employed by another Dahdaleh company also named AA Alumina and Chemicals (AAAC-2).

AC ¶¶ 98, 100; RCS at 17 & Ex 9.  Ainsworth's letter conveyed the false impression to Alba that

it was sent on behalf of Alcoa or a duly authorized agent of Alcoa, conspicuously bearing the

Alcoa trademark and referring to "***our*** excellent long term relationship for the last thirty years,"

even though AAAC-2 had existed for less than sixteen months.  AC ¶ 100(b); RCS at 17 & Ex. 9.

The invoices that AAAC-2 sent to Alba during the period of the 2003 extension likewise bore the

name and logo of Alcoa, and correspondence from Ainsworth to Alba regarding pricing used the

Alcoa logo.  AC ¶ 100(e); RCS at 17 & Exs. 10, 21.

As with the prior assignments, AAAC-2 was not a legitimate business enterprise and had

no prior experience in the alumina supply business.  AC ¶¶ 14, 16, 100-06; RCS at 17-18.  In

fact, AAAC-2 was a shell company that had existed for less than sixteen (16) months at the time

of the 2003 amendment.  AC ¶ 100(b); RCS at 17-18.  Alcoa, through its subsidiary, remained

the source of the alumina sold to Alba.  RCS at 17-18, 26 & Ex. 17.  The only reason the Alcoa

Defendants  injected this Dahdaleh-owned shell company into its contractual relationship with

Alba was to funnel bribes to officials of Alba and the Government of Bahrain, distribute the

hundreds of millions of dollars in overpayments fraudulently extracted from Alba through those

bribes, and conceal the involvement of the Alcoa Defendants and their senior executives in that

scheme.  AC ¶¶ 14, 16, 100-06; RCS at 2, 17, 26, 32-33.  Those bribes are specifically

documented in a series of cash wire transfers to officials of Alba and the Government of Bahrain that are individually enumerated and identified in Alba's Pleadings.  AC ¶ 103; RCS at 14.

### 7. The 2005 Contract and Alcoa's Attempt to Acquire a Significant Stake in Alba through Bribery

In 2005, Alba entered into an agreement with yet another Dahdaleh-owned entity named AA Alumina and Chemicals (AAAC-3) under which Alba continued to purchase alumina until 2009.  AC ¶ 108; RCS at 9.  The Defendants defrauded Alba into entering the 2005 contract on unfavorable terms through a scheme to: (a) acquire a controlling stake in Alba at a depressed price through bribery; and (b) extort an excessive contract price from Alba through bribery – and the threat that Alcoa would cease supplying Alba with alumina altogether, thereby threatening Alba's very existence.  AC ¶ 110; RCS at 12-13, 29-30.

In 2003 and 2004, Defendants Rice and Dahdaleh, along with Alain Belda, then the CEO of Alcoa and the Chairman of Alcoa's Board of Directors, personally represented Alcoa in negotiations to obtain a significant equity interest in Alba at a price that drastically undervalued Alba's shares by bribing officials of Alba and the Government of Bahrain.  AC ¶¶ 113, 116, 119-20; RCS at 11-12.  Those bribes are specifically documented in a series of cash wire transfers to officials of Alba and the Government of Bahrain that are individually enumerated and identified in Alba's Pleadings.  AC ¶ 117; RCS at 14, 29-30.  The purpose of the bribes, which were transferred by Dahdaleh on behalf of the Alcoa Defendants, was to induce Alba to agree to the economically disadvantageous sale of its equity to Alcoa, which was eventually memorialized in an MOU signed on September 15, 2003 by Alcoa and the Government of Bahrain.  AC ¶ 117; RCS at 29-30.  The Alcoa Defendants and their senior U.S. executives, including Rice and Alain Belda, were aware of, intended, and participated in Dahdaleh's involvement in the scheme to acquire an equity stake in Alba, as evidenced by: (1) an April 26, 2004 letter from Belda to the

12

Minister of Finance and National Economy of Bahrain, copying Rice and Dahdaleh, stating that Belda had received a message from a recipient of Defendants' bribes that the highest levels of authority in Bahrain "would strongly like Alcoa to take an equity position in Alba"; (2) numerous e-mails from Alcoa employees, located in Pittsburgh, to Alba employees concerning the equity transaction, often copying Dahdaleh; and (3) the joint participation by Defendants Rice and Dahdaleh in conference calls and face-to-face negotiations concerning the terms of the equity transaction. AC ¶¶ 119-21; RCS at 11-12, 36-38. The Government of Bahrain ultimately withdrew from the equity transaction, after concluding that it was not in Alba's best interests, even as the Alcoa Defendants and the recipients of Alcoa's bribes pressured Bahraini Government officials to consummate the transaction. AC ¶¶ 123-26; RCS at 20.

Upon termination of the MOU, Alba had only about ninety (90) days to secure an additional alumina supply before termination of the latest extension of the 1990 Contract on December 31, 2004. AC ¶ 129; RCS at 29. On September 6, 2004, Alba published its tender for alumina requirements for 2005-2014. AC ¶ 130. One week later, Dahdaleh paid a bribe of $66,439.17 to the then-CEO of Alba. AC ¶ 132; RCS at 14. On September 26, 2004, an associate of both Alcoa and Dahdaleh named David Debney (not to be confused with David Dabney) submitted a bid on behalf of the Dahdaleh-owned entity AA Alumina and Chemicals. AC ¶ 134; RCS at 30. Another bribe of $41,789 to Alba's CEO followed four days later. AC ¶ 136; RCS at 14.

As with the prior supply agreements, the Alcoa Defendants fostered the false impression that Dahdaleh and his shell companies were legitimate representatives of Alcoa and its subsidiaries. AC ¶¶ 138, 147-48; RCS at 30. During negotiations on the 2005 contract, Alba specifically requested assurance from Rice that Alba was dealing with an Alcoa subsidiary in AA

Alumina and Chemicals.  AC ¶¶ 138, 147-48.  Rice responded in an October 26, 2004 facsimile

transmission from Pittsburgh, falsely stating that *"[f]or the avoidance of doubt and any*

*confusion,"* AA Alumina and Chemicals was *"an associate company and distributor"* of Alcoa

of Australia involved *"for commercial reasons"* and was *"fully and solely authorized to*

*negotiate the present alumina supply agreement with Alba."*  AC ¶¶ 138, 147-48; RCS at 30, 41

& Ex. 6.  Similarly, on or about November 26, 2004, Debney and Alba signed revised terms for

the 2005 agreement.  AC ¶ 147(f); RCS at 18 & Ex. 14.  Those terms were written on Alcoa

letterhead and signed by Debney on behalf of AA Alumina and Chemicals.  AC ¶ 147(f); RCS at

18 & Ex. 14.  And on January 14, 2005, Debney wrote to a senior officer of Alba to thank Alba

for its decision "to continue our alumina supply contract" and the "business relationship formed

over many years," again on letterhead bearing Alcoa's logo and bearing the legend "AA Alumina

and Chemicals is an associate company of Alcoa of Australia Limited."  AC ¶ 147(h); RCS at 18.

