# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALUMINIUM BAHRAIN B.S.C. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:08-cv-299-DWA |
| ALCOA, INC., ALCOA WORLD ALUMINA LLC, WILLIAM RICE and VICTOR DAHDALEH, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT WILLIAM RICE'S MOTION TO DISMISS THE AMENDED COMPLAINT

Dated: March 1, 2012

Mark J. MacDougall
Kristine L. Sendek-Smith
James E. Sherry
Lauren B. Kerwin
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave. NW
Washington, DC 20036
(202) 887-4000

Charles B. Gibbons
Christopher A. Amar
Victoria B. Kush
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219
(412) 562-8800

*Counsel for Plaintiff Aluminum Bahrain B.S.C.*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

THE FIRST AMENDED COMPLAINT AND RICO CASE STATEMENT ................................3

LEGAL STANDARD .................................................................................17

LEGAL ARGUMENT ..............................................................................18

I.    ALBA HAS PLED AN ACTIONABLE CIVIL RICO CLAIM AGAINST RICE .................................................................................18

II.    ALBA HAS PLED ACTIONABLE CLAIMS FOR RELIEF AND HAS PLED FRAUD WITH THE REQUISITE PARTICULARITY ...........................22

    A.    Alba Has Stated a Viable Claim for Violation of RICO (18 U.S.C. § 1962(c)) .............................................................23

        1.    Conduct of an Enterprise ...................................................23

        2.    Racketeering Activity.......................................................24

            a)    Predicate Act: Use of Mails and Wires to Defraud Alba in Violation of 18 U.S.C. §§ 1341 and 1343 ...........................................25

            b)    Predicate Act: Transport and Receipt of Stolen Money in Violation of 18 U.S.C. §§ 2314 and 2315....................................26

            c)    Predicate Acts: Illegal Payments to Foreign Officials in Violation of 15 U.S.C. §§ 78dd-2 and 78dd-3 .........................................27

            d)    Predicate Act: Travel in Furtherance of Scheme to Defraud in Violation of 18 U.S.C. § 1952................................................30

    B.    Alba Has Stated Viable Claims of Conspiracy to Violate RICO (18 U.S.C. § 1962(d)) and Common Law Conspiracy........30

    C.    Alba Has Pled An Actionable Common Law Fraud Claim ..........32

CONCLUSION.....................................................................................35

# TABLE OF AUTHORITIES

CASES

*Adams v. NVR Homes, Inc.*, 193 F.R.D. 243 (D. Md. 2000) ..........................................26

*Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372 (S.D.N.Y. 2010) ................................22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................. *passim*

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................2, 17, 19, 21

*Christidis v. First Penn. Mortg. Trust*, 717 F.2d 96 (3d Cir. 1983)...............................18

*CIT Group/Equipment Financing, Inc. v. Krones, Inc.*, No. 9-432, 2009 WL 3579037 (W.D. Pa. Sept. 16, 2009) .................................................................17, 18

*Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F.Supp. 937 (E.D. Pa. 1995) .............................31

*Cont'l Mgmt. v. United States*, 527 F.2d 613 (Ct. Cl. 1975) ........................................34

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989).................................35

*Cranberry Promenade, Inc. v. Cranberry Twp.*, No. 09-1242, 2010 WL 653915 (W.D. Pa. Feb. 22, 2010) .................................................................25

*Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F. Supp. 2d 400 (W.D. Pa. 2002) .................................................................31

*Ebasco Svcs. Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421 (E.D. Pa. 1975) .................................................................34

*Elysian Fed. Sav. Bank v. First Interregional Equity Corp.*, 713 F.Supp. 737 (D.N.J. 1989).................................................................27

*Envtl. Tectonics v. W. S. Kirkpatrick, Inc.*, 847 F.2d 1052 (3d Cir. 1988) ................................27

*Foman v. Davis*, 371 U.S. 178 (1962) .................................................................35

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009).................................17, 19, 21

*Freedom Med. Inc. v. Gillespie*, 634 F. Supp. 2d 490 (E.D. Pa. 2007) ........................................25

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) ......................................32

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 429 U.S. 229 (1989) .................................24, 25

*In re Am. Inv. Life Ins. Co.*, 2006 WL 1531152 (E.D. Pa. 2006) ...................................25

*In re Catanella Sec. Litig.*, 583 F.Supp. 1388 (E.D. Pa. 1984)......................................23

*In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 516 (D.N.J. 2004) ..................................31

*In re Le-Nature's, Inc.*, No. 9-MC-162, 2011 WL 2112533 (W.D. Pa. May 26, 2011) .......................................................................................................................19, 21

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F. Supp. 152 (E.D. Pa. 1989) ...................31

*In re McClellan Estate*, 365 Pa. 401 (1950) .................................................................34

*In re Meridian Sec. Litig.*, 772 F.Supp. 223 (E.D. Pa. 1985) .........................................17

*In re Optimal U.S. Litig.*, --- F.Supp. ---, 2011 WL 1676067 (S.D.N.Y. 2011) ...........................22

*Lefco v. United States*, 74 F.2d 66 (3d Cir. 1934) ........................................................31

*Levine v. Metal Recovery Techs., Inc.*, 182 F.R.D. 108 (D. Del. 1998) ........................................29

*Lorenz v. CSX Corp.*, 1 F.3d 1406 (3d Cir. 1993) ........................................................35

*Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004)........................................................25, 26

*Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010)........................................21

*Mursau Corp. v. Florida Penn Oil & Gas, Inc.*, 683 F.Supp. 259 (W.D. Pa. 1986) ...................31

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 540 F. Supp. 2d 438 (S.D.N.Y. 2007) ...................20

*Palm Beach County Envtl. Coal. v. Florida*, 651 F. Supp. 2d 1328 (S.D. Fla. 2009) ....................................................................................................................29

*Pramer S.C.A. v. Abaplus Int'l Corp.*, 907 N.Y.S.2d 154 (N.Y. App. Div. 2010)......................34

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008).......................................2, 17, 24, 26

*Pinkerton v. United States*, 328 U.S. 640 (1946)....................................................28, 33

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)........................................................23, 24

*Roman v. City of Reading*, 121 Fed. Appx. 955 (3d Cir. 2005)........................................22

*Rose v. Bartle*, 871 F.2d 331 (3d Cir. 1989) ................................................................31

*Rotec Indus., Inc. v. Mitsubishi Corp.*, 163 F. Supp. 2d 1268 (D. Or. 2001) ...............................27

*Sedmia, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985)..............................................23

*Sentry Ins. v. Stillman*, 1990 WL 96104 (E.D. Pa. July 5, 1990) ....................................31

iii

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3d Cir. 1984) ................................................................................................17, 18, 23, 25

*Shaprio v. UBJ Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) ............................................35

*Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001) ..........................................................28, 33

*Sun Microsystems, Inc. v. Versata Ents., Inc.*, 630 F. Supp. 2d 395 (D. Del. 2009) ....................35

*Twp. of Wayne v. Messercola*, 789 F.Supp. 1305 (D.N.J. 1992) ...................................34

*United States v. Aguilar*, 783 F. Supp. 2d 1108 (C.D. Cal. 2011) .................................29

*United States v. Carson*, No. SACR 09-00077-JVS, 2011 WL 5101701 (C.D. Cal. May 18, 2011) ......................................................................................29

*United States v. Payment Processing Ctr., LLC*, No. 06-0725, 2006 WL 2990392 (E.D. Pa. Oct. 18, 2006) ...........................................................................35

*United States v. Zolicoffer*, 869 F.2d 771 (3d Cir. 1989)............................................30

*VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007) ....................................34

*Weiner v. Quaker Oats Co.*, 129 F.3d 310 (3d Cir. 1997) ............................................35

**STATUTES AND RULES**

15 U.S.C. § 78dd-2(h)(2)(A)...................................................................................28

18 U.S.C. § 1952(a) ..............................................................................................30

18 U.S.C. § 1962...............................................................................................28, 30

Federal Rules of Civil Procedure 8(a) ......................................................................23

Federal Rule of Civil Procedure 9(b)............................................................... *passim*

Federal Rules of Civil Procedure 12(b)(6)..................................................................17

**OTHER AUTHORITIES**

Restatement (Second) of Agency § 312......................................................................34

## <u>INTRODUCTION</u>

For nearly twenty years, U.S. corporations Alcoa and Alcoa World Alumina, their subsidiaries, and senior executives in Pittsburgh, Pennsylvania, in concert with overseas agents and shell companies, defrauded Alba by bribing senior Alba executives and officials of the Government of Bahrain. Those bribes, in turn, caused Alba to remain a loyal Alcoa customer for nearly two decades while overpaying for Alcoa's alumina in an aggregate amount of at least $430 million. This fraud was conceived, orchestrated, and directed in and from the United States by Defendant William Rice and other senior U.S. executives of Defendants Alcoa and Alcoa World Alumina, for the primary benefit of Alcoa, which is headquartered and has its principal place of business at 201 Isabella Street in Pittsburgh, Pennsylvania.

In order to facilitate and conceal their criminal bribery scheme, Defendants channeled Alba's overpayments, and the *quid pro quo* bribes paid to officials of Alba and the Government of Bahrain, through a web of sham companies operated by their agent and co-conspirator Victor Dahdaleh, who was recently indicted in the United Kingdom for his role in the scheme. The purpose of the sham Dahdaleh entities was to nominally purchase alumina from Alcoa at market prices and execute a paper transfer of the very same alumina to Alba at a higher price without ever taking legal title to the alumina or assuming the attendant risk. Alba only paid for that alumina because Defendants were simultaneously bribing its senior executives and officials of the Government of Bahrain. Since no later than 2001, Rice acted as Alcoa's principal for both sides of these fraudulent deals, negotiating and signing not only Alcoa's purchase agreements with Alba, but also a series of secret, parallel side agreements with the Dahdaleh shell companies. Rice also led Alcoa's successful effort to conceal its fraud from Alba, repeatedly assuring Alba that Dahdaleh and his shell companies were Alcoa's legitimate affiliates and

representatives when, in fact, they existed for no reason except to facilitate a massive fraud on Alba.

