**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALUMINIUM BAHRAIN B.S.C. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:08-cv-299-DWA |
| ALCOA, INC., ALCOA WORLD ALUMINA LLC, WILLIAM RICE and VICTOR DAHDALEH, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT**
**VICTOR DAHDALEH'S MOTION TO DISMISS THE AMENDED COMPLAINT**

Dated:  March 1, 2012

Charles B. Gibbons
Christopher A. Amar
Victoria B. Kush
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA  15219-1410
(412) 562-8800

Mark J. MacDougall
Kristine L. Sendek-Smith
James E. Sherry
Lauren B. Kerwin
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave. NW
Washington, DC 20036
(202) 887-4000

*Counsel for Plaintiff Aluminium Bahrain*
*B.S.C.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

THE FIRST AMENDED COMPLAINT AND RICO CASE STATEMENT ............................... 3

LEGAL STANDARD............................................................................................ 11

LEGAL ARGUMENT.......................................................................................... 14

      I.      THIS COURT HAS PERSONAL JURISDICTION OVER DAHDALEH. ........ 14

              A.     Personal Jurisdiction Is Appropriate Over Dahdaleh Pursuant to the Absent Co-Conspirator Doctrine. ................................... 14

                      1.     Dahdaleh Acted Together With the Other Defendants As a Co-Conspirator to Defraud Alba. ..................... 15

                      2.     The Conspirators Acted Within the Forum in Furtherance of the Conspiracy. ..................................................... 16

                      3.     Dahdaleh Was or Should Have Been Aware of the Acts of His Co-Conspirators. ......................................................... 18

              B.     Personal Jurisdiction Is Appropriate Over Dahdaleh Through His Companies' Contacts with the Forum. ............................... 20

              C.     Personal Jurisdiction Is Also Appropriate Over Dahdaleh Based on His Nationwide Contacts Pursuant to Rule 4(k)(2). ........................................................................................... 23

              D.     Exercising Jurisdiction Over Dahdaleh is Reasonable and Comports With Fair Play and Substantial Justice..................................... 25

              E.     In the Alternative, Alba Should be Permitted to Take Jurisdictional Discovery.............................................................. 27

      II.     ALBA HAS PLED ITS RICO CLAIM WITH PARTICULARITY. .................. 28

      III.    ALBA HAS PLED ACTIONABLE STATE LAW CLAIMS. ........................... 31

CONCLUSION..................................................................................................... 34

## TABLE OF AUTHORITIES

**Cases**

*Am. Trade Partners L.P. v. A-1 Int'l Importing Enters., Ltd.*, 755 F. Supp. 1292 (E.D. Pa. 1990) ................................................................................................ 15, 20, 24

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .............................................................. 12, 33

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................... 12, 33

*Boyle v. United States*, 129 S. Ct. 2237 (2009) ............................................................ 29

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254 (3d Cir. 2000) ........................ 26

*Bro-Tech Corp. v. Thermax, Inc.*, No 05-2330, 2006 WL 516767 (E.D. Pa. Feb. 28, 2006) ..................................................................................................................... 11

*Bur-Cam Group, LLC v. Pearson*, No. 3:10-cv-240, 2010 WL 1565521 (M.D. Pa. Apr. 19, 2010) ............................................................................................................. 23

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ................................................ 26

*Christian v. Fulton Fin. Corp.*, No. 10-789, 2010 WL 3398966 (E.D. Pa. Aug. 24, 2010) ......................................................................................................................... 3

*Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96 (3d Cir. 1983) ............................ 13

*CIT Group v. Krones, Inc.*, No. 9-432, 2009 WL 3579037 (W.D. Pa. Sept. 16, 2009) ..................................................................................................... 12, 13, 14, 27

*Coll. Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 360 A.2d 200 (Pa. 1976) ........................................................................................................................ 20

*Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F. Supp. 937 (E.D. Pa. 1995) ...................... 32, 33

*Cullen v. Paine Webber Group, Inc.*, 689 F. Supp. 269 (S.D.N.Y. 1988) ................................... 29

*D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94 (3d Cir. 2009) ...................................... 11

*Elsevier Inc. v. W.H.P.R., Inc.* 692 F. Supp. 2d 297 (S.D.N.Y. 2010) ................................ 29, 31

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ............................................... 12

*Franco v. Connecticut General Life Ins. Co.*, No. 07-cv-6039, 2011 WL 4448908 (D.N.J. Sept. 23 2011) ............................................................................................... 29

*Grant Street Group, Inc. v. D&T Ventures, LLC*, No. 10-1095, 2012 WL 13689 (W.D. Pa. Jan. 4, 2012) ............................................................................................... 19

*Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012 (10th Cir. 1990) .................... 22

*Hunt v. Global Incentive & Meeting Mgmt.*, No. 09-4921, 2010 WL 3740808 (D.N.J. Sept. 20, 2010) ...................................................................................... 22

*In re Auto. Refinishing Paint Antitrust Litig.*, No. 1426, 2002 WL 31261330 (E.D. Pa. July 31, 2002) ...................................................................................... 27

*In re Le-Nature's, Inc.*, No. 9-MC-162, 2011 WL 2112533 (W.D. Pa. May 26, 2011) .............................................................................................................. 11

*In re McClellan's Estate*, 75 A.2d 595 (Pa. 1950)........................................................ 32

*In re Meridian Sec. Litig.*, 772 F. Supp. 223 (E.D. Pa. 1991) .................................... 13

*Koresko v. Bleiweis*, Civ. No. 04-cv-769, 2005 WL 2436693 (E.D. Pa. Sep. 27, 2005) .............................................................................................................. 15

*Kyle v. Cont'l Cap. Corp.*, 575 F. Supp. 616 (E.D. Pa.1983).................................... 11

*Lorenz v. CSX Corp.*, 1 F.3d 1406 (3d Cir. 1993) ...................................................... 12

*Lumax Indus., Inc. v. Aultman*, 669 A.2d 893 (Pa. 1995).......................................... 21

*Mellon Bank (East) PSFS, Nat'l Ass'n. v. Farino*, 960 F.2d 1217 (3d Cir. 1992) ...................... 28

*Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324 (3d Cir. 2009)........................... 27

*Miller Yacht Sales Inc. v. Smith*, 384 F.3d 93 (3d Cir. 2004) ..................................... 11

*Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256 (Fed. Cir. 1985) .................... 22

*Monroe's Estate v. Bottle Rock Power Corp.*, No. 03-2682, 2004 WL 737463 (E.D. La. Apr. 2, 2004) ...................................................................................... 22

*Morales v. Superior Living Prods., LLC*, 398 Fed. Appx. 812 (3d Cir. 2010)............................ 29

*Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).............................. 2

*Mursau Corp. v. Florida Penn Oil & Gas, Inc.*, 638 F. Supp. 259 (W.D. Pa. 1986) ............ 31, 32

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978).......................................... 27

*Patroski v. Ridge*, No. 2:11-cv-1065, 2011 WL 4955274 (W.D. Pa. Oct. 18, 2011) .................. 22

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2010)..................................... 11

*Rao v. BP Prods. N. Am., Inc.* 589 F.3d 389 (7th Cir. 2009)....................................... 31

*Salinas v. United States*, 522 U.S. 52 (1997)................................................................. 29

*Sedmia, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) ........................................... 28

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3d Cir. 1984) .................................................................................................................... 13, 14

*Shouse v. Nat'l Corrective Group Inc.*, No. 3:10-CV-0175, 2010 WL 4942222 (M.D. Pa. Nov. 30, 2010) ............................................................................ 14, 15, 24

*Southco, Inc. v. Fivetech Tech. Inc.*, No. 10-1060, 2011 WL 71440 (E.D. Pa. Jan. 10, 2011) ................................................................................................................. 23

*Temtex Prods., Inc. v. Kramer*, 479 A.2d 500 (Pa. Super. 1984) ................................ 15

*Toys "R" Us, Inc. v. Step Two S.A.*, 318 F.3d 446 (3d Cir. 2003)......................... 27, 28

*United States v. Int'l Bhd. of Teamsters*, 945 F. Supp. 609 (S.D.N.Y. 1996) ............. 24

*United States v. Turkette*, 452 U.S. 576 (1981) ........................................................... 29

*Wise v. Lindamood*, 89 F. Supp. 2d 1187 (D. Colo. 1999)........................................... 22

*Zubik v. Zubik*, 384 F.2d 267 (3d Cir. 1967)................................................................. 21

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALUMINIUM BAHRAIN B.S.C. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:08-cv-299-DWA |
| ALCOA, INC., ALCOA WORLD ALUMINA | ) | |
| LLC, WILLIAM RICE and VICTOR | ) | |
| DAHDALEH, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>INTRODUCTION</u>

Plaintiff's Complaint illustrates the transformation of normal business dealings between Aluminium Bahrain, B.S.C. ("Alba") and Defendant Alcoa Inc. ("Alcoa") into a conspiracy with a bagman paying millions of dollars in bribes.  The puppet master was Alcoa; the façade was a series of shell companies operated by Victor Dahdaleh ("Dahdaleh") which facilitated the scheme but otherwise added no value.  Alcoa already had a longstanding relationship with Alba prior to 1990 which was preserved and enhanced when bribery became the "new normal."

