1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3      ALUMINUM BAHRAIN, B.S.C.,
                    Plaintiff
4        vs.
                                        Civil Action 08-299
5      ALCOA INC., ALCOA WORLD ALUMINA
       LLC, WILLIAM RICE and VICTOR
6      DAHDALEH,
                    Defendants.
7

8        Transcript of Oral Argument Proceedings Thursday, March
    29, 2012, United States District Court, Pittsburgh,
9   Pennsylvania, before Donetta W. Ambrose, Senior District Judge.

10  APPEARANCES:

11     For the Plaintiff:              Mark J. MacDougall, Esq.
                                       Charles B. Gibbons, Esq.
12

13

14     For the Defendant Aloca,        Evan R. Chesler, Esq.
       Inc.:                           Julie A. North, Esq.
15

16     For the Defendant William       Richard L. Beizer, Esq.
       Rice:
17
       For the Defendant Victor        David C. Esseks, Esq.
18     Dahdaleh:

19

20  Court Reporter:                    Juliann A. Kienzle, RMR, CRR
                                       5300 USPO & Courthouse
21                                     700 Grant Street
                                       Pittsburgh, PA 15219
22                                     (412) 261-6122

23

24

25       Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription.

1  (Proceedings held in open court; Thursday, March 29, 2012.)

2         THE COURT:  You all have asked for oral argument on

3  the motions to dismiss the amended complaint filed by all the

4  defendants.  I'm glad to do it.

5         I have to be frank, I hope it's more helpful than

6  I'm anticipating that it might be right now.  I do only have an

7  hour.  I don't know how you have decided to divide your time.

8  If the defendants are going -- many of the arguments are

9  duplicative, so I don't know what you want to do, but I'm glad

10 to see whatever you'd like to do.

11        Who wants to speak first?  Someone on behalf of the

12 Alcoa defendants, maybe?

13        MR. CHESLER:  Yes, Your Honor.

14        THE COURT:  What is your scheme of things in terms

15 of how you're dividing time?

16        MR. CHESLER:  Your Honor, there are three defendant

17 groups.

18        THE COURT:  Alcoa defendants, Dahdaleh, and Rice.

19        MR. CHESLER:  We're going to go in that order.  I'm

20 going to take no more than 12 minutes and we will take no more

21 than 30 all together for our side, and plaintiffs will have

22 even time on their side.

23        MR. MacDOUGALL:  That's fine with us.  Mr. Gibbons

24 and I will split the remaining 30 minutes on behalf of Alba.

25        MR. CHESLER:  Good afternoon, Your Honor.  I'm Evan

1  Chesler.  I'm going to speak for the Alcoa defendants.

2           In order to do this -- and I do hope we are helpful

3  to Your Honor, that's our intent -- to do this as expeditiously

4  and efficiently as possible, if I may, I'd like to hand up a

5  very skinny little pamphlet.

6           THE COURT:  When I said that, I want to explain

7  myself because, normally, I don't have oral argument on

8  dispositive motions until I am well into them, and then I know

9  exactly what it is that I want to know, so it's easier to focus

10 and to call people in at some stage.  But when you all wanted

11 this, I didn't want you to think that I wouldn't listen to you.

12 So all I can say to you is, I normally don't do this.  I'm not

13 really into it yet because I simply am not there yet.  And if I

14 need to call you all back again at some point, I'll let you

15 know that.

16           MR. CHESLER:  We appreciate that, Judge.

17           So with that, I'll begin and move through this

18 quickly as possible.

19           Your Honor, I wanted to start in what seemed like a

20 logical place, which is just a very quick summary of what this

21 case is about from the plaintiff's pleadings perspective.

22 That's the intent of the document behind the numbered Tab 1.

23 It is, and I don't believe there can be any dispute about this

24 based upon the pleadings, it is about sales of foreign alumina

25 from Australia by a foreign company called Alcoa of Australia

1 to foreign purchasers, either companies controlled by

2 Mr. Dahdaleh, foreigner, and his foreign companies, or Alba,

3 which is a Bahraini company, which is also a purchaser of the

4 alumina, which related to alleged bribes by a foreign person or

5 entity, Mr. Dahdaleh or his entities, to foreign recipients,

6 both officers of Alba and officials of the Bahraini government

7 which, according to the complaint, resulted in overpayments for

8 that foreign alumina by the ultimate foreign purchaser, which

9 is Alba.  That is what the entire complaint tells the story of.

10          Of course, as I'm sure Your Honor understands from

11 the way I phrased it, it is quite markedly a story about

12 foreign participants engaged in foreign events.  We would

13 submit, therefore, that the central question which is raised by

14 our motion, which is whether this is a case about a domestic

15 RICO enterprise or not, begins, and one might argue, indeed I

16 argue, ends with the description of this case as a case

17 virtually entirely among and between foreign entities about

18 foreign events.

19          Now, there have been nine cases decided since

20 Morrison on the subject of the extra territorial application of

21 a RICO claim.  Those nine cases, as we've read them and

22 analyzed them, look at three things in trying to answer the

23 ultimate question of whether this is a domestic enterprise or

24 not.  They look at who the participants in the enterprise are

25 said to be.  They look at what is said to have constituted the

1 scheme of the enterprise.  And they look at how that scheme was

2 carried out, according to the pleadings.  Who, what, and how.

3 Which leads to the second charge, which is who.

4          We have taken this list directly from the

5 plaintiff's documents, in this case, from the RICO Case

6 Statement, and we've grouped them as they are logically grouped

7 into five groups.  The entire top group behind Tab 2, Your

8 Honor, are the data-related entities, all of which are foreign.

9 They're all incorporated various places around the world.  None

10 in the United States.  Mr. Dahdaleh is not a United States

11 citizen, does not reside in the United States.

12          The second group, as it says, are one or more former

13 officers or former directors of Alba, which, of course, is a

14 Bahrainian entity, and all the individuals named there are

15 non-U.S. citizens and residents.

16          The third group of participants in the alleged

17 enterprise are one or more senior officials of the government

18 of Bahrain, obviously, a foreign entity, then Alcoa of

19 Australia, a foreign company.

20          And then the last group and only the last group at

21 the bottom are the three U.S. related participants in the

22 alleged enterprise.

23          With respect to Alcoa, the first of those, the

24 allegation in the pleadings of the first involvement by Alcoa,

25 Inc. itself, the pleading uses ubiquitously the word Alcoa,

1 which I would submit to Your Honor is a bit slight of hand

2 because when you actually look at what it is actually referring

3 to, it is in almost all instances referring to subsidiaries,

4 foreign subsidiaries, and in one case a U.S. subsidiary, AWA,

5 which I'll come to, but not to Alcoa, Inc. itself, the American

6 parent company.

7          The allegation of the first direct involvement by

8 the parent company in anything related to this alleged

9 enterprise is in 2003 relating to negotiations over a joint

10 venture that never took place.  2003 is 13 years after the

11 alleged formation of the RICO enterprise and the beginning of

12 the alleged RICO scheme which is alleged in the complaint to

13 have begun in 1990 and continued to at least 2007.

14          So, the first time that this first U.S. entity,

15 Alcoa, Inc., arrives on the scene, according to the plaintiff's

16 version, and actually does something allegedly involved in this

17 enterprise is 13 years into a 17-year scheme.

18          The second U.S. related entity is AWA, which stands

19 for Alcoa World Alumina, LLC.

20          Now, that enterprise, this is demonstrated in the

21 record, was not even created until 1994.  So, when the RICO

22 enterprise was supposedly formed and the scheme begun, AWA

23 didn't even exist.  And not only did it not exist until 1994,

24 it is not alleged to have had anything to do with the activity

25 involved until 1996, according to the complaint, when one of

1  its employees, Mr. Burgess, was copied on one fax and signed

2  two of the ten agreements involved here on behalf of the

3  Australian company.  That's the first appearance by AWA in

4  these events.

