UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

_____
                                              )
ALUMINIUM BAHRAIN B.S.C.,                     )
                                              )
          Plaintiff,                          )
                                              )
     v.                                       )         Case No. 2:08-cv-299-DWA
                                              )
ALCOA, INC., ALCOA WORLD                      )
ALUMINA LLC, WILLIAM RICE and                 )
VICTOR DAHDALEH,                              )
                                              )
          Defendants.                         )
_____      )


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT VICTOR DAHDALEH'S MOTION TO DISMISS THE
AMENDED COMPLAINT, OR IN THE ALTERNATIVE FOR A STAY AND ORDER
<u>COMPELLING MANDATORY ARBITRATION</u>**

**TABLE OF CONTENTS**

I.      **INTRODUCTION** ...................................................................................................1

II.     **BACKGROUND** ..................................................................................................2

     A.     Alba's 1990 Contract with Alcoa of Australia. ......................................2

     B.     Alba's 2005 Contract with AAAC.............................................................3

     C.     Alba Agreed To Arbitrate All Disputes "in Connection with" Both
             Contracts. .................................................................................................4

     D.     Alba's Damages Claim Is Based on the Terms of the Contracts. ............5

     E.     Mr. Dahdaleh's Involvement Was Known to Alba Throughout the
             Relevant Period. ........................................................................................5

     F.     Alba Continued Performing under the 2005 Contract with AAAC for Two
             Years after It Alleges It Learned of Mr. Dahdaleh's Involvement. ........6

     G.     No Discovery Has Taken Place in this Lawsuit, Which Has Been Stayed
             Nearly Continuously Since It Was Filed. ................................................6

     H.     Mr. Dahdaleh Was Acquitted of All Charges in the U.K. Criminal Trial. .............7

III.    **ARGUMENT** ........................................................................................................8

     A.     The FAA Establishes a Strong Federal Policy Favoring Arbitration. ....................8

     B.     Alba Agreed That Arbitrators Would Determine All Issues "in Connection
             with" the Contracts, Including Whether the Claims Are Arbitrable.....................10

     C.     Even if the Court Determines Arbitrability, Any Doubts Concerning the
             Scope of Arbitrable Issues Must Be Resolved in Favor of Arbitration. ...............11

     D.     The Arbitration Clauses Easily Embrace This Dispute. ........................................12

     E.     The Arbitration Agreements Require Arbitration of this Dispute,
             Regardless of the Particular Claims Asserted........................................................13

     F.     There Are No Allegations of Fraud Directed at the Agreement to
             Arbitrate. .................................................................................................15

i

G.      Mr. Dahdaleh Can Enforce the Arbitration Agreements. .....................................15

H.      This Motion Is Timely. ........................................................................................17

**IV.     CONCLUSION .....................................................................................................20**

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Apollo Computer, Inc. v. Berg, 886 F.2d 469 (1st Cir. 1989)* ......................................................11

*AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643 (1986)* ................................10, 11

*Bannet v. Hankin, 331 F. Supp. 2d 354 (E.D. Pa. 2004)* ............................................................13

*Bonny v. Soc'y of Lloyd's, 3 F.3d 156 (7th Cir. 1993)* ................................................................14

*Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972)* ....................................................................9

*Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440 (2006)* ................................................15

*Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585 (1991)* ..........................................................9

*Colbert v. Mercy Behavioral Health, 845 F. Supp. 2d 633 (W.D. Pa. 2012)* .................................1

*Colonial Penn Ins. Co. v. Material Damage Adjustment Corp. of Fla., No. 97-0035, 1997 WL 587261 (E.D. Pa. Sept. 15, 1997) (Pollak, J.)* ................................................18

*Contec Corp. v. Remote Solution Co., 398 F.3d 205 (2d Cir. 2005)* ............................................10

*Coregis Ins. Co. v. Am. Health Found., Inc., 241 F.3d 123 (2d Cir. 2001) (Sotomayor, J.)* ..........................................................................................................................12

*Dayhoff, Inc. v. H.J. Heinz Co., 86 F.3d 1287 (3d Cir. 1996)* ......................................................16

*Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213 (1985)* ............................................................9

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187 (3d Cir. 2001)* ..................................................................................17

*Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207 (3d Cir. 2007)* ..........................................18, 19

*FCMA, LLC v. Fujifilm Recording Media U.S.A., Inc., No. 09-4053, 2010 WL 3076486 (D.N.J. Aug. 5, 2010)* ..........................................................................................14

*Gavlik Constr. Co. v. H.F. Campbell Co., 526 F.2d 777 (3d Cir. 1975)* ......................................18

*Grynberg v. BP P.L.C., 585 F. Supp. 2d 50 (D.D.C. 2008)* ........................................................14

*Guidotti v. Legal Helpers Debt Resolution, LLC, 716 F.3d 764 (3d Cir. 2013)* .............................1

*Health Robotics, LLC v. Bennett, No. 09-0627, 2009 WL 1708067 (E.D. Pa. June 16, 2009)* ..........................................................................................................................12

*Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992) ...........................18

*Huffington v. T.C. Grp., LLC*, 637 F.3d 18 (1st Cir. 2011) ............................................12

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 133 F.3d 225 (3d Cir. 1998)..................14

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070 (3d Cir. 1997) .....................12, 13

*KPMG LLP v. Cocchi*, 132 S. Ct. 23 (2011) ..................................................................9

*Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998) ...........................14

*Lorenz v. CSX Corp.*, 1 F.3d 1406 (3d Cir. 1993) ..........................................................1

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ........................9

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ..........................11, 17

*PaineWebber Inc. v. Faragalli*, 61 F.3d 1063 (3d Cir. 1995) .................................................18, 19

*Palcko v. Airborne Express, Inc.*, 372 F.3d 588 (3d Cir. 2004) ...........................................18, 19

*Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001)........................................16

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) ..................................14, 15

*Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir. 1993) ......................................................................................................................15, 16

*Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006)..........................................10

*Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir. 1998) ...........................................14

*Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993)..................................................14