Along with the bribes paid to Alba's CEO, these false representations were critical to inducing

Alba to enter into the 2005 contract on commercially unreasonable terms.  AC ¶¶ 144, 148, 219.

Those terms included a requirement that Alba wire payment within seventy-two (72) hours of

receiving the invoice – a change from the earlier contracts, which had allowed for payment

within thirty days – which caused harm to Alba amounting to several million dollars and caused

Alba to experience problems maintaining enough capital to meet its business needs.  AC ¶ 144.

 As negotiation of the 2005 contract progressed, officials of Alba and the Government of

Bahrain, who had not received Defendants' bribes, urged Alba to reject the proposal by AA

Alumina and Chemicals as not being in Alba's best interest.  AC ¶ 139.  On October 29, 2004,

Rice responded to this resistance by a facsimile sent from Pittsburgh to Alba's CEO (Bruce Hall),

a key recipient of the Defendants' bribes, who was arrested by authorities in the United Kingdom

in October 2010 on criminal charges arising out his role in the scheme.  AC ¶ 140; RCS at 12 & Ex. 7.  In that facsimile message from Pittsburgh, Rice pressured the bribed Hall to accept the proposal, threatening:  "However, should Alba decide not to accept this offer, it is understandable that you will need to find alternatives in order to supply Alba's long term alumina requirements. I hope you can also appreciate this will dictate that we will direct the alumina, which we anticipate continuing to supply Alba, to other long term customers."  AC ¶ 140; RCS at 12 & Ex. 7.  In this facsimile, Rice further referred to AA Alumina and Chemicals as "our associated company" and stated that Alcoa wished for "the mutually beneficial relationship between Alba and Alcoa" to continue so that "we can continue to be Alba's alumina supplier for the next 10 years."  AC ¶ 147(e); RCS at 12 Ex. 7.  Alcoa paid additional cash bribes to Hall, through Dahdaleh, in December 2004 and November and December 2005.  AC ¶¶ 149-50; RCS at 14. After these additional bribes, another Alba official directed that Alba agree to the Defendants' proposal, and Alba signed the agreement with AAAC-3 on June 8, 2005 on the clearly unreasonable terms detailed in Alba's complaint and RICO case statement.  AC ¶¶ 141-43.

As with the prior supply agreements and assignments, the Defendants structured the 2005 contract to enable Dahdaleh-owned companies to serve as pass-through entities, marking up the price of the Alcoa alumina without ever taking title or assuming the risk of shipment, and re-selling the same alumina to Alba at inflated prices while funneling bribes to officials of Alba and the Government of Bahrain.  AC ¶¶146-47; RCS at 9, 14-15.

AA Alumina World and Chemicals was not a legitimate business enterprise and had no prior experience in the alumina supply business.  AC ¶¶ 146-47; RCS at 9.  In fact, no incorporated or registered company by that name existed at the time of the September 29, 2004 bid.  AAAC-1 and AAAC-2 had been renamed, and AAAC-3 was not incorporated until

15

December 30, 2004.  AC ¶ 147(b).  As they  had in the past, while the 2005 contract with Alba was being negotiated, the Defendants finalized a secret shadow "Distribution Agreement" between Alcoa's Australian subsidiary and the Dahdaleh entities.  AC ¶¶ 151-52; RCS at 9, 13. Each page of that agreement was endorsed by Rice.  AC ¶ 155; RCS at 13.  Notwithstanding the assignment, Alcoa, through its subsidiary, remained the source of the alumina sold to Alba. AAAC-3 simply executed a paper transfer of the same alumina it purchased from Alcoa to Alba at higher prices, which were paid to AAAC-3 by wire transfers to bank accounts in the United States and elsewhere.  AC ¶ 152; RCS at 33-35 and Ex. 22.  The only reason Alcoa injected this shell company into its contractual relationship with Alba was to funnel bribes to officials of Alba and the Government of Bahrain, distribute the hundreds of millions of dollars in overpayments fraudulently extracted from Alba through those bribes, and conceal the involvement of the Alcoa Defendants and their senior executives in that scheme.  AC ¶¶ 146, 152.

In total, the Defendants succeeded in retaining Alba's business and extracting more than $433 million in fraudulently induced overpayments from Alba, between 1990 to 2009, as a direct result of their criminal bribery of officials of Alba and the Government Bahrain.  AC ¶ 30; RCS at 55-57.  On February 27, 2008, Alba filed its initial Complaint in this matter, leading almost immediately to criminal investigations into Defendants' conduct by the United States Department of Justice, the Serious Fraud Office of the United Kingdom, and criminal authorities in several other countries.  AC ¶ 31; RCS 43.  Defendant Dahdaleh and former Alba CEO Bruce Hall have been charged with crimes related to the scheme in the United Kingdom; the U.S. federal investigation of Alcoa and its executives remains in progress.  AC ¶ 31; RCS 43.

## **LEGAL STANDARD**

In deciding a motion to dismiss under Rule 12(b)(6), this Court must "accept all factual allegations [in Alba's Pleadings] as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 224, 234; *see also In re Le-Nature's, Inc.*, No. 9-MC-162, 2011 WL 2112533, at *1 (W.D. Pa. May 26, 2011) (Ambrose, J.); *CIT Group/Equipment Financing, Inc. v. Krones, Inc.*, No. 9-432, 2009 WL 3579037, at *4 (W.D. Pa. Sept. 16, 2009) (Ambrose, J.) (same). Although the Court need not credit a plaintiff's "legal conclusions," the presumption of truth indisputably extends to all "factual allegations" in a complaint. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 212 (3d Cir. 2009) (denying motion to dismiss where plaintiff's factual allegations rose above the level of mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action"); *CIT Group*, 2009 WL 3579037, at * 4. This pleading standard does not require the plaintiff to prove its case before discovery, and does not even "impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. It "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" of each necessary element, "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). The question is whether the complaint contains enough facts, taken as true, "to state a claim to relief that is plausible on its face." *Id.* at 570; *see also Iqbal*, 129 S. Ct. at 1949. And in a civil RICO case, where a supplemental RICO Case Statement is required by local rule, the Court will consider not only the factual allegations in the complaint, but also all of the detailed facts in the plaintiff's

RICO Case Statement when deciding whether the plaintiff has stated a plausible claim for relief. *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993).