Rice now attempts to hide behind the very same offshore shell companies and agents he and his co-conspirators used to defraud Alba and launder their own criminal profits to prevent Alba from seeking redress in this Court or any court in the United States, arguing that Alba has alleged a foreign racketeering enterprise not actionable under U.S. law.  But that argument, as with all of Rice's arguments, rests on a gross mischaracterization of Alba's detailed factual allegations, improper attempts to minimize Alba's particular allegations concerning Rice's direction of and participation in the fraudulent scheme, the erroneous legal proposition that a fraud conceived and directed from the United States is not actionable in U.S. courts, and a complete failure to acknowledge or contend with the well-settled rule that this Court must accept all of Alba's factual assertions as true and construe them in the light most favorable to Alba. *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  Alba is not even required, at this preliminary stage prior to any discovery, to establish a probability that its allegations are true; Alba need only plead a plausible claim for relief.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  The First Amended Complaint and Rico Case Statement (the "Pleadings") plead Alba's claims with a level of detail and substance that far exceeds those requirements at this stage of the case.  This Court should deny Rice's Motion because it is without basis in law, and because dismissal would reward Defendants for their use of offshore middlemen to carry out and cover up a substantial fraud.  Dismissal would further provide a roadmap for other U.S. companies seeking to insulate themselves from civil liability for defrauding foreign plaintiffs, and leave the foreign victims of fraudulent domestic schemes without redress in the U.S. courts.

**THE FIRST AMENDED COMPLAINT AND RICO CASE STATEMENT**

The Pleadings allege the following facts, which must be taken as true for the purpose of Rice's Motion to Dismiss ("MTD"):

### 1.   The Parties, Their Relationship, and Alcoa's Scheme to Defraud Alba

Plaintiff Alba, one of the world's largest aluminum smelters, is a company organized under the laws of Bahrain and majority-owned by the Government of Bahrain.[1]  AC ¶¶ 3, 17; RCS at 4.[2]  Since 1969, Alba has purchased alumina for its smelter operations from Defendant Alcoa – a domestic corporation organized under the laws of Pennsylvania and located in Pittsburgh – and its subsidiaries.  AC ¶¶ 5-6, 19-21.  Alcoa's supply agreements with Alba were overseen and negotiated by its domestic subsidiary, Defendant Alcoa World Alumina, and the alumina itself was supplied by a foreign subsidiary, Alcoa of Australia.  AC ¶20.  Alcoa is the majority owner of Alcoa of Australia and, along with Alcoa World Alumina, controls its operations directly and indirectly through its representatives on the Alcoa World Alumina and Chemicals Strategic Council.  AC ¶¶ 11-13; RCS at 10.

Between 1969 and 1989, Alcoa supplied alumina to Alba directly, without the use of an intermediary, through its Australian subsidiary.  AC ¶ 21.  In 1990, however, Alcoa injected Victor Dahdaleh into its contractual relationship with Alba, assigning portions or all of its supply contracts with Alba to Dahdaleh-owned offshore shell companies.  AC ¶ 21; RCS at 6, 10.  There is no commercially legitimate explanation for Dahdaleh's involvement.  AC ¶ 21; RCS at 10-11 & Ex. 6.  Instead, over the course of the fraudulent scheme described in the Pleadings, the Alcoa Defendants and their senior U.S. executives, including Rice, used Dahdaleh and his shell

---

[1] Alba's common stock is traded on the London Stock Exchange and is majority-owned by the Government of Bahrain.

[2] "AC" refers to Alba's First Amended Complaint.  "RCS" refers to Alba's RICO Case Statement.

companies for the purpose of facilitating and concealing their scheme to (a) extract hundreds of millions of dollars in overpayments from Alba and (b) maintain a contractual relationship with Alba by bribing the company's senior executives and officials of the Government of Bahrain. AC ¶¶ 21-25; RCS at 1-5.  Dahdaleh and his shell companies were thus employed by the Alcoa Defendants and their senior executives, including Rice.  That relationship existed to facilitate and conceal their receipt and distribution of the overpayments fraudulently exacted from Alba and their payment of *quid pro quo* bribes to senior officials of Alba and the Government of Bahrain. AC ¶¶ 14, 21, 23-25; RCS at 1-5.  The shell companies never took title to the alumina and merely served as pass-throughs for bribe payments.  RCS at 14-15.  Throughout this fraudulent conspiracy, Defendants falsely represented to Alba that the Dahdaleh-owned shell companies – which existed for no reason other than to defraud Alba and conceal the involvement of the Alcoa Defendants and their senior domestic executives – were legitimate businesses controlled by, affiliated with, and duly authorized to act on behalf of Alcoa.  AC ¶¶ 24-25; RCS at 5.

As detailed in Alba's Pleadings, Defendants' fraudulent scheme was carried out in at least three distinct ways during the period of the conspiracy.  AC ¶ 26.  *First*, from 1990 to 2004, the Alcoa Defendants, through Alcoa's Australian subsidiary, contracted to pay Dahdaleh millions of dollars in "commissions," the cost of which was passed on to Alba in the form of inflated alumina prices.  AC ¶ 26(a); RCS at 6.  Dahdaleh performed no legitimate services for these "commissions," which were instead part of his compensation for facilitating bribes to senior officials of Alba and the Government of Bahrain.  AC ¶ 26(a); RCS at 6.  *Second*, between 1993 and 2009, the Alcoa Defendants assigned portions or all of the supply contracts with Alba to Dahdaleh-owned shell companies.  AC ¶ 26(b); RCS at 6-7.  Pursuant to these assignments, Alcoa sold alumina to the Dahdaleh companies, who then executed a paper transfer of the same

alumina to Alba at higher prices.  AC ¶ 26(b); RCS at 6-7.  Defendants distributed these overpayments among themselves and used portions of them to pay *quid pro quo* bribes to senior officials of Alba and the Government of Bahrain, who induced Alba to enter into economically unfavorable contracts.  AC ¶ 26(b); RCS at 4-5.  *Third*, in 2003, Defendants induced the Government of Bahrain to enter into a memorandum of understanding ("MOU") for the sale of up to 26% of Bahrain's shares in Alba to Alcoa at a price that undervalued those shares by hundreds of millions of dollars.  AC ¶ 26(c); RCS at 10.  One of the major purposes of this scheme was to ensure that Alcoa retained Alba's business in the future.  AC ¶¶ 26(c), 110, 123, 149-50.  The Government of Bahrain entered into this economically disadvantageous MOU only because Defendants bribed senior officials of Alba and the Government of Bahrain.  AC ¶ 26(c).

This scheme was conceived, orchestrated, and directed in and from the United States by the Alcoa Defendants and senior U.S. executives of those companies, including Rice.  The actions of overseas agents in furtherance of the scheme, including Dahdaleh, the Dahdaleh-owned entities, and Alcoa's Australian subsidiary, were also directed, controlled, and coordinated in and from the United States by the Alcoa Defendants and the senior executives of those companies, including Rice.  AC ¶¶ 13-14, 27, 37; RCS at 1-5, 10.

### 2.  *1990-2004:  Payment of Fraudulent Commissions to Dahdaleh*

In 1990 Alba and Alcoa, through its Australian subsidiary, entered into a ten-year alumina supply contract (the "1990 Contract").  AC ¶ 38; RCS at 6.  The contract was amended once and extended twice, ultimately expiring in 2004.  AC ¶ 38; RCS at 6.  The price of alumina under the contract was determined in two ways:  for approximately 60% of the contract tonnage, the rate was set by formula; for the remaining 40% (the "Market Tonnage"), the rate was negotiated by the parties.  AC ¶ 43; RCS at 6.

Throughout the existence of the 1990 Contract and extensions thereto, Defendants paid Dahdaleh more than $13.5 million in unearned "commissions" pursuant to a series of "Agency Agreements" between: (a) Alumet Limited, one of Dahdaleh's shell companies, with no assets or operations, and the "agent" under these agreements, and (b) Alcoa of Australia, the "principal," all as defined under the Agency Agreements. AC ¶¶ 39-40; RCS at 6. Dahdaleh and Alumet provided no legitimate services in return for those commissions, which were instead Dahdaleh's compensation for facilitating bribes to officials of Alba and the Government of Bahrain, cloaking the domestic defendants' fraud under Dahdaleh's corporate alias. AC ¶ 42; RCS at 6. The cost of these fraudulent "commissions" was passed on to Alba in the form of inflated alumina prices. AC ¶ 41; RCS at 6.

### 3. The 1993 Assignment

In 1993, Alcoa caused the supply responsibility for the Market Tonnage portion of the 1990 Contract to be assigned to a Dahdaleh-owned shell company named Kwinalum. AC ¶ 46; RCS at 6-7. Kwinalum was registered in Singapore, and the assignment was negotiated at a meeting in Singapore in or about 1992, at which Alcoa was represented by John Diederich, a U.S. national, and others. AC ¶ 45; RCS at 16. Kwinalum was not a legitimate business enterprise and had no prior experience in the alumina supply business, but was instead incorporated less than a month prior to its first shipment to Alba. AC ¶ 47; RCS at 7. Notwithstanding the assignment, Alcoa, through its subsidiary, remained the source of the alumina sold to Alba. AC ¶ 49. Kwinalum never took possession of the alumina, but simply conducted a paper transfer of the same alumina it purchased from Alcoa to Alba at higher prices, which were paid to Kwinalum by wire transfers to Kwinalum bank accounts in the United States and elsewhere. AC ¶¶ 49, 53; RCS at 7, 31-32 & Exs. 17, 19. The only reason Alcoa injected

this Dahdaleh-owned shell company into its contractual relationship with Alba was to facilitate the payment of bribes to officials of Alba and the Government of Bahrain, on the one hand, and the collection and distribution of the fraudulent overpayments exacted from Alba, on the other. AC ¶ 50; RCS at 7.