Dahdaleh is the only Defendant challenging this Court's jurisdiction.  In support thereof, Dahdaleh mischaracterizes the extent of his participation in a lengthy, sophisticated, and criminally profitable scheme involving the other Defendants and based in Pittsburgh, Pennsylvania.  That scheme defrauded Alba of hundreds of millions of dollars through bribery and other criminal acts over a nearly twenty-year period.  So significant was Dahdaleh's involvement that he currently faces charges in England which arise from the *identical* factual averments asserted in this action.

Dahdaleh's motion highlights his Anglo-Canadian citizenship and his European domicile. He minimizes the actions of the sham companies he created and controlled (the "Dahdaleh

Companies" or his "Companies"), arguing that any contacts that his Companies had with this forum – even if at his direction – are irrelevant to a personal jurisdiction analysis.  Dahdaleh further argues that jurisdiction under Rule 4(k)(2) does not exist due to his lack of minimum contacts with the United States as a whole.

The controlling law of Pennsylvania and this Circuit is fatal to Dahdaleh's motion. Simply put, foreign members of a conspiracy or RICO enterprise based in Pittsburgh are subject to personal jurisdiction here.  The Complaint's averments plausibly show that Dahdaleh participated in the alleged scheme.  Thus, any argument regarding physical absence from Pennsylvania is without merit.  Active participation in the conspiracy, both individually and through his Companies, renders Dahdaleh subject to jurisdiction.

Dahdaleh argues the implications of *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) and Alba's need to plead the alleged RICO enterprise with particularity.  Alba has addressed *Morrison* and the domestic nature of the RICO enterprise in its companion briefs in opposition to the Motions to Dismiss filed by Defendants Alcoa, Inc., Alcoa World Alumina LLC and William Rice which are incorporated herein by reference.  In the interests of judicial economy, Alba will not repeat those arguments here.

With respect to pleading the RICO claim with particularity, the First Amended Complaint and RICO Case Statement (the "Pleadings") set forth in sufficient detail the Defendants' enterprise and easily surpass the pleading requirements at this preliminary stage of the case. Thus, Dahdaleh's RICO argument, along with his derivative and equally deficient state fraud and civil conspiracy arguments, are equally without merit.

## THE FIRST AMENDED COMPLAINT AND RICO CASE STATEMENT[1]

Alba's Pleadings aver the following facts, which must be presumed true for the purpose of Alcoa's motion to dismiss.

### 1.   Alcoa's Nineteen-Year Scheme to Defraud Alba

Alba, one of the world's largest aluminum smelters, is a company organized under the laws of Bahrain and is majority-owned by the Government of Bahrain.  AC ¶¶ 3, 17; RCS at 4.[2] Since 1969, Alba has purchased alumina for its smelter operations from Defendant Alcoa, a Pennsylvania corporation, and its subsidiaries.  AC ¶¶ 5-6, 19-21.  Alcoa and/or its domestic subsidiary, Alcoa World Alumina (together, the "Alcoa Defendants"), negotiated and oversaw these supply agreements for alumina, which was supplied by Alcoa's subsidiary, Alcoa of Australia.  AC ¶ 20.  Alcoa is the majority owner of Alcoa of Australia and controls its operations directly and indirectly through its representatives on the Alcoa World Alumina and Chemicals Strategic Council.  AC ¶¶ 11-13; RCS at 10.

Between 1969 and 1989, Alcoa supplied alumina to Alba directly through its Australian subsidiary in a routine commercial manner.  AC ¶ 21.  In 1990, however, Alcoa inserted Dahdaleh into its contractual relationship with Alba, assigning portions or all of its supply contracts with Alba to Dahdaleh-owned offshore shell companies.  AC ¶ 21; RCS at 6, 10.  There was no legitimate business reason for Dahdaleh's or his Companies' involvement. AC ¶ 21; RCS at 10-11.  Instead, Alcoa, Alcoa World Alumina, and senior executives of those companies, including Rice, engaged Dahdaleh and the Dahdaleh Companies to execute their scheme to retain

---

[1] Given the extensive and detailed factual allegations in the First Amended Complaint and RICO Case Statement regarding Dahdaleh, this case is a far cry from *Christian v. Fulton Financial Corp.*, No. 10-789, 2010 WL 3398966 (E.D. Pa. Aug. 24, 2010), on which Dahdaleh repeatedly attempts to rely for the proposition that "naked allegation[s]" are insufficient to establish personal jurisdiction.  *See* Dahdaleh Mem. at pp. 5, 7, 8.
[2] "AC" refers to Alba's Amended Complaint and "RCS" refers to its RICO Case Statement.

Alba as a high-volume purchaser of their alumina and to extract hundreds of millions of dollars in overpayments by bribing senior officials of Alba and the Government of Bahrain, while also concealing their own involvement in that scheme.  AC ¶¶ 21-25; RCS at 1-5.  Throughout this fraudulent conspiracy, the Defendants falsely represented to Alba that the Dahdaleh Companies – which existed for no reason other than to defraud Alba and conceal the involvement of the Alcoa Defendants and their senior domestic executives – were legitimate businesses controlled by, affiliated with, and duly authorized to act on behalf of Alcoa.  AC ¶¶ 24-25; RCS at 5.

As detailed in the Pleadings, the Defendants' fraudulent scheme was carried out in at least three distinct ways, with Dahdaleh deeply involved in each facet.  AC ¶ 26.  First, from 1990 to 2004, Alcoa, through its subsidiary, contracted to pay Dahdaleh millions of dollars in "commissions," the cost of which was passed on to Alba in the form of inflated alumina prices.  AC ¶ 26(a); RCS at 6.  Dahdaleh performed no legitimate services for these commissions, which were really part of his compensation for bribing senior officials of Alba and the Government of Bahrain.  AC ¶ 26(a); RCS at 6.  Second, between 1993 and 2009, Alcoa assigned portions or all of its supply contracts with Alba to Dahdaleh-owned shell companies.  AC ¶ 26(b); RCS at 6-7.  Pursuant to these assignments, Alcoa sold alumina to the Dahdaleh companies, which then resold the same alumina to Alba at significantly higher prices.  AC ¶ 26(b); RCS at 6-7.  The Defendants distributed these overpayments among themselves and used portions of the overpayments to pay bribes to senior officials of Alba and the Government of Bahrain to induce Alba to enter into economically disadvantageous contracts.  AC ¶ 26(b); RCS at 4-5.  Third, starting in 2003, Alcoa (acting through Dahdaleh and others) induced the Government of Bahrain to enter into a memorandum of understanding ("MOU") for the sale of up to 26% of Bahrain's shares in Alba to Alcoa at a price that undervalued those shares by hundreds of millions of

dollars.  AC ¶ 26(c); RCS at 10.  The Government of Bahrain entered into this economically disadvantageous MOU only because the Defendants had bribed senior officials of Alba and the Government of Bahrain.  AC ¶ 26(c).  While never consummated, one major purpose of this scheme was to ensure that Alcoa retained Alba's business into the future, which in fact occurred when Alcoa secured another extension of its supply agreement with Alba through its bribery scheme.  AC ¶¶ 26(c), 110, 123, 149-50.

This scheme, in all of its iterations over the course of nearly two decades, was conceived, orchestrated, and directed from the United States by the Alcoa Defendants and senior U.S. executives of those companies.  The actions of Alcoa's overseas agents in furtherance of the scheme, including Dahdaleh, the Dahdaleh Companies, and Alcoa's Australian subsidiary, were directed, controlled, and coordinated from the United States by the Alcoa Defendants and senior executives of those companies.  AC ¶¶ 13-14, 27, 37; RCS at 1-5, 10.

2.      *The Payment of Fraudulent Commissions to Dahdaleh, 1990-2004*

In 1990 Alba and Alcoa, through its subsidiary, entered into a ten-year alumina supply contract (the "1990 Contract").  AC ¶ 38; RCS at 6.  The contract was amended once and extended twice, with its term ending in 2004.  AC ¶ 38; RCS at 6.  The price of alumina under the 1990 Contract was determined in two ways:  for approximately 60% of the supply, the rate was set by formula; for the remaining 40% (the "Market Tonnage"), the rate was negotiated by the parties.  AC ¶ 43; RCS at 6.

Throughout the existence of the 1990 Contract and extensions thereto, Alcoa paid Dahdaleh over $13.5 million in unearned "commissions" pursuant to a series of "Agency Agreements" between Alumet Limited ("Alumet") – one of the Dahdaleh Companies and the agent under these agreements – and Alcoa of Australia, the principal.  AC ¶¶ 39-40; RCS at 6.

5

Dahdaleh and Alumet provided no legitimate services in return for these commissions, which were instead Dahdaleh's compensation for facilitating bribing officials of Alba and the Royal Government and cloaking the domestic Defendants' fraud with Dahdaleh's corporate façades. AC ¶ 42; RCS at 6.  The cost of Dahdaleh's fraudulent commissions was passed on to Alba in the form of inflated alumina prices.  AC ¶ 41; RCS at 6.

### 3.      The Assignment of Alba's Contracts to Dahdaleh-Owned Shell Companies (1993-2004)

Between 1993 and 2004, Alba assigned portions or entire supply contracts with Alba to Dahdaleh-owned shell companies.  AC ¶ 26(b); RCS at 6-7.  Pursuant to these assignments, Alcoa sold alumina to the Dahdaleh Companies, which then resold the same alumina to Alba at much higher prices.  AC ¶ 26(b); RCS at 6-7.