5          Lastly, Mr. Rice, William Rice is a named defendant.

6  The first allegation of Mr. Rice being involved in anything

7  comes in 2001, 11 years into the alleged scheme, when he sends

8  a letter to Alba discussing the possibility of an extension of

9  the supply agreements that were in place between Alcoa of

10  Australia and Alba.  That's the extent of the involvement of

11  the introduction into the alleged scheme and involvement of the

12  three U.S. entities among this list of 20 or so participants in

13  the conspiracy and the enterprise, excuse me, all the rest of

14  whom are foreign entities.

15          Which takes me to the next question, which is what,

16  under the case law, what is it that the scheme consisted of?

17  And in Paragraph 26 of the amended complaint, as we cite here,

18  it is alleged to have consisted of three things; payment of

19  commissions, the assignment of portions of the supply

20  agreement, and a joint venture.

21          The first two are the key.  That's where the money

22  is supposedly coming from that pays the bribes.

23          Now, who is paying the commissions according to the

24  complaint?  Alcoa of Australia, a foreign company, which is, by

25  the way, only 60 percent owned by Alumina, Inc.  It's not a

totally owned subsidiary.  The other 40 percent is owned by an
Australian interest.

This Australian company is alleged to have paid
commissions to Mr. Dahdaleh or his entities for work he did in
connection with these sales of alumina.  So it's a foreign
company making foreign payments to a foreign recipient is the
commissions piece of this.

The assignment of portions of the supply agreements
are assignments by Alcoa of Australia, again, assigning
portions of its supply agreements to various Dahdaleh entities,
all foreign controlled and foreign residents, with respect to
sales of alumina through to Alba, a foreign purchaser, entirely
foreign activity, no U.S. involvement in that.

And then lastly is the joint venture piece which, as
I said before, involves some negotiations about a venture that
was supposed to be between Alcoa, Inc. and Alba, which never
happened.  Those involved one trip from some people in Bahrain
to New York for due diligence on a deal that never happened,
and it's 13 years into a 17-year conspiracy.

Those are the what of this alleged conspiracy and
this alleged RICO enterprise.

That takes us to the how, the third element under
the case law.  Again, the RICO Case Statement, and the amended
complaint, and we've cited relevant portions, identify four
ways of how this enterprise carried out the alleged scheme that

1 consisted of three elements I mentioned before.

2         The first is by bribery.  Of course, that's the key.
3 That's what this case is about.  There are 26 bribes alleged in
4 the amended complaint.  Not one of those 26 bribes, Your Honor,
5 not one, is alleged to have been paid in the United States.
6 Not one is alleged to have been paid by anyone in the United
7 States, or any U.S. entity.  Not one is alleged to have been
8 paid to anyone in the United States or any U.S. entity.  They
9 are all alleged to have been paid by foreign entities to
10 foreign entities.  In fact, there are no facts alleged that tie
11 any U.S. person or entity to the actual payment of the bribes,
12 none.

13         That leads to the second how element, which is
14 misrepresentations.

15         The misrepresentations are alleged to have taken
16 place in connection with ten separate contracts, supply
17 contracts and distribution contracts, assignments of those
18 contracts, ten agreements beginning in 1990 and running up
19 through 2005 that are all set forth in the pleadings.  Every
20 single one of those agreements, Your Honor, without exception,
21 is between or among foreign entities.  No U.S. party is a party
22 to any one of those ten agreements.

23         And with respect to every one of them, they relate
24 to foreign sales of a foreign product to foreign -- by foreign
25 parties to foreign parties, supposedly for the purpose of

1  creating funds that could be used to pay bribes by foreign

2  parties to foreign parties.

3        Now, in connection with a few of those agreements,

4  there are -- absolutely there are incidental touches to the

5  United States.  So there's one instance, for example, in 1996

6  where Mr. Burgess, who is an employee of AWA, which is an

7  American entity, is copied on a fax that is sent from AOA,

8  Alcoa of Australia, to Alba talking about possible extensions

9  of an agreement.  He's copied.  He also, Burgess signs two of

10 the ten agreements, explicitly signing on behalf of Alcoa of

11 Australia.  And there is one letter sent in connection with a

12 later agreement and a couple of telephone calls and faxes.

13 That's it.  The U.S. contacts are entirely incidental to 17

14 years of alumina sales and alleged bribes among only foreign

15 parties paying and receiving.

16        That leads, Your Honor, to the fourth of the how

17 elements, which is wire transfers.

18        The wire transfers are all situations in which AOA,

19 Alcoa of Australia, and the Dahdaleh-controlled entities are

20 alleged to have caused Alba, the Bahrainian company, to make

21 transfers to Dahdaleh-controlled entities, in some instances,

22 to bank accounts in the United States owned by

23 Dahdaleh-controlled entities.  In that connection, Your Honor,

24 there are at least three of the nine post-Morrison cases, the

25 Toyota case, the Sorota case and the Cedeno case which involved

1  U.S. bank accounts and at least two of those I believe U.S.

2  bank accounts, unlike this case, owned by U.S. customers, which

3  were found by those courts in all three cases to be entirely

4  incidental to what were, in fact, non-domestic RICO

5  enterprises, and in all three of those cases, the complaints

6  were dismissed.

7           Finally, travel, with the exception of the one trip

8  to New York that I mentioned before in connection with due

9  diligence for a JV, joint venture, that never happened, all the

10  travel is to Bahrain, to the United Kingdom, to France, and to

11  Singapore.

12           That takes us, Your Honor, to the fifth document in

13  the book, which is a chart we prepared of the nine cases I

14  mentioned before.  I won't go through them because we've set

15  out what we think are the salient points there.  Suffice it to

16  say, Your Honor, that seven of the nine have resulted in

17  dismissals of the complaint, two have not.  One of the two is

18  the LeNature's case that Your Honor decided where the

19  defendants stipulated that it was a domestic enterprise.  The

20  other is the CGC case, where all the victims were Americans,

21  where a U.S. lawyer was retained to assist in the scheme, where

22  a U.S. lawyer was retained to inspect U.S. properties connected

23  to the scheme, and where some of those that were running the

24  enterprise were in specific factual terms alleged to be in the

25  U.S. and U.S. citizens and specifically linked to running the

1  enterprise, unlike here.

2         Last point, Your Honor, then I'll sit down.

3         One of the arguments that Alba makes in an effort to

4  defeat this motion is that you must have jurisdiction to apply

5  RICO here because the United States Department of Justice is

6  investigating possible violations of the Foreign Corrupt

7  Practices Act.  I want to spend one minute on that and then

8  I'll sit down.

9         Your Honor, this is entirely the straw man.  The

10 FCPA, as I'm sure Your Honor knows, is a statute that was

11 specifically drafted to deal with non-U.S. conduct by U.S.

12 issuers on U.S. exchanges.  That's the whole point of the

13 statute.  If you, in fact, engage in bribing a U.S. government

14 official, you may well have committed a crime, but it's not an

15 FCPA violation.  By definition, the violation has to take place

16 with respect to a foreign government official.  That has

17 nothing to do with the jurisdictional basis of and the extra

18 territorial reach of RICO, which is governed by the Morrison

19 case.  All nine of the district court decisions that have

20 followed Morrison that relate to RICO, all nine of them,

21 including Your Honor's decision, have all said absolutely

22 clearly, Morrison analysis governs the decision whether a RICO

23 conspiracy can withstand the challenge or not.  All nine agree

24 on that.  So it's an entirely different jurisdictional basis,

25 and trying to conflate the two is simply not an appropriate

1  comparison for this purpose.