*Schering Corp. v. First Databank, Inc.*, 479 F. Supp. 2d 468 (D.N.J. 2007) ..............................12

*Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974) ......................................................9, 15

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115 (2d Cir. 2003) ...................................11

*Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220 (1987)...........................................8, 14

*Silec Cable S.A.S. v. Alcoa Fjardaal SF*, No. 12-01392, 2012 WL 5906535 (W.D. Pa. Nov. 26, 2012) ............................................................................................10, 11

*Weiss v. Experts, Inc.*, No. 12-1069, 2012 WL 4762200 (W.D. Pa. Oct. 5, 2012) .......................12

*Wood v. Prudential Insurance Co. of America*, 207 F.3d 674 (3d Cir. 2000)..............................19

iv

*Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 224 (3d Cir. 2008)* ...............................18, 19, 20

## OTHER AUTHORITIES

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ............................................................................8, 9

Foreign Corrupt Practices Act, 15 U.S.C. § 78dd–1, *et seq.* (1977)...........................................14

Federal Rule of Civil Procedure 12(b)(6) .....................................................................................1

Federal Rule of Civil Procedure 16 ...............................................................................................7

Rules of Arbitration of the International Chamber of Commerce art. 6(3) (2012).....................5, 6

## I.  INTRODUCTION

As the Court knows, on December 10, 2013, defendant Victor Dahdaleh was acquitted in the U.K. of all charges that had been brought against him—charges based on the same allegations Plaintiff Aluminium Bahrain B.S.C. ("Alba") makes here.  Mr. Dahdaleh now moves to have Alba's U.S. claims referred to the proper forum of arbitration.

Alba alleges that it misunderstood the affiliation of various entities from which it purchased alumina, the principal raw material for the manufacture of aluminum.[1]  Alba's pleadings state that it believed those contracting entities were Alcoa affiliates when instead they were owned by Mr. Dahdaleh.  Alba further asserts that payments to certain Alba and Bahraini government officials—payments allegedly made by Mr. Dahdaleh at the behest of Alcoa— prompted Alba to enter into and maintain alumina supply contracts on terms unfavorable to Alba.  Alba contends it was harmed because the amounts paid under the contracts exceeded market prices; indeed Alba's purported damages arise entirely from allegedly unfair pricing terms in the alumina supply contracts.  Each of the relevant contracts, however, contains a dispute resolution clause requiring arbitration of all disputes "arising under or in connection with" the contracts and specifying that arbitration take place in London under the Rules of Arbitration of the International Chamber of Commerce ("ICC").  This dispute plainly is "in connection with" the contracts Alba signed.  Further, by consenting to the ICC rules, Alba agreed

---

[1] Alba's pleadings contain numerous allegations that Mr. Dahdaleh contests.  Solely for purposes of this Motion, this Memorandum assumes—but does not concede—the truth of Alba's allegations.  Where the relevant pleadings present a *prima facie* case for arbitrability, as here, Rule 12(b)(6) governs a motion to compel arbitration.  *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 771–76 (3d Cir. 2013).  In a civil RICO case, the RICO Case Statement is part of the pleadings.  *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993).  Also included in the pleadings are documents cited or referred to in the pleadings, as well as documents essential to the plaintiff's claim.  *E.g.*, *Colbert v. Mercy Behavioral Health*, 845 F. Supp. 2d 633, 637 (W.D. Pa. 2012).

that the arbitrators would decide any dispute about arbitrability.  For these reasons, Alba's complaint should be dismissed without prejudice in favor of arbitration, or the Court should stay the matter and compel arbitration.

## II.  BACKGROUND

Alba, a Bahraini entity, is one of the world's largest aluminum producers and is majority owned by the Government of Bahrain.  AC at 2 & ¶ 17.[2]  Alcoa Inc. is a Pennsylvania corporation and the majority owner of Alcoa World Alumina LLC and Alcoa of Australia Ltd.  AC ¶¶ 5, 10–12.  William Rice was Alcoa World Alumina's Vice President of Marketing from 2001 through 2006, then served as Vice President of Mining of Alcoa World Alumina and Chemicals, the Alcoa subsidiary through which Alcoa owns Alcoa of Australia.[3]  AC ¶¶ 7, 10–12.

Mr. Dahdaleh was the owner of several entities involved in the provision of alumina to Alba.  AC ¶¶ 14–15.  Those entities were Alumet Limited, Kwinalum Trading Pte Limited, Alumet Asia Pte Limited, and three companies called AA Alumina & Chemicals ("AAAC").  *Id.*

Alumina is the "principal raw input" for the production of aluminum and constitutes 80 percent of Alba's raw material costs.  AC ¶ 18.  During the relevant period, Alba obtained its alumina supply under the terms of two successive contracts, as described below.

### A.    Alba's 1990 Contract with Alcoa of Australia.

Alba alleges that Alcoa "introduced Dahdaleh and his shell companies into the longstanding relationship between Alcoa's subsidiary (Alcoa of Australia) and Alba in 1990."

---

[2] References to "AC" are to the Amended Complaint.  Dkt. No. 64 (Nov. 28, 2011).  References to "RCS" are to Alba's RICO Case Statement.  Dkt. No. 66 (Dec. 28, 2011).  References to "Decl. Ex." are to the exhibits to the Declaration of Sarah L. Lochner, Esq., dated January 15, 2014, submitted in support of this motion as Exhibit A.

[3] The Alcoa defendants, including Mr. Rice, settled with Alba and were dismissed with prejudice.  Order Granting Stipulation of Dismissal, Dkt. No. 129 (Oct. 11, 2012).

AC ¶ 21; RCS at 6.  That same year, Alba and Alcoa of Australia entered into the 1990 alumina supply contract, an agreement that—following several extensions and a 1996 amendment—remained in effect through 2004.  *E.g.*, AC ¶¶ 73, 98–99.  Alba asserts that Alcoa of Australia fulfilled its alumina supply obligations under the 1990 contract by entering into separate agreements with companies owned by Mr. Dahdaleh, under which those entities would participate in the provision to Alba of some (or at times all) of the alumina required under the 1990 contract.  *E.g.*, RCS at 6–8.