A complaint subject to the particularity requirements of Rule 9(b) need only set forth "the circumstances of the alleged fraud" with sufficient particularity to put the defendants on notice of the "misconduct with which they are charged."  *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) (denying motion to dismiss civil RICO claims where "each allegation of fraud adequately describes the nature and subject of the alleged misrepresentation").  While allegations of "date, place or time" are sufficient to meet this standard, Rule 9(b) does not require them in every case.  *Id.*; *see also CIT Group*, 2009 WL 3579037, at *5.  Plaintiffs may also use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."  *Seville*, 742 F.2d at 791; *CIT Group*, 2009 WL 3579037, at *5.  Additionally, a complaint need not identify which defendant was responsible for which elements of the alleged fraud.  *In re Meridian Sec. Litig.*, 772 F. Supp. 223, 230 (E.D. Pa. 1991) (denying a motion to dismiss where plaintiffs identified the source, location, dates, and manner of false or misleading statements, but were unable to identify which defendants were responsible); *CIT Group*, 2009 WL 3579037, at *5-7 (complaint "pass[ed] muster" under Rule 9(b) despite some allegations that did "not delineate between the actions of particular Defendants" where other paragraphs "contain[ed] sufficient detail concerning the role of each defendant").  The Third Circuit has cautioned that "focusing exclusively on [the] 'particularity' language [of Rule 9(b)] 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules,'" *Christidis v. First Penn. Mortg. Trust*, 717 F.2d 96, 100 (3d Cir. 1983) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 407 (1969)), and this Court has emphasized that an overly strict standard is

particularly inappropriate "where a party alleges a complex corporate fraud" since "much of the factual information necessary to describe the details of the fraud may be 'peculiarly within the defendant's knowledge and control,'" *CIT Group*, 2009 WL 3579037, at * 5; *see also Seville Indus. Mach.*, 742 F.2d at 791 (discouraging courts from subjecting allegations of fraud to "too strict a scrutiny").[3]

## **LEGAL ARGUMENT**

## I.    **ALBA HAS PLED AN ACTIONABLE CIVIL RICO CLAIM AGAINST ALCOA AND ALCOA WORLD ALUMINA**

The Alcoa Defendants raise two arguments in support of their motion to dismiss Alba's civil RICO claims.  First, they contend that Alba's Pleadings allege a foreign enterprise to which "RICO does not apply as a matter of law."  MTD at 18.  Second, they contend that Alba has failed to plead "particularized facts" about the Alcoa Defendants' "involvement in this enterprise or its alleged racketeering activity."  *Id.*  Both of those arguments fail because Alba has made detailed factual allegations that the Alcoa Defendants, both of which are domestic companies, and senior executives of those companies, including Rice and others, conceived, orchestrated, and directed the bribery scheme in and from the United States, and that they employed Dahdaleh and his overseas entities in order to funnel bribes to foreign officials, launder the criminal profits obtained thereby, and conceal the involvement of the U.S. Defendants in the fraud.  Those factual allegations *must* be presumed true on a motion to dismiss, and are more than sufficient to establish not only that the RICO enterprise alleged by Alba was primarily domestic, but that the Alcoa Defendants and their senior executives were its principal architects and beneficiaries.

---

[3] The Alcoa Defendants argue that pleading "on information and belief" is insufficient under Rule 9(b).  That is wrong.  Rule 9(b) permits pleading "on information and belief" provided such allegations are grounded in the same level of "factual support" required of all pleadings under Rule 9(b).  *See, e.g., Sun Microsystems, Inc. v. Versata Ents., Inc.*, 630 F. Supp. 2d 395, 406-07 (D. Del. 2009).

Moreover, Alba's allegations of domestic leadership of the fraudulent scheme by the Alcoa Defendants and their executives are not at all speculative or conclusory; they are amply supported by Alba's detailed, specific, and documented allegations of actions in furtherance of the scheme by senior domestic executives of the Alcoa Defendants, most conspicuously Rice.[4] All of this detailed information has been submitted to the Court before even the first step of discovery has been taken in this case.

### A.   Alba Has Pled a Domestic RICO Enterprise

The Alcoa Defendants' principal argument in support of dismissal is that Alba's Pleadings allege a RICO "enterprise" that is predominantly foreign, and therefore not actionable under RICO. MTD at 18-26. Defendants claim that this argument is grounded in *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), where the U.S. Supreme Court held that the Securities Exchange Act of 1934 does not apply extraterritorially because the statute "gives no clear indication of extraterritorial application." *Id.* at 2878. Applying that general principle, the *Morrison* Court found that the plaintiffs had failed to state a claim under the 1934 Act because the "'focus' of Congressional concern" embodied in the 1934 Act was a fraud in connection with the purchase or sale of securities traded *on U.S. exchanges*, whereas the plaintiff's allegations concerned securities traded on foreign exchanges. *Id.* at 2879, 2884. *Morrison* thus prescribes a three step analysis. First, the court must examine the statute to determine if Congress "clearly expressed" its intent "to give a statute extraterritorial effect." *Id.* at 2877 (citations omitted). If Congress did not express a clear intent to apply the statute extraterritorially, the court must then

---

[4] The Alcoa Defendants do not contend that they would not be held vicariously liable for the actions of their senior executives alleged in Alba's Pleadings. Nor could they. *See*, *e.g.*, *Chuy v. Phil. Eagles Football Club*, 595 F.2d 1265, 1276 (3d Cir. 1979) (en banc) (employer is responsible for the torts of its employees "performed to further the business of the employer and not for the [employee's] personal purposes").

identify the "focus of Congressional concern" embodied in the statute.  *Id.* at 2884.  Finally, the

court must assess whether the plaintiff has pled facts which, if true, would establish that the

"focus" of statutory concern in the instant case is domestic rather than foreign.  *Id.*

      Since *Morrison*, a number of courts, including this one, have considered whether RICO

applies extraterritorially.  *See Le-Nature's*, 2011 WL 2112533, at *2; *Cedeno v. Castillo*, No. 10-

3861-cv, 2012 WL 205960, at *1 (2d Cir. Jan. 25, 2012) (*aff'g Cedeno v. Intech Group*, 733 F.

Supp. 2d 471, 473-74 (S.D.N.Y. 2010)); *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29,

32-33 (2d Cir. 2010); *Sorota v. Sosa*, --- F. Supp. 2d ---, 2012 WL 313530, at *4 (S.D. Fla. Jan

31, 2012); *United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 29 (D.D.C. 2011); *In re*

*Toyota Motor Corp.*, 785 F. Supp. 2d 883, 912-15 (C.D. Cal. 2011); *CGC Holding Co., LLC v.*

*Hutchens*, No. 11-CV-01012, 2011 WL 5320988, at *14 ( D. Colo. Nov. 1, 2011); *European*

*Cmty. v. RJR Nabisco, Inc.*, No. 02-CV-5771, 2011 WL 843957, *3-7 (E.D.N.Y. Mar. 8, 2011).