### 4. *The 1996 Amendment and Extension*

On September 19, 1996, the 1990 Contract was amended to provide that Alcoa, through its subsidiary, would supply the Market Tonnage to Alba from 1997 through 2000, and to extend the term of the 1990 Contract through December 31, 2000.  AC ¶ 54; RCS at 7-8 & Ex. 1. Although the Alcoa contracting entity to the 1996 amendment was nominally Alcoa of Australia, the Amendment was signed by Peter Burgess, the Sales and Marketing Manager of Defendant Alcoa World Alumina in Pittsburgh, Pennsylvania.  AC ¶ 55; RCS at 11 & Ex. 1.  Burgess was also involved in negotiating the terms of the 1996 amendment, as evidenced by his receipt of a September 15, 1996 facsimile transmission from Alcoa of Australia to Alba stating the terms of Alcoa's offer.  AC ¶ 56.

The 1996 amendment provided that Alcoa's subsidiary would assign the Market Tonnage to "a company associated with" it.  AC ¶ 57; RCS at 7 & Ex. 1.  On the same day that the 1996 Amendment was signed, Alcoa's subsidiary entered into a secret "Sales Agreement" with a Dahdaleh-owned shell company, Alumet Limited.  AC ¶ 59; RCS at 7-8.  Once again, although Alcoa of Australia was the nominal party to the sales agreement with Alumet, the agreement was signed by Peter Burgess, a senior U.S. executive of the domestic Alcoa subsidiary, Defendant Alcoa World Alumina.  AC ¶ 61; RCS at 8.  A senior U.S. executive of a domestic Alcoa subsidiary thus signed both the 1996 amendment with Alba and the secret, parallel agreement with the Dahdaleh-owned offshore shell companies.  AC ¶¶ 55, 61; RCS at 7-8, 11.

As with the 1993 assignment to Kwinalum, Alumet was not a legitimate business enterprise and had no prior experience in the alumina supply business.  AC ¶ 63.  Notwithstanding the assignment, Alcoa, through its subsidiary, remained the source of the alumina sold to Alba.  AC ¶ 65.  Alumet simply executed a paper transfer of the same alumina it purchased from Alcoa to Alba at higher prices, which were paid to Alumet by wire transfers to Alumet bank accounts in the United States and elsewhere.  AC ¶ 65, 72(a); RCS at 32, 48-50 & Ex. 20.  The only reason Defendants injected this Dahdaleh-owned shell company in to the contractual relationship with Alba was to facilitate the payment of bribes to officials of Alba and the Government of Bahrain and the collection and distribution of the fraudulent overpayments exacted from Alba.  AC ¶ 63.  Rice, the Alcoa Defendants, and their agents affirmatively misrepresented these facts to Alba, however, falsely claiming that the assignment of the Market Tonnage was necessary in order to avoid disclosure of Alcoa's prices to other customers and the Government of Australia.  AC ¶¶ 67-68.  Rice fostered the false impression that Alumet was a legitimate company and affiliate of Alcoa's Australian subsidiary by permitting Alumet to use Alcoa's logo on invoices and correspondence with Alba.  RCS at 17 & Ex. 8.

### 5.  *The 2001 Extension*

In 2001, the 1990 Contract was amended again to extend its term through 2003.  AC ¶ 73; RCS at 8.  This extension was proposed by Defendant Alcoa World Alumina, a domestic company, through its senior U.S. officer, Rice, by an April 21, 2001 letter on Alcoa World Alumina stationary sent from Pittsburgh, Pennsylvania.  AC ¶ 74; RCS at 11 & Ex. 2.  Notably, the letter, signed by Rice on behalf of Alcoa World Alumina, refers to the 1990 Contract as "our present purchase agreement" and seeks "to continue the relationship we have had for 30 years,"

notwithstanding the fact that Alcoa of Australia is the nominal party to the 1990 Contract.  AC ¶ 74; RCS at 11 & Ex. 2.

As with the prior assignments, the Defendants structured the 2001 extension to involve Dahdaleh-owned shell companies to facilitate the payment of bribes and the receipt and distribution of overpayments fraudulently exacted from Alba.  AC ¶ 75; RCS at 8.  The 2001 amendment was thus signed on behalf of Alcoa's Australian subsidiary by David Dabney, a U.S. citizen and former Alcoa employee.  AC ¶ 78.  At the time he signed the 2001 extension, however, Dabney was not an employee or representative of Alcoa or its Australian subsidiary.  AC ¶¶ 78, 86(b)-(c); RCS at 11.  Instead, he was a shareholder and officer in various Dahdaleh-controlled enterprises.  AC ¶¶ 78, 86(c); RCS at 11.  Defendants knew of and intended Dabney's involvement in the negotiations' with Alba, however, and fostered the false impression that Dabney was a legitimate representative of Alcoa's Australian subsidiary, as in an August 15, 2001 email from Rice to an employee of Alba, which stated that Dabney would supply pricing information and that "we look forward to continuing our long term relationship."  AC ¶ 79; RCS at 11 & Ex. 4.

On or about February 14, 2002, Alcoa's Australian subsidiary entered into a secret parallel "Distribution Agreement" with the Dahdaleh-owned shell companies Alumet and AA Alumina and Chemicals (AAAC-1), appointing the Dahdaleh-owned shell companies as Alcoa's sole distributors of alumina to Alba for 2002 through 2004.  AC ¶ 80.  This secret, parallel integration of the Dahdaleh-entities, although nominally entered into by the Australian subsidiary, was initiated and directed by Rice, the U.S.-based executive of a domestic Alcoa subsidiary, Defendant Alcoa World Alumina.  AC ¶ 80; RCS at 11.

As with the prior assignments, AAAC-1 was not a legitimate business enterprise and had no prior experience in the alumina supply business.  AC ¶ 81; RCS at 8.  In fact, AAAC-1 was not even incorporated until four months *after* Dabney executed the 2001 amendment.  AC ¶ 81; RCS at 8.  Notwithstanding the secret assignment, Alcoa, through its subsidiary, remained the source of the alumina sold to Alba.  AC ¶ 83; RCS at 26 & Ex. 17.  AAAC-1 simply effectuated a paper transfer of the same alumina it purchased from Alcoa to Alba at higher prices, which were paid to AAAC-1 by wire transfers to bank accounts in the United States and elsewhere.  AC ¶¶ 83, 97; RCS at 32-33 & Ex. 21.  The only reason Defendants injected this Dahdaleh-owned shell company into its contractual relationship with Alba was to facilitate the payment of bribes and the collection and distribution of the fraudulent overpayments exacted from Alba.  AC ¶¶ 81, 83; RCS at 11.  Those bribes are specifically documented in a series of cash wire transfers to officials of Alba and the Government of Bahrain that are individually enumerated and identified in Alba's Pleadings.  AC ¶¶ 93-94; RCS at 13-14.

Defendants and their agents affirmatively misrepresented these facts to Alba, fostering the false impression that AAAC-1 was a legitimate business enterprise and an integral part of Alcoa and its Australian operations.  AC ¶¶ 86(e), 88-90; RCS at 40.  The 2002 "Distribution Agreement" specifically authorizes the Dahdaleh-owned shell company to use Alcoa's logo and trademarks, including on official stationery, in advertising, or on its place of business.  AAAC-1 did, in fact, use Alcoa's logo and trademarks in a continuing stream of correspondence with Alba in order to foster the false impression that it was a legitimate business enterprise and a duly authorized affiliate of Alcoa.  AC ¶¶ 85, 86(e), 88-89; RCS at 40.  For example, Dabney transmitted the executed 2001 extension to Alba by a letter bearing the logo of Alcoa of Australia.  The invoices that AAAC-1 sent to Alba bore the Alcoa trademark and explicitly

identified AAAC-1 as "an associate company" of Alcoa's Australian subsidiary.  AC ¶¶ 86(e), 88; RCS at 32-33, 40 & Exs. 12, 21.  Defendants also continued to conceal the role of Dahdaleh and his companies from the Alba officials, who were unaware of the bribery scheme.  AC ¶ 90.  For example, on March 3, 2002, Bruce Hall, the former CEO of Alba and a direct recipient of Defendants' bribes, sent an email to Rice in anticipation of a visit by an Alba representative to an Alcoa facility in Tennessee, stating, ***"Just for proper form, I don't make Victor's activities on behalf of [another recipient of Defendants' bribes], knowledgeable to the plant hence I have removed references to him from your email before forwarding it to others."***  AC ¶ 90.  In an email response two days later, apparently sent from the United States, Rice stated that the host of the Tennessee visit ***"is also not aware of Victor's role so we should not get into any misunderstandings."***  AC ¶ 90.

### 6.  *The 2003 Extension*

Defendants proposed a further extension of the 1990 Contract by letter dated July 8, 2003.  AC ¶ 98; RCS at 17 & Ex. 9.  That letter was sent by Sandra Ainsworth, who was employed by another Dahdaleh shell company also named AA Alumina and Chemicals (AAAC-2).  AC ¶¶ 98, 100; RCS at 17 & Ex. 9.  Ainsworth's letter conveyed the false impression to Alba that it was sent on behalf of Alcoa or a duly authorized agent of Alcoa, conspicuously bearing the Alcoa trademark and referring to "our excellent long term relationship for the last thirty years," even though AAAC-2 had existed for less than sixteen months.  AC ¶ 100(b); RCS at 17 & Ex. 9. The invoices AAAC-2 sent to Alba during the period of the 2003 extension likewise bore the name and logo of Alcoa, as did correspondence from Ainsworth to Alba regarding pricing.  AC ¶ 100(e); RCS at 17 & Exs. 10, 21.

As with the prior assignments, AAAC-2 was not a legitimate business enterprise and had no prior experience in the alumina supply business. AC ¶¶ 14, 16, 100-06; RCS at 17-18. In fact, AAAC-2 was a shell company that had existed for less than sixteen months at the time of the 2003 amendment. AC ¶ 100(b); RCS at 17-18. Alcoa, through its subsidiary, remained the source of the alumina sold to Alba. RCS at 17-18, 26 & Ex. 17. The only reason Defendants injected this Dahdaleh-owned shell company into the contractual relationship with Alba was to facilitate the payment of bribes and the collection and distribution of the fraudulent overpayments exacted from Alba. AC ¶¶ 14, 16, 100-06; RCS at 17, 26, 32-33. Those bribes are specifically documented in a series of cash wire transfers to officials of Alba and the Government of Bahrain individually enumerated and identified in the Pleadings. AC ¶ 103; RCS at 14.