In 1993, Alcoa assigned the supply responsibility for the Market Tonnage portion of the 1990 Contract to Kwinalum, one of the Dahdaleh Companies.  AC ¶ 46; RCS at 6-7.  Kwinalum was not a legitimate business enterprise and had no prior experience in the alumina supply business; in fact, it was incorporated less than a month prior to its first shipment of alumina to Alba.  AC ¶ 47; RCS at 7.  Kwinalum simply resold to Alba the same alumina it purchased from Alcoa, but at increased prices.  AC ¶¶ 49; RCS at 31-32 & Ex. 19.

On September 19, 1996, the 1990 Contract was amended to provide that Alcoa, through its subsidiary, would supply the Market Tonnage to Alba from 1997 through 2000.  AC ¶ 54; RCS at 7-8 & Ex. 1.  The 1996 amendment provided that Alcoa's subsidiary would assign the Market Tonnage to "a company associated with" it.  AC ¶ 57; RCS at 7 & Ex. 1.  That same day, Alcoa's subsidiary entered into a secret "Sales Agreement" with Alumet, an illegitimate business enterprise with no prior experience in the alumina supply business.  AC ¶¶ 59, 63; RCS at 7-8.

Alumet simply executed a paper transfer to Alba of the same alumina it purchased from Alcoa, but at much higher prices.  AC ¶¶ 65, 72(a); RCS at 32, 48-50 & Ex. 20.

In 2001, the term of the 1990 Contract was extended through 2003.  AC ¶ 73; RCS at 8.  As with the prior assignments, the Defendants structured the 2001 extension to involve one of the Dahdaleh Companies to facilitate the payment of bribes and the receipt and distribution of fraudulent overpayments by Alba.  AC ¶ 75; RCS at 8.  The 2001 extension was signed by David Dabney, a U.S. citizen and officer in various Dahdaleh Companies.  AC ¶¶ 78, 86(c); RCS at 11.

On or about February 14, 2002, Alcoa's Australian subsidiary entered into a secret parallel "Distribution Agreement" with Alumet and AA Alumina and Chemicals ("AAAC-1"), appointing the two Dahdaleh Companies as Alcoa's sole distributors of alumina to Alba for 2002 through 2004.  AC ¶ 80.  The 2002 "Distribution Agreement" authorized AAAC-1 to use Alcoa's logo and trademarks, including on stationery, in advertising, and at its place of business.  AC ¶¶ 85, 86(e), 88-89; RCS at 40 & Ex. 12.  AAAC-1, like Kwinalum and Alumet, was not a legitimate business enterprise and had no prior experience in the alumina supply business.  AC ¶ 81; RCS at 8.  AAAC-1 was not even incorporated until four months *after* Dabney executed the 2001 extension.  AC ¶ 81; RCS at 8.  Notwithstanding the assignment, Alcoa, through its subsidiary, remained the source of the alumina sold to Alba.  AC ¶ 83; RCS at 26 & Ex. 17.  Like Kwinalum and Alumet, AAAC-1 simply resold the same alumina to Alba that it purchased from Alcoa, but at much higher prices.  AC ¶¶ 83, 97; RCS at 32-33 & Ex. 21.

The Defendants also continued to conceal the role of Dahdaleh and his Companies from Alba.  AC ¶ 90.  For example, on March 3, 2002, Bruce Hall, the former CEO of Alba and a direct recipient of Defendants' bribes, sent an e-mail to Rice in anticipation of a visit by an Alba representative to an Alcoa facility in Tennessee, stating, "***Just for proper form, I don't make***

7

*[Dahdaleh's] activities on behalf of [another recipient of Defendants' bribes] knowledgeable to the plant hence I have removed references to him from your email before forwarding it to others.*"  AC ¶ 90.  In an e-mail response two days later, Rice stated that the host of the Tennessee visit "*is also not aware of [Dahdaleh's] role so we should not get into any misunderstandings.*"  AC ¶ 90.

The Defendants proposed another extension of the 1990 Contract in a July 8, 2003 letter from Sandra Ainsworth at AA Alumina and Chemicals ("AAAC-2"), another of the Dahdaleh Companies.  AC ¶ 98, 100; RCS at 17 & Ex. 9.  At the time of the letter, AAAC-2 had existed for less than sixteen months.  AC ¶ 100(b); RCS at 17-18.  AAAC-2 was not a legitimate business enterprise and had no prior experience in the alumina supply business.  AC ¶¶ 14, 16, 100-06; RCS at 17-18.  Alcoa, through its subsidiary, remained the source of the alumina sold to Alba.  RCS at 17-18, 26 & Ex. 17.

For each amendment or extension of the 1990 Contract described above, the Alcoa Defendants engaged Dahdaleh and his Companies to facilitate and conceal their scheme to extract overpayments from Alba by bribing senior officials of Alba and the Government of Bahrain.  ACS ¶¶ 14, 16, 50, 63, 81, 83, 90, 100-06; RCS at 7, 11, 17, 26, 32-33.  Those bribes are specifically documented in a series of cash wire transfers to officials of Alba and the Government of Bahrain and identified in the Pleadings.  AC ¶¶ 93-94, 103; RCS at 13-14.  Alba paid the inflated prices for alumina by wire transfers to Dahdaleh Company bank accounts in the United States and elsewhere.  AC ¶¶ 49, 53, 65, 72(a), 83, 97, 152; RCS at 31-35, 48-50, & Exs. 19-22.  In addition, Defendants repeatedly misrepresented to Alba that the Dahdaleh Companies were legitimate businesses controlled by, affiliated with, and duly authorized to act on behalf of, Alcoa.  AC ¶¶ 86(e), 88-90; RCS at 17, 40 & Ex. 8.

**4.      Alcoa's Illegal Attempt to Acquire a Significant Stake in Alba**

In 2003 and 2004, Defendants Rice and Dahdaleh, along with Alain Belda (Alcoa's CEO and Chairman of the Board) represented Alcoa in an effort to obtain a significant equity interest in Alba at a price that drastically undervalued Alba's shares.  AC ¶¶ 113, 116, 119-20; RCS at 11-12.  Once again, Defendants used bribes to officials of Alba and the Government of Bahrain, as specifically identified in the Pleadings, to achieve their goal.  AC ¶ 117; RCS at 14, 29-30. The proposed sale was eventually memorialized in the MOU signed on September 15, 2003 by Alcoa and the Government of Bahrain.  AC ¶ 111; RCS at 29-30.  Dahdaleh was deeply involved in the proposed equity transaction, receiving numerous e-mails from Alcoa employees in Pittsburgh to Alba employees concerning the transaction and also participating in conference calls and face-to-face negotiations.  AC ¶¶ 119-21; RCS at 11-12, 36-38.  The Government of Bahrain ultimately withdrew from the proposed transaction and terminated the MOU after concluding that it was not in Alba's best interests, even as Alcoa and the recipients of Alcoa's bribes pressured Bahraini government officials to consummate the transaction.[3]  AC ¶¶ 123-26; RCS at 20.

**5.      The 2005 Contract**

In 2005, Alba entered into a contract with yet another Dahdaleh Company named AA Alumina and Chemicals ("AAAC-3"), under which Alba continued to purchase alumina until 2009.  AC ¶ 108; RCS at 9.  The Defendants defrauded Alba into entering into the 2005 Contract on unfavorable terms following the termination of the MOU through bribery and the threat that Alcoa would cease supplying Alba with alumina altogether.  AC ¶ 110; RCS at 12-13, 29-30.

---

[3] These averments regarding the signing of the MOU through the payment of bribes show the Defendants' scheme at work.  The fact that the scheme failed in this one instance does not somehow sanitize Defendants' actions.

Upon termination of the MOU, Alba had little time to secure additional alumina supply before termination of the 1990 Contract, as extended in 2003.  AC ¶ 129; RCS at 29.  During negotiations of the 2005 Contract, to provide Alba reassurance, Defendants repeatedly made false representations that the Dahdaleh Companies were associated with Alcoa.  AC ¶¶ 138, 147-48; RCS at 12, 18, 30, 41 & Exs. 6, 7, 14.  Alcoa, through Dahdaleh, also paid additional bribes to Alba senior officials during the negotiation period, who in turn directed that Alba agree to the Alcoa Defendants' proposal.  AC ¶ 132, 136, 149-50; RCS at 14.  Such bribes and misrepresentations were critical to inducing Alba to sign the agreement with AAAC-3 on June 8, 2005 on commercially unreasonable terms.  AC ¶¶ 141-44, 148, 219.  AAAC-3 resold to Alba the same alumina it purchased from Alcoa, again at much higher prices.  AC ¶¶ 146-47; RCS at 9.  Like its predecessors, AAAC-3 was not a legitimate business enterprise and had no prior experience in the alumina supply business.  AC ¶¶ 146-47; RCS at 9.

As in 1996 and 2002, while the 2005 Contract with Alba was being negotiated, the Defendants finalized a secret parallel "Distribution Agreement" between Alcoa's Australian subsidiary and the Dahdaleh Companies.  AC ¶¶ 151-52; RCS at 9, 13.  Notwithstanding the assignment, Alcoa, through its subsidiary, remained the source of the alumina sold to Alba.  AC ¶ 152.  The Alcoa Defendants again structured the 2005 Contract to enable AAAC-3 to serve as a pass-through entity, marking up the price of alumina that it bought from Alcoa and re-selling it to Alba at inflated prices while funneling bribes to officials of Alba and the Government of Bahrain.  AC ¶ 146, 152; RCS at 33-35 & Ex. 22.