2          Unless Your Honor has any questions?

3          THE COURT:  Thank you, Mr. Chesler.  Thank you.

4          Who is next?  Somebody for Mr. Dahdaleh?

5          MR. ESSEKS:  Yes, Your Honor.  David Esseks

6  representing Mr. Dahdaleh.

7          Your Honor, we have three points that we want to

8  make quickly.  They're all variations on a theme and we join in

9  and echo the arguments that Mr. Chesler has made.

10         The theme is simply that this case has no business

11 in this courtroom because what we're talking about here is the

12 dispute between a Bahraini company and a citizen of Canada and

13 Great Britain who lives and works in London and Switzerland and

14 is not alleged even to have been here, much less to have done

15 anything in particular with respect to anywhere in the United

16 States, much less anywhere in Pennsylvania.  So, this argument

17 and this theme is expressed in a variety of different ways.

18 I'm about to address three today; personal jurisdiction, the

19 lack of proper pleading of any conspiratorial agreement at all

20 here involving Alcoa, and, finally, no fraud.  There's no

21 proper fraud allegation, it is self-defeating, as I will

22 explain.

23         Now, on personal jurisdiction, Your Honor, our

24 client is not American, does not do business here, does not

25 run -- doesn't control businesses that are formed here, is not

1  alleged in the complaint to have done anything here.

2  Therefore, we challenge personal jurisdiction.

3            As is their burden, the plaintiffs attempted to

4  respond saying, well, we think we've met the qualifications.

5  But if we look at what they've done, Judge, they have made two

6  arguments.  They claim co-conspirator jurisdiction -- I'll

7  address that in a moment -- and they say, well, Mr. Dahdaleh's

8  companies had contacts with the U.S., and we think we've

9  properly alleged piercing the corporate veil, and, therefore,

10 those contacts count.

11           We have addressed in our papers, Judge, that we

12 don't think they have come close to meeting the pierce the

13 corporate veil standard.  I won't dwell on that now.  We're

14 certainly not abandoning the argument.  But if we then look,

15 well, what are the contacts that they claim Mr. Dahdaleh's

16 companies had, any contacts that they claim, anything that

17 actually happened in the United States as a result, or buying

18 those companies, the only thing that you can find in the four

19 corners of the complaint or the RICO Case Statement is some

20 money transfers in New York, corresponding bank transfers in

21 New York.  We have cited cases in our papers, Judge, an

22 Eleventh Circuit case and a series of Southern District of New

23 York cases that say quite clearly corresponding bank transfers

24 don't provide minimum contacts for jurisdiction, even over the

25 foreign bank that owns the account, much less the account

1 holder and the foreign bank on whose behalf the money is routed

2 through New York, simply because there's a transfer in U.S.

3 dollars.  So, contact buying Mr. Dahdaleh's companies, we don't

4 think they get to use those, but they don't count anyway.  So,

5 one of their two arguments definitely does not work, doesn't

6 advance the ball.

7         So they put the entire weight of the argument that

8 Mr. Dahdaleh is properly before this Court on an attempt to get

9 this Court to adopt the co-conspirator jurisdiction theory.

10 And, Your Honor, they haven't given Your Honor anything like

11 the help that you need in order to, if you were to follow the

12 Marfin Bank decision in the Third Circuit to find that this is

13 a valid jurisdictional basis within Pennsylvania.  The Marfin

14 Bank case says very clearly if Your Honor is going to rely on

15 that as a jurisdictional theory, you have to either see that

16 the Supreme Court of Pennsylvania has adopted it, which it

17 hasn't, or you have to be able to predict that it would.  They

18 provide you no basis upon which to do that because there is no

19 basis upon which to make that prediction.  Why?  Because as

20 follows.

21         There's no state court decision in Pennsylvania that

22 has relied on this theory to find jurisdiction.  There are a

23 couple that mention it, but they don't rely on it.

24         There are a variety of federal court cases, Judge,

25 sitting in Pennsylvania that have referred to it, but not

1 relying on it.  There's one that we identify that refers to it

2 and appears to rely on it without any of the analysis required

3 by Marfin Bank.

4          So, our view, Your Honor, is it's their burden.

5 They have not met it.  There is no basis upon which this Court

6 can predict that the Supreme Court of Pennsylvania would find

7 that to be an appropriate theory of jurisdiction.

8          And, Your Honor, beyond the fact that there's no

9 authority for it, there's no good reason for it either.  This

10 is a controversial decision.  We set out in our papers that the

11 courts around the country have gone different ways on it, with

12 many courts deciding it's not due process and it's not

13 appropriate.

14          Here's why, Judge.  This involves haling a man in

15 court from London based not on anything he did, but on the bare

16 allegation that he has entered into an agreement with others

17 who may have done something in this district.

18          Now, Mr. Chesler has just described how there really

19 aren't any allegations about anybody doing anything in this

20 district anyway, but the theory here is pernicious, and most

21 pernicious because it's not a workable theory, Your Honor, in

22 practice.  Here's why.  What it means is Your Honor would not

23 know whether Your Honor had jurisdiction over Mr. Dahdaleh

24 until the jury verdict at trial.  Alternatively, you could have

25 a hearing that would be entirely the same as the trial on the

1    merits about was there or wasn't there a conspiracy.  So, you

2    then have the prospect that Mr. Dahdaleh could be dragged into

3    court, go through discovery, motion practice, trial, verdict

4    and then find out the Court never had power even to have him

5    sit here if he's acquitted or gets a verdict in his favor.  So,

6    that, just that concept, Judge, does not pass due process

7    muster and there's no reason that the Court should reach to

8    find that as a basis for jurisdiction in the absence of clear

9    authority supporting it.

10           So, for those reasons, Judge, the two arguments that

11   they point to when pressed to substantiate their burden fail

12   utterly.

13           So what is left?  Nothing.  They have pointed to

14   nothing that constitutes any form of minimal context by our

15   client with this district, this state, or even this country.

16   And, therefore, there's no -- this case has no business being

17   before Your Honor.

18           Now, they've asked about jurisdictional discovery,

19   Judge.

20           THE COURT:  Yes, they have.  That's one thing, I

21   probably would have asked Mr. Chesler about, too, because Alba

22   seems to think that before I decide the territorial reach of

23   these claims, they're entitled to some discovery.

24           MR. ESSEKS:  Your Honor, I'll let Mr. Chesler

25   address that issue as to territorial reach of the claims, but

1   as to jurisdictional discovery --

2              THE COURT:  Personal jurisdiction for you.

3              MR. ESSEKS:  -- here is our argument.  The Third

4   Circuit has been perfectly clear -- I think Your Honor has had

5   some cases on this issue saying, yes, in theory, there can be

6   jurisdictional discovery, but it can't be a fishing expedition.

7              Now, Mr. MacDougall wants to go fishing.  If you

8   agree with what I have set out so far, we ask them what is your

9   basis?  They came back with co-conspirator theory and company

10  contacts.  It ends up being nothing.  Judge, if they have

11  nothing and they say, please, let us look, that is the very

12  definition of a fishing expedition, and it's not warranted.

13             Judge, on the jurisdictional basis, there is the

14  concept of what is fair, what comports with substantial

15  justice?  Haling them into court on this non-basis does not

16  comport with it, and requiring him even to submit to

17  jurisdictional discovery when they don't have a place to stand,

18  they have absolutely nothing.  They have had four years to

19  investigate and to replead and add a RICO Case Statement and

20  they have nothing, so, Your Honor, we don't think that there's

21  a basis even to offer -- to allow them to conduct

22  jurisdictional discovery.