### B.    Alba's 2005 Contract with AAAC.

Alba alleges that as the final extension to the 1990 contract was coming to a close, Alba and Alcoa negotiated over whether Alcoa would take a "virtual equity" stake in Alba in return for providing Alba's long-term alumina supply.  *E.g.*, *id.* at 11–13.  The negotiations were facilitated through correspondence and face-to-face meetings attended by representatives of Alcoa and Alba, with Mr. Dahdaleh allegedly playing a prominent role on Alcoa's behalf.  AC ¶¶ 119–121; RCS at 12, 36–37; *see also, e.g.*, RCS at Exs. 5, 23, 24, 25.  Alba contends that

> Dahdaleh acted as, and was held out to be, an authorized agent and representative of Alcoa during the share sale negotiations . . . and us[ed] [his] shell companies to . . . send correspondence to Alba that contained Alcoa's logo and indicated that Dahdaleh's shell companies were "associate" companies of Alcoa.

RCS at 15.  Based on Alba's pleadings, Alba's and Alcoa's alumina supply relationship was central to the virtual equity negotiations.  *See, e.g.*, AC ¶ 124; RCS at 37.

Ultimately, Alcoa and Alba could not agree on Alba's value, prompting Alba to solicit bids for a new alumina supply contract.  AC ¶¶ 123, 129–30.  AAAC was the only company to complete a responsive bid, and Alba awarded it a ten-year contract, from January 1, 2005 through December 31, 2014.  AC ¶ 142; Decl. Ex. 3 (2005 alumina supply agreement).

Alba contends that the virtual equity negotiations prejudiced it and contributed to the

purportedly unfavorable terms in the 2005 alumina supply agreement.  *E.g.*, RCS at 29–30.  Alba

claims the Defendants "defrauded" Alba "through a scheme either to acquire a controlling stake

in Alba at a depressed price" or to threaten to "cease supplying Alba with alumina, threatening

Alba's very existence."  AC ¶ 110.  Alba further alleges that when it resolved to contract with

AAAC, it sought and received from Alcoa assurances that AAAC was an Alcoa affiliate.  AC ¶

138; RCS at 12–13.

### C. Alba Agreed To Arbitrate All Disputes "in Connection with" Both Contracts.

The contracts under which Alba received alumina contain substantively identical clauses

requiring arbitration in London of any dispute "in connection with" the agreement.  The 1990

contract between Alba and Alcoa of Australia provided, at Art. 13.1, that:

> Any dispute, controversy or claim arising under or in connection with this
> Agreement shall be referred at the instance of either Party for final determination
> under the Rules of Conciliation and Arbitration of the International Chamber of
> Commerce by three arbitrators (unless otherwise agreed) who shall be appointed
> in accordance with the said Rules and shall sit in London.  Both Parties to the
> Agreement submit to the jurisdiction of the said arbitrators and to the said Rules.
> Arbitration proceedings shall be held in English and the award shall be final and
> binding on both Parties.

Decl. Ex. 1 (1990 alumina supply agreement) at 20.  Although the 1990 agreement was amended

once and extended several times, neither the extensions nor the amendment in any way affected

the arbitration agreement.  Decl. Exs. 1, 2 (1996 Additional Agreement).  Article 13.1 of the

2005 alumina supply contract likewise provided:

> Any dispute, controversy or claim arising under or in connection with this
> Agreement shall be referred at the instance of any Party for final determination
> under the Rules of Arbitration of the International Chamber of Commerce (the
> "Rules") by three arbitrators (unless otherwise agreed) who shall be appointed in
> accordance with the Rules and shall sit in London (the "Arbitrators").  Both
> Parties submit to the jurisdiction of the Arbitrators and to the Rules.  Arbitration
> proceedings shall be held in English and the award shall be final and binding on
> both Parties.

Decl. Ex. 3 at 10.  In turn, the ICC Rules, which apply according to these agreements, provide:

4

> If any party against which a claim has been made does not submit an Answer, or raises one or more pleas concerning the existence, validity or scope of the arbitration agreement . . . the arbitration shall proceed and any question of jurisdiction or of whether the claims may be determined together in that arbitration shall be decided directly by the arbitral tribunal, unless the Secretary General refers the matter to the Court for its decision pursuant to Article 6(4).

Decl. Ex. 4 (ICC Rules art. 6(3) (2012)).

## D.   Alba's Damages Claim Is Based on the Terms of the Contracts.

Alba contends that Alcoa and its executives were the "principal architects and beneficiaries" of a plan to make illegal payments to Alba and Bahraini government officials. Mem. of Law in Opp. to Alcoa Defs.' Mot. to Dismiss, Dkt. No. 85, at 19 (Mar. 1, 2012). Those payments supposedly prompted Alcoa and AAAC to seek, and Alba to pay, excessive prices for the supply of alumina under the contracts. *See, e.g.*, AC ¶¶ 30–31, 44; RCS at 54–58. Alba alleges for example, that it paid "inflated alumina prices under the [1990] supply agreements with Alcoa's subsidiary." AC ¶ 41; *see also id.* ¶¶ 52, 70, 95, 104–05. Under the 1996 contract amendment alone, Alba alleges that "Defendants overcharged Alba more than $102 million." AC ¶ 59. Furthermore, under the 2005 contract, Alba contends the pricing "was excessive and Alba would not have agreed to it but for Defendants' unlawful acts." AC ¶ 143. Alba additionally suggests that the payment and other terms of the 2005 agreement were "commercially detrimental to Alba." AC ¶¶ 144–45. Thus, Alba's damages claim in this case is based entirely on the alumina pricing contained in the supply contracts, which it alleges was inflated.