Most courts to reach the issue have concluded that "RICO 'focuses,' in the context of a territorial

analysis, on domestic rather than foreign *enterprise*."  *Le-Nature's*, 2011 WL 2112533, at *3

(emphasis added); *see also Sorota*, 2012 WL 313530, at *4; *Cedeno*, 2012 WL 205960, at *1-2;

*Toyota*, 785 F. Supp. 2d at 914; *Philip Morris*, 783 F. Supp. 2d at 28-29; *European Cmty.*, 2011

WL 843957, at *5.[5]  Under the analytical rubric adopted by this Court in *Le-Nature's*, the

question is thus whether Alba has sufficiently pled a predominantly domestic RICO enterprise.

      Alba has clearly done so.  Although this Court's decision in *Le-Nature's* did not address

how *Morrison* would "apply to an associated-in-fact enterprise, which might not have a distinct

---

[5] Contrary to this Court's decision in *Le-Nature's*, the district court in *Hutchens* held that RICO's "focus" is on the "pattern of racketeering activity" rather than the "enterprise," *see Hutchens*, 2011 WL 5320988, at 14, and found that the plaintiff had alleged racketeering activity occurring in the United States sufficient to survive a motion to dismiss.  The Second Circuit's decisions in *Cedeno* and *Norex* – the only U.S. Court of Appeals cases to address RICO's territorial reach since *Morrison* – leave the question of RICO's "focus" open.

'location' as does an enterprise that is a legal entity," 2011 WL 2112533, at *3 n. 9, other courts have analogized to the "nerve center" test familiarly used to determine a corporation's principal place of business.  *See European Cmty.*, 2011 WL 843957, at *5-6 (citing *Hertz Corp. v. Friend,* 130 S. Ct. 1181 (2010)).  As the U.S. Supreme Court held in *Hertz*, a corporation's "nerve center" is its "actual center of direction, control, and coordination."  *Hertz*, 130 S. Ct. at 1192; *see also Brewer v. SmithKline Beacham Corp.*, 774 F. Supp. 2d 720, 729 (E.D. Pa. 2011) ("nerve center" is "the place where the operational goals are set").

Alba plainly and repeatedly alleges that the Alcoa Defendants and their senior executives "conceived, orchestrated, and directed" the scheme to defraud Alba by bribing officials of Alba and the Government of Bahrain – in other words, that the "nerve center" of the association-in-fact RICO enterprise was domestic.  *E.g.*, AC ¶¶ 13, 14, 27, 37; RCS at 1-5, 10-14.  Alba likewise alleges that the Alcoa Defendants and their senior executives were the principal recipients and beneficiaries of the hundreds of millions of dollars of overpayments fraudulently extracted from Alba.  *E.g.*, AC ¶¶ 22, 35, 42, 52, 63, 81, 105-06, 157; RCS at 2, 5.  Most importantly, Alba's Pleadings allege that the Alcoa Defendants and their senior executives, including Rice, engaged and used Dahdaleh and his offshore sham companies in order to funnel bribes to foreign officials, launder their own criminal proceeds, and conceal their own involvement in the scheme to defraud Alba.  *E.g.*, AC ¶¶ 42, 157; RCS at 3.  Those allegations do not assert "threadbare" "legal conclusions" that may be disregarded under *Twombly*, *Iqbal*, and their progeny.  Rather, these factual allegations identify *who* exercised control of the fraudulent scheme and *who* benefitted from it, and must be presumed true for purposes of the present motion.  *See Iqbal*, 129 S. Ct. at 1949-50; *Twombly*, 550 U.S. at 556; *Fowler*, 578 F.3d at 212; *Le-Nature's,* 2011 WL 2112533, at *1; *CIT Group*, 2009 WL 3579037, at *4.

Even if those allegations required further evidentiary detail to establish the facial "plausibility" standard set by *Twombly* and *Iqbal* – which they do not – Alba has provided that detail in abundance.  Alba's contention that the fraudulent scheme was conceived, orchestrated, and directed by the U.S.-based Alcoa Defendants and their senior U.S. executives is amply supported by specific, documented, factual allegations demonstrating the involvement and leadership of those U.S. companies and their U.S. executives, including, *inter alia*:

- Senior executives of the Alcoa Defendants, including Peter Burgess and Rice, all acting in and from the United States, signed, endorsed, and negotiated *both* the supply agreements between Alcoa's Australian subsidiary and Alba, *and* the secret, parallel "assignments" to Dahdaleh's offshore shell companies, which were engaged by the Alcoa Defendants precisely in order to funnel bribes to officials of Alba and the Government of Bahrain, distribute the hundreds of millions of dollars in overpayments fraudulently extracted from Alba through those bribes, and conceal the involvement of the Alcoa Defendants and their senior executives in that scheme. AC ¶¶ 55, 56, 61, 73-74, 80; 137, 140, 147-48, 155; RCS at 7-8, 11-15, 30, 41, & Exs. 1, 2, 6, 7.

- Senior executives of the Alcoa Defendants, including Peter Burgess and Rice, repeatedly and falsely assured Alba that (a) Dahdaleh, (b) the Dahdaleh-controlled entities, and (c) various employees of those entities, were legitimate associates and representatives of Alcoa and its subsidiaries, and were duly authorized to act on behalf of Alcoa and its subsidiaries.  AC ¶¶ 67-68, 79, 86(e), 88-90, 138, 147-48; RCS at 11-12, 30, 40-42, & Exs. 4, 6, 7.  In addition to the numerous written communications identified specifically in Alba's Pleadings, these false representations were also made orally, as during a telephone conversation on or about October 31, 2004, when Rice falsely assured Bahrain's Minister of Finance & National Economy that AA Alumina and Chemicals was a subsidiary of Alcoa.  RCS at 12-13.

- The Alcoa Defendants and their senior executives, acting at times through their controlled subsidiaries, specifically authorized Dahdaleh and his shell companies to use Alcoa trademarks in their correspondence with Alba in order to conceal the true purpose of Dahdaleh's involvement, which was to execute and conceal the U.S.-based fraudulent bribery scheme.  AC ¶¶ 78-79, 85, 86(e), 88-89, 100(b), 100(e), 147(f), 147(h); RCS at 17-18, 32-33, 40,  & Exs. 8, 9, 12, 14, 21.

- Senior executives of the Alcoa Defendants, including Rice and Alcoa CEO Alain Belda, along with Dahdaleh, jointly represented and spoke for Alcoa and its subsidiaries during negotiations with Alba, including negotiations concerning Alcoa's unsuccessful attempt to obtain a significant equity stake in Alba.  AC ¶¶ 113, 116, 110-21; RCS at 11-12, 36-38 & Ex. 5.  During those negotiations, the Alcoa Defendants' executives introduced Dahdaleh as a consultant or advisor to Alcoa, and as a member of Alcoa's negotiating "team," and copied Dahdaleh on their correspondence with Alba concerning the proposed transaction, AC ¶¶ 119-21; RCS at 11-12, 36-38.