### 7. *The 2005 Contract and Alcoa's Attempt to Acquire a Significant Stake in Alba through Bribery*

In 2005, Alba entered into an agreement with yet another Dahdaleh-owned entity named AA Alumina and Chemicals (AAAC-3) under which Alba continued to purchase alumina until 2009. AC ¶ 108; RCS at 9. Defendants defrauded Alba into entering into the 2005 contract on unfavorable terms through a scheme to acquire a controlling stake in Alba at a depressed price through bribery, or to extort an excessive price from Alba through bribery, accompanied by the threat that Alcoa would cease supplying Alba with alumina altogether, thereby threatening Alba's very existence. AC ¶ 110; RCS at 12-13, 29-30.

In 2003 and 2004, Rice and Dahdaleh, along with Alain Belda, then the CEO of Alcoa and the Chairman of Alcoa's Board of Directors, personally represented Alcoa in an effort to obtain a significant equity interest in Alba at a price that drastically undervalued Alba's shares by bribing officials of Alba and the Government of Bahrain. AC ¶¶ 113, 116, 119-20; RCS at 11-12. Those bribes are specifically documented in a series of cash wire transfers to officials of Alba

and the Government of Bahrain individually enumerated and identified in Alba's Pleadings.  AC ¶ 117; RCS at 14, 29-30.  The purpose of the bribes, which were transferred by Dahdaleh on behalf of Defendants, was to induce Alba to agree to the economically disadvantageous sale of its equity to Alcoa, which was eventually memorialized in a MOU signed on September 15, 2003 by Alcoa and the Government of Bahrain.  AC ¶ 117; RCS at 29-30.  The Alcoa Defendants and their senior U.S. executives, including Rice and Alain Belda, were aware of, intended, and participated in Dahdaleh's involvement in the scheme to acquire an equity stake in Alba, as evidenced by: (1) an April 26, 2004 letter from Belda to the Minister of Finance and National Economy of Bahrain, copying Rice and Dahdaleh, stating that Belda had received a message from a recipient of Defendants' bribes that the highest levels of authority in Bahrain "would strongly like Alcoa to take an equity position in Alba"; (2) numerous e-mails from Alcoa employees, located in Pittsburgh, to Alba employees concerning the equity transaction, often copying Dahdaleh; (3) the joint participation by Rice and Dahdaleh in conference calls and face-to-face negotiations concerning the terms of the equity transaction.  AC ¶¶ 119-21; RCS at 11-12, 36-38.

The Government of Bahrain ultimately withdrew from the equity transaction after concluding that it was not in Alba's best interests, even as Defendants and the recipients of Alcoa's bribes pressured Bahraini government officials to consummate the transaction.  AC ¶¶ 123-26; RCS at 20.  Upon termination of the MOU, Alba had only about ninety (90) days to secure additional alumina supply before termination of the latest extension of the 1990 Contract on December 31, 2004.  AC ¶ 129; RCS at 29.  On September 6, 2004, Alba published its tender for alumina requirements for 2005-2014.  AC ¶ 130.  One week later, Dahdaleh paid a bribe of $66,439.17 to the then-CEO of Alba.  AC ¶ 132; RCS at 14.  On September 26, 2004, an

associate of both Alcoa and Dahdaleh named David Debney (not to be confused with David Dabney) submitted a bid on behalf of the Dahdaleh-owned entity AAAC-3.  AC ¶ 134; RCS at 30.  Another bribe of $41,789 to Alba's CEO followed four days later.  AC ¶ 136; RCS at 14.

As with the prior supply agreements, Defendants fostered the false impression that Dahdaleh and his shell companies were legitimate representatives of Alcoa and its subsidiaries. AC ¶¶ 138, 147-48; RCS at 30.  During negotiations on the 2005 contract, Alba specifically requested assurance from Rice that Alba was dealing with an Alcoa subsidiary in AAAC-3.  AC ¶¶ 138, 147-48.  Rice responded in an October 26, 2004 facsimile transmission from Pittsburgh, falsely stating that "[f]or the avoidance of doubt and any confusion," AA Alumina and Chemicals was ***"for commercial reasons…an associate company and distributor"*** of Alcoa of Australia and was ***"fully and solely authorized to negotiate the present alumina supply agreement with Alba."***  AC ¶¶ 138, 147-48; RCS at 30, 41 & Ex. 6.  Similarly, on November 26, 2004, Debney and Alba signed revised terms for the 2005 agreement.  AC ¶ 147(f); RCS at 18 & Ex. 14.  Those terms were written on Alcoa letterhead and signed by Debney on behalf of AA Alumina and Chemicals.  AC ¶ 147(f); RCS at 18 & Ex. 14.  And on January 15, 2004, Debney wrote to a senior officer of Alba to thank Alba for its decision "to continue our alumina supply contract" and the "business relationship formed over many years," again on letterhead bearing Alcoa's logo and bearing the legend "AA Alumina and Chemicals is an associate company of Alcoa of Australia Limited."  AC ¶ 147(h); RCS at 18. Along with the bribes paid to Alba's CEO, these false representations were critical to inducing Alba to enter into the 2005 contract on commercially unreasonable terms.  AC ¶¶ 14, 148, 219.

As negotiation of the 2005 contract progressed, officials of Alba and the Government of Bahrain who had not received Defendants' bribes urged Alba to reject the proposal by AA

Alumina and Chemicals as not being in Alba's best interest.  AC ¶ 129.  On October 29, 2004, Rice responded to this resistance by a facsimile sent from Pittsburgh to Alba's CEO (Bruce Hall), a key recipient of Defendants' bribes who was arrested by authorities in the United Kingdom in October 2010 on criminal charges arising out of his role in the scheme.  AC ¶ 140; RCS at 12 & Ex. 7.  In that facsimile message from Pittsburgh, Rice pressured the bribed Hall to accept the proposal, threatening:  "However, should Alba decide not to accept this offer, it is understandable that you will need to find alternatives in order to supply Alba's long term alumina requirements. I hope you can also appreciate this will dictate that we will direct the alumina, which we anticipate continuing to supply Alba, to other long term customers."  AC ¶ 140; RCS at 12 & Ex. 7.  In this facsimile, Rice further referred to AA Alumina and Chemicals as "our associated company" and stated that Alcoa wished for "the mutually beneficial relationship between Alba and Alcoa" to continue so that "we can continue to be Alba's alumina supplier for the next 10 years."  AC ¶ 147(e); RCS at 12 & Ex. 7.  Alcoa paid additional cash bribes to Hall, through Dahdaleh, December 2004 and November and December 2005.  AC ¶¶ 149-50; RCS at 14.  After those additional bribes from Defendants, another Alba official directed that Alba agree to Defendants' proposal, and Alba signed the agreement with AAAC-3 on June 8, 2005 on the clearly unreasonable terms detailed in the Pleadings.  AC ¶¶ 141-43.

As with the prior supply agreements and assignments, Defendants structured the 2005 contract to enable Dahdaleh-owned entities to serve as pass-throughs, marking up the price of alumina they bought from Alcoa and re-selling it to Alba at inflated prices and funneling bribes to officials of Alba and the Government of Bahrain.  AC ¶¶ 146-47; RCS at 9.  AA Alumina World and Chemicals was not a legitimate business enterprise, had no prior experience in the alumina supply business, never took title to the alumina shipment, and imposed short payment

terms on Alba.  AC ¶¶ 146-47; RCS at 9, 14-15.  In fact, no incorporated or registered company

by that name even existed at the time of the September 29, 2004 bid.  AAAC-1 and AAAC-2 had

been renamed, and AAAC-3 was not incorporated until December 30, 2004.  AC ¶ 147(b).  As

they had in the past, while the 2005 contract with Alba was being negotiated, Defendants

finalized a secret shadow "Distribution Agreement" between Alcoa's Australian subsidiary and

the Dahdaleh entities.  AC ¶¶ 151-52; RCS at 9, 13.  Each page of that agreement was endorsed

by Rice.  AC ¶ 155; RCS at 13.  Notwithstanding the assignment, Alcoa, through its subsidiary,

remained the source of the alumina sold to Alba.  AAAC-3 simply executed a paper transfer of

the same alumina it purchased from Alcoa to Alba at higher prices, which were paid to AAAC-3

by wire transfers to bank accounts in the United States and elsewhere.  AC ¶ 152; RCS at 33-35

& Ex. 22.  The only reason Alcoa injected this Dahdaleh-owned shell company in to its

contractual relationship with Alba was to facilitate the payment of bribes to officials of Alba and

the Government of Bahrain and the collection and distribution of the fraudulent overpayments

exacted from Alba.  AC ¶¶ 146, 152.

      In total, the Defendants succeeded in exacting more than $433 million in fraudulently

induced overpayments from Alba, between 1990 to 2009, as a direct result of their criminal

bribery of officials of Alba and the Government of Bahrain.  AC ¶ 30; RCS at 55-57.  On

February 27, 2008, Alba filed its initial Complaint in this matter, leading almost immediately to

criminal investigations into Defendants' conduct by the United States Department of Justice, the

Serious Fraud Office of the United Kingdom and criminal authorities in several other countries.

AC ¶ 31; RCS 43.  Dahdaleh and former Alba CEO Bruce Hall have been charged with crimes

related to the scheme in the United Kingdom; the U.S. federal investigation of Alcoa and its

executives remains in progress.  AC ¶ 31; RCS at 43.