In total, the Defendants succeeded in exacting more than $433 million in fraudulently induced overpayments from Alba between 1990 to 2009 as a direct result of their bribery of officials of Alba and the Government of Bahrain.  AC ¶ 157; RCS at 55-57.  On February 27,

2008, Alba filed its initial Complaint in this matter, directly resulting in criminal investigations into Defendants' conduct by the Department of Justice ("DOJ") and criminal authorities in several other countries. AC ¶ 31; RCS at 43. Dahdaleh and Hall have been arrested by authorities in the United Kingdom on criminal charges arising out of their roles in the scheme. The DOJ investigation of Alcoa and its executives is ongoing. AC ¶ 31; RCS at 43.

## LEGAL STANDARD

To survive a challenge to personal jurisdiction under Rule 12(b)(2), a plaintiff need only make "a prima facie showing of jurisdictional facts." *See Kyle v. Cont'l Capital Corp.*, 575 F. Supp. 616, 619 (E.D. Pa. 1983). The plaintiff's allegations are assumed to be true for jurisdictional analysis. *Miller Yacht Sales Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). The court may consider evidence presented in affidavits to assist in its determination. *Bro-Tech Corp. v. Thermax, Inc.*, No. 05-2330, 2006 WL 516767, at *2 (E.D. Pa. Feb. 28, 2006). In determining whether a plaintiff has made a *prima facie* case, "the Court does not act as a fact-finder" but rather "accepts properly supported proffers of evidence by the plaintiff as true." *Id.* (citing *Leonard A. Feinberg, Inc. v. Cent. Asia Capital Corp.,* 936 F. Supp. 250, 254 (E.D. Pa. 1996)). "While the plaintiff bears the burden of establishing that a court's exercise of personal jurisdiction over a defendant is proper, in the preliminary stages of the litigation . . . that burden is light." *D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 109-10 (3d Cir. 2009) (citing *Doe v. Nat'l Med. Servs.*, 974 F.2d 143, 145 (10th Cir. 1992) (internal quotations omitted)).

In considering Dahdaleh's 12(b)(6) motion, this Court must "accept all factual allegations [in Alba's Amended Complaint] as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2010); *see also In re Le-Nature's, Inc.*, No. 9-MC-162, 2011 WL 2112533, at *1 (W.D. Pa. May 26, 2011)

(Ambrose, J.); *CIT Group v. Krones, Inc.*, No. 9-432, 2009 WL 3579037, at *4 (W.D. Pa. Sept. 16, 2009) (Ambrose, J.) (same).  Although the Court need not credit a plaintiff's "legal conclusions," the presumption of truth indisputably extends to all "factual allegations" set forth in a complaint.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 212 (3d Cir. 2009) (denying motion to dismiss where plaintiff's factual allegations rose above the level of mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action"); *CIT Group*, 2009 WL 3579037, at * 4 ("for the purposes of a motion to dismiss, courts must accept as true all factual allegations set forth in the complaint, but . . . not . . . any legal conclusions couched as factual allegations").

       This standard does not require the plaintiff to prove its case before discovery, and does not even "impose a probability requirement at the pleading stage"; instead, it "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" of each necessary element, "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  *Twombly*, 550 U.S. at 570 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *accord Iqbal*, 129 S.Ct. at 1949.  The question, therefore, is whether the complaint contains enough facts, taken as true, "to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  In a civil RICO case, where a supplemental RICO Case Statement is required by local rule, the Court will consider not only the factual allegations in the complaint, but also the facts in the Case Statement when deciding whether the plaintiff has stated a plausible claim for relief.  *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993) (noting that the RICO Case Statement is a pleading that may be considered part of the complaint for the purposes of a motion to dismiss).

A complaint subject to the particularity requirements of Rule 9(b) need only set forth "the circumstances of the alleged fraud" sufficient to put the defendants on notice of the "misconduct with which they are charged." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) (denying motion to dismiss civil RICO claims where "each allegation of fraud adequately describes the nature and subject of the alleged misrepresentation"). The Third Circuit has held that while allegations of "date, place, or time" are sufficient to meet this standard, Rule 9(b) does not require them in every case. *Id.*; *see also CIT Group*, 2009 WL 3579073, at *5. Plaintiffs may also use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Mach.*, 742 F.2d at 791; *CIT Group*, 2009 WL 3579073, at *5. Additionally, a complaint need not identify which defendant was responsible for which elements of the alleged fraud. *In re Meridian Sec. Litig.*, 772 F. Supp. 223, 230 (E.D. Pa. 1991) (denying a motion to dismiss where plaintiffs identified the source, location, dates, and manner of false or misleading statements, but were unable to identify which defendants were responsible); *CIT Group*, 2009 WL 3579073, at *5-7 (holding that complaint "pass[ed] muster" under Rule 9(b) despite some allegations that did "not delineate between the actions of particular Defendants" where other paragraphs "contain[ed] sufficient detail concerning the role of each defendant").

In applying Rule 9(b), the Third Circuit has cautioned that "focusing exclusively on its 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 100 (3d Cir. 1983) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 407 (1969)). This Court has emphasized that an overly strict standard is particularly inappropriate "where a party alleges a complex corporate fraud" since "much of the

factual information necessary to describe the details of the fraud may be 'peculiarly within the defendant's knowledge and control.'" *CIT Group*, 2009 WL 3579037, at * 5; *see also Seville Indus. Mach.*, 742 F.2d at 791 (discouraging courts from subjecting allegations of fraud to "too strict a scrutiny").

## LEGAL ARGUMENT

## I.   THIS COURT HAS PERSONAL JURISDICTION OVER DAHDALEH.

Support for this Court's exercise of jurisdiction over Dahdaleh includes (1) the absent co-conspirator doctrine, (2) the RICO exception to the fiduciary shield doctrine in Pennsylvania, (3) attribution of the Dahdaleh Companies' contacts with this forum to Dahdaleh under veil-piercing and alter ego theories, and (4) Dahdaleh's nationwide contacts under Rule 4(k)(2).  While Alba believes Dahdaleh is subject to jurisdiction, if this Court has any question about the extent of Dahdaleh's ties to the forum, Alba should at the very least be permitted to conduct jurisdictional discovery.

### A.   Personal Jurisdiction Is Appropriate Over Dahdaleh Pursuant to the Absent Co-Conspirator Doctrine.

Once jurisdiction is established over one member of a RICO conspiracy, a court may exercise jurisdiction over *all other members* of that conspiracy when the co-conspirators were or should have been aware of the acts in furtherance of the conspiracy.  *Shouse v. Nat'l Corrective Group*, *Inc.*, No. 3:10-CV-0175, 2010 WL 4942222, at *6 (M.D. Pa. Nov. 30, 2010) .  As averred, the RICO enterprise and conspiracy operated under Alcoa's control and direction from Pittsburgh.  Thus, Alcoa's extensive contacts with this forum are imputed to Dahdaleh for jurisdictional purposes.

Pennsylvania recognizes the absent co-conspirator doctrine:

> [U]nder Pennsylvania law personal jurisdiction of a non-forum co-conspirator may be asserted . . . where a plaintiff demonstrates that substantial acts in furtherance of the conspiracy occurred in Pennsylvania and that the non-forum co-conspirator was aware or should have been aware of those acts.

*Id.* at *6 (citing *Santana Prod., Inc. v. Bobrick Washroom Equip.*, 14 F. Supp. 2d. 710, 718 (M.D. Pa. 1998)) (internal citation omitted);  *see also Koresko v. Bleiweis*, Civ. No. 04-cv-769, 2005 WL 2436693, at *3 (E.D. Pa. Sep. 27, 2005) (same).

Under the co-conspirator theory, courts impute jurisdictional contacts to foreign defendants in the absence of a partnership or other legal entity based on the conspiracy.  *See, e.g., Am. Trade Partners L.P. v. A-1 Int'l Importing Enters., Ltd.*, 755 F. Supp. 1292 (E.D. Pa. 1990) (holding that forum contacts of co-defendants could be attributed to defendant under co-conspirator theory in action alleging RICO violations).  In fact, "even a single act" in Pennsylvania in furtherance of the conspiracy provides sufficient basis for Pennsylvania courts to exercise jurisdiction over all co-conspirators, regardless of residence.  *Temtex Prods., Inc. v. Kramer*, 479 A.2d 500, 506 (Pa. Super. Ct. 1984).

Alba's averments establish that:  (1) Dahdaleh acted together with the other Defendants as a co-conspirator to defraud Alba; (2) the conspirators acted within the forum in furtherance of the conspiracy; and (3) Dahdaleh was or should have been aware of the acts of the conspirators.