23             If you want to have us back when you have engaged

24  with the papers more on that, we'd be very pleased to be heard

25  again on that issue.  My time is short, but if the Court has

1  questions, I'm happy to answer.

2            THE COURT:  No, I'm fine.

3            MR. ESSEKS:  Second point.

4            THE COURT:  Now, you want to get into the

5  sufficiency of the complaint?

6            MR. ESSEKS:  I do, Your Honor.  I think this is

7  actually a much simpler point than it might appear.

8            I have here, Judge, the amended complaint and the

9  RICO Case Statement.  We have 229 paragraphs in the complaint.

10  We have 59 pages of RICO Case Statement and 84 pages of

11  documents appended to it.

12            There are a lot of words and they say over and over

13  again, more times than I can count, Alcoa knew, Alcoa directed

14  the payments by Mr. Dahdaleh.  All conclusionary, Judge.

15            So, we press then our motion.  Well, what is the

16  well-pleaded factual set of allegations that give rise to a

17  plausible inference that anybody in Alcoa knew?  And, Judge,

18  this is fundamental to the entire case.  There can't be a RICO

19  enterprise, can't be a RICO enterprise conspiracy, there can't

20  be a scheme of any kind that certainly has anything to do with

21  the United States.  Can't be if nobody at Alcoa had any idea

22  what Mr. Dahdaleh is alleged to have been doing abroad.

23            And so we push and say, what is it?  And we get back

24  a lot of conclusory allegations.  Again, same story.  And then

25  one and only one argument, which is, look, back in 1990, there

1    had been a course of dealing, Alba selling direct -- Alcoa

2    selling direct to Alba, and now all of a sudden there is this

3    guy Dahdaleh in some fashion, somewhere in the middle.  Hey,

4    that's inherently suspicious.  We know now that there were

5    allegedly payments and, therefore, the people in Alcoa must

6    have known.  This must have been a seismic event.

7            Judge, that lone fact about something that happened

8    in 1990 can't possibly, especially against the backdrop that

9    Mr. Chesler has just laid out about how everything is going on

10   in Australia at the time, that lone fact can't possibly sustain

11   as the keystone of the entire edifice here which is that

12   requires that Your Honor be able to infer that there's a

13   possible inference of an agreement, an understanding involving

14   anybody at Alcoa to have corrupt payments being made.  Please

15   do not be deceived by the number of words and the number of

16   times they repeat their conclusory allegations.  This

17   allegation doesn't make any sense.

18           I want to put a little more context before Your

19   Honor because I think it makes a big difference on this

20   question Your Honor has to decide, which is on the one fact

21   that they are relying, is that a plausible inference?  I want

22   to hand up, if I could a -- this is an agreement to which they

23   refer in their complaint but that they have not appended.

24           Your Honor, a sentence of background, then I'll take

25   you through the agreement.  They allege that the seismic event

1  was the insertion of Mr. Dahdaleh into this arrangement between

2  Alcoa and Alba.  In order for the Court to focus on what the

3  actual potential effect of that allegedly seismic event on

4  anybody in Alcoa and what goes into their head, well, let's

5  look at what actually happened in 1990 that is so new.

6          It's Mr. Dahdaleh becomes a 1 percent commissioned

7  agent for Alcoa.  The idea -- that's what this agreement shows,

8  Your Honor.  This is an agency agreement from 1990.  This is

9  the beginning and it provides that one of Mr. Dahdaleh's

10 companies will provide local support services and market

11 information for Alcoa and, in return, they get 1 percent.

12         Now, the point -- my argument, Your Honor, is

13 simple.  If the entire existence of an agreement between

14 anybody at Alcoa and Mr. Dahdaleh to do these allegedly

15 nefarious things in Bahrain, which would be the only possible

16 basis to get any connection to any part of Alcoa, much less any

17 American part of Alcoa, if the entire basis is this mere fact

18 of his insertion, Your Honor would have to say, people in Alcoa

19 in 1990, in a commercial context about which nothing is

20 alleged, there's no context to it, Judge, that it's plausible

21 that this agreement meant to -- had to mean to Alcoa, oh, gosh,

22 this guy is up to no good.  He's going to be bribing people of

23 Bahrain on our behalf.

24         Is it possible, Judge?  Sure.  I don't say it's an

25 illogical, irrational inference.  But Iqbal says possible is

not enough.  It has to be plausible.  It has to be strong.  And
I don't say this is irrational, but I do say this is the only
thing that they have relied on, and while grudgingly I will say
possibly, it does not support the immense weight of this
conspiracy that they are trying to bring right here to
Pittsburgh.  It can't bear the weight.  And with four years to
investigate, private investigators around the world, three
bites of the apple, if you include the RICO Case Statement,
they have nothing more.  Without that, Your Honor, they
shouldn't be able to bring Mr. Dahdaleh into this courtroom.

Last point.  No fraud.  Very quickly, Judge.
Plaintiff is Alba.  Alba says, hey, you defrauded me by bribing
me.  According to their complaint, the bribing was paying Bruce
Hall, the then CEO of Alba, and someone they describe as a
official of Alba and government official.

Well, they haven't alleged who that is, but as a
matter of public record on the charges, on the same payments in
London, that person is identified.  He's Shaikh Isa Bin Ali.
He was the chairman of the board of Alba.  So our point simply,
Judge, is it can't be fraud if their claim is we didn't know
what their CEO and their chairman knew.

There may be some other claim.  There may be some
other plaintiff who can complain.  There may be a complaint
that can be made in the courts of Bahrain by a company against
its former officers, but the claim in this court with this

1 plaintiff that they were defrauded because their CEO and

2 chairman got money does not work.  It just doesn't work, Judge.

3          So those are our points.  We do not think that there

4 are any fair, appropriate bases for this case by a foreign

5 company to proceed against an entirely foreign defendant for a

6 foreign cause, allegedly fraud, and we ask Your Honor to

7 dismiss the complaint.

8          THE COURT:  Thank you, Mr. Esseks.

9          Mr. Beizer.

10          MR. BEIZER:  May it please the Court, my name is

11 Rick Beizer.  Together with Ashley Bailey, we represent Bill

12 Rice.  I see my time is up, if I may have a moment or two.

13          THE COURT:  Yes, you may.

14          MR. BEIZER:  If conclusions and adjectives suffice

15 to plead a complaint, we would be in trouble on our motion, but

16 as Your Honor knows, they don't.  This complaint is replete

17 with conclusory allegations and with adjectives, and none

18 suffice to make well pleaded facts, which are required in the

19 Court's analysis of this complaint.

20          Let me, if I can, just go through a few of those

21 conclusory complaint allegations because they focus to a

22 certain extent not only on Alcoa and AWA, but also on Mr. Rice.

23          For example, Paragraph 169 alleges that upon

24 information and belief, the non-domestic activities of the

25 enterprises were carried out by agents, employees or

1    subsidiaries of Alcoa, AWA, and senior executives of those

2    enterprises, including Mr. Rice.  Conclusionary allegations.

3    No facts to support it.

4           There are other allegations, such as in Paragraph

5    76, upon information and belief -- and many of the

6    conclusionary allegations are an information and belief.  And I

7    should point out to Your Honor that should be a signal that

8    they don't have it, they don't have particularized facts.  So

9    our motion is based not only on Rule 8, it's based on Rule 9(b)

10   as well, as Your Honor knows.

11          So, for example, the first amended complaint,

12   Paragraph 76, on information and belief, Alcoa and AWA and Rice

13   knowingly directed the negotiation and signature of two

14   contracts, one with Alba and the other with Victor Dahdaleh for

15   the sale of aluminum.