## E.   Mr. Dahdaleh's Involvement Was Known to Alba Throughout the Relevant Period.

Alba alleges that until 2007, it believed the Dahdaleh-owned entities were affiliates of Alcoa and Mr. Dahdaleh was acting on behalf of Alcoa. The Amended Complaint asserts that Mr. Dahdaleh represented Alcoa in negotiations with Alba. AC ¶ 113. Mr. Dahdaleh routinely

was copied on e-mail and fax correspondence between Alcoa and Alba relating to alumina supply. *Id.* ¶¶ 121, 168(f). He supposedly arranged conference calls on behalf of Alcoa, traveled to Bahrain with Alcoa representatives to meet with Alba and appeared in multiple London meetings with Alcoa and Alba representatives. AC ¶¶ 114–16, 168(e); RCS at 12, 41, 49. "Throughout the scheme," according to Alba's pleadings, "Defendants falsely identified Dahdaleh as a legitimate agent of or consultant to Alcoa and the Dahdaleh-owned shell companies as affiliates or subsidiaries of Alcoa." RCS at 53. Indeed, Alba consistently refers to Mr. Dahdaleh as the "agent" of Alcoa and its subsidiaries acting at their direction, the "'middleman' in relation to Alba supply contracts," and the "represent[ative]" of Alcoa in its long-term alumina supply relationship with Alba.[4] *E.g.*, AC ¶¶ 8, 106, 113, 115, 118; RCS 22, 25, 41.

### F. Alba Continued Performing under the 2005 Contract with AAAC for Two Years after It Alleges It Learned of Mr. Dahdaleh's Involvement.

Alba alleges that it discovered the "fraud" in 2007, AC ¶ 29, and it filed this lawsuit on February 27, 2008, *see* Dkt. No. 1. Alba pleads that it nonetheless continued doing business with AAAC under the 2005 contract until September 2009. AC ¶ 157–58. During that time, Alba continued receiving alumina from AAAC under the 2005 supply contract knowing that Mr. Dahdaleh owned and controlled AAAC. *Id.*

### G. No Discovery Has Taken Place in this Lawsuit, Which Has Been Stayed Nearly Continuously Since It Was Filed.

Less than a month after this lawsuit was filed, the U.S. government intervened and requested a stay because the government was investigating Alcoa, its subsidiaries, officers, and directors, and others related to this lawsuit. Mem. of Law in Support of Unopposed Mot. to

---

[4] Alba's characterizations of Mr. Dahdaleh's relationship with Alcoa and its affiliates are among those Mr. Dahdaleh contests. Nonetheless, given the procedural posture of this case, Mr. Dahdaleh assumes the allegations are true *solely for purposes of this Motion. See supra* note 1.

Intervene and for a Stay of Discovery, Dkt. No. 9-1, at 2 (Mar. 20, 2008). The government's motion was not opposed by Alba or Alcoa. *Id.* at 14. This Court granted the stay and administratively closed the case. Orders, Dkt. Nos. 16, 21 (Mar. 27, 2008). Mr. Dahdaleh was not served until at least April 19, 2008, two weeks after the stay was entered.

That stay remained in place for more than three years until Alcoa sought a Rule 16 conference in October 2011. *See* Mot. for Rule 16 Conf., Dkt. No. 29 (Oct. 25, 2011). After Alba served an Amended Complaint and RICO Case Statement, the Alcoa defendants and Mr. Rice moved to dismiss, asserting that the allegations involved an impermissible extraterritorial application of RICO and that Alba had neither made particularized allegations regarding the RICO claims nor alleged state-law claims. *See* Alcoa's Mot. to Dismiss and Mem. of Law, Dkt. Nos. 70, 71 (Jan. 27, 2012); Rice's Mot. to Dismiss, Dkt. No. 74 (Jan. 27, 2012). Mr. Dahdaleh joined in those arguments and additionally asserted that he is not subject to the jurisdiction of this Court. Dahdaleh's Mem. of Law, Dkt. No. 75 (Jan. 27, 2012). The Court denied the motions to dismiss. Orders, Dkt. Nos. 97–99 (June 11, 2012). Mr. Dahdaleh's petition to the Third Circuit to appeal the personal jurisdiction ruling was denied. Mr. Dahdaleh immediately moved to stay the action pending criminal charges in London and a criminal investigation in the United States. Mot. to Stay Discovery and Mem. of Law, Dkt. Nos. 108, 109 (July 9, 2012). The Court granted that motion and later extended the stay until shortly after resolution of the criminal trial in London. Orders, Dkt. Nos. 133 (Oct. 25, 2012), 155 (July 9, 2013).

Due to the settlement between Alba and the Alcoa defendants, Mr. Dahdaleh is the sole remaining defendant in this lawsuit. At present, Mr. Dahdaleh has not filed any responsive pleading, no discovery requests have been served, and no discovery has taken place.

## H.    Mr. Dahdaleh Was Acquitted of All Charges in the U.K. Criminal Trial.

In October 2011 the Serious Fraud Office ("SFO") in the U.K. brought criminal charges

of conspiracy, corruption and money laundering against Mr. Dahdaleh, based on allegations similar to those in Alba's Amended Complaint and RICO Case Statement.  Mr. Dahdaleh's trial on those charges began on November 4, 2013, and the SFO presented weeks of evidence, including testimony by current and former representatives of Alba.  On December 10, however, the SFO notified the court that it could not fairly proceed with the prosecution and that there was "no longer a realistic prospect of conviction" in the case.  Tr. of Hr'g at 4 (Dec. 10, 2013), *attached to* Ltr. from David E. Kendall (Dec. 10, 2013).  The court directed the jury to acquit Mr. Dahdaleh on all charges that same day.  *See id.*  The SFO invited the court to direct an acquittal of Mr. Dahdaleh because (a) trial testimony by Alba's former CEO, Bruce Hall, contradicted his prior statements and tended to exculpate Mr. Dahdaleh, and (b) lawyers for Akin Gump, Alba's counsel here, who had promised to testify at trial, refused to appear and be cross-examined.  *Id.* at 1–2.  As to the latter, the U.K. trial judge found that an SFO Case Officer had "delegated his disclosure enquiries and duties in Bahrain to Akin Gump and in particular to Mr. MacDougall." *Id.* at 4–5.  The judge noted:  "Neither Mr. MacDougall nor Mr. Teslik, both of whom are fully bound witnesses, are prepared to be questioned about their enquiries or their disclosure role.  In fact they have deliberately absented themselves and remain in America." *Id.* at 5.  In the aftermath of these events, the U.K. court has scheduled a March 10, 2014, hearing to consider whether Akin Gump should be sanctioned or further investigated for misconduct.