- Senior executives of the Alcoa Defendants, including Rice, plainly manifested their knowledge of Dahdaleh's secret role in the fraudulent scheme to defraud Alba in written communications with officials of Alba.  These communications included, but were not limited to:  (a) Rice's March 3, 2002 emails with Bruce Hall, one of the officials that Alcoa bribed through Dahdaleh, in which they discussed concealing Dahdaleh's role from Alba officials who had not been bribed, AC ¶ 90; (b) Rice's October 26, 2004 facsimile transmissions from Pittsburgh, Pennsylvania, in which he assured Alba that the Dahdaleh shell company ***"AA Alumina and Chemicals, an associate company and distributor of Alcoa of Australia Ltd., is fully and solely authorized to negotiate the present alumina supply agreement with Alba"*** and was involved ***"for commercial reasons."*** AC ¶¶ 138, 147-48; RCS at 30, 41 & Ex. 6; and (c) Rice's October 29, 2004 facsimile transmission from Pittsburgh, Pennsylvania in which Rice referred to AA Alumina and Chemicals as "our associated company."  RCS at 12 & Ex. 7.

A critical consideration for the Court is that Alba has proffered all of these factual allegations and supporting evidence without the benefit of even the most basic discovery.

The Alcoa Defendants' motion to dismiss simply ignores or glosses over these highly detailed and well-sourced factual allegations of U.S.-based leadership of the fraudulent scheme, blithely arguing that "the only U.S. activity that Alba says occurred over this purported two-decade scheme is of the incidental variety."  MTD at 4.  But the glaring complicity of the U.S. Alcoa Defendants and their senior U.S. executives in the bribery scheme is anything but "incidental," and their use of offshore shell companies to funnel bribes to officials in Bahrain and conceal their own involvement in the scheme does not make their leadership of that scheme any less domestic.  The extensive domestic activity by the Alcoa Defendants and their executives specifically identified in Alba's pleadings is central to the fraudulent scheme alleged by Alba and is more than sufficient to establish, at this preliminary stage, a "plausible" claim that the RICO enterprise described in Alba's Amended Complaint and RICO case statement was directed in and from the United States by U.S.-based executives of U.S. corporations.[6]

---

[6] The Alcoa Defendants cite the district court's opinion in *Norex*, 540 F. Supp. 2d 438, 443-44 (S.D.N.Y. 2007), for the proposition that "general allegations that U.S. Defendants 'masterminded, operated and directed' the illegal conduct" are insufficient to establish a domestic RICO enterprise.  But as is evident from the complaint in *Norex*, all of the alleged

The Alcoa Defendants also attempt to distance themselves from the scheme by fleeing from the actions of their subsidiary, Alcoa of Australia. MTD at 5, 21 & n.6. Notably, this Court rejected an almost identical argument in *CIT Group*, denying the defendants' motion to dismiss despite the fact that certain of the plaintiff's allegations did "not distinguish between" putatively distinct corporate entities where "it appear[ed] from the Complaint that [the plaintiff's] theory [wa]s that any corporate distinction between the companies is legally meaningless." *CIT Group*, 2009 WL 3579037, at *7. Here, too, Alba has specifically alleged that the Alcoa Defendants controlled the actions of Alcoa of Australia in connection with the bribery scheme. AC ¶¶ 11-13; RCS at 10. Once again, those are allegations of *fact* concerning the effective control of Alcoa of Australia, not "threadbare" legal conclusions, and must be presumed true for purposes of the present motion. *See Iqbal*, 129 S. Ct. at 1949-50; *Twombly*, 550 U.S. at 556; *Fowler*, 578 F.3d at 212; *Le-Nature's*, 2011 WL 2112533, at *1; *CIT Group*, 2009 WL 3579037, at *7. And Alba has gone much further than the plaintiff in *CIT Group* by making specific factual allegations demonstrating the Alcoa Defendants' control of Alcoa of Australia in connection with the bribery scheme, including: (1) Alcoa's majority ownership of Alcoa of Australia; (2) Alcoa's effective control over the Alcoa World Alumina and Chemicals Strategic Council which manages Alcoa of Australia; and (3) the fact that senior U.S. executives of the Alcoa Defendants, including Rice, negotiated, signed, and endorsed numerous legal instruments and correspondence on behalf of Alcoa of Australia in connection with the fraudulent scheme, including the supply agreements

---

"corporate masterminds" in that case were foreign corporations incorporated in the Isle of Man. *See* Decl. of Nicole A. Stockey, Ex. 7, ¶¶ 69-78. Here, Alba has alleged and fully demonstrated that the "corporate masterminds" of the scheme to defraud Alba were U.S. companies and their executives. Moreover, as noted by the district court in *Norex*, the plaintiffs' "specific allegations of U.S. conduct" in that case were "few and far between." *Norex*, 540 F. Supp. At 444. The same simply cannot be said of Alba's highly detailed and documented allegations of direct, controlling, and hands-on involvement by Alcoa, Alcoa World Alumina, and their senior executives in planning and executing the scheme to defraud Alba.

with Alba and the secret, parallel "assignments" to the Dahdaleh shell companies.  AC ¶¶ 11-13, 55, 56, 61, 73-74, 80; 137, 140, 147-48, 155; RCS at 7-8, 10-13, 30, 41, & Exs. 1, 2, 6, 7.  The question is not, as the Alcoa Defendants argue, whether Alba has alleged facts sufficient to "pierce the corporate veil" – a legal doctrine that no court has suggested is relevant to territoriality analysis under RICO.  The question is whether Alba has alleged a domestic "nerve center" for the RICO enterprise described in its Pleadings notwithstanding the fact that a number of the contracts in question were signed nominally on behalf of Alcoa's Australian subsidiary.  The fact that those contracts were negotiated, signed, and administered by *U.S.-based* executives of Alcoa's *U.S.-based* subsidiary, Alcoa World Alumina, answers that question conclusively.[7]

The Alcoa Defendants – by focusing on the overseas activities of Dahdaleh and his shell companies to the complete exclusion of the domestic activities of their own senior executives – completely fail to address the gravamen of Alba's Amended Complaint – which is that the Alcoa Defendants and their senior U.S. executives *used* Dahdaleh and his offshore pass-through companies to carry out and conceal their bribery of foreign officials.  Obviously, a fraudulent scheme of that variety *must* involve some overseas conduct and participants.  But there is nothing in RICO, or *Morrison*, or the cases decided since *Morrison*, to support the proposition that U.S. companies may insulate themselves from civil liability by camouflaging their conduct by