## **LEGAL STANDARD**

Rule 12(b)(6) only requires that the pleadings have enough "factual matter (taken as true)
to suggest" the required elements of the claims; a complaint "does not need detailed factual
allegations." *Twombly*, 550 U.S. at 547, 555-56 (the Court was "not requiring heightened fact
pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face").
This pleading standard "does not impose a probability requirement at the pleading stage," but
rather "simply calls for enough facts to raise a reasonable expectation that discovery will reveal
evidence" of the necessary element. *Id.* at 556; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1959-60
(2009) (same); *Phillips*, 515 F.3d at 234 (same); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-
211 (3d Cir. 2009) (same).  In deciding whether a complaint states a plausible claim, courts must
"accept all factual allegations as true, construe the complaint in the light most favorable to the
plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff
may be entitled to relief."  *Phillips*, 515 F.3d at 233; *CIT Group/Equipment Financing, Inc. v.
Krones, Inc.*, No. 9-432, 2009 WL 3579037, at *4 (W.D. Pa. Sept. 16, 2009) (Ambrose, J.)
(same).

Under Rule 9(b), a complaint alleging a cause of action for fraud need only set forth "the
circumstances of the [alleged] fraudulent acts" in order to put defendants on notice of their
alleged misconduct.  *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791
(3d Cir. 1984).  Allegations of "date, place or time" are sufficient, but not required.  *Id.*; *see also
CIT Group*, 2009 WL 3579037, at *5.  Plaintiffs may also use "alternative means of injecting
precision and some measure of substantiation into [their] allegations of fraud."  *Id.*  Additionally,
a complaint need not identify which defendant was responsible for which elements of the alleged
fraud.  *In re Meridian Sec. Litig.*, 772 F.Supp. 223, 230 (E.D. Pa. 1991) (denying a motion to
dismiss where plaintiffs identified the source, location, dates, and manner of false or misleading

17

statements, but were unable to identify which defendants were responsible); *CIT Group*, 2009 WL 3579037, at *5-7 (complaint "pass[ed] muster" under Rule 9(b) despite some allegations that did "not delineate between the actions of particular Defendants" where other paragraphs "contain[ed] sufficient detail concerning the role of each defendant").  In applying Rule 9(b), the Third Circuit has cautioned that "focusing exclusively on its 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" *Christidis v. First Penn. Mortg. Trust*, 717 F.2d 96, 100 (3d Cir. 1983) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 407 (1969)); *see also Seville Indus. Mach.*, 742 F.2d at 791 (discouraging courts from subjecting allegations of fraud to "too strict a scrutiny").

## LEGAL ARGUMENT

### I.   ALBA HAS PLED AN ACTIONABLE CIVIL RICO CLAIM AGAINST RICE

Rice claims that the Pleadings allege an enterprise that is predominantly foreign and therefore not actionable under RICO.  MTD at 1-9.  Rice's co-defendants, Alcoa and Alcoa World Alumina, make a similar argument and Alba's response is set forth in full in its Opposition to the Alcoa Defendants' Motion to Dismiss.  That response is incorporated herein by reference.

As to Rice specifically, Alba has clearly alleged a domestic RICO enterprise with which Rice was deeply and personally involved and over which he exerted substantial control.  The Pleadings allege that Rice, a U.S. based Alcoa executive, directed the payment of illegal bribes and benefited from overpayments and increased contractual relations with Alba through deception.  AC ¶ 26(b); RCS at 4-5.  Those are factual allegations about who exercised control of the fraudulent scheme and who benefitted from it – not bare legal conclusions that may be disregarded under *Twombly*, *Iqbal*, and their progeny.  They must be presumed true.  *See  Iqbal*,

18

129 S. Ct. at 1951; *Twombly*, 550 U.S. at 556; *Fowler*, 578 F.3d at 212; *In re Le-Nature's, Inc.*, No. 9-MC-162, 2011 WL 2112533, at *1 (W.D. Pa. May 26, 2011) (all holding that factual allegations must be presumed true when resolving a motion to dismiss under Rule 12(b)(6)).

Even if Alba's factual allegations required further evidentiary support at this preliminary stage – which they do not – Alba has provided abundant support.  Alba's allegation that the fraudulent scheme was conceived, orchestrated, and directed by Rice, is amply supported by specific, documented, factual averments including:

- Peter Burgess and Rice, acting in and from the United States, signed or endorsed the supply agreements between Alcoa's Australian subsidiary and the secret, parallel "assignments" to Dahdaleh-controlled companies, the purpose of which was to facilitate payment of bribes to officials of Alba and the government of Bahrain, to distribute overpayments fraudulently exacted from Alba through those bribes, and to maintain a contractual relationship with Alba through false pretenses and the payment of bribes.  AC ¶¶ 55, 61; RCS at 7-8, 11.

- Rice repeatedly and falsely assured Alba that (a) Dahdaleh, (b) the Dahdaleh-controlled entities, and (c) various employees of those entities were legitimate associates and representatives of Alcoa and its subsidiaries who were duly authorized to act on their behalf.  AC ¶¶ 79, 85, 86(e), 88-90, 138, 147-48; RCS at 11-12, 30, 40 & Ex. 4.

- Rice and Alcoa CEO Alain Belda, along with Dahdaleh, jointly represented and spoke for Alcoa and its subsidiaries during negotiations with Alba, including negotiations concerning Alcoa's unsuccessful attempt to obtain a significant equity stake in Alba.  AC ¶¶ 113, 116, 119-20; RCS at 11-12.  During those negotiations, the U.S. Alcoa and Alcoa World Alumina executives introduced Dahdaleh as a consultant or advisor to Alcoa, and as a member of Alcoa's negotiating "team."  AC ¶¶ 113, 116, 119-20; RCS at 11-12.

- Rice plainly manifested his knowledge of Dahdaleh's secret role in the scheme to defraud Alba in written communications with corrupt officials of Alba.  Those communications included, but were not limited to, (a) Rice's March 2, 2002 emails with Bruce Hall, one of the officials that Alba bribed through Dahdaleh, and (b) Rice's October 26, 2004 facsimile transmissions from Pittsburgh, Pennsylvania, in which he assured Alba that the Dahdaleh shell-company ***"AA Alumina and Chemicals, an associate company and distributor of Alcoa of Australia Ltd., is fully and solely authorized to negotiate the present alumina supply agreement with Alba."***  AC ¶¶ 90, 138, 147-48; RCS at 30, 41 & Ex. 6.

19

Rice's Motion ignores these detailed and well-sourced factual allegations of U.S.-based leadership of the fraudulent scheme, arguing that they do not go "to the crux" of the case. Rice's conduct, and that of Alcoa and Alcoa World Alumina, is central to the fraudulent scheme alleged by Alba. The factual allegations are more than sufficient to establish, at this preliminary stage, and before the first step of discovery, a "plausible" claim that the RICO enterprise described in Alba's Pleadings was directed in and from the United States by U.S. based executives of U.S. corporations.[3] A critical consideration for the Court is that all of the factual allegations and evidence proffered in the Pleadings have been provided without the benefit of even the most basic discovery.

Rice also attempts to distance himself from the scheme by disavowing the actions of Alcoa's majority-owned subsidiary, Alcoa of Australia. MTD at 5. But Alba has specifically alleged that Alcoa, Alcoa World Alumina, and their executives, including Rice, controlled the actions of Alcoa of Australia in connection with the bribery scheme alleged in the Pleadings. AC ¶¶ 11-13, 20, 55-56, 61; RCS at 7-8, 10-11 & Ex. 1 (alleging Alcoa's majority ownership of Alcoa of Australia, its effective control over the entity that manages Alcoa of Australia, and alleging that senior U.S. executives of Alcoa and Alcoa World Alumina signed or endorsed

---

[3] Rice cites the district court's opinion in *Norex Petroleum Ltd. v. Access Industries, Inc.*, 540 F. Supp. 2d 438, 443-44 (S.D.N.Y. 2007), for the proposition that "general allegations that U.S. Defendants 'masterminded, operated and directed' the illegal conduct" are insufficient to establish a domestic RICO enterprise. MTD at 3-4. But as is evident from the complaint in *Norex*, *all* of the alleged "corporate masterminds" in that case were foreign corporations incorporated in, or residents of, the Isle of Man. *See* Decl. of Nicole A. Stockey, Ex. 7, ¶¶ 69-78, attached to Alcoa Defendants' Joint Motion to Dismiss. Here, Alba has alleged, and fully demonstrated, that the "corporate masterminds" of the scheme to defraud Alba were U.S. companies and their domestic executives, including Rice. Moreover, as noted by the district court in *Norex*, the plaintiffs' "specific allegations of U.S. conduct" in that case were "few and far between." *Norex*, 540 F. Supp. 2d at 444. The same cannot be said of Alba's highly detailed and documented allegations of direct, controlling, and hands-on involvement by Alcoa, Alcoa World Alumina, and their senior U.S. executives in planning and executing the scheme to defraud Alba.

numerous legal instruments and correspondence on behalf of Alcoa of Australia in furtherance of the fraudulent scheme, including secret parallel assignment agreements with the phony Dahdaleh companies).  In any case, the effective control of Alcoa of Australia is a matter of fact and must be presumed true at this stage.  *See  Iqbal*, 129 S. Ct. at 1951; *Twombly*, 550 U.S. at 556; *Fowler*, 578 F.3d at 212; *Le-Nature's,* 2011 WL 2112533, at *1.  The question, then, is whether Alba has alleged a domestic RICO enterprise notwithstanding the fact that a number of the contracts in question were signed nominally on behalf of Alcoa's Australian subsidiary, rather than Alcoa itself.  The fact that those contracts were negotiated, signed, and administered by *U.S.-based* executives of Alcoa's *U.S.-based* subsidiary, Alcoa World Alumina, answers that question conclusively.