### 1.      Dahdaleh Acted Together With the Other Defendants As a Co-Conspirator to Defraud Alba.

Dahdaleh has been sued as a conspirator under the provisions of RICO, 18 U.S.C. § 1962(d), for conspiracy to violate 18 U.S.C. § 1962(c).  AC Count Two, ¶¶ 204-210.  The predicate acts averred with regard to the § 1962(d) claim involved a conspiracy to violate federal civil RICO among Alcoa, Alcoa World Alumina, Dahdaleh, and Rice, with each conspirator

knowingly, willfully, and unlawfully conspiring to facilitate a scheme which included the operation and management of the RICO enterprise through a pattern of racketeering activity. AC Count Two, ¶ 205. The conspiracy operated to defraud Alba of hundreds of millions of dollars through bribery and other criminal acts that were conceived, directed, controlled and coordinated in and from the United States by senior executives of Alcoa and Alcoa World Alumina. AC ¶ 26; RCS at 3-5, 23-24, 45, 48, 58. To facilitate and conceal the fraud, the co-conspirators funneled overpayments and *quid pro quo* bribes through the Dahdaleh Companies – shell companies which added no value – to accomplish the fraud against Alba. AC ¶¶ 14, 23, 25-26, 35, 63, 64, 83; RCS at 4-23, 25-30. Thus, accepting Alba's averments, there is no question that Dahdaleh conspired with the other Defendants to defraud Alba.

### 2.   The Conspirators Acted Within the Forum in Furtherance of the Conspiracy.

Dahdaleh had regular and continuous contacts with his co-conspirators located here through his actions on behalf of, and business relationships with, Alcoa and the other co-conspirator Defendants. *See* AC ¶ 9; RCS at 13-15, 25-29, 36-38, 41, 44-45, 51. Alcoa is a corporation organized under the laws of the Commonwealth of Pennsylvania, with corporate offices on Isabella Street in Pittsburgh. AC ¶¶ 2, 5. It was the proverbial "nerve center" of the RICO enterprise and related conspiracy. AC ¶¶ 2, 5, 55-56, 74, 121,127, 138, 140, 147, 177; RCS at 10-12, 15, 36-42, 49.

Alba's averments demonstrate substantial acts in furtherance of the conspiracy took place here. For example, the 2001 Extension of the 1990 Contract, which extended the term of the agreement through 2003, was proposed by Alcoa World Alumina through its officer, Rice, in an April 12, 2001 letter on Alcoa World Alumina stationery sent from Pittsburgh. AC ¶ 74; RCS at 11. As the conspirators attempted to acquire a stake in Alba at a depressed price through bribery

in 2003 and 2004, Alcoa employees located in Pittsburgh corresponded extensively via e-mail over three months with Alba employees and third party consultants, often copying Dahdaleh, to plan a due diligence review of Alba's operations in preparation for the sale of Alba's shares.  AC ¶ 121; RCS at 49.  In addition, Alain Belda was involved with the attempted acquisition of Alba in connection with the proposed sale of its shares.  AC ¶ 128; RCS at 12, 15-16.  Moreover, while negotiating the 2005 Contract, the co-conspirator Defendants, through Rice, rejected Alba's requests for further negotiations, instead threatening to redirect Alcoa's alumina supply to other customers.  Indeed, in an October 29, 2004 facsimile from Pittsburgh to Alba's CEO Bruce Hall, Rice stated, "However, should Alba decide not to accept this offer, it is understandable that you will need to find alternatives in order to supply Alba's long term alumina requirements.  I hope you can also appreciate this will dictate that we will direct the alumina, which we anticipate continuing to supply Alba, to other long term customers."  AC ¶ 140; RCS at 12, 39, 42.

Additional contacts with this forum, as averred in the Pleadings, related to the contract negotiations among the parties.  When Alba requested assurance that it was dealing with the appropriate entity during the negotiation of the 2005 Contract, Defendant Rice stated in a fax dated October 26, 2004 and sent from Pittsburgh that "*[f]or the avoidance of doubt and any confusion*," AA Alumina and Chemicals is "*an associate company and distributor*" of Alcoa of Australia and that it is "*fully and solely authorized to negotiate the present alumina supply agreement with Alba*."[4]  This Pittsburgh-based fax was later referenced in, and an exhibit to, the 2005 Contract.  AC ¶ 147; RCS at 12 & Ex. 6.  Days later, in a fax dated October 29, 2004 and

---

[4] Rice's October 26, 2004 fax to Bruce Hall at Alba poses the question:  *Who* "authorized" AAAC to negotiate the alumina supply agreement with Alba?  The express use of the term "authorization" demonstrates the existence of an agent-principal relationship between AAAC and Alcoa World Alumina.

sent from Pittsburgh, Rice responded to concerns raised by Alba about the 2005 Contract and referred again to "the offer which was submitted by our associated company, AA Alumina." Rice stated that Alcoa wished for "the mutually beneficial relationship between Alba and Alcoa" to continue so that "**we** can continue to be Alba's alumina supplier for the next 10 years."[5]  AC ¶ 147; RCS at 12 & Ex. 7.  These averments reflect that the very heart of the conspiracy was in Pittsburgh.

Additionally, a Pittsburgh-based manager with Alcoa World Alumina signed the 1996 Amendment on behalf of Alcoa of Australia, which is averred to have occurred at the direction of both Alcoa and Alcoa World Alumina.  AC ¶ 55; RCS at 11.  Further, the offer addressing pricing for the Market Tonnage, which was negotiated between Alcoa of Australia's Marketing Manager and a former officer of Alba and subsequently accepted by Alba, was communicated to a manager of Alcoa World Alumina in Pittsburgh, proving that the conspiracy's nerve center was here, and that substantial acts in furtherance of the conspiracy occurred here.

**3.**     **Dahdaleh Was or Should Have Been Aware of the Acts of His Co-Conspirators.**

Dahdaleh cannot plausibly claim that he was unaware of the acts of his co-conspirators in furtherance of the conspiracy.  First, Dahdaleh was personally involved in carrying out the conspiracy by making bribery payments to Alba on behalf of his co-conspirators.  Dahdaleh paid bribes outside the United States as the agent of Alcoa and its subsidiaries, including Alcoa World Alumina and Alcoa of Australia.  AC ¶ 96; RCS at 13-15.  He also represented Alcoa in

---

[5] The October 29, 2004 fax from Rice to Hall repeatedly uses the plural "we" despite coming only from Rice.  Specifically, the communication expresses that "*[w]e* share your view…"; "*we* will direct the alumina…"; "*we* anticipated continuing…"; "*[w]e* are hopeful…"; and "*we* can continue…"  Once again, Rice's language demonstrates the conspirator relationship among the Defendants working together to preserve Alba as a lucrative customer of Alcoa.

negotiations in London and Bahrain regarding Alcoa's potential investment in Alba.  AC ¶¶ 113-14; RCS at 11, 15.

Second, Dahdaleh was privy to communications in furtherance of the conspiracy.  Alcoa employees e-mailed Alba employees from Pittsburgh, often copying Dahdaleh, regarding a proposed due diligence review of Alba's operations in preparation for the sale of Alba's shares.  AC ¶¶ 121, 167(f); RCS at 16, 49.  This ongoing and repeated awareness of co-conspirator conduct in this forum is critical to finding jurisdiction over him as a member of the conspiracy.[6]

Third, the actions of his Companies further show Dahdaleh's knowledge of his co-conspirators' activities.  Defendants structured the 2001 Extension to involve the Dahdaleh Companies for the sole purpose of facilitating the payment of bribes and the payment of excessive prices by Alba for alumina.  AC ¶ 75; RCS at 8-9, 11, 13-15, 18.  At the same time, Defendants also negotiated a secret Distribution Agreement with Alumet and AAAC-1.  AC ¶ 75; RCS at 11.  Dahdaleh's Companies also contracted with Alcoa of Australia to purchase and distribute alumina, and to make and receive payments via bank accounts in New York in furtherance of the conspiracy.  AC ¶¶ 20, 26, 49, 53, 57, 65, 72, 73, 77-78, 83-84, 91, 97, 152; RCS at 6-10, 13-15, 31-35, 48-50 & Exs. 19-22.  These averments provide additional support for Dahdaleh's knowledge of his co-conspirators' actions.

Alba adequately avers that Dahdaleh was aware of Alcoa's conduct in the forum, both by his direct participation in the scheme as intermediary between Alcoa and Alba, and by his actions taken through his Companies, all in furtherance of the conspiracy.

---

[6] Dahdaleh's suggestion that *Grant Street Group, Inc. v. D & T Ventures, LLC*, No. 10-1095, 2012 WL 13689 (W.D. Pa. Jan. 4, 2012) provides guidance regarding how those e-mails should be treated for jurisdictional purposes is wrong.  *See* Dahdaleh Mem. at p. 9.  *Grant Street Group* was a patent infringement lawsuit that involved no conspiracy allegations, and therefore has no bearing on this case.

**B.**     **Personal Jurisdiction Is Appropriate Over Dahdaleh Through His Companies' Contacts with the Forum.**

Dahdaleh claims that contacts between his companies and Alcoa in Pittsburgh are insufficient to establish jurisdiction over him.  *See* Dahdaleh Mem. at pp. 10-12.  Under Pennsylvania law, however, the fiduciary of a corporation that commits a RICO violation in a particular forum is subject to personal jurisdiction in that forum.  *See Am. Trade Partners L.P.*, 755 F. Supp. at 1303 n. 17 (concluding that jurisdiction existed over a shareholder and organizer of a corporation who allegedly used the corporate form to commit RICO violations and that the "fiduciary shield" doctrine did not apply in RICO cases).  Thus, exercising personal jurisdiction over Dahdaleh through his corporations' contacts with the forum is entirely appropriate.  *Id.* Dahdaleh cannot hide behind his own corporate creations to avoid personal jurisdiction.