16          Paragraph 137 regarding the 2005 distribution

17   contract.  Upon information and belief, Alcoa, AWA, and Rice

18   directed Victor Dahdaleh and his enterprises to pay bribes.

19   The core of the case.  On information and belief as to Bill

20   Rice directed the payment of bribes.  I don't think you can get

21   any clearer than that that that's insufficient.

22          So we ask, we said in our motion papers, we said,

23   what are the specific allegations with respect to the

24   conspiracy?  Because that's what is alleged here, conspiracy to

25   commit a violation of RICO and conspiracy to commit common law

1  fraud.

2          Alba wrote back in its response, and you can check

3  it at Page 31 and 32 of their opposition to our motion, they

4  said:  We have pled numerous highly detailed allegations about

5  the entry of the agreement and about the overt acts and

6  furtherance.

7          Alba did not cite one paragraph of the complaint or

8  the RCS, RICO Case Statement, in support of that assertion.

9  That in itself we believe is telling.

10          With respect to the allegations of false statements,

11  misrepresentations, which is at the core of common law fraud,

12  again, Alba cites a number of paragraphs of its complaint in

13  support of those allegations, but when you examine them, only a

14  couple actually call what Mr. Rice said as a false statement or

15  a concealment.

16          Let me just give you one example, Your Honor.  That

17  would be in Paragraph 138, and this allegation is repeated

18  several times throughout the complaint.  That's the allegation

19  that on October 26, 2004, Mr. Rice faxed a statement to

20  Mr. Hall, one of the alleged recipients of the payments from

21  Mr. Dahdaleh, the CEO of Alba, that Mr. Dahdaleh's companies

22  AAAC were associate companies and distributors of Alcoa of

23  Australia, and that they were fully authorized and solely

24  authorized to negotiate the ongoing supply and current supply

25  agreement that is the 2005 supply agreement.

1            That's alleged to be a false statement, but the rest

2 of the complaint belies the allegation.  The rest of the

3 complaint details that, indeed, there were distribution

4 agreements between Alcoa of Australia and Mr. Dahdaleh's

5 companies, so, in fact, the statement that AAAC was a

6 distributor is borne out by the facts.

7            No. 2 is they were fully and solely authorized to

8 negotiate the contracts.  Again, there are allegations in the

9 complaint that not only did they negotiate the contracts,

10 employees, Mr. Dahdaleh, Mr. Dahdaleh and Ms. Ainsworth were

11 involved in negotiating the on-sale contracts from Dahdaleh's

12 entities to Alcoa of Australia, but they also submitted all of

13 these invoices for payment for the alumina that they had sold.

14            It's those kinds of representations, Your Honor,

15 allegations that are alleged to be false statements by our

16 client that the complaint itself, that the complaint itself

17 belies and says, they weren't false statements, they were true.

18 You can't make a fraud case out of a true statement.

19            Your Honor, if there are any questions, as I said,

20 my time was up before I began.

21            THE COURT:  That's okay.  Thank you, Mr. Beizer.

22            Who is going to speak for Alba?  Mr. MacDougall?

23            MR. MacDOUGALL:  Yes, Your Honor.  Thank you.

24            Good afternoon, Your Honor.  Mark MacDougall for

25 plaintiff, Aluminum Bahrain.

1          And as I noted earlier on, if we may, we'll be

2 respectful of the Court's time and Mr. Gibbons will address the

3 Dahdaleh motion and I'll address the Alcoa and Rice motions.

4          Also, I should note that Alba did not request

5 argument here.  We're very happy to be here.

6          THE COURT:  I'm sorry.  I thought -- maybe it was

7 all the defendants that did.

8          MR. MacDOUGALL:  Yes, Your Honor.

9          There is a tradition among politicians in my

10 hometown of Washington that when you don't have an answer, you

11 change the question.  What I would submit is being proposed

12 today by the defendants is a change of the question.

13          The standard of 12(b)(6) is that the Court must

14 construe all allegations in the light most favorable to the

15 moving party, the plaintiff, and determine that any reasonable

16 reading of those allegations would entitle the plaintiff to

17 relief.

18          The question that they want to change is the summary

19 judgment standard.  They want to raise the bar.  They want to

20 apply a standard that, at this stage of the proceedings, is

21 absolutely inappropriate.

22          Mr. Rice in his motion, for example, demands that we

23 provide specific uncontradicted facts.  That's not where we

24 are, Your Honor.  The Court is well aware of that.  There has

25 been no discovery in this case, Your Honor, zero.  What is

really remarkable is when you look at the RICO statement, I
would urge the Court to do that in depth, what is really
remarkable is that there has been no discovery and that the
evidence supporting the allegations that is present there has
been found.

I would ask the Court to look at Exhibit 6, the Bill
Rice letter.  Mr. Beizer just made reference to that.  That's a
remarkable document, Your Honor.  If the Court would look at
only one thing, I would ask Your Honor to look at that.

In 2004, Mr. Rice, an officer of Alcoa, embraces
Mr. Dahdaleh's company and says, this is our beloved agent.
Listen to him.  He is us.  We are him.  That ties this case
together, Your Honor, in a way that no other piece of evidence
does.  But that's only one small piece of the picture.

If the Court looks at Exhibit 16 to the RICO Case
Statement, we have wire transfer confirmations of the bribes
going from Mr. Dahdaleh's company to our CEO.  I don't know any
case, and I've had a fair number of fraud cases on both sides
of the aisle, where that quality of evidence is available to
support the allegation.  No one has disputed it at this stage.

If you look at Paragraph 90 of the amended
complaint, Your Honor, it cites the e-mails from Mr. Rice to
Mr. Hall, the bribed CEO, agreeing to let's keep things quiet.
Let's not tell anybody about Victor's role.

Your Honor, the evidence here at this stage, at this

1 very early stage of the proceedings to support these

2 allegations, I would submit, is deep and wide and substantial.

3        The only question that I think the Court really has

4 to address is can discovery proceed, and we would submit that

5 at this stage it must.

6        The Court must decide two questions here.  The first

7 is whether a domestic RICO conspiracy has been shown under the

8 Morrison standard, and, second, is fraud properly pled under

9 Rule 9(b)?

10        Your Honor, Alcoa, and I don't think even

11 Mr. Chesler would disagree, Alcoa is in the aluminum business.

12 A big part of that business is mining and processing alumina

13 and selling it to customers.  That's what they do.

14        Mr. Chesler made much of the foreign aspect of this.

15 Let me, please, direct the Court to a critical and I would say

16 central aspect of what is domestic about this, and that's the

17 money.  If the Court would look, and when the time comes at

18 Paragraph 157 of the amended complaint, there's a table there.

19 That table shows who got what.  It shows from 1997 to 2009 the

20 cash that flowed into Alcoa's books through its subsidiary.

21 And Mr. Chesler might have you multiply that by 60 percent,

22 which is the shareholdings on the Australia sub, that is

23 billions of dollars, Your Honor.

24        For example, in the year 2006, the estimated, and by

25 estimated we're talking about the market calculation, money

1  paid to Alcoa, paid to Alcoa in Pittsburgh in Pennsylvania, was

2  $575 million.  Mr. Dahdaleh gets 44 million of that.  And as

3  the Court can see, paid some of it to our offices.  There's no

4  doubt about that.  The first element of discovery will show

5  that money, billions of dollars, flowing into Alcoa, registered

6  with the FCC, traded on the New York Stock Exchange, resident

7  here in Pittsburgh.  That, Your Honor, I would submit is the

8  heart of the matter.