## III.    ARGUMENT

### A.    The FAA Establishes a Strong Federal Policy Favoring Arbitration.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, establishes a "federal policy favoring arbitration, requiring that [courts] rigorously enforce agreements to arbitrate." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987).  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall*

direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *KPMG LLP v. Cocchi*, 132 S. Ct. 23, 25–26 (2011) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

This "emphatic" federal policy applies with "special force" when international commercial agreements are at issue. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). Arbitration provisions are "an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974). By allowing private parties to contract for greater certainty in their commercial transactions, the enforcement of arbitration agreements—a special kind of forum-selection clause—spares judicial resources and litigation expense. *See id.* at 518–19; *accord Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–94 (1991); *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). The FAA promotes the enforcement of international arbitration agreements by adopting and implementing the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, commonly called the New York Convention, which requires courts to enforce international agreements to arbitrate.[5] *See* 9 U.S.C. §§ 201–08; N.Y. Convention art. II.3 (1958).

The agreements in this case plainly are international agreements involving Bahraini, Australian, and Swiss entities regarding the supply of alumina worldwide. *E.g.*, AC ¶¶ 3, 12, 15; *see also* Decl. Exs. 1 at 1, 17, 3 at 9. Because the contracts contain clauses requiring arbitration, the FAA and the New York Convention govern.

---

[5] The "domestic" provisions of the FAA also apply to international arbitration agreements to the extent they do not conflict with the Convention. 9 U.S.C. § 208.

**B.  Alba Agreed That Arbitrators Would Determine All Issues "in Connection with" the Contracts, Including Whether the Claims Are Arbitrable.**

Under the alumina supply contracts, Alba agreed to arbitrate "any dispute, controversy, or claim arising under or in connection with" the agreements.  Alba's contracts require it to arbitrate all aspects of such disputes, including the issues of *whether* it is required to arbitrate and *which disputes* are arbitrable.  Although those issues typically are reserved for judicial determination, they are to be arbitrated when the parties manifest a clear and unmistakable intent to submit them to the determination of the arbitral tribunal.  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

This Court already has decided that when parties agree to arbitration governed by ICC Rules, they clearly and unmistakably agree to arbitrate arbitrability.  *See Silec Cable S.A.S. v. Alcoa Fjardaal SF*, No. 12-01392, 2012 WL 5906535, at *18 (W.D. Pa. Nov. 26, 2012); *accord Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (When parties "explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."), *cited in Silec Cable*, 2012 WL 5906535, at *18; *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006) (same).  In *Silec Cable*—which also involved an aluminum smelter—Silec Cable argued that the court should determine whether its dispute with Alcoa Fjardaal was arbitrable.  The relevant agreement, however, specified that arbitration "shall be conducted in accordance with the Rules of the ICC."  *Id.* at *5.  Because Silec Cable had agreed to be governed by the ICC Rules and Article 6(3) of those Rules empowers the arbitrators to determine their jurisdiction,[6] this Court refused to determine the arbitrability of the dispute and

---

[6] Article 6(3) applies when "any party against which a claim has been made . . . raises one or more pleas concerning the existence, validity or scope of the arbitration agreement."  Decl. Ex. 4.

"[left] for the arbitrators to decide the scope of arbitrable claims and the merits of the parties' disputes ." *Id.* at \*18–20; *see also* Decl. Ex. 4.   "[B]y incorporating the ICC Rules into their agreement," this Court explained, the parties "necessarily agreed to the procedures set forth in those Rules which specify that the arbitrators or the International Court of Arbitration of the [ICC] will decide the issue of the jurisdiction of the arbitrators, i.e., whether the dispute is arbitrable." *Silec Cable*, 2012 WL 5906535, at \*18 (citing *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115 (2d Cir. 2003), and *Apollo Computer, Inc. v. Berg*, 886 F.2d 469 (1st Cir. 1989)).

Because Alba's alumina supply contracts specify that arbitration shall be governed by the ICC Rules and because those rules empower the arbitrators to determine their own jurisdiction, all issues in this dispute—including arbitrability—are arbitrable.  On this basis alone, the Court should compel arbitration.

### C.   Even if the Court Determines Arbitrability, Any Doubts Concerning the Scope of Arbitrable Issues Must Be Resolved in Favor of Arbitration.

Even if the Court itself were to decide whether this dispute falls within the scope of the arbitration clauses, the result would be the same:  the Court should order arbitration.  Consistent with the "emphatic federal policy" favoring arbitration, an order compelling arbitration should not be denied unless it can be said "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Techs.*, 475 U.S. at 650.  And "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language . . . or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone*

---

Here, claims have been made against Mr. Dahdaleh, and he asserts that a valid arbitration agreement encompasses this dispute.

*Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

> **D.      The Arbitration Clauses Easily Embrace This Dispute.**

"The question of the scope of a forum selection clause is one of contract interpretation," and when determining the breadth of an arbitration clause, courts look first to the language of the agreement.  *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1073, 1075 (3d Cir. 1997).  The language in Alba's contracts requires arbitration of any "dispute, controversy or claim arising under or in connection with" the agreements.  Decl. Exs. 1 at 20, 3 at 10.  The "in connection with" language is equivalent to that of phrases such as "with reference to," "associated with," and "relating to."  *See, e.g.*, *Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 22 (1st Cir. 2011); *see also Weiss v. Experts, Inc.*, No. 12-1069, 2012 WL 4762200, at *2 (W.D. Pa. Oct. 5, 2012); *Health Robotics, LLC v. Bennett*, No. 09-0627, 2009 WL 1708067, at *3 (E.D. Pa. June 16, 2009).  Those phrases are broader than terms such as "arising out of" and broader even than the concept of a causal connection, instead encompassing disputes connected to the agreement merely by "an established or discoverable relation."  *Huffington*, 637 F.3d at 22 (quoting *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128–29 (2d Cir. 2001) (Sotomayor, J.)).  Interpreting a similarly broad forum-selection clause in *John Wyeth*, then-Judge Alito explained that any "logical or causal connection" brings the dispute within the ambit of the agreement.  119 F.3d at 1074–75; *see also Schering Corp. v. First Databank, Inc.*, 479 F. Supp. 2d 468, 470–71 (D.N.J. 2007).