---

[7] The Alcoa Defendants' remaining argument – *i.e.*, that the "racketeering activity" was foreign and therefore beyond the scope of RICO – is fundamentally contrary to the territoriality analysis that this Court announced in *Le-Nature's*, where it held that RICO's "focus" is not on racketeering activity *simpliciter*, but on the use of an enterprise in connection with that activity. 2011 WL 2112533, at *3.  The argument also depends upon a basic mischaracterization of Alba's allegations.  The "racketeering activity" alleged in Alba's pleadings is, at its core, the bribery of officials of Alba and the Government of Bahrain.  Although certain acts in furtherance of that activity occurred overseas, Alba has alleged, in detail, that the activity was conceived, orchestrated, and directed by the Alcoa Defendants and their senior executives in and from the United States for the principal benefit of the Alcoa Defendants and their executives.  The actions of the Alcoa Defendants and their senior executives in furtherance of the fraudulent bribery scheme *are* "racketeering activity," and those actions occurred in the United States.

collaborating with offshore middlemen and laundering their fraudulent profits through the use of shadow shell corporations.  Those are, in truth, the time-honored tools of corrupt and criminal business enterprises, and U.S. law neither protects domestic companies from the consequences of their fraudulent conduct nor leaves the foreign victims of fraud without redress in the U.S. courts simply because offshore intermediaries are employed to transfer of bribes and conceal the complicity of U.S. corporations and their officers in paying those bribes.  Notably, the U.S. Department of Justice considers the conduct in this case sufficiently "domestic" to justify the commitment of extensive law enforcement resources to a multi-year investigation of the Alcoa Defendants' conduct.  And as the Supreme Court made clear in *United States v. Pasquantino*, 544 U.S. 349, 371-72 (2005), fraudulent schemes hatched, launched, and operated from the United States against foreign entities are territorial offenses that are properly challenged in U.S. courts. By asking this Court to dismiss Alba's complaint, the Alcoa Defendants are attempting to hide behind the nationality of their offshore shell corporations, which they deliberately engaged to defraud Alba, in order to stymie Alba's efforts to obtain justice in the courts of the United States. That result would be not only illogical and unjust, but would provide a roadmap for U.S.-based businesses to immunize themselves from civil liability for fraud, bribery, theft, and corruption. Nothing in RICO, *Morrison*, or any other authority cited by the Alcoa Defendants requires that result.

## B. Morrison Does Not Bar Extraterritorial Application of RICO

Alba has pled a domestic RICO enterprise.  Its Amended Complaint therefore presents no issue of extraterritoriality under *Morrison*.  But even if it did, dismissal would not be required because RICO, unlike the securities laws at issue in *Morrison*, applies extraterritorially. Although this Court rejected that proposition in *Le-Nature's*, 2011 WL 2112533, at *2, the Third Circuit has not yet considered the question.  When it does, it should rule that RICO *does* apply

extraterritorially.  As the Supreme Court has admonished, "RICO is to be read broadly," and " is to 'be liberally construed to effectuate its remedial purposes.'"  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985) (quoting Pub. L. 91-452, § 904(a), 84 Stat. 947).  Unlike the securities fraud statutes at issue in *Morrison*, Congress included within RICO's ambit of predicate racketeering offenses a number of criminal statutes with undisputed extraterritorial reach, including but not limited to, mail and wire fraud, 18 U.S.C. §§ 1341, 1343, the Travel Act, 18 U.S.C. § 1952, and Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-2, all of which Alba has pled as part of the Defendants' pattern of racketeering activity.  Accordingly, *Morrison*'s construction of the federal securities statutes does not preclude extraterritorial application of RICO, since RICO *does* contain exactly the sort of "clear indication of extraterritoriality" that the Court found lacking in the securities statutes.  130 S. Ct. at 2883.

### C.   Alba Has Pled the Involvement and Leadership of Alcoa and Alcoa World Alumina With Sufficient Particularity

Apart from arguing extraterritoriality, the Alcoa Defendants do *not* contend that Alba has failed to plead an actionable RICO claim.  They do not, for example, contend that Alba has failed to plead an adequate association-in-fact enterprise united by a common purpose, or that it has failed to allege a pattern of racketeering activity or a sufficient effect on interstate commerce.  Rather, the Alcoa Defendants simply claim that Alba has failed to plead sufficiently particularized facts demonstrating their involvement in and leadership of the RICO enterprise.

That argument is frivolous.  As detailed in Alba's Pleadings, the Alcoa Defendants and their senior domestic executives were intimately involved in the scheme to defraud Alba.  As such, nearly every point that the Alcoa Defendants make in support of this argument rests on an obvious mischaracterization of Alba's allegations.  For example, the Alcoa Defendants contend that "Alba has not alleged any facts to show that Alcoa Defendants engaged in any day-to-day

28

decision-making regarding the operation of the contracts (all of which were between foreign entities)." MTD at 26. That claim is false. Alba has alleged with great specificity, and largely demonstrated, that every one of the contracts in question was negotiated and signed or endorsed by senior U.S. executives of the Alcoa Defendants – notwithstanding the fact that Alcoa's Australian subsidiary was the nominal party to those contracts. AC ¶¶ 55, 56, 61, 73-74, 80, 137, 140, 147-48, 155; RCS at 7-8, 11-13, 30, 41, & Exs. 1, 2, 6, 7. Alba has also specifically alleged that the Dahdaleh-owned "foreign entities" were created and operated by the domestic Defendants in order to execute and conceal the fraud on Alba. That specific allegation is supported and documented with specific facts demonstrating the Alcoa Defendants' knowledge of Dahdaleh's role and their efforts to conceal that role from Alba officials who had not received their bribes. *E.g.* AC ¶¶ 14, 16, 30, 37, 67-68, 79, 86(e), 88-90, 138, 147-48; RCS at 1-2, 4-12, 30, 40-42, & Exs. 4, 6, 7. The Alcoa Defendants also argue that "Alba has not alleged any facts to show that U.S.-based actors bribed any foreign officials." MTD at 26. The opposite is true. Alba's allegation, repeatedly expressed in its Pleadings, is that the Alcoa Defendants and their U.S. executives bribed officials of Alba and the Government of Bahrain. *E.g.*, AC ¶¶ 14, 22-23, 26, 35, 51, 69, 83, 92-93, 96, 102-04, 137, 157; RCS at 1-13, 27-30. The fact that the U.S.-based Defendants did not hand-deliver bags of cash, but instead employed offshore shell companies to funnel their bribes and conceal their fraud, does not absolve them of their responsibility for the bribery.