Rice – by focusing on the overseas activities of Dahdaleh and his shell companies – entirely fails to address the gravamen of the Pleadings.  Alcoa, Alcoa World Alumina, and their senior U.S. executives, including Rice, used Dahdaleh and his offshore pass-through companies to facilitate and conceal their bribery of foreign officials.  The *entire point* of this bribery scheme was to generate fraudulently-obtained profits that were deposited in U.S. bank accounts for the illegal benefit of a U.S. company and its U.S.-based executives – specifically including Rice.  There is nothing in RICO, or *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), or the cases decided since *Morrison*, to support the proposition that U.S. companies may shield themselves from civil liability by masking their conduct and laundering their fraudulent revenue through the use of offshore shell corporations, shadow agents, and middlemen.  U.S. law is not, and should not be, oblivious to the basic tools of sophisticated international frauds.  Just because offshore intermediaries are employed to facilitate the transfer of bribes and conceal the complicity of U.S. corporations and their officers in paying those bribes, the law does not afford

protection to domestic companies from the consequences of their fraudulent conduct, nor does it leave the foreign victims of fraud without redress in the U.S. courts.  By asking this Court to dismiss Alba's complaint, Rice is attempting to use the very same offshore entities that he and his co-defendants formed and utilized to defraud Alba to prevent Alba from seeking justice in the courts of the United States.  Such a result would be not only illogical and unjust, but would provide a roadmap for U.S.-based businesses to immunize themselves from civil liability for fraud, bribery, theft, and corruption.  Nothing in RICO, *Morrison*, or any other authority cited by Rice requires that result.

Finally, in moving to dismiss Alba's RICO claims with prejudice, Rice fails to acknowledge that Alba's common law fraud claims – which also exceed the Rule 9(b) pleading standards – rest upon the very same conduct and allegations as the RICO claim, and so require exactly the same discovery.  Even if the Court were to question the sufficiency of Alba's RICO pleading, it would be premature to dismiss those claims at this stage, prior to discovery on the common law fraud claims that will certainly reveal additional relevant facts, including the extent of Rice's involvement in the fraudulent scheme.  *Roman v. City of Reading*, 121 Fed. Appx. 955, 961 (3d Cir. 2005) ("Often, a trial judge rejects a defendant's motion to dismiss for failure to state a claim to allow the plaintiff time to develop evidence through discovery.").[4]

## II.   **ALBA HAS PLED ACTIONABLE CLAIMS FOR RELIEF AND HAS PLED FRAUD WITH THE REQUISITE PARTICULARITY**

Rice claims that the First Amended Complaint should be dismissed because it fails to meet the pleading requirements of Federal Rules of Civil Procedure 9(b) and 12(b)(6).

---

[4] Courts repeatedly hold that the reach of a plaintiff's allegations is an issue that is better decided based on a developed factual record concerning where conduct that is the focus of the statute occurred, and is therefore more appropriate for summary judgment.  *In re Optimal U.S. Litig.*, --- F. Supp. 2d ---, 2011 WL 1676067 (S.D.N.Y. 2011); *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372 (S.D.N.Y. 2010).

Specifically, he argues that the Pleadings are "replete with allegations that are conclusory, redundant, and pleaded only on unsupported information and belief…" which supports dismissal. MTD at 10.  That statement, itself highly conclusory, is just not true.[5]  The Pleadings set forth detailed allegations supporting the elements of each claim and lay out the circumstances of the alleged fraud at length.  Because the Pleadings meet the standards of both Rule 9(b) and Rule 12(b)(6), Rice's Motion should be denied.

### A.   Alba Has Stated a Viable Claim for Violation of RICO (18 U.S.C. § 1962(c))

To state an adequate claim for violation of 18 U.S.C. § 1962(c), a claimant must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).[6]  When a plaintiff alleges a fraud-based civil RICO claim, that claim is subject to the particularity requirement of Rule 9(b).  *Seville*, 742 F.2d at 790-91.  Here, Rice erroneously argues that the Pleadings do not adequately plead "conduct" and "racketeering activity" (MTD at 14) despite numerous detailed factual allegations concerning those very elements.

#### 1.   Conduct of an Enterprise

Conduct of an enterprise is sufficiently pled when the complaint alleges the defendant participated "directly or indirectly" in the enterprise's affairs.  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Although "conduct" may require "some degree of direction," RICO liability "is

_____

[5] Rice also argues that the Pleadings are lengthy and redundant, and therefore do not follow Rule 8(a)'s "short and plain statement" directive.  Rice then expends considerable verbiage making the diametrically opposed argument that the Pleadings do not contain enough detail.  Apparently, in Rice's view, the Pleadings are both too long and too short.  In any case, the fact that a complaint is long is not, standing alone, sufficient to justify dismissal.  *See, e.g.*, *In re Catanella and E.F. Hutton and Co., Inc. Sec. Litig.*, 583 F.Supp. 1388 (E.D. Pa. 1984) (denying motion to dismiss RICO counts under rule requiring a short a plain statement of the claims).

[6] Additionally, the Pleadings repeatedly allege an enterprise that affects interstate commerce, which Rice does not dispute.  AC ¶¶ 53, 72, 97, 107, 127, 161; RCS at 36.

not limited to those with a formal position in the enterprise" and extends to a defendant that has but "some part in directing the enterprise's affairs."  *Id.* at 178-79

Rice argues that the Pleadings are deficient as to the "conduct" element because they only allege that Rice was an Alcoa employee.  MTD at 16-17.  That characterization of the allegations is belied by a simple reading of the Pleadings.  The First Amended Complaint alone specifically alleges, among other things, that Rice (a) directed the negotiation of fraudulent contracts, (b) directed the payment of bribes, (c) directed and controlled bogus entities while fostering the false impression that they were legitimate, and (d) directed and controlled Dahdaleh while fostering the false impression that Dahdaleh's role was legitimate.  *See, e.g.*, AC ¶¶ 76, 79, 81-82, 90, 96, 106, 115, 118, 126, 137-38, 147.  Rice also concedes that several of the allegations, including allegations concerning his own misrepresentations and omissions, are sufficiently pled.  MTD at 11-13 (listing numerous "particular, non-conclusory" allegations against him, including paragraphs 79, 90, 115, and 126, which all concern Rice's misrepresentations and acts of concealment and those made at his direction).  Without acknowledging those detailed allegations, or his own admissions about them, Rice claims that "it is at least equally plausible that [he] was unaware of any RICO enterprise…."  MTD at 16.  The existence of a potential alternate explanation for the alleged conduct is not enough to sustain Rice's Motion, however.  The Pleadings need only state a plausible claim for relief; they are not required to disprove all other possible alternative explanations.  *Iqbal*, 129 S. Ct. at 1949; *Phillips*, 515 F.3d at 234 (same).

### 2.  <u>Racketeering Activity</u>

Rice next asserts that the Pleadings fail to allege predicate acts sufficient to establish a pattern of racketeering activity.  MTD at 17.  All the law requires is that Alba allege two or more related and continuous predicate acts "that amount to, or threaten the likelihood of, continued

criminal activity."  *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237 (1989); *Lum v. Bank of America*, 361 F.3d 217, 223 (3d Cir. 2004) (abrogated on other grounds); *Cranberry Promenade, Inc. v. Cranberry Twp.*, No. 09-1242, 2010 WL 653915, *3 (W.D. Pa. Feb. 22, 2010).  Rice does not dispute that the predicate acts alleged are related and continuous and ignores detailed allegations describing numerous predicate acts sufficient to establish a pattern of criminal racketeering activity.

### a) <u>Predicate Act: Use of Mails and Wires to Defraud Alba in Violation of 18 U.S.C. §§ 1341 and 1343</u>

Alba's mail and wire fraud allegations need only allege "sufficient facts…from which one can infer that the defendant used the mails or interstate wires as part of a scheme to defraud, or took some action where such use of the mails or interstate wires was reasonably foreseeable." *In re Am. Inv. Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*, No. 1712, 2006 WL 1531152, at *11 (E.D. Pa. 2006) (applying *Pereira v. United States*, 347 U.S. 1, 8-9 (1954) and *United States v. Bentz*, 21 F.3d 37, 40 (3d Cir. 1994), which both addressed liability for use of mails or wires); *see also Freedom Med. Inc. v. Gillespie*, 634 F. Supp. 2d 490, 512-13 (E.D. Pa. 2007) (same).  Alba has met that standard by alleging that Defendants, including Rice, transmitted documents and communicated in furtherance of their fraudulent scheme by mail or wire on numerous specific occasions.  *See, e.g.*, AC ¶¶ 74, 138, 147, 177-179; RCS at 38-39 (listing seven specific acts of mail and wire fraud).  Contrary to Rice's assertion, Alba is not required to allege the date, time or place of a specific mailing.  *Seville*, 742 F.2d at 791.[7]  Under

---

[7] Rice cites *Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004) (abrogated on other grounds), for the proposition that Alba's mail fraud allegations fail because they do not allege the date, time, or place of a mailing.  MTD at 18.  Rice misstates the court's holding in *Lum*.  *Lum* is, in fact, consistent with other Third Circuit cases holding that plaintiffs may satisfy the Rule 9(b) particularity requirements not only be alleging date, time, or place, but also through "alternative

the applicable standard, Alba has alleged extensive and abundant facts, including facts concerning the transmission of documents, more than sufficient to sustain the claim that Defendants, including Rice, used the mails as part of a scheme to defraud or took some action where use of the mails was reasonably foreseeable.

The same is true of the wire fraud allegations.  Rice argues, without legal support, that Alba's wire fraud allegation must fail because Alba has not alleged "uncontradicted facts" demonstrating that Rice knew of the unlawful scheme or intended to participate in it.  MTD at 18.  This contention has no bearing on the Court's consideration of a motion to dismiss.  At this procedural stage, and before any discovery has taken place, all facts in the Pleadings are to be accepted as true and construed in Alba's favor.  *Phillips*, 515 F.3d at 233.  Moreover, Rice's citation to *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243 (D. Md. 2000), for the proposition that legitimate activities cannot sustain a wire fraud claim, is inapposite and misleading.  Here, Alba is claiming the reverse – that Rice was engaged in entirely *illegitimate* activities, including knowingly sending faxes with misrepresentations and knowingly using email to coordinate concealment of the fraudulent scheme.  AC ¶¶ 79, 90, 138, 147-48; RCS at 11, 30, 41 & Exs. 4, 6.  Rice's unsupported, self-serving claim that his activities were lawful is not sufficient to support his Motion in light of the Pleadings' plausible factual allegations to the contrary – which must be taken as true.