Dahdaleh acknowledges, as he must, the concept of piercing the corporate veil.  *See* Dahdaleh Mem. at p. 10.  Pennsylvania courts will disregard the corporate form "whenever one in control of a corporation uses that control or corporate assets to further one's own personal interests."  *See Coll. Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 360 A.2d 200, 207 (Pa. 1976).  The averments here support piercing the corporate veil given the fraudulent conduct of Dahdaleh and his Companies.

Alba sufficiently avers the fraudulent activities that transpired through Dahdaleh's shell companies.  There is nothing conclusory about specifically pleading that the Dahdaleh Companies, which included (i) Alumet Limited, (ii) Kwinalum Trading Pte Limited, (iii) Alumet Asia Pte Limited, (iv) three separate companies named AA Alumina and Chemicals, and (v) United Legal Engineering Consultants Limited, operated for "the sole purpose of facilitating Defendants' receipt and distribution of the overpayments that were fraudulently exacted from Alba and the Defendants' *quid pro quo* payment of bribes to senior officials of Alba and the

Government of Bahrain." AC ¶¶ 15, 16, 25; RCS at 4-10, 14-15, 25-35. Nor is it conclusory to aver with details that between 1993 and 2009, Alcoa assigned portions or all of its supply contracts with Alba to various Dahdaleh Companies which otherwise did not mine or have access to a single ounce of alumina or have Alba as its customer for this material. AC ¶ 26; RCS at 4-10, 14-15, 25-36. Pursuant to these assignments, Alcoa, through its subsidiary Alcoa of Australia, sold its alumina to the Dahdaleh Companies, which then re-sold the same alumina to Alba at higher prices. AC ¶ 26; RCS at 4-10, 14-15, 25-36. Defendants distributed the overpayments fraudulently exacted from Alba among themselves and used portions of the overpayments to pay *quid pro quo* bribes to the senior officials of Alba and the Government of Bahrain who, in turn, induced Alba to enter into economically disadvantageous contracts. AC ¶ 26; RCS at 4-10, 14-15, 25-36. None of the Dahdaleh Companies ever provided any legitimate services to Alba or Defendants. AC ¶¶ 16, 25; RCS at 5-8, 10, 14, 16, 18-19, 54. Instead, they were used as vehicles by Defendants for the sole purpose of enabling and concealing their conspiracy to defraud Alba. AC ¶¶ 16, 25; RCS at 2-3, 5, 7, 11, 18, 20, 23, 25, 30, 41, 47. The Pleadings show the date and amount of numerous bribes; those bribes are facts, not conclusions. RCS at 13-14, 27-28.

Dahdaleh does not dispute that Alba's claims sound in fraud. As the Third Circuit has long recognized, using the corporate form to perpetrate a fraud, as Dahdaleh has done, is a paradigmatic basis for piercing the corporate veil. *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995); s*ee also Zubik v. Zubik*, 384 F.2d 267, 272 (3d Cir. 1967) ("the appropriate occasion for disregarding the corporate existence occurs when the court must prevent fraud . . . or when recognition of the corporate entity would . . . shield someone from liability for a

crime"); *Patroski v. Ridge*, No. 2:11-cv-1065, 2011 WL 4955274, at *3 (W.D. Pa. Oct. 18, 2011)

(piercing the corporate veil warranted to prevent fraud).

      Federal courts routinely disregard the corporate form and exercise jurisdiction over an

individual officer where appropriate, as it is here.  For example, in *Home-Stake Products Co. v.*

*Talon Petroleum, C.A.*, 907 F.2d 1012, 1017, 1021 (10th Cir. 1990), the court determined that

the corporate form would not preclude the exercise of jurisdiction over an individual where the

corporate entity was a "mere shell for its owner," explaining:

> [In situations] in which the individual alleged to dominate the corporation
> has no contacts with the forum, but the alter ego corporation has sufficient
> contacts, courts have attributed the corporation's contacts with the forum
> state to the individual for jurisdictional purposes. . . . In such situations,
> attribution of contacts to the individual defendant merely reflects the
> reality that, although the contacts were ostensibly those of the corporation,
> the true actor was the defendant.

*Id.* (citing *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634 (8th

Cir. 1975)).[7]

      At this early stage of the case, Alba has met its pleading burden to show that Dahdaleh,

acting through his Companies, committed sufficient fraudulent acts with Alcoa in Pittsburgh to

---

[7] Other jurisdictions uniformly apply the same principle.  *See e.g., Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1264-65 (Fed. Cir. 1985) (noting that "one . . . factor[] to which courts have looked when piercing the corporate veil is whether insistence on the corporate form would enable a stockholder to avoid legal liability" and concluding, "the precedents establish that a court which has jurisdiction over a corporation has jurisdiction over its alter egos") (internal quotations omitted); *Hunt v. Global Incentive & Meeting Mgmt.*, No. 09-4921, 2010 WL 3740808, at *8 (D.N.J. Sept. 20, 2010) (noting the extensive case law imputing an alter-ego corporation's minimum contacts to an individual shareholder); *Monroe's Estate v. Bottle Rock Power Corp.*, No. 03-2682, 2004 WL 737463, at *9 (E.D. La. Apr. 2, 2004) (exercising personal jurisdiction over corporate officer due to corporation's contacts with forum); *Wise v. Lindamood*, 89 F. Supp. 2d 1187, 1194-95 (D. Colo. 1999) ("employees of a corporation that is subject to the personal jurisdiction of the courts of the forum may themselves be subject to jurisdiction if those employees were primary participants in the activities forming the basis of jurisdiction over the corporation").

justify piercing the corporate veil and exercising personal jurisdiction over him.  This Court therefore can and should exercise personal jurisdiction over Dahdaleh based on his Companies' activities.  *See Bur-Cam Group, LLC v. Pearson*, No. 3:10-cv-240, 2010 WL 1565521, at *6 (M.D. Pa. Apr. 19, 2010) (denying motion to dismiss fraud claims against individual member of corporation because he "could be liable, despite the existence of a corporate entity" where plaintiffs alleged that member "participated directly in the fraud, . . . and that he used the corporation as a means of executing this scheme").

### C.   Personal Jurisdiction Is Also Appropriate Over Dahdaleh Based on His Nationwide Contacts Pursuant to Rule 4(k)(2).

Dahdaleh is also subject to jurisdiction in this forum resulting from his nationwide contacts pursuant to Rule 4(k)(2).  Rule 4(k)(2) was intended to be an extension of federal jurisdiction to fill a "gap" in the enforcement of federal law:

> Under the former rule, a problem was presented when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection, but having insufficient contact with any single state to support jurisdiction under state long-arm legislation. . . . In such cases, the defendant was shielded from the enforcement of federal law by the fortuity of a favorable limitation on the power of state courts, which was incorporated into the federal practice by the former rule.

Fed. R. Civ. P. 4(k)(2), advisory committee's notes (1993); *see also Southco, Inc. v. Fivetech Tech. Inc.*, No. 10-1060, 2011 WL 71440, at *4 (E.D. Pa. Jan. 10, 2011).  The Rule therefore serves as a federal long-arm statute and ensures that federal claims will have a U.S. forum if sufficient contacts exist with the U.S. as a whole.  *Id.*

Jurisdiction under Rule 4(k)(2) is appropriate where (1) the cause of action arises under federal law; (2) the defendant is not subject to the jurisdiction of any specific state; and (3) the defendant's contacts with the U.S. as a whole satisfy the requirements of due process.  *Southco,*

*Inc.*, 2011 WL 71440, at *4; *see also United States v. Int'l Bhd. of Teamsters*, 945 F. Supp. 609, 617 (S.D.N.Y. 1996).

While acknowledging Rule 4(k)(2) as a mechanism for securing personal jurisdiction over him, Dahdaleh argues that he lacks minimum contacts with the United States as a whole. *See* Dahdaleh Mem. at p. 6 n.2.  Dahdaleh fails to acknowledge, however, that the actions of his co-conspirators are imputed to him by virtue of the alleged conspiracy.  *See Shouse v. Nat'l Corrective Group Inc.*, No. 3:10-CV-0175, 2010 WL 4942222, at *6 (M.D. Pa. Nov. 30, 2010) (citing *Santana Prod., Inc. v. Bobrick Washroom Equip.,* 14 F. Supp. 2d. 710, 718 (M.D. Pa. 1998)) (discussed *supra* at section I.A.).  In addition, jurisdiction exists over Dahdaleh by virtue of the fraudulent activities undertaken by his otherwise-purposeless shell companies.  *See Am. Trade Partners L.P.*, 755 F. Supp. at 1303 n. 17 (discussed *supra* at sections I.A. and I.B.).