9          Norex is the doctrine from the Second Circuit that

10  Alcoa looks to as support for its contention that the Morrison

11  standard hasn't been met.  In fact, Alcoa attached the Norex

12  complaint to its motion.  I don't know if they read it, but I

13  read it.  What the Norex complaint is all about is an

14  allegation that some Russians in the United States and

15  elsewhere attempted to take over the Russian oil industry.  If

16  you read that complaint, aside from wire transfers, which every

17  one of these complaints has, there is one single reference to

18  one event in the United States, a conversation in San

19  Francisco.  I would ask the Court to contrast that, and that

20  was attached by Alcoa to its motion, to the abundance of

21  evidence, documentary evidence and references to witnesses that

22  the Court has before it to demonstrate this is a deeply and

23  profoundly domestic conspiracy.

24          Mr. Chesler asked the Court to study a binder that

25  he provided to us just now, and I'd ask the Court to refer back

1 to that, Tab 2.

2          Mr. Chesler's exhibit is captioned "Who."  He lists

3 Victor Dahdaleh, and then the string of shell companies that

4 are set up over time, many of which have the same name and one

5 of which is the one that Mr. Rice anointed in his letter,

6 written from Pittsburgh as being an agent, without any doubt,

7 for Alcoa.  All of those companies are controlled by

8 Mr. Dahdaleh.  They were set up by him.  They are the tools of

9 the money launderer, Your Honor.  Shell companies, offshore

10 bank accounts, middlemen.  That's what they do.  So no one

11 should be surprised when Victor Dahdaleh, who shared handsomely

12 as the complaint and the RICO complaint demonstrates, used

13 shell companies.  Those are the tools of the trade.  Below that

14 there are four individuals.  What Mr. Chesler didn't tell you

15 is that three out of four of them were former Alcoa employees

16 before they went to work for Mr. Dahdaleh.

17          You drop down and Mr. Hall is listed there.

18 Mr. Hall, Bruce Hall, under one or more former officers that

19 Mr. Chesler contends are non-U.S. persons was the CEO who was

20 receiving the money from Mr. Dahdaleh, anointed by Alcoa as its

21 agent, sharing in the proceeds of the trade.

22          Finally, at the bottom is Alcoa of Australia.

23 Nominally a foreign company, perhaps.  60 percent is control

24 everywhere.  And there's no doubt that Alcoa of Australia is an

25 instrumentality of Alcoa right here on Isabella Street.

1          The documents, Your Honor, that are attached to the
2  RICO Case Statement, I have mentioned a couple of them, but I
3  ask the Court to look for closely at others.  Mr. Chesler
4  mentioned Peter Burgess.  Well, Peter Burgess signs the
5  contracts on behalf of Alcoa of Australia.  So this notion that
6  Alcoa of Australia is some exotic, foreign being, the people
7  right here in Pittsburgh sign contracts on their behalf.  It's
8  a front.  It's the way most businesses do business outside of
9  the United States, but it belongs to Alcoa and Alcoa
10  representatives, officers in Pittsburgh are signing the
11  contracts and making it all happen.
12          Throughout the RICO Case Statement, Your Honor, we
13  make note of the fact that Mr. Dahdaleh, apparently with
14  Alcoa's permission, uses the Alcoa logo, uses the Alcoa name,
15  identifies himself as an associated company, maintains his
16  office in Switzerland in their building and does it with their
17  permission.  If you look on Pacer, Your Honor, if anyone looks
18  on Pacer, you'll see that Alcoa goes to court and sues people
19  for violating that trademark.  Mr. Dahdaleh used it.  The
20  reason he used it was to pretend to be Alcoa.  When you look at
21  the series of communications and the activity and the sharing
22  of billions of dollars, Mr. Dahdaleh is not a Canadian citizen
23  living in Britain doing his business, he has been embraced by
24  Alcoa and he has been made one of them.
25          Why can I say that?  Because our own client reacted

1  to it.  And if you look back at Exhibit 6, the reason that

2  Mr. Rice had to write that letter, because our client was

3  beginning to asked questions, what is going on here?  Who is AA

4  Alumina Chemical?  Mr. Rice stepped right up from his office in

5  Alcoa here and said, he is us, we are him.  Do business with

6  him as you do business with us.

7            Your Honor, I submit that obviates, that destroys

8  any suggestion that you have foreign persons being sued in this

9  court.  Mr. Dahdaleh belongs in this courtroom not because

10 we're bringing him here, because Alcoa brought him here.  That,

11 Your Honor, is documented loudly and clearly in the RICO Case

12 Statement.

13           If I may briefly, Your Honor, with respect to the

14 9(b) allegations, Alcoa claims that it has no duty to speak, so

15 there's no actionable omission, but it must disclose if there's

16 been a partial statement.  Your Honor, when you look at some of

17 the correspondence in here, there was an absolute duty to

18 disclose.  Alcoa claims that the statements are true, but

19 that's a matter for the trier of fact, Your Honor, that's not a

20 matter for this stage of the proceedings.

21           Alcoa claims that scienter was not pled, but what

22 Rule 9(b) calls for is malice, intent, knowledge, and other

23 conditions of a person's mind may be pled generally.  That's

24 well pled here, Your Honor.

25           In truth, there is a great deal of particularity at

this stage.  The placement of Mr. Dahdaleh, the middleman, in

existing lucrative relationships.  Mr. Chesler -- I know

Mr. Beizer acknowledged this, from 1969 until 1990, there is no

Victor Dahdaleh in the picture.  Alcoa is selling huge amounts

of alumina to the largest smelter in the world.  In 1990,

Mr. Dahdaleh appears and Alcoa begins to increase the prices

and pay Mr. Dahdaleh.  That's an unnatural act, Your Honor.

That is not an act of honest businesses entering into the

marketplace.

Why does Mr. Dahdaleh, who has no business, his

offices, his employees are two or three employees, fax machines

and lots of offshore accounts, why does he suddenly appear with

Alcoa's blessing in this relationship?  By the year 2004, he's

the only one they're doing business with.  They, our client,

believes he's Alcoa, and the reason they believe he's Alcoa is

over and over again Alcoa says he is.

Your Honor, I would submit that it never really gets

more clear and more well documented and more well pled at this

stage of the proceedings than we have here.

For those of us over 50, and I think anyone under 50

S.I. Hayakawa was the president of San Francisco State in the

'70s and '80s, and, actually, served a term in the Senate, and

the thing that he's best remembered for was a statement he made

when the Senate was debating returning the Panama Canal to

Panama.  He was opposed to it.  He said, we should keep it.  We

1 stole it fair and square.

2          When Alcoa and what Mr. Rice and Mr. Dahdaleh are

3 saying is we want this court to protect us.  Mr. Chesler came

4 to this court five months ago and said, and I quote, we're an

5 American company.  We want our day in American court.  What I

6 submit he's really saying is we want this Court to protect our

7 right to commit this fraud and to use shell companies, to use

8 middlemen, to use deception from Pittsburgh, from the United

9 States, and we want you to protect us.  I would implore the

10 Court, please don't do it.  Please let us find out through

11 discovery, through the process the rules provide what really

12 happened here.  And demonstrate, as I think we have certainly

13 to satisfy the standard that we're held to now, that Alcoa and

14 Mr. Rice and Mr. Dahdaleh all belong here in court.

15          Finally, a couple of notes, Your Honor.

16          Mr. Chesler made much of the Department of Justice

17 investigation.  He did not mention that the U.S. Securities

18 Exchange Commission is deeply involved in an investigation of

19 this case.  We know that because we provide documents to them

20 frequently upon request.