This dispute fits comfortably within the scope of the arbitration agreements in the 1990 and 2005 alumina supply contracts.  More than sixty paragraphs in the Amended Complaint address the negotiation, terms, and amendment of the contracts.  *See* AC ¶¶ 26, 35, 36, 38, 39, 43–46, 52, 54–59, 61–62, 66, 72–80, 83, 86–87, 98–101, 103–04, 108, 110, 129–34, 136–52, 156–57, 161, 168–69, 178–79, 189, 208, 216–17, 223.  Alba's claim for damages, moreover,

hinges on the purportedly unfavorable pricing and payment terms in the contracts, which Alba

alleges it would not have agreed to "but for" Defendants' conduct.  AC ¶¶ 143–45.  In other

words, without the contracts, Alba would have no damages to allege and no complaint to file.

Alba's pleading establishes the strong connection between the contracts and the dispute, bringing

this lawsuit within the scope of the arbitration clauses.

###    E.    The Arbitration Agreements Require Arbitration of this Dispute, Regardless of the Particular Claims Asserted.

Arbitrability does not depend on the assertion of particular causes of action when the

dispute is encompassed within a broad arbitration agreement like the one in Alba's contracts.

The FAA and New York Convention require that any dispute, "whether contractual or not," be

referred to arbitration if subject to an arbitration agreement.  N.Y. Convention Art. II.1.

Moreover, Alba's contracts require arbitration for all "claims, disputes or controversies . . . *in*

*connection with*" the agreements.  Decl. Exs. 1 at 20, 3 at 10 (emphasis added).  That language

bolsters the FAA's requirement by mandating that the dispute be arbitrated regardless of how the

claims are defined or styled.  *See John Wyeth*, 119 F.3d at 1074 & n.3 (rejecting the view that a

broad dispute resolution clause applies only when a plaintiff asserts claims "based upon" or that

"grow out of" contractual duties).  Accordingly, the "court must focus on the factual allegations

in the complaint rather than the legal causes of action asserted" to determine whether the dispute

is "in connection with" the agreement.  *Bannet v. Hankin*, 331 F. Supp. 2d 354, 360 (E.D. Pa.

2004).  As explained above in Part II.D, such a connection is clear in this case because the

factual allegations are integrally connected to—indeed, dependent upon—the contracts

containing the arbitration agreements.

For example, Alba asserts claims for the torts of fraud and conspiracy.  Courts routinely

compel arbitration of tort claims when the factual allegations—shorn of their labels—fall within

the scope of arbitration clauses like those in Alba's alumina supply contracts. *See, e.g.*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967); *FCMA, LLC v. Fujifilm Recording Media U.S.A., Inc.*, No. 09-4053, 2010 WL 3076486, at *1–2, *6 (D.N.J. Aug. 5, 2010) (fraud, conspiracy to commit fraud, and other claims); *Bannett*, 331 F. Supp. 2d at 360–61 (conversion, breach of fiduciary duty, and other claims) .

Regarding Alba's civil RICO claims, the Supreme Court has made clear that the FAA's mandate to arbitrate "is not diminished when a party bound by an agreement raises a claim founded on statutory rights." *McMahon*, 482 U.S. at 226. In particular, there is no "basis for concluding that Congress intended to prevent enforcement of agreements to arbitrate RICO claims."[7] *Id.* at 242. In *McMahon*, the Court concluded that RICO claims were subject to an arbitration agreement containing a broad "relating to" clause similar to the one in Alba's contracts. *Id.* at 223. Other courts likewise have found RICO claims subject to arbitration agreements using "in connection with" language like Alba's contracts.[8] *E.g.*, *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 133 F.3d 225 (3d Cir. 1998); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993).

---

[7] Furthermore, there is no basis to exclude these particular RICO claims simply because the predicate acts are alleged violations of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd–1, *et seq.* (1977). Where the arbitration clause is sufficiently broad to encompass the substance of the dispute—as in this case, *see supra* Part II.D—the particular statutory provision under which the plaintiff seeks to establish the predicate RICO offenses is immaterial. *Grynberg v. BP P.L.C.*, 585 F. Supp. 2d 50, 54–55 (D.D.C. 2008).

[8] Whether Alba can bring RICO claims in a London arbitration governed by English law may be an issue for the arbitration, but it does not affect the arbitrability of this dispute. English arbitration and forum-selection clauses are enforceable even when pending RICO and other statutory claims cannot be brought in the English forum. *See, e.g.*, *Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993) (enforcing arbitration and forum-selection clauses in a case involving securities and RICO claims, concluding that the law and remedies available in England are adequate, even if not identical to those in the U.S.); *accord, e.g.*, *Richards v. Lloyd's of London*, 135 F.3d 1289, 1296 (9th Cir. 1998); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1298–99 & n.20 (11th Cir. 1998); *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993).

**F.     There Are No Allegations of Fraud Directed at the Agreement to Arbitrate.**

An arbitration clause is only invalid for fraud or overreaching "if the inclusion of that clause in the contract was the product of fraud or coercion." *Scherk*, 417 U.S. at 519 n.14. Under the FAA, an arbitration clause is severable from the remainder of the contract. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006). Consequently, allegations of fraud or invalidity directed at the contract as a whole—rather than specifically at the agreement to arbitrate—are matters for the arbitrators to decide in the first instance. *Id.*; *Prima Paint*, 388 U.S. 395, 402–07 ("[W]here no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud."); *see also Scherk*, 417 U.S. at 519 n.14. Because Alba directs no allegations specifically at the inclusion of the arbitration agreements, either in its Amended Complaint or its RICO Case Statement, Alba's allegations of fraudulent conduct do not affect its agreements to arbitrate.