### D.    Dismissal of the RICO Claims Prior to Discovery Is Premature

Finally, Alcoa fails to address that Alba's common law fraud claims – which plainly exceed the pleading standards of Rule 9(b), *see infra* Part II – rest upon *precisely the same conduct* and *precisely the same allegations* as Alba's RICO claims, and will thus entail *precisely the same discovery*. Accordingly, even if the Court were to question the sufficiency of Alba's

RICO claims, it would be premature to dismiss those claims at this stage, since discovery on Alba's common law claims almost certainly will reveal additional facts relevant to the RICO claims, including the extent of the involvement of the Alcoa Defendants and their domestic executives in the scheme to defraud Alba.  In similar circumstances, courts ruling on motions to dismiss under *Morrison* have held that factual disputes over the territorial reach of a plaintiff's allegations are matters "better-suited for a motion for summary judgment in the context of a more fully-developed factual record that unequivocally establishes where" the conduct that is the "focus" of the statute occurred.  *In re Optimal U.S. Litig.*, --- F. Supp. ----, 2011 WL 1676067, at *12 (S.D.N.Y. 2011); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 405 (S.D.N.Y. 2010) (denying motion to dismiss under *Morrison* because a "more developed factual record is necessary to inform a proper determination" of the territorial reach of the plaintiff's allegations).  *See generally Roman v. City of Reading*, 121 Fed. Appx. 955, 961 (3d Cir. 2005) ("Often, a trial judge rejects a defendant's motion to dismiss for failure to state a claim to allow the plaintiff time to develop evidence through discovery.").  The parties' factual dispute over the location of the RICO enterprise described in Alba's pleadings is exactly the sort of factual issue that should not be resolved, on the preliminary pleadings alone, prior to any discovery.

## II.    ALBA HAS PLED AN ACTIONABLE COMMON LAW FRAUD CLAIM AGAINST ALCOA AND ALCOA WORLD ALUMINA

The Alcoa Defendants argue that Alba has failed to plead the elements of common law fraud with sufficient particularity because: (1) the Alcoa Defendants had no "duty to speak"; (2) the fraudulent misstatements specified in Alba's pleadings were, in fact, true; (3) Alba has not pled scienter with the requisite particularity; (4) Alba has not alleged justifiable reliance; and (5) Alba has not alleged loss causation.  MTD at 27-34.  Those arguments are meritless.

As an initial matter, common law has long recognized civil causes of action for the victims of commercial bribery *even in the absence* of any affirmative misstatements or misleading omissions.  *See*, *e.g.*, Restatement (Second) of Agency § 312 ("A person who, without being privileged to do so, intentionally causes or assists an agent to violate a duty to his principal is subject to liability to the principal."); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 634 (3d Cir. 2007) (acknowledging civil liability for knowingly aiding and abetting an agent's breach of a duty of loyalty to its principal); *Ebasco Svcs. Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421, 452 (E.D. Pa. 1975) (same); *Twp. of Wayne v. Messercola*, 789 F.Supp. 1305, 1311 (D.N.J. 1992) (third party is liable to the principal if he knowingly aids an agent in breaching a fiduciary duty through the payment of bribes); *Pramer S.C.A. v. Abaplus Int'l Corp.*, 907 N.Y.S.2d 154, 161 (N.Y. App. Div. 2010) (allegations of bribery are sufficient to state a common-law fraud claim); *Cont'l Mgmt. v. United States*, 527 F.2d 613, 616 (Ct. Cl. 1975) ("In nearly unbroken succession, courts have declared that victimized principals may obtain non-statutory remedies against outsiders who have knowingly participated in or induced an agent's breach of duty.").  The fact that the Defendants obtained hundreds of millions of dollars in excess payments from Alba by bribing officials of Alba, and causing these officials to breach their duties to Alba, is the gravamen of Alba's common law fraud claim.  That claim would be actionable *even if* Alba had not alleged any fraudulent misstatements or omissions.  The Alcoa Defendants' motion to dismiss should be denied for this reason alone.[8]

---

[8] An actionable common law claim should not be dismissed simply because it is styled "fraud" rather than "bribery" or "inducing a breach of fiduciary duty," as any such technical defect may be cured by amendment.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.").

But in this case, Alba *has* specifically alleged numerous affirmative fraudulent statements

and misleading omissions by the Defendants in furtherance of their scheme to defraud Alba,

including, *inter alia*:

- The Alcoa Defendants and their senior executives affirmatively misrepresented the true reason for their assignment of the Market Tonnage under the 1996 Amendment to a Dahdaleh-owned entity, claiming the assignment was necessary in order to avoid disclosure of Alcoa's prices to other customers and the Government of Australia, when its true purpose was to facilitate and conceal the bribery of Alba's officers.  AC ¶¶ 67-68.

- In their secret 2002 "Distribution Agreement" with Dahdaleh, the Alcoa Defendants authorized the Dahdaleh-owned shell company to use Aloca's logo and trademarks, including on stationery, in advertising, or on its place of business, and the Dahdaleh entity did, in fact, use Alcoa's logo and trademarks in correspondence with Alba in order to foster the false impression that it was a legitimate business enterprise and a duly authorized affiliate of Alcoa. AC ¶¶ 85, 86(e), 88-89; RCS at 40.  The Alcoa Defendants continued to authorize, and the Dahdaleh entities continued to use, Alcoa's trademarks and logos in subsequent correspondence with Alba in order to perpetuate the false impression that the Dahdaleh entities were Alcoa's legitimate associates.  AC ¶¶ 138, 147-48; RCS at 11-12, 30, 40-42, & Exs. 4, 6, 7.

- The Alcoa Defendants and their senior executives also fostered the false impression that the Dahdaleh entities were their legitimate affiliates in correspondence with Alba, *e.g.*, AC ¶¶ 67-68, 79, 86(e), 88-90, 138, 147-48; RCS at 11-12, 30, 40-42, & Exs. 4, 6, 7., and during oral conversations, such as a telephone conversation on or about October 31, 2004, when Rice falsely assured Bahrain's Minister of Finance & National Economy that AA Alumina and Chemicals was a subsidiary of Alcoa.  RCS at 12-13.

- The Defendants openly discussed with the recipients of their bribes the fact that they were concealing Dahdaleh's role from Alba officials who had not been bribed.  For example, on March 3, 2002, Bruce Hall, the former CEO of Alba and a direct recipient of Defendants' bribes, sent an email to Rice in anticipation of a visit by an Alba representative to an Alcoa facility in Tennessee, stating, ***"Just for proper form, I don't make Victor's activities on behalf of [another recipient of Defendants' bribes], knowledgeable to the plant hence I have removed references to him from your email before forwarding it to others."***  AC ¶ 90.  In an email response two days later, presumably sent from the United States, Rice stated that the host of the Tennessee visit ***"is also not aware of Victor's role so we should not get into any misunderstandings."***  AC ¶ 90.