### b) <u>Predicate Act: Transport and Receipt of Stolen Money in Violation of 18 U.S.C. §§ 2314 and 2315</u>

Rice argues that Alba has not stated when or how he transported or received fraudulently taken property or how he knew property was fraudulently taken.  MTD at 23.  Again, Rice

---

means of injecting precision and some measure of substantiation into their allegations of fraud." *Lum*, 361 F.3d at 224 (citing *Seville*, 742 F.2d at 791).

grossly misstates the plain language of the allegations.  The Pleadings set forth the details of numerous specific transactions reflecting the transport and receipt of fraudulently obtained money either by, or at the direction of, Rice and his co-conspirators.  *See, e.g.*, RCS at 31-36. The Pleadings also allege facts, taken as true, that establish Rice was fully aware of Dahdaleh's illegitimate role in the business relationship between Alcoa and Alba and directed Dahdaleh to accept fraudulently obtained money and pass that money on to Alba executives and Bahraini government officials in the form of bribes.  *See, e.g.*, AC ¶¶ 23-26, 50-52, 69, 90-95, 102-106, 113-116, 149-150; RCS at 27-28, 36-37, 41.  These detailed allegations plainly refute Rice's claim of a pleading deficiency.

### c) <u>Predicate Acts: Illegal Payments to Foreign Officials in Violation of 15 U.S.C. §§ 78dd-2 and 78dd-3</u>

Rice disputes the validity of Alba's FCPA claims for four reasons, none of which have any merit.  *First*, Rice argues that FCPA violations cannot constitute predicate acts under RICO. MTD at 23 (citing *Gov't of Dom. Rep. v. AES Corp.*, 466 F. Supp. 2d 680, 691 (E.D. Va. 2006)). Although the court in *Gov't of Dom. Rep. v. AES Corp.* stated that it did not consider FCPA violations predicate acts under RICO, that view is not binding on this Court and conflicts with case law in this jurisdiction acknowledging FCPA violations as predicate acts.  *See Envtl. Tectonics v. W. S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1063 (3d Cir. 1988) (finding that predicate acts alleged, including mail and wire fraud, bribery, and FCPA violations, satisfied RICO's "pattern of racketeering activity" requirement); *Elysian Fed. Sav. Bank v. First Interregional Equity Corp.*, 713 F.Supp. 737 (D.N.J. 1989) (same).[8]  Rice's argument that FCPA violations

---

[8] Other courts agree that FCPA violations may satisfy RICO's predicate act requirement and establish a pattern of racketeering activity.  *See, e.g.*, *Rotec Indus., Inc. v. Mitsubishi Corp.*, 163 F. Supp. 2d 1268, 1278 (D. Or. 2001) (finding that a violation of the FCPA is within the scope of RICO predicate acts because FCPA violations are indictable).

cannot be predicate acts is far from definitive, is in conflict with dispositive case law from this jurisdiction and elsewhere, and cannot support dismissal.

*Second*, Rice claims that Alba has not alleged that he played any role in making payments to foreign officials and has not alleged he even knew about it. MTD at 23-24. That statement is likewise untrue. The Pleadings allege, no fewer than three distinct times, that Rice knowingly directed Dahdaleh to pay bribes to Alba executives and officials of the Government of Bahrain. *See, e.g.*, AC ¶¶ 106, 118, 137. Further, Rice's complaint that Alba has attempted to cure this imagined pleading defect by improperly "lumping all of the defendants together" ignores the well-established rule that Rice is liable for the actions of his co-conspirators. *See, e.g.*, *Pinkerton v. United States*, 328 U.S. 640, 647 (1946) (overt acts of one conspirator in furtherance of the conspiracy are attributable to the other co-conspirators); *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001) (civil conspiracy liability under 18 U.S.C. § 1962 is governed by the "general principles of criminal conspiracy law").

*Third*, Rice seeks to challenge Alba's FCPA claims relying on the notion that they (a) do not allege that named bribe recipients are foreign officials, or (b) do not identify Bahraini officials who received bribes by name. As to the first, by statute, foreign officials include "any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality…." 15 U.S.C. § 78dd-2(h)(2)(A). The Pleadings allege that Bruce Hall, Zamil Al Joweiser, and Yousif Al Shirawi were all executives and agents of Alba – which is majority-owned by the Government of Bahrain – during the alleged bribery scheme. AC ¶ 3; RCS at 21-23. Whether a state-owned company is an instrumentality of a foreign government such that its employees and agents qualify as foreign officials is a question of fact that should not

be decided on a motion to dismiss.[9]  As to his second argument, Rice cites *Palm Beach County*

*Envtl. Coal. v. Florida*, which does not support his assertion.  The district court in that case

simply required plaintiffs to describe "who bribed who."  651 F. Supp. 2d 1328, 1349 (S.D. Fla.

2009) (containing no requirement that plaintiffs identify bribe recipients by name).  Similarly,

courts in the Third Circuit have found that bribery allegations meet Rule 9(b)'s particularity

requirements without identifying all bribe recipients by name.  *See, e.g.*, *Levine v. Metal*

*Recovery Techs., Inc.*, 182 F.R.D. 108, 111 (D. Del. 1998) (finding that an amended complaint

sufficiently alleged a bribery scheme when it identified only four of over 100 alleged bribe

recipients).  Alba has certainly alleged "who bribed who."  The Pleadings describe a

sophisticated, long-standing, far-reaching scheme involving Alcoa's payment of *quid pro quo*

bribes to senior Alba executives and officials of the Government of Bahrain.  *See, e.g.*, AC ¶¶ 23-

26, 50-52, 69, 91-95, 102-106, 149-150; RCS at 2.  Rice attempts to extend his argument that

Alba's failure to name the corrupt government officials makes him unable to assert the

affirmative defense that the payments were unlawful under the laws of the bribe recipient's

country.  MTD at 24.  That argument is difficult to comprehend because, as Rice himself points

out, Alba has alleged that he and his co-conspirators paid bribes to officials in the government of

*Bahrain*.  MTD at 24.  There is no ambiguity, then, about which country's bribery laws impact

Rice's ability to raise that affirmative defense.  His argument is illogical and should be ignored.

---

[9] *See, e.g.*, *United States v. Carson*, No. SACR 09-00077-JVS, 2011 WL 5101701, at * 3-
4 (C.D. Cal. May 18, 2011) (acknowledging that employees of state-owned companies could be
foreign officials within the meaning of the FCPA and that instrumentalities of foreign
governments include entities that are not departments or agencies of a foreign government);
*United States v. Aguilar*, 783 F. Supp. 2d 1108 (C.D. Cal. 2011) (holding that a utility company
owned by the government of Mexico was an instrumentality of a foreign government and the
company's officers were foreign officials under the FCPA).

**d)  Predicate Act: Travel in Furtherance of Scheme to Defraud in Violation of 18 U.S.C. § 1952**

Alba's Travel Act allegations are sufficiently pled because they assert as fact that Rice and his co-conspirators engaged in foreign travel with the intent to promote the unlawful scheme and committed an overt act in furtherance of it.  18 U.S.C. § 1952(a); *United States v. Zolicoffer*, 869 F.2d 771, 774 (3d Cir. 1989).  Rice again mischaracterizes the Pleadings, claiming they reflect details of legitimate travel without alleging how the travel furthered the fraud.  MTD at 25.  But Rice ignores detailed allegations doing exactly that.  For example, Alba alleges that Rice and Dahdaleh traveled to Bahrain in connection with a proposed sale of Alba shares to Alcoa at a depressed price.  That proposed corporate transaction was only possible because of bribes.  AC ¶¶ 111-128.[10]  Rice directed Dahdaleh to pay several bribes after that trip to Bahrain.  AC ¶ 117. Because there is no dispute that Rice traveled to Bahrain, and because the Pleadings set forth detailed facts about the improper reasons for his travel and the overt acts he and his co-conspirators committed afterward, Alba's allegations concerning the Travel Act are adequately pled.

**B.  Alba Has Stated Viable Claims of Conspiracy to Violate RICO (18 U.S.C. § 1962(d)) and Common Law Conspiracy**

A complaint states a viable claim under 18 U.S.C. § 1962(d) if it alleges "(1) [an] agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c)." *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) (internal citations and quotation marks omitted).

---

[10] Rice argues that Alcoa's MOU with Alba, concerning the potential purchase of a substantial number of Alba shares at a disadvantageous price, is a "red herring" because the purchase did not ultimately take place.  MTD at 9, n. 9.  The MOU is clear evidence of the fraudulent scheme at work, however, whether or not a sale of shares actually took place.  Alcoa induced Alba to enter into the MOU in the first place through the payment of bribes.  AC ¶ 26(c).

Conspiracy allegations need only "describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." *Id.*  Similarly, a complaint states a claim for common law conspiracy to defraud when it alleges that two or more people had a "common purpose supported by a concerted action to defraud, that each ha[d] the intent to do it, and that it is common to each of them, and that each understands that the other has that purpose." *Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F.Supp. 937, 961 n. 27 (E.D. Pa. 1995).  *See also Mursau Corp. v. Florida Penn Oil & Gas, Inc.*, 638 F.Supp. 259, 261 (W.D. Pa. 1986) (setting forth elements of fraud necessary to support allegation of conspiracy to defraud); *Sentry Ins. v. Stillman*, No. 90-2129, 1990 WL 96104, at *3 (E.D. Pa. July 5, 1990) (citing *Averbach v. Rival Mfg. Co.*, 809 F.2d 1016 (3d Cir. 1987)) (same).