Moreover, Dahdaleh's actions and those imputed to him by his co-conspirators result in additional contacts with the United States.  For example, in connection with the proposed equity sale of Alba, the CEO and Chairman of Alcoa, Alain Belda, sent a letter from New York urging the Government of Bahrain to reconsider Alcoa's offer, emphasizing his belief that the top levels of the Bahraini Government wanted the deal completed.  RCS at 12.  Under the 1990 Contract as amended and extended, Alcoa's subsidiary issued invoices to Alba for Formula Tonnage alumina at an inflated price due to Dahdaleh's "commissions" and the bribes that Defendants paid in an effort to retain Alba as an Alcoa customer.  Alcoa's subsidiary caused Alba to pay those invoices by wire transfer to accounts held at Chase Manhattan Bank and ANZ Investment Bank in New York City.  AC ¶¶ 49, 53, 65, 72(a), 83, 97, 152; RCS at 31-35, 48-50, & Exs. 19-22.  From January 1, 1993 through December 31, 1995, Kwinalum, one of the Dahdaleh Companies, issued inflated invoices to Alba on behalf of Alcoa and Alcoa World Alumina, seeking payment for the

24

supply of Market Tonnage alumina under the 1990 Contract.  Through the issuance of these

invoices, Defendants Alcoa, Alcoa World Alumina, and Dahdaleh caused Alba to transport

unlawfully converted funds in interstate and foreign commerce to accounts held at Royal Bank of

Canada and Chase Manhattan Bank in New York.  RCS at 31-32.  Similar activity occurred from

1997 through 2001 between Alumet Asia and Alba, with the unlawfully converted funds again

held at Royal Bank of Canada and Chase Manhattan Bank in New York, as well as from 2005

through 2009 between AAAC-3 and Alba, with the unlawfully converted funds held at Deutsche

Trust Company America in New York.  RCS at 32-34.  Other contacts in the United States

included meetings in New York pursuant to Defendants' scheme to gain control of Alba, in

which officers of Alcoa, Alcoa World Alumina, and AWAC participated with representatives of

Alba.  RCS at 36-37.

     The activities and contacts with the United States imputed to Dahdaleh through the

actions of his co-conspirators and his Companies are more than adequate to establish Dahdaleh's

contacts with the United States as a whole.  *See also,* section I.B., *supra*.  The exercise of

jurisdiction over Dahdaleh is reasonable, comports with fair play and substantial justice, *see*

section I.D., *infra*, and is appropriate pursuant to Rule 4(k)(2).

> **D.**    <u>**Exercising Jurisdiction Over Dahdaleh is Reasonable and Comports**</u>
> <u>**With Fair Play and Substantial Justice.**</u>

     As set forth in section I.A., *supra*, Dahdaleh, as a co-conspirator in a nineteen-year

scheme to defraud Alba of hundreds of millions of dollars, has sufficient contacts to subject him

to jurisdiction by the imputation or attribution of Alcoa's contacts to him.  Nevertheless, as

Dahdaleh notes, this Court may only exercise jurisdiction over him if such exercise also

comports with "fair play and substantial justice."  Dahdaleh Mem. at pp. 12-13.  That inquiry

balances various factors, including (1) the burden on the defendant, (2) Pennsylvania's interest in

adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the States' shared interest in furthering fundamental social policies.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985).

Alba respectfully submits that exercising jurisdiction over Dahdaleh comports with fair play and substantial justice.  The nineteen-year scheme to defraud Alba of hundreds of millions of dollars was directed from Pittsburgh and necessarily involved multiple domestic Defendants directing their activities to and in this forum.  Pennsylvania has a significant interest in adjudicating this dispute, which alleges extensive criminal activity by one of its largest corporations.  Moreover, given that the RICO enterprise's nerve center was here, and that Alba has already had to wait over three years to prosecute its case, the judicial system's interest in efficiency and the States' policy interests are equally robust.  The only factor that Dahdaleh can plausibly assert is his limited burden in defending this action here.  This argument, when considered in the context of the massive fraud in which he engaged, is not persuasive.  Given his personal resources and the extensive relationship that he had with Alcoa in furtherance of the fraudulent scheme alleged in the Pleadings, the inconvenience that he might suffer as a result of having to defend himself here is minor at best.[8]

---

[8] Dahdaleh's reliance on *BP Chemicals Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254 (3d Cir. 2000) is inapt.  There, the Third Circuit, in a dispute that it characterized as between "two non-citizens," denied the exercise of jurisdiction over a Taiwanese corporation where there were no significant contacts with the United States, noting that the defendant had done "nothing of substance" in the United States.  *Id.* at 262.  The court did not even undertake an analysis of the factors listed in the *Burger King* decision to determine whether exercising jurisdiction would comport with fair play and substantial justice, because it found that the plaintiff had not established the requisite minimum contacts in the first place.  *Id.* at 261.  Here, Dahdaleh's longstanding conspiratorial relationship with Alcoa in this forum, constituting substantial contacts and justifying the attribution of other substantial contacts to him, distinguishes this dispute from *BP Chemicals*.

**E.      In the Alternative, Alba Should be Permitted to Take Jurisdictional Discovery.**

Although Alba submits that Dahdaleh falls within this Court's jurisdiction, if this Court has any question about the extent of Dahdaleh's ties to the forum, Alba respectfully requests that the Court allow the parties to conduct discovery in aid of jurisdiction.

"The Supreme Court instructs that 'where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues.'" *Metcalfe v. Renaissance Marine, Inc*., 566 F.3d 324, 336 (3d Cir. 2009) (citing *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 n. 13 (1978)). Thus, "[b]efore dismissing a case for lack of personal jurisdiction, courts should generally permit discovery into jurisdictional facts." *In re Auto. Refinishing Paint Antitrust Litig.*, No. 1426, 2002 WL 31261330, at *5 (E.D. Pa. July 31, 2002).

In *CIT Group*, No. 9-432, 2009 WL 3579037, at *14 (W.D. Pa. Sept. 16, 2009), this Court allowed jurisdictional discovery related to an individual defendant.  The Court said:

> Where the plaintiff's claim is not clearly frivolous, the court should ordinarily allow jurisdictional discovery in order to aid the plaintiff in his attempt to establish jurisdiction.  Thus, if a plaintiff can present factual allegations that suggest with a reasonable particularity the possible existence of the requisite contacts between the party and the forum state, the plaintiff should have a right to conduct jurisdictional discovery.

*Id.* (internal citations and quotations omitted).  While this Court acknowledged that jurisdictional discovery more often relates to corporate defendants, the court permitted jurisdictional discovery related to an individual defendant.  *Id.; see also Sanders*, 437 U.S. at 351 n.13 ("where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on the issues").  Indeed, where a plaintiff presents factual allegations that suggest "with reasonable particularity" the possible existence of the requisite "contacts between [the party] and the forum state," the plaintiff's right to conduct jurisdictional discovery should be sustained.  *Toys "R" Us, Inc. v. Step Two S.A.*, 318 F.3d 446, 456 (3d Cir. 2003); *Mellon Bank (East) PSFS, Nat'l Ass'n.*

*v. Farino,* 960 F.2d 1217, 1223 (3d Cir. 1992).  Further, limited jurisdictional discovery is warranted when a plaintiff can show that the jurisdictional claim is not "clearly frivolous."  *Toys "R" Us, Inc.*, 318 F.3d at 456 (citing *Mass. School of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997)).

Here, the averments in the Pleadings are based on the limited information available to Alba.  Discovery is very likely to corroborate Alba's pre-discovery facts and to add to the weight of jurisdictional evidence.  Under the circumstances of this case, there has been no opportunity for Alba to engage in meaningful jurisdictional discovery due to the administrative stay that was in place for over three years.  Allowing discovery will almost certainly reveal more information about Dahdaleh's specific activities, travels, interactions, and correspondence with individuals and corporate entities in this forum.  Such details from a foreign defendant are not easily obtained, and the allowance of jurisdictional discovery would permit identification and development of additional facts that would demonstrate the appropriate basis for jurisdiction over Dahdaleh in this forum.  Accordingly, Alba requests, at a minimum, the allowance of discovery in aid of establishing jurisdiction over Dahdaleh.

## II.   ALBA HAS PLED ITS RICO CLAIM WITH PARTICULARITY.

Dahdaleh claims that Alba has not pled its RICO claim with particularity based on failure to plead the common "purpose" element of an association-in-fact enterprise.  Despite Dahdaleh's assertion, the Pleadings contain specific allegations concerning the required elements, and thus state claims for violations of 18 U.S.C. § 1962(c)[9] and 18 U.S.C. § 1962(d)[10] that readily survive Dahdaleh's Motion.

---

[9] To state a claim of violation of 18 U.S.C. § 1962(c), a claimant must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedmia, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *see also Morales v. Superior Living Prods., LLC*, 398 Fed. Appx.

The Supreme Court's opinion in *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009) governs the contours of what constitutes an "association-in-fact enterprise" within the meaning of RICO.  *Franco v. Connecticut General Life Ins. Co.*, No. 07-cv-6039, 2011 WL 4448908, at *23 (D.N.J. Sept. 23 2011).  "An association-in-fact enterprise must have at least three structural features:  (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle*, 129 S. Ct. at 2244.  Dahdaleh does not challenge Alba's ability to show elements (2) or (3); Dahdaleh only challenges the "purpose" element.  *See* Dahdaleh Mem. at pp. 23-26.