21          The SFO press statement, the Serious Fraud Office,

22 the Agency of the Crown that charged Mr. Dahdaleh and Mr. Hall

23 in October issued a press statement on October 24th.  I quote

24 one sentence from this press statement.  "These payments were

25 in connection with contracts with a U.S. company, Alcoa, Inc.,

1    for supplies of alumina shipped to Bahrain."  Again, the

2    Serious Fraud Office of the United Kingdom.

3              Your Honor, a domestic RICO claim is well pled here.

4    It satisfies Morrison.  Fraud is pled with remarkable

5    particularity for this preliminary stage, and we believe Alba

6    is entitled to all favorable presumptions in the Court's

7    analyses of these allegations.

8              If there are any questions, I'm happy to answer

9    them.

10             THE COURT:  Thank you, Mr. MacDougall.

11             Mr. Gibbons.

12             MR. GIBBONS:  Thank you, Your Honor.

13             Just a couple of points.  I would first note that

14   the statement that we relied upon in the investigation by the

15   Department of Justice to establish jurisdiction is not true.

16   We relied on what we pled in our pleadings.  The fact that the

17   Justice Department has an ongoing investigation is simply

18   information, but it's not the basis for the jurisdiction we

19   assert in this court today.

20             In listening to some of the arguments today, I

21   almost got the feeling that Dahdaleh was like some force of

22   nature, like a 17-year locust that suddenly appeared in 1990

23   and then proceeded for the next 15 or 20 years to engage in the

24   conduct that we have talked to the Court about.

25             I think one of the most important allegations and

1  averments that is made by the plaintiff in this case is the one

2  that says, Paragraph 21 of the amended complaint, and it's not

3  conclusory, it can't be attacked as nonspecific, we say that

4  there was a time when Alcoa and Aluminum Bahrain had a normal

5  commercial relationship.  We don't say that relationship was

6  with Alcoa of Australia, or Alcoa of Singapore, Alcoa of the

7  Arctic Circle, we say it was Alcoa, Inc. and Bahrain in a

8  normal, commercial relationship that extended over a period of

9  time of 20 years.  That's our averment.

10         Now, why do we say that it was Alcoa and not some

11  force of nature that put Dahdaleh, injected him into the

12  transaction?  I know various of the counsel for the defendants,

13  certainly my learned brother, Mr. MacDougall, have referenced

14  the attachments to the amended complaint, as well as the RICO

15  Case Statement.  And I'm going to do the same, and

16  specifically, I'm going to refer the Court to Exhibit 2 in the

17  case statement.

18         That was the Rice letter, and it was written to

19  Shaikh Isa, and it was written on the letterhead that gives the

20  address of Isabella Street in the North Side here in

21  Pittsburgh.

22         In that letter, Your Honor, Mr. Rice always refers

23  to Alcoa as "we," and "our."  When you look at that Exhibit 2,

24  it says, our agreement expires on 31, December.  It says, our

25  excellent long-term relationship.  It says, the relationship we

1  have had for the last 30 years.  It says, Alcoa will be willing

2  to guarantee.  It says, we anticipate reaching.  And it also

3  says, Alcoa is interested in supplying.

4         Those are all references by Mr. Rice in his letter

5  to Shaikh Isa in Bahrain referencing Alcoa.

6         Everyone has cited to you, but especially

7  Mr. MacDougall, the letter or the fax and letter that Rice

8  wrote where he identified Dahdaleh and these dummy corporations

9  as being fully authorized to negotiate the present alumina

10 supply agreement with Alba.

11        Now, those are the -- that is the language, rather,

12 Your Honor, of principal and agent.  Authorized by whom?  He

13 was authorized, he, Dahdaleh, is authorized indisputably by

14 Alcoa.

15        Now, turning to some of Mr. Esseks points, he makes

16 reference to the fact that he can't find any Supreme Court

17 authority for the proposition that even a single act in

18 Pennsylvania by the conspirator, co-conspirator in furtherance

19 of that conspiracy provides jurisdiction.

20        Now, that is a statement taken right from the Temtex

21 Products versus Kramer case.  I will be the first to admit it

22 is from the Superior Court.  There was a day when, as Your

23 Honor knows, the jurisdiction of the Supreme Court ran to, at

24 least on direct jurisdiction on the capital cases, they were

25 handling perhaps 400 cases a year.  Probably when you clerked

1  for Justice Manderino that was so.  Their jurisdiction today by
2  certiorari only is about 70 or 80 cases --

3          THE COURT:  If that.

4          MR. GIBBONS:  -- well below 100.  In many instances
5  in this state, as Your Honor knows from your own service on the
6  state trial bench, what the Superior Court says is the law of
7  Pennsylvania, until such time as the Supreme Court addresses
8  the issue.

9          So, we do cite in our brief the Temtex case from
10 Pennsylvania, and we also cite in our brief a series of federal
11 cases, also from here in Pennsylvania, all of which stand for
12 the same proposition, that if you can show that one is a
13 co-conspirator, he or she does not need to be in the
14 jurisdiction, present in the jurisdiction, and that a single
15 act, and here of course we have many acts, is more than enough
16 to carry the day.

17         Now, with respect to the argument that Mr. Esseks
18 made on the discovery, there, of course, he referred to, and so
19 will I, to Your Honor's case, the C.I.T. case, and in that
20 case, as you know, what you wrote was that if the plaintiff's
21 claim is not clearly frivolous, then the Court ordinarily
22 should allow jurisdictional discovery in order to aid the
23 plaintiff in his attempt to establish jurisdiction.

24         We don't feel in this case that that is necessary.
25 We think it is done simply on the strength of the averments

1  that are in front of the Court, but certainly, as an

2  alternative position, where you said that Kronseder,

3  Mr. Kronseder, I guess was a German citizen and was asserting

4  he was never present in Pennsylvania in any way, shape or form,

5  you said that in point of fact, it was not a frivolous case.

6          You also rejected the notion that Kronseder tried to

7  make to Your Honor, that LeNature's had had -- and the

8  LeNature's bankruptcy had occurred three years earlier, he said

9  there was all kinds of time to find out what he was and was not

10 doing and whether he was present and whether there was indeed

11 jurisdiction.

12         As Mr. MacDougall indicated, and as the Court knows,

13 we have not been allowed discovery for the past three and a

14 half years, and if it is true that truth walks toward you along

15 the path of the questions that you ask, we have not been

16 allowed to ask any questions at all.  We do have a substantial

17 amount of information that we were able to develop ourselves,

18 which appears in the complaint, and it is certainly sufficient

19 to carry the day with respect to the jurisdiction of

20 Mr. Dahdaleh and the validity of this case.

21         And, with respect, Your Honor, we would stand on our

22 brief with respect to the rest of the issues.

23         THE COURT:  Thank you, Mr. Gibbons.

24         Do you want a couple minutes?

25         MR. CHESLER:  Just a couple, Your Honor.  Very

1 briefly.

2          Your Honor indicated after I sat down that you might

3 have wanted to ask me about the discovery questions, so let me

4 start there.

5          In not one of the post-Morrison RICO cases has there

6 been discovery on the question I rose to speak about, which is

7 not the personal jurisdiction question but the question of the

8 sufficiency of the pleading under the Morrison standard.  It is

9 treated like every other 12(b)(6) question, which is whether on

10 the face of the pleading the standard is satisfied or not.

11 There is no precedent whatsoever to take discovery to try to

12 create a basis for jurisdiction that didn't already exist on

13 the face of the pleading, and I would submit no authority has

14 been cited to the Court for that proposition and none exists,

15 so far as we know.

16          Second, Your Honor, just a few quick points.

17          Those of us unfortunate enough of us to be north of

18 50 are going to quote things to each other.  I'd go with Ronald

19 Reagan's quote, there you go again, with respect to

20 Mr. MacDougall.  Mr. MacDougall, because he did it several

21 times, and it's exactly the point I raised in my argument, he

22 said, quote, Mr. Dahdaleh -- this may be paraphrasing not a

23 quote -- Mr. Dahdaleh was an agent for Alcoa.