**G.     Mr. Dahdaleh Can Enforce the Arbitration Agreements.**

Although not himself a formal signatory to the alumina supply agreements, Mr. Dahdaleh can enforce the arbitration clauses for each of several well recognized reasons. *First*, when a principal enters a contract containing an arbitration agreement, its alleged agents are covered by and can enforce the agreement. *E.g.*, *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1121 (3d Cir. 1993). Taking Alba's allegations as true, this applies to both the 1990 and 2005 agreements. The signatories to the 1990 contract were Alba and Alcoa's subsidiary, Alcoa of Australia, Decl. Ex. 1, and Alba alleges Mr. Dahdaleh was Alcoa of Australia's agent. For example, the Amended Complaint repeatedly describes Mr. Dahdaleh "as the agent of Alcoa and its subsidiaries, including Alcoa World Alumina and Alcoa of Australia." AC ¶¶ 96, 106, 118, *see also* AC ¶ 91 (asserting an agency relationship). The RICO Statement likewise asserts:

"Between 1990 and 2004, Defendants . . . appointed Dahdaleh as the 'agent' of Alcoa's subsidiary . . . ."  RCS at 26; *see also id.* at 6, 22, 28 (alleging agency).

The signatories to the 2005 alumina supply contract were Alba and AAAC, Decl. Ex. 3, and Alba's pleadings allege that Mr. Dahdaleh controlled AAAC and acted on its behalf by making payments that secured the 2005 agreement,[9] *e.g.*, RCS at 13, 20–22; *see supra* Part II.B. Accordingly, Alba's assertion that Mr. Dahdaleh acted as an agent of the contract signatories— Alcoa of Australia under the 1990 agreement and AAAC under the 2005 agreement—confers on Mr. Dahdaleh standing to enforce the arbitration clauses in both contracts.

*Second*, Mr. Dahdaleh can enforce both the 1990 and 2005 arbitration agreements because Alba alleges alter ego status as to Mr. Dahdaleh.  *Pritzker*, 7 F.3d at 1122.  The Amended Complaint states that the "Dahdaleh-owned shell companies served no legitimate business purpose" and that their "sole purpose" was to facilitate the Defendants'—including Mr. Dahdaleh's—"fraudulent scheme."[10]  AC ¶¶ 25–26.  Those allegations allow Mr. Dahdaleh to enforce the 2005 arbitration agreement because Dahdaleh-owned AAAC was a signatory.  They also allow Mr. Dahdaleh to enforce the 1990 arbitration agreement because Dahdaleh-owned entities allegedly were appointed as agents and assignees of that contract.  *Id.* ¶ 24.

*Third*, a non-signatory to an arbitration agreement can enforce the agreement against a

[9] The agency allegations distinguish this case from those in which a corporate parent seeks to enforce a forum-selection or arbitration clause "by reason of their corporate relationship." *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1297 (3d Cir. 1996).  Because Mr. Dahdaleh was engaging in transactions on behalf of AAAC, he is not seeking to enforce the agreement merely as an otherwise uninvolved owner.  *Dayhoff* also does not apply to cases, like this one, involving allegations supporting alter ego and estoppel bases to enforce arbitration.  *See infra* pp. 16–17.

[10] Pleading an alter ego relationship requires allegations that the corporation was an abuse of the corporate fiction, "actually function[ing] as a single entity" with its parent or owner, or "merely a façade for the operations of the dominant stockholder."  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484–85 (3d Cir. 2001).  Alba has asserted that its allegations are sufficient to establish an alter ego basis for jurisdiction.  *See* Opp. to Def. Dahdaleh's Mot. to Dismiss at 20–23, Dkt. No. 87 (Mar. 1, 2012).

16

signatory by equitable estoppel. *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001).  Estoppel applies where there is a "close relationship between the entities involved, as well as [a] relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract[,] . . . and [where] the claims [a]re intimately founded in and intertwined with the underlying contract obligations." *Id.*  In this case, Alba alleges that it did not know AAAC was owned by Mr. Dahdaleh perhaps until 2007 but believed Mr. Dahdaleh was representing Alcoa with respect to Alba's alumina supply. *E.g.*, RCS at 2, 5.  "Throughout the scheme," Alba asserts, "Defendants falsely identified Dahdaleh as a legitimate agent of or consultant to Alcoa." *Id.* at 53.  Mr. Dahdaleh participated in negotiations between Alcoa and Alba, received correspondence between Alcoa and Alba, and attended meetings with Alcoa and Alba personnel in Bahrain and London.  *See supra* Part II.B. Accordingly, if Alba sincerely believed it was dealing with an Alcoa affiliate under the 2005 agreement, it also believed Mr. Dahdaleh had a "close relationship" with the signing entities.

Finally, even accepting Alba's allegation that it only fully understood Mr. Dahdaleh's involvement as of 2007, estoppel is appropriate because Alba took advantage of the 2005 contract for another two years, until September 2009.  Having received the benefits of the contract for that time knowing its counterparty was owned by Mr. Dahdaleh and understanding his involvement in the very conduct it alleges, Alba cannot now disclaim knowledge of Mr. Dahdaleh's close relationship to AAAC and the interconnectedness of his alleged conduct and the alumina supply contracts.  *See, e.g.*, *Rhone Poulenc Fiber*, 269 F.3d at 199.

## H.    This Motion Is Timely.

Although filed in February 2008, this lawsuit has not progressed beyond a preliminary motion to dismiss.  As discussed above, all doubts about arbitrability are to be resolved in favor of arbitration.  *Moses H. Cone*, 460 U.S. at 24–25.  And "[c]onsistent with the strong preference

17

for arbitration in federal courts, waiver 'is not to be lightly inferred.'" *PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 1068 (3d Cir. 1995) (quoting *Gavlik Constr. Co. v. H.F. Campbell Co.*, 526 F.2d 777, 783 (3d Cir. 1975)).  The proponent of waiver thus carries a heavy burden. *Colonial Penn Ins. Co. v. Material Damage Adjustment Corp. of Fla.*, No. 97-0035, 1997 WL 587261, at *2 (E.D. Pa. Sept. 15, 1997) (Pollak, J.) (citing *Moses H. Cone*).