- During negotiations on the 2005 Contract, Alba requested assurance from Rice that Alba was dealing with an Alcoa subsidiary in AA Alumina and Chemicals.  AC ¶¶ 138, 147-48; RCS at 30.  Rice responded in an October 26, 2004 facsimile transmission from Pittsburgh, falsely stating that ***"[f]or the avoidance of doubt and any confusion,"*** AA Alumina and Chemicals was ***"an associate company and distributor"*** of Alcoa of Australia involved ***"for commercial***

*reasons"* and was ***"fully and solely authorized to negotiate the present alumina supply agreement with Alba."*** AC ¶¶ 138, 147-48; RCS at 30, 41 & Ex. 6.

These allegations are more than sufficient to make out a common law fraud claim on a theory of affirmative misrepresentations and misleading omissions, and the Alcoa Defendants' counterarguments are unavailing.

First, the Alcoa Defendants argue that they had no duty to disclose to Alba that they were defrauding Alba by bribing officials of Alba and the Government of Bahrain. But as the Alcoa Defendants acknowledge in their motion, a duty to disclose arises when the defendant makes "a partial disclosure that is misleading if additional information is withheld." MTD at 29 (citing *Alvarez v. Ins. Co. of N. Am.*, No. 06-4326, 2006 WL 3702641, at *2 (E.D. Pa. Dec. 12, 2006)). Obviously, the Alcoa Defendants misled Alba in a very profound way by responding to specific questions from Alba officials, who had not been bribed, that Dahdaleh and his companies were injected into the transactions in order to protect the confidentiality of Alcoa's pricing information (even if that much were true) without also disclosing that those entities were engaged to bribe Alba officials and thereby to induce massive overpayments by Alba. Moreover, the Alcoa Defendants rely on a decision that applied the common law of the District of Columbia, *see id.*, at *1, conspicuously ignoring the common law of Pennsylvania, which has long held that "[f]raud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. It is any artifice by which a person is deceived to his disadvantage." *In re McClellan's Estate*, 365 Pa. 401, 407 (1950). Alba's allegations that the Defendants' defrauded Alba by bribing its officers and concealing that bribery plainly satisfy Pennsylvania's common law definition of fraud.

33

Second, the Alcoa Defendants argue that the numerous affirmative misstatements identified in Alba's Pleadings are not actionable because "they were not false or misleading" but "were in fact true and accurate statements."  MTD at 29-30.  But this is a matter of fact – indeed, it is the ultimate matter of fact on any claim of fraud – and cannot be resolved on a motion to dismiss.  Tellingly, the only case that the Alcoa Defendants cite in support of this argument is the memorandum opinion of a *bench trial*.  MTD at 30 (citing *In re Marta Group, Inc.*, 47 B.R. 220, 224 (Bankr. E.D. Pa. 1985)).  A bench trial, of course, is sufficient to resolve disputed matters of fact; a motion to dismiss is not.  The Alcoa Defendants' argument that these statements were true because Dahdaleh and his entities *were* associated with Alcoa of Australia also ignores entirely the gist of Alba's allegation:  The Defendants fostered the false impression that the Dahdaleh entities were *legitimate* companies and were engaged for *legitimate* purposes, when in fact they were engaged to execute and conceal the Defendants' fraudulent scheme.  Considered in context of Alba's detailed allegations of bribery, Alba's Pleadings clearly are sufficient "to identify what was 'false' about the representations" in question.  *CIT Group*, 2009 WL 3579037, at *7.

Third, the Alcoa Defendants contend that Alba has not pled scienter with particularity. MTD at 31-32.  But Rule 9(b) does not require that; it states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Once again, the Alcoa Defendants deceptively rely on inapposite case law, citing a decision under the Private Securities Litigation Reform Act (PSLRA).  MTD at 32 (citing *Majer v. Sonex Research, Inc.*, 541 F. Supp. 2d 693, 704 (E.D. Pa. 2008)).  But the PSLRA, unlike Rule 9, *does* require civil plaintiffs alleging securities fraud to plead scienter with heightened particularity.  As the Third Circuit has specifically held, "[t]he PSLRA's requirement for pleading scienter . . . marks a *sharp break* with Rule 9(b)," since under the PSLRA, "'a plaintiff can no longer plead the

34

requisite scienter element generally, as he previously could under Rule 9(b).'" *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008)) (emphasis added).  Alba's allegations of scienter, considered in the context of its detailed factual demonstration of the Alcoa Defendants' complicity in the fraudulent bribery scheme, are more than enough to satisfy Rule 9(b).

The Alcoa Defendants' remaining arguments – *i.e.*, that Alba has not adequately alleged justifiable reliance or loss causation – are frivolous.  MTD at 32-34.  Alba has specifically, and exhaustively, articulated the Defendants' fraudulent bribery scheme that induced Alba to enter into commercially unreasonable alumina purchase agreements that resulted in overpayments by Alba in excess of $430 million.

The question is not, as the Alcoa Defendants would have it, whether "a precise understanding of Alcoa Defendants' relationship with Dahdaleh" was relevant to Alba's decision to enter into the economically disadvantageous contracts.  The question is whether the Defendants fraudulently induced Alba to enter into those contracts by bribing Alba's officers and concealing that bribery from Alba by, *inter alia*, misrepresenting the nature and reasons for Dahdaleh's involvement.  Alba's Pleadings allege, in great detail, that the Defendants' fraud *did* induce Alba's reliance and *did* result in hundreds of millions of dollars in damages to Alba.[9]

## CONCLUSION

For the foregoing reasons, the Alcoa Defendants' Motion to Dismiss Plaintiff's Amended Complaint should be DENIED.

---

[9] The Alcoa Defendants also argue that Alba's conspiracy claims (Counts 2 and 4) must be dismissed because Alba has failed to state actionable underlying claims for RICO violations and common law fraud.  Because Alba's RICO and common law fraud claims are adequately pled, as demonstrated herein, its conspiracy claims are also actionable.

Respectfully submitted,

Dated:  March 1, 2012              /s/ Mark J. MacDougall
                                  Mark J. MacDougall
                                  Kristine L. Sendek-Smith
                                  James E. Sherry
                                  Lauren B. Kerwin
                                  AKIN GUMP STRAUSS HAUER & FELD LLP
                                  1333 New Hampshire Ave. NW
                                  Washington, DC 20036
                                  (202) 887-4000

                                  Charles B. Gibbons
                                  Christopher A. Amar
                                  Victoria B. Kush
                                  BUCHANAN INGERSOLL & ROONEY PC
                                  One Oxford Centre, 20th Floor
                                  301 Grant Street
                                  Pittsburgh, PA  15219-1410
                                  (412) 562-8800

                                  *Counsel for Plaintiff Aluminium Bahrain B.S.C.*

<u>**CERTIFICATE OF SERVICE**</u>

  I hereby certify that on March 1, 2012, I electronically filed a true and correct copy of the

foregoing document with the Clerk of Court through the Court's CM/ECF system, which will

send notification of such filing to all registered users.

            /s/Mark J. MacDougall    
            Mark J. MacDougall