Rice argues the conspiracy allegations are not sufficient because they only assert that he came into contact with the conspiracy incidentally through a job change.  MTD at 31.[11]  That statement is followed by equally incredible claims that the Pleadings do not allege that the contracts at issue contemplated the making of corrupt payments, or that Rice knew about and agreed to making the payments.  MTD at 31.  The Pleadings include numerous highly specific allegations that Rice and his co-defendants knowingly agreed to obtain fraudulent profits through

---

[11] Rice also notes that this job change occurred 10 years after the alleged start of the conspiracy.  MTD at 31.  To the extent that statement was intended to be an argument that Rice is not liable for acts in furtherance of the conspiracy that occurred before he joined, he is mistaken as a matter of law.  *Lefco v. United States*, 74 F.2d 66, 68-69 (3d Cir. 1934) ("Those who come on later and cooperate in the common effort to obtain the unlawful results become parties thereto and assume responsibility for all done before."); *Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F. Supp. 2d 400, 413-14 (W.D. Pa. 2002) (acknowledging co-conspirator liability for acts committed prior to joining and noting that the time of joining is a matter of fact that may be revealed by discovery); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F.Supp. 152, 153-54 (E.D. Pa. 1989) (noting that there is nothing in the jurisprudence of the Third Circuit that would warrant rejection of a late joinder rule in civil conspiracy cases); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538-39 (D.N.J. 2004) (applying criminal late joinder rule in a civil antitrust conspiracy case).

the payment of bribes and committed various overt acts in furtherance of that scheme, including but not limited to (a) traveling to Bahrain to effectuate the purchase of Alba stock by Alcoa at a reduced price, (b) inducing Alba to enter into disadvantageous alumina supply contracts, (c) misrepresenting the legitimacy of Dahdaleh-owned shell entities and Dahdaleh himself, and (d) directing the payment of bribes to Alba executives and Bahraini government officials. Those detailed allegations, supported by the extensive documentation of the RICO Case Statement, plainly allege an agreement to engage in a fraudulent pattern of racketeering activity and so adequately plead both RICO conspiracy and common law conspiracy to defraud.

### C.  **Alba Has Pled An Actionable Common Law Fraud Claim**

Rule 9(b) only requires Alba to set forth the circumstances of the alleged fraud. Alba's common law fraud claim does this repeatedly and in great detail. Rice's arguments to the contrary are deeply flawed. As an initial matter, Rice argues that Alba has not pled scienter with the requisite particularity. MTD at 28. He misleadingly cites *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004), for the totally baseless proposition that, in a Private Securities Litigation Reform Act case, scienter must be pled with particularity. He fails to disclose that the particularity requirement in that case was imposed by the PSLRA, a statute that is not implicated here. He also fails to cite Rule 9(b)'s plain statement that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Rice's assertion that Alba has not alleged that he made material misrepresentations and omissions also fails under scrutiny. Alba has alleged detailed misrepresentations and omissions of material fact, many of which Rice personally made. The misrepresentations include, among others, that (a) bogus shell companies were legitimate participants in the contractual relationship between Alcoa and Alba, (b) Dahdaleh and others served a legitimate purpose in negotiations

between Alcoa and Alba, knowing those representations were false, and (c) certain entities were subsidiaries of Alcoa. *See, e.g.*, AC ¶¶ 79, 81, 90, 115, 138, 147; RCS at 42.[12]  Rice knew those misrepresentations were material to Alba and he made them for the purpose of inducing Alba to enter into disadvantageous contracts that directly benefited him and his co-conspirators. *See, e.g.*, AC ¶¶ 22-28.  Rice's challenge to the materiality of these false statements is, therefore, directly contradicted by the Pleadings.  His claim is also contradicted by his own Motion where he cites no fewer than fifteen allegations that are highly specific to him, that extend through three single-spaced pages, and that he admits are sufficiently particular and non-conclusory.  Those allegations pertain to the very misrepresentations and omissions he claims are absent.  MTD at 11-14 (noting that the list is not exclusive).[13]

Rice further claims that Alba cannot maintain a common law fraud claim against him based on omissions because he had no duty to disclose information to Alba.  MTD at 27.  That argument is a thin attempt to paint an enduring pattern of concealment and suppression of truth

---

[12] With respect to the shell companies in particular, Rice claims Alba does not explain how his use of the term "associated company" to describe the relationship between AAAC and Alcoa of Australia was fraudulent.  Alba has described the fraudulent nature of that misrepresentation in detail.  For example, Alba alleges that AAAC was an illegitimate entity whose only purpose was to facilitate and conceal the fraud Rice and his co-conspirators perpetrated on Alba.  AC ¶ 81.  It was therefore fraudulent for Rice to falsely represent that AAAC was a legitimate company associated with Alcoa of Australia.  His deception induced Alba to believe that the company was dealing with an Alcoa subsidiary, fostering the false belief that the alumina supply contracts it had with Alcoa were reasonable.  AC ¶ 148.  Rice also makes much of a claimed substantive distinction between the word "subsidiary" and the words "associated" and "affiliated" as used to describe the relationship of certain illegitimate companies to Alcoa.  This is a distinction without a difference.  As the Pleadings allege in detail, Rice led Alba to believe something that was not true (that AAAC and other sham entities were associated with Alcoa as subsidiaries or otherwise, leading Alba to incorrectly believe they were legitimate).  Alba relied on those misrepresentations and entered into a series of economically disadvantageous contracts just as Defendants hoped it would.  Rice is liable for the damage Alba suffered as a result.

[13] Rice conveniently ignores the other detailed allegations concerning his co-conspirators, for which he is also liable.  *See, e.g.*, *Pinkerton*, 328 U.S. at 647; *Smith*, 247 F.3d at 538.

33

as the mere omission of a fact he was not obligated to disclose.  In reality, Rice made statements

that were deceptive and grossly misleading to conceal from Alba the true purpose of the shell

entities and his co-conspirators.  Rice does not cite any case that requires this Court to disregard

such conduct simply because Rice did not have a fiduciary relationship with Alba.  Indeed, under

Pennsylvania common law, fraud consists of "anything calculated to deceive, whether by single

act or combination, or by suppression of truth…whether it be by direct falsehood or by innuendo,

by speech or silence…."  *In re McClellan's Estate*, 365 Pa. 401, 407 (1950).  Moreover, common

law has long recognized that victims of bribery have private rights of action even in the absence

of affirmative misstatements or misleading omissions.  *See, e.g.*, Restatement (Second) of

Agency § 312 ("A person who, without being privileged to do so, intentionally causes or assists

an agent to violate a duty to his principal is subject to liability to the principal."); *VFB LLC v.

Campbell Soup Co.*, 482 F.3d 624, 634 (3d Cir. 2007) (acknowledging potential civil liability for

knowingly aiding and abetting an agent's breach of a duty of loyalty to its principal); *Ebasco

Svcs. Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421, 452 (E.D. Pa. 1975) (same);

*Twp. of Wayne v. Messercola*, 789 F.Supp. 1305, 1311 (D.N.J. 1992) (a third party is liable to the

principal if he knowingly aids an agent in breaching a fiduciary duty through the payment of

bribes).[14]  Here, Alba has alleged facts, which must be taken as true, that Rice – or those acting at

his direction – offered bribes to Alba executives.  Rice does not dispute that acceptance of such a

bribe constitutes a breach of an Alba executive's duty to Alba.  Because Rice and his co-

---

[14] Other courts agree.  *See, e.g.*, *Pramer S.C.A. v. Abaplus Int'l Corp.*, 907 N.Y.S. 2d 154, 161 (N.Y. App. Div. 1st Dep't 2010) (allegations of bribery are sufficient to state a common-law fraud claim); *Cont'l Mgmt. v. United States*, 527 F.2d 613, 616 (Ct. Cl. 1975) ("In nearly unbroken succession, courts have declared that victimized principals may obtain non-statutory remedies against outsiders who have knowingly participated in or induced an agent's breach of duty.").

conspirators caused Alba executives to violate a duty they owed to their principal, he is liable for the resulting damages.[15]

Finally, Rice contends that pleading facts "upon information and belief" is not permitted unless a plaintiff also describes its efforts to obtain information about the fraud, alleges that the necessary information lies within the defendant's control, and provides a statement of facts upon which the allegations are based.  MTD at 3, n. 2.  Rice cites *Weiner v. Quaker Oats Co.*, 129 F.3d 310 (3d Cir. 1997), in support of these additional requirements, based in part on the Third Circuit's reading of two prior decisions, *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989), and *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992).  But the pleading requirements set forth in *Craftmatic* and its progeny are not triggered merely by pleading allegations of fraud "upon information and belief."  They are only applicable when a plaintiff alleges that the factual information giving rise to the fraud claim lies exclusively with the defendant.  *Shapiro*, 964 F.2d at 285; *United States v. Payment Processing Ctr., LLC*, No. 06-0725, 2006 WL 2990392, at *6 (E.D. Pa. Oct. 18, 2006).  That is not the situation here and Alba's pleading upon information and belief is entirely appropriate.  *See, e.g.*, *Sun Microsystems, Inc. v. Versata Ents., Inc.*, 630 F. Supp. 2d 395, 406-07 (D. Del. 2009) (holding pleadings on information and belief to the same particularity standard as all other factual allegations).

## <u>CONCLUSION</u>

For the foregoing reasons, Rice's Motion to Dismiss Plaintiff's Amended Complaint should be denied.

---

[15] Moreover, to the extent Rice argues that an actionable common law claim for bribery should be dismissed simply because it is styled as an action for "fraud," any such technical defect, curable by amendment, would not support dismissal with prejudice.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject for relief, he ought to be afforded an opportunity to test his claim on the merits."); *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413-14 (3d Cir. 1993) (same).

Respectfully submitted,

Dated:  March 1, 2012

/s/ Mark J. MacDougall
Mark J. MacDougall
Kristine L. Sendek-Smith
James E. Sherry
Lauren B. Kerwin
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave. NW
Washington, DC 20036
(202) 887-4000

Charles B. Gibbons
Christopher A. Amar
Victoria B. Kush
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219
(412) 562-8800

*Counsel for Plaintiff Aluminum Bahrain B.S.C.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 1, 2012, I electronically filed a true and correct copy of the

foregoing document with the Clerk of Court through the Court's CM/ECF system, which will

send notification of such filing to all registered users.

<u>/s/Mark J. MacDougall</u>
Mark J. MacDougall