Dahdaleh's suggestion that Alba's claim should be dismissed because Alba has not alleged that anyone at Alcoa agreed to the bribery is without merit.  Dahdaleh fails to point to any case suggesting that an express "agreement" is a necessary element to support the notion of a common purpose.  Alba's averments point to "an ongoing organization, formal or informal, and [to] evidence that the various associates [were functioning] as a continuing unit."  *See United States v. Turkette*, 452 U.S. 576, 583 (1981); *compare Elsevier Inc. v. W.H.P.R., Inc.* 692 F. Supp. 2d 297, 306-07 (S.D.N.Y. 2010) (finding that "common purpose" element was met where complaint alleged that "defendants associated together for the common purpose of carrying out the scheme of buying journal subscriptions at lower rates, based on false representations about the identity of the purchasers, and then reselling the journals to institutions at a higher rate") *with Cullen v. Paine Webber Group, Inc.*, 689 F. Supp. 269, 273 (S.D.N.Y. 1988) (finding no

---

812, 814 (3d Cir. 2010).  When a plaintiff alleges a fraud-based RICO claim, that claim is subject to the particularity requirement of Federal Rule of Civil Procedure 9(b).

[10] An adequately pled 1962(d) claim must allege that a conspirator intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive RICO claim; it suffices that the conspirator adopt the goal of furthering or facilitating the endeavor, short of agreeing to undertake the acts necessary for the crime's completion.  *Salinas v. United States*, 522 U.S. 52, 65 (1997).

enterprise where "the clients of the broker-plaintiffs did not share a common purpose or associate together; their only link was their broker," so their relationship did not constitute an enterprise "any more than would, for example, a stamp collection").

Throughout its Pleadings, Alba has adequately averred an association-in-fact enterprise and the enterprise's common purposes:  extorting money from Alba for the monetary benefit of the conspirators and ensuring that Alba continued to buy alumina from Alcoa.  This purpose is detailed with particularity throughout Alba's Pleadings.  For example, in its Complaint, Alba explains that the nature of the case involved a scheme perpetrated by Alcoa Inc., Alcoa World Alumina, William Rice and Dahdaleh to defraud Alba of hundreds of millions of dollars.  AC Nature of the Case at 1-2.  Indeed, the members of the enterprise "were united by the common purpose of defrauding Alba and increasing Defendants' own profits through the sale of overpriced alumina and the payment of bribes to senior officials of Alba and the Government of Bahrain."  RCS at 45.  Further, the Pleadings detail with particularity how Dahdaleh acted in concert with the other Defendants with the common purpose to defraud Alba of hundreds of millions of dollars by paying bribes to senior officials of Alba and the Government of Bahrain, by creating sham companies to contract with Alba, and by executing secret agreements to purchase alumina at prices well below those paid by Alba.  *See* AC ¶¶ 211-221.  As the Complaint states, "[p]ursuant to their agreement(s), Defendants, and each of them, acted in concert to support their common purpose of defrauding [Alba] in order to cause [Alba] to overpay for alumina purchased from Defendants as well as to cede a substantial portion of Alba's equity to Alcoa."  *See* AC ¶ 225.

After 20 years of supplying Alba with alumina in a normal commercial context, Alcoa injected Dahdaleh into its own existing relationship with Alba, identifying Dahdaleh as its agent

and directing Alba to deal with him and his Potemkin village of Companies.  AC ¶ 21.  Why

such a change?  Because, as is plausibly averred, Dahdaleh gave Alcoa cover.  Alba was not

Dahdaleh's customer; it was Alcoa's longstanding customer.  Thus began years of gross

overcharges and bribery.  To assert that Alba has not tied together the various Defendants or

adequately pleaded their association for a common purpose is utter nonsense.[11]

### III.   ALBA HAS PLED ACTIONABLE STATE LAW CLAIMS.

Rule 9(b) requires only that Alba set forth the circumstances of the alleged fraud with

sufficient particularity to put the Defendants on notice of their misconduct.  *Seville Indus. Mach.*

*Corp.*, 742 F.2d at 791.  Dahdaleh makes a five-sentence argument that Alba has failed to plead

its common law fraud claim with particularity.  That argument is without merit.

In Pennsylvania, a fraud claim should allege: "1) a false or fraudulent representation of

material fact; 2) which defendant knew, or ought to have known, was false or fraudulent; 3)

which is intended to be acted upon by plaintiff; 4) which in fact was acted upon justifiably by

plaintiff; 5) to its detriment."  *Mursau Corp. v. Florida Penn Oil & Gas, Inc.*, 638 F. Supp. 259,

261 (W.D. Pa. 1986).  Pennsylvania law holds that fraud "consists in anything calculated to

---

[11] Dahdaleh cites *Rao v. BP Prods. N. Am., Inc.* 589 F.3d 389, 400 (7th Cir. 2009) and *Elsevier Inc. v. W.H.P.R.., Inc.* 692 F. Supp. 2d at 306-07 for the notion that "other courts have dismissed RICO claims for failure to plead with particularity the existence of the enterprise, including its common purpose."  Dahdaleh Mem. at p. 24.  A close reading of these cases, however, inures to the benefit of Alba.  In *Rao*, dismissal of the RICO claim was warranted, in part, because the allegations contained different actors for each event, thereby failing to indicate how the different actors were associated and failing to suggest a group of persons acting together for a common purpose or course of conduct.  Here, Alba avers that the same actors were involved in each of the three aspects of the scheme.  *See* AC ¶ 26; RCS at 4-7, 10.  Moreover in *Elsevier*, the court dismissed the complaint based on failure to allege the third "relationship" element for an association-in-fact enterprise.  692 F. Supp. 2d at 306.  In fact, the *Elsevier* court found that the "common purpose" element was satisfied where the complaint alleged that the "defendants associated together for the common purpose of carrying out the scheme of buying journal subscriptions at lower rates, based on false representations about the identity of the purchasers, and then reselling the journals to institutions at a higher rate."  *Id.*  As such, Alba's pleadings more than satisfy the common purpose element.  *See* AC ¶¶ 16, 25, 21, 166, 211-221, 224.

deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be direct falsehood or by innuendo, by speech or silence . . . . It is any artifice by which a person is deceived to his disadvantage." *In re McClellan's Estate*, 75 A.2d 595, 600 (Pa. 1950).

Alba's Pleadings aver numerous fraudulent acts by Dahdaleh that fostered the false impressions that the Dahdaleh Companies were legitimate companies engaged for legitimate purposes, when in fact, they were engaged for the sole purpose of facilitating and concealing the Defendants' bribery scheme.  These acts include Dahdaleh and his Companies' repeated misrepresentations in correspondence with Alba to foster the false impression that they were legitimate business enterprises and duly authorized Alcoa affiliates, including through the use of Alcoa's logo, stationery, and trademarks.  *See, e.g.*, AC ¶¶ 20, 26, 53, 57, 72-73, 75, 77-78, 83-84, 91, 93, 103, 117, 132, 136, 148-49, 166-201.  They also include Dahdaleh and his Companies' repeated concealment of the bribery scheme from Alba, which induced enormous overpayments by Alba.  *See* AC ¶¶ 55-68, 74-90, 134-140, 147, 150-56, 166-201.  Alba has therefore pled its common law fraud claim with sufficient particularity and as a result, Dahdaleh's threadbare request for dismissal on this basis fails.

Dahdaleh makes a similarly thin argument that Alba has failed to state a claim for civil conspiracy.  *See* Dahdaleh Mem. at p. 27.  Under Pennsylvania law, a complaint states a claim for conspiracy to defraud when it alleges that two or more people had a "common purpose supported by a concerted action to defraud, that each ha[d] the intent to do it, . . . that it is common to each of them, and that each understands that the other has that purpose." *Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F. Supp. 937, 961 n.27 (E.D. Pa. 1995); *see also Mursau Corp.*, 638 F. Supp. at 261.  A co-conspirator is liable for conspiracy to defraud even if he or she

did not personally make a misrepresentation, and can be held responsible for fraudulent misstatements or conduct on the part of his or her co-conspirators that furthered the conspiracy. *Cont'l Cas. Co.*, 884 F. Supp. at 961.

The detail with which Alba pleads civil conspiracy belies Dahdaleh's argument and well exceeds the pleading requirements of *Iqbal* and *Twombly*.  As set forth in detail in the Pleadings, Dahdaleh acted in concert with the other Defendants with the common purpose to defraud Alba of hundreds of millions of dollars by paying bribes to senior officials of Alba and the Government of Bahrain, by creating sham companies to contract with Alba, and by executing secret agreements to purchase alumina at prices well below those paid by Alba.  *See* AC ¶¶ 20, 26, 53, 55-68, 72-91, 93, 103, 117, 132, 134-40, 147-56, 166-201, 211-221.  The activities that Alba avers Dahdaleh engaged in, taken as true as they must, are the very embodiment of civil conspiracy under Pennsylvania law.

## CONCLUSION

Dahdaleh's motion to dismiss should be denied because he is subject to this Court's jurisdiction and because his other legal arguments are without merit.  Alba has met all applicable pleading requirements and is entitled to prove its case against him.

Respectfully submitted,

Dated:  March 1, 2012

/s/ Charles B. Gibbons
Charles B. Gibbons
Christopher A. Amar
Victoria B. Kush
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA  15219-1410
(412) 562-8800

Mark J. MacDougall
Kristine L. Sendek-Smith
James E. Sherry
Lauren B. Kerwin
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave. NW
Washington, DC 20036
(202) 887-4000

*Counsel for Plaintiff Aluminium Bahrain B.S.C.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2012, I electronically filed a true and correct copy of the foregoing document with the Clerk of Court through the Court's CM/ECF system, which will send notification of such filing to all registered users.

/s/ Charles B. Gibbons
Charles B. Gibbons