24          In fact, the documents are all incorporated into the

25 complaint.  They're all part of this record.  He was never an

1 agent for Alcoa.  All of the agreements which the plaintiff

2 itself relies upon are agency agreements between Alcoa of

3 Australia and Mr. Dahdaleh.  For this purpose, it is critical

4 because that's the issue that comes up over and over again in

5 these cases.  There are always U.S. contacts, and I would

6 submit when Your Honor looks at the seven cases that have been

7 dismissed in the post-Morrison era, you will find that the U.S.

8 contacts in every one of those cases are significantly greater

9 than they are here.  The contact test is dead.  The test is

10 exactly what Your Honor said it was in the LeNature's case, is

11 the enterprise a domestic enterprise?  I won't repeat all that

12 I said before in the opening argument as to why it is not and

13 cannot be under this complaint a domestic enterprise.

14         Mr. MacDougall also said that I listed in Exhibit 2

15 former Alcoa employees.  There he goes again.  Not one of those

16 people is a former Alcoa employee.  Each of them is a former

17 Alcoa of Australia employee.  It's very easy to use words

18 loosely, Your Honor, but we're in a federal court where words

19 matter and on a pleadings motion, the pleading words matter,

20 and they can't stand here and misrepresent things like that.

21 These people worked for the foreign company, not for Alcoa.

22         He also said that AOA, Alcoa of Australia, is a,

23 quote, front for Alcoa.  There's no basis for that.  That's

24 just a derogatory statement that's made.  In fact, it's a

25 company, 40 percent of which is owned by a completely

1 independent organization.  It does business independently.  It

2 owns the material it sold.  And it, and not Alcoa, was a party

3 to every single one of the ten agreements which they allege are

4 the vehicles by which the misrepresentations that supposedly

5 support this conspiracy were made.  In this context under

6 Morrison, that is a critical and dispositive fact.

7 　　　　　THE COURT:  What about the Rice letters?

8 　　　　　MR. CHESLER:  The Rice letter comes, Your Honor, in

9 2004, 14 years into a 17-year alleged conspiracy.  They knew

10 who Mr. Dahdaleh was.  Indeed, it was Alba that asked for

11 Mr. Dahdaleh to be our agent in 1990.  We had had an agent

12 years before, then we didn't.  The relationship had

13 deteriorated dramatically, and they said, if you want this

14 relationship to improve, then you should have a local agent.

15 Their own government recommended at the time the use of local

16 agents for U.S. companies doing business there.  Our own state

17 department recommended it.  So, for them to say they didn't

18 know who Mr. Dahdaleh was, under the Iqbal standards for you to

19 draw that inference is absolutely untenable.  They knew exactly

20 who he was and they cannot satisfy the plausible, not possible,

21 but the plausible inference standard of Iqbal on that basis,

22 Your Honor.

23 　　　　　THE COURT:  Mr. Beizer wants to say something.

24 　　　　　MR. BEIZER:  If I may.  Just a couple points.

25 　　　　　Your Honor, raised what about the 2004, there's an

1  Exhibit 7 to the RICO Case Statement that is an October 29,

2  2004, fax from Mr. Rice in which -- the lead up to that is

3  Mr. Hall says, hey, I can't get -- I'm paraphrasing -- I can't

4  get a better price from Dahdaleh, can you help me?  Mr. Rice

5  says, deal with AAAC, they're Alcoa of Australia's authorized

6  associated company and distributor.  There's a distributorship

7  here.  Deal with the distributor.

8          This claim, again -- I won't reiterate what

9  Mr. Chesler said about the difference between Alcoa and Alcoa

10 of Australia.

11         There are a couple of other points I would like to

12 address very briefly.

13         Alba argues that they satisfied Rule 9(b) with

14 respect to knowledge.  What Alba didn't say, though, is whether

15 it satisfied Iqbal, 129 Supreme Court at 1954, which, as Your

16 Honor knows, says it's one thing that 9(b) says that knowledge

17 may be pled generally in contrast to particularity for fraud,

18 but that doesn't satisfy the conclusory allegation of knowledge

19 under Rule 8.  And you have to allege more than conclusions and

20 the bare elements of the causes of action in order to satisfy

21 Rule 8.  Just saying knowledge may satisfy Rule 9(b), but it

22 does not satisfy Rule 8.  That's what the Supreme Court said at

23 Page 1954.

24         With respect to the thing that Mr. Gibbons pointed

25 out, Exhibit 2 to the RCS, to the RICO Case Statement, again,

1 | it is a proposal by Alcoa on April 12, 2001, but what happened
2 | after that is, the complaint makes clear, is that there was a
3 | distribution agreement entered into on February 14, 2002,
4 | between Alcoa of Australia and AAAC and now Mr. Dahdaleh's
5 | companies, and they became responsible for selling.
6 |        There's one thing, Your Honor, that should be
7 | pointed out here.  The complaint makes much of the, quote, 2001
8 | extension, as well as the 2003 extension of the 1990 contract,
9 | but if you see what Exhibit 3 to the RCS says, Exhibit 3 is the
10 | request for the extension, and it's for the extension beginning
11 | on January 1, 2002, by which time, as I've just said to Your
12 | Honor, Mr. Dahdaleh becomes the sole distributor of the
13 | alumina.  So let's not get caught up with what happened in 2001
14 | because what we're really talking about is, particularly with
15 | respect to Mr. Rice, what happened in 2002.
16 |        I have nothing further.  Thank you.
17 |        MR. ESSEKS:  Your Honor, one sentence.  As to
18 | personal jurisdiction, please do look at the Temtex case in the
19 | Superior Court.  We addressed it in our papers.  It's not a
20 | holding and we stand by our position about the appropriateness,
21 | the lack of authority for that co-conspirator jurisdiction
22 | theory and the inappropriateness on a due process basis.
23 |        THE COURT:  You wanted to say something, Mr.
24 | MacDougall, the last word?
25 |        MR. MacDOUGALL:  If I may, Your Honor.  We yielded

 1  much of our time.  We have 30 seconds.

 2            We really just have two points, Your Honor.

 3            The first is, Mr. Chesler just a moment ago began, I

 4  think, trying to explain the relationship between Mr. Dahdaleh,

 5  who said what to whom, he invoked the U.S. government; that's

 6  exactly why we need discovery, Your Honor.  Mr. Chesler is

 7  testifying or whatever witness told him that, if there's an

 8  explanation, that's why we need discovery.

 9            The only other point I would make, Your Honor, is

10  the reference to agent and Mr. Chesler's denial that

11  Mr. Dahdaleh was their agent.  About 20 minutes ago Mr. Esseks

12  handed up a document, asked the Court to look at it.  It's

13  called an Agency Agreement.  It's between Alcoa of Australia

14  and Victor Dahdaleh's company going back to 1990, president of

15  the creation.  The reason I respectfully redirect the Court

16  back to that is if you adopt Mr. Chesler's reasoning, then you

17  will have immunized every American company to put subsidiaries

18  outside the United States and wreak havoc, that they will never

19  be held accountable in the courts of this country for what they

20  do through subsidiaries that they control.  That, Your Honor, I

21  submit is not right and shouldn't stand.

22            THE COURT:  Thank you.

23            Thank you all very much.

24            This was very helpful, actually, so I thank you all

25  for coming.  I'll be in touch.

1        (Court adjourned.)

2                            -----

3

4

5                    C E R T I F I C A T E

6              I, Juliann A. Kienzle, certify that the
foregoing is a correct transcript from the record of
7  proceedings in the above-titled matter.

8
s/Juliann A. Kienzle
9  _____
Juliann A. Kienzle, RMR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25