As the Third Circuit repeatedly has explained, "prejudice is the touchstone for determining whether the right to arbitrate has been waived by litigation conduct." *E.g.*, *Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 231 (3d Cir. 2008) (quoting *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 221 (3d Cir. 2007)); *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 598 (3d Cir. 2004).  "Merely answering on the merits, asserting a counterclaim (or cross-claim) or participating in discovery, without more, will not necessarily constitute a waiver."[11] *Faragalli*, 61 F.3d at 1063, 1069 n.4 (quoting *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 925 (3d Cir. 1992)).  Here, none of those events has occurred; no answer or counterclaims have been served, and no discovery has taken place.

Significantly, there has been no change of position as between Alba and Mr. Dahdaleh because this case has been stayed nearly continuously from its inception, and the claims against Mr. Dahdaleh remain pending.  Although several years have passed, the mere passage of time does not create prejudice.  *See Zimmer*, 523 F.3d at 232 ("[T]he length of the time period

---

[11] The Third Circuit has identified various factors for consideration, but it has emphasized that they are non-exclusive because the touchstone is prejudice and courts should consider all the circumstances.  The non-exclusive factors are (1) the timeliness or lack thereof of the motion to arbitrate; (2) the extent to which the party seeking arbitration has contested the merits of the opposing party's claims; (3) whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings; (4) the extent to which a party seeking arbitration engaged in non-merits motion practice; (5) the party's acquiescence to the court's pretrial orders; and (6) the extent to which the parties have engaged in discovery.  *E.g.*, *Zimmer*, 523 F.3d at 231–32; *Faragalli*, 61 F.3d at 1069 n.4.

involved alone is not determinative."); *Faragalli*, 61 F.3d at 1068–69.  In *Faragalli*, the court

affirmed an order compelling arbitration even though the defendant had litigated (and lost) a

motion to dismiss five years after the filing of the initial writ.  61 F.3d at 1068–69.  Even if all

that time had counted in the waiver analysis, the delays had not caused any prejudice.  *Id.* at

1069.  Here, too, the passage of time was not the result of Mr. Dahdaleh actively litigating the

claims and has not prejudiced Alba with respect to this Motion; it merely has maintained the

positions of the parties, at little expense.

   The history of this litigation places it squarely in the company of cases finding no waiver.

In *Wood v. Prudential Insurance Co. of America*, 207 F.3d 674 (3d Cir. 2000), for example, the

Third Circuit found no waiver where the parties had litigated a motion to dismiss, the court had

granted dismissal of one of several claims, and the parties had submitted a joint discovery plan,

*id.* at 676, 679–80.  Even though the parties had recently begun discovery, Prudential had not

waived its right to compel arbitration because its "litigation tactics had not been extensive: it had

not taken any depositions nor served any discovery demands."  *Id.* at 680.  Indeed, "waiver will

normally *only* be found where the demand for arbitration came long after the suit commenced

and when both parties had engaged in extensive discovery."  *Zimmer*, 523 F.3d at 23–32

(emphasis added) (quoting *Ehleiter*, 482 F.3d at 222–23).  Accordingly, the absence of discovery

"cuts significantly against a finding of waiver."  *Pharmacy Benefit Mgrs. Antitrust Litig.*, 700

F.3d 109, 120 (3d Cir. 2012); *see, e.g.*, *Palcko*, 372 F.3d 588; *Wood*, 207 F.3d at 676, 679–80;

*Faragalli*, 61 F.3d at 1068–69.  Where little or no discovery has taken place, the Third Circuit

has found waiver only rarely, and only where the party seeking to compel arbitration has taken

steps to actively litigate the merits of the matter over a sustained period.  *E.g.*, *Pharmacy Benefit*,

700 F.3d at 112–14 (finding waiver where the movant previously engaged in substantial motions

19

practice contesting the merits of the claims, "rais[ing] issues outside . . . the scope of the pleadings," answered the complaint, and submitted a joint discovery plan, thus participating in "ten months of active . . . litigation").

In the present case, no discovery has taken place whatsoever.  Nor has Mr. Dahdaleh instigated substantial merits disputes, answered Alba's Amended Complaint, or done anything (such as engage in discovery planning) to move this case beyond the pleading stage.  Mr. Dahdaleh's arguments in support of dismissal were made after Alcoa filed a motion to dismiss and were purely jurisdictional.  The overriding story of this case thus far is the maintenance of the status quo—including Alba's continuing to operate and receive alumina under the 2005 supply contract for over a year and a half after filing this lawsuit claiming the contract was secured by fraud and its pricing was unfair.  Under the facts here, Alba cannot carry its heavy burden to establish any prejudice that would justify a finding that Mr. Dahdaleh waived his right to seek arbitration, which is the "touchstone" of the analysis.  *E.g.*, *Zimmer*, 523 F.3d at 231.

## IV. CONCLUSION

For the foregoing reasons, this Court should order that Alba's Amended Complaint against Mr. Dahdaleh be dismissed without prejudice in favor of arbitration, or in the alternative should stay the action and compel mandatory arbitration.

DATED:  January 16, 2014

Respectfully submitted,

VICTOR DAHDALEH

By his attorneys,

s/ David J. Berardinelli
David E. Kendall
Joseph G. Petrosinelli
Sarah L. Lochner
WILLIAMS & CONNOLLY LLP

20

725 Twelfth Street N.W.
Washington, DC  20005
(202) 434-5000
dkendall@wc.com

David J. Berardinelli
DEFOREST KOSCELNIK YOKITIS SKINNER &
BERARDINELLI
436 Seventh Avenue
3000 Koppers Building
Pittsburgh, PA 15219
(412) 227-3100
berardinelli@deforestlawfirm.com