**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALUMINIUM BAHRAIN B.S.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 2:08-cv-299-DWA** |
| **ALCOA, INC., ALCOA WORLD** | ) | |
| **ALUMINA LLC, WILLIAM RICE and** | ) | |
| **VICTOR DAHDALEH,** | ) | |
| | ) | |
| **Defendants.** | ) | |


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE AMENDED COMPLAINT
OR FOR A STAY AND ORDER COMPELLING ARBITRATION**


Charles B. Gibbons
Christopher A. Amar
Mackenzie A. Baird
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA  15219-1410
(412) 562-8800

Mark J. MacDougall
W. Randolph Teslik
Kristine L. Sendek-Smith
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC  20036
(202) 887-4000

Dated:  February 21, 2014          *Counsel for Plaintiff Aluminium Bahrain B.S.C.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

I.   INTRODUCTION .................................................................................................. 1

II.  PROCEDURAL BACKGROUND ...................................................................... 3

III. FACTUAL BACKGROUND ................................................................................ 3

IV. LEGAL ARGUMENT ........................................................................................... 4

    A.  Legal Standard ................................................................................................. 4

    B.  This Court Must Decide Issues of Arbitrability, Scope, and Waiver ........................... 5

    C.  The 1990 and 2005 Arbitration Provisions Do Not Apply to Dahdaleh ...................... 6

        1.  No Agreement Exists Between Alba and Dahdaleh. ........................................ 7

        2.  Alba's Claims Are Beyond the Scope of Either Arbitration Provision ............... 10

    D.  An English Arbitration Is Not Comparable to This Proceeding. ............................... 11

        1.  Dahdaleh Will Assert the Consent of Principal Defense in England. .................. 13

        2.  The Effective Vindication Doctrine Applies to This Case. ................................. 14

    E.  Dahdaleh Has Waived His Right to Seek Arbitration. ............................................ 15

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

<u>Cases</u>

*14 Penn Plaza LLC v. Pyett*,
  556 U.S. 247 (2009) ........................................................................................... 14

*BDO Seidman, LLP v. Kirschner*,
  No. 09-634, 2009 WL 2168765 (W.D. Pa. July 16, 2009) ................................. 5, 11

*Bonny v. Soc'y of Lloyd's*,
  3 F.3d 156 (7th Cir. 1993) ................................................................................. 15

*Cent. Nat'l-Gottesman, Inc. v. M.V. "Gertrude Oldendorff,"*
  204 F. Supp. 2d 675 (S.D.N.Y. 2002) ............................................................... 14

*Choice Sec. Sys., Inc. v. AT&T Corp.*,
  141 F.3d 1149 (Table), 1998 WL 153254 (1st Cir. Feb. 25, 1998) ...................... 10

*Dayhoff Inc. v. H.J. Heinz Co.*,
  86 F.3d 1287 (3d Cir. 1996) ................................................................................ 6

*Denney v. Jenkins & Gilchrist*,
  412 F. Supp. 2d 293 (S.D.N.Y. 2005) ................................................................. 9

*Devon Robotics v. Deviedma*,
  No. 09-cv-3552, 2009 WL 4362822 (E.D. Pa. Nov. 30, 2009) ............................. 8

*Doe v. Princess Cruise Lines, Ltd.*,
  657 F.3d 1204 (11th Cir. 2011) ......................................................................... 11

*Ehleiter v. Grapetree Shores, Inc.*,
  482 F.3d 207 (3d Cir. 2007) ........................................................................... 5, 16

*Ford v. NYLCare Health Plans of the Gulf Coast, Inc.*,
  141 F.3d 243 (5th Cir. 1998) ........................................................................ 10, 11

*Graham Oil Co. v. Arco Prods. Co.*,
  43 F.3d 1244 (9th Cir. 1995) ............................................................................. 14

*Gray Holdco, Inc. v. Cassady*,
  No. 09-1519, 2010 WL 4687744 (W.D. Pa. Nov. 10, 2010),
  *aff'd*, 654 F.3d 444 (3d Cir. 2011) ..................................................................... 5

*Great Am. Lines, Inc. v. Sanovi-Aventis U.S., LLC*,
  No. 2:12-cv-0988, 2013 WL 596421 (W.D. Pa. Jan. 22, 2013) ............................. 4

*Guidotti v. Legal Helpers Debt Resolution, LLC*,
  716 F.3d 764 (3d Cir. 2013) ................................................................................ 4

*Hemispherx Biopharma, Inc. v. Johannesburg Consol. Inv.*,
    553 F.3d 1351 (11th Cir. 2008) ...................................................................... 10, 11

*Howsam v. Dean Witter*,
    537 U.S. 79 (2002) ................................................................................................. 7

*Hoxworth v. Blinder, Robinson & Co.*,
    980 F.2d 912 (3d Cir. 1992) ................................................................................ 16

*In re Pharmacy Benefit Managers Antitrust Litig.*,
    700 F.3d 109 (3d Cir. 2012) ........................................................... 15, 16, 17, 18

*Invista S.A.R.L. v. Rhodia, S.A.*,
    625 F.3d 75 (3d Cir. 2010) ................................................................................ 5, 6

*Kaneff v. Del. Title Loans, Inc.*,
    587 F.3d 616 (3d Cir. 2009) ................................................................................. 4

*Khan v. Parsons Global Servs., Ltd.*,
    521 F.3d 421 (D.C. Cir. 2008) ........................................................................... 18

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
    560 F.3d 156 (3d Cir. 2009) ................................................................................. 4

*La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    626 F.3d 156 (2d Cir. 2010) ............................................................................... 18

*Lipcon v. Underwriters at Lloyd's, London*,
    148 F.3d 1285 (11th Cir. 1998) ......................................................................... 15

*MacDonald v. Unisys Corp.*,
    No. 12-1705, 2013 WL 2626929 (E.D. Pa. June 12, 2013) .............................. 5, 11

*McCarthy v. Azure*,
    22 F.3d 351 (1st Cir. 1994) .................................................................................. 8

*Miron v. BDO Seidman, LLP*,
    342 F. Supp. 2d 324 (E.D. Pa. 2004) ............................................................ 7, 8, 9

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ................................................................................ 5, 14, 15

*Nino v. Jewelry Exch., Inc.*,
    609 F.3d 191 (3d Cir. 2010) ......................................................................... 15, 16

*Oral Cancer Prevention Int'l, Inc. v. Johnson & Johnson*,
    3:11-cv-3878, 2011 WL 6130599 (D.N.J. Dec. 7, 2011) ...................................... 9

*PaineWebber Inc. v. Faragalli,*
    61 F.3d 1063 (3d Cir. 1995)........................................................................... 19

*Paladino v. Avnet Computer Tech., Inc.,*
    134 F.3d 1054 (11th Cir. 1998) .................................................................... 14

*Pearson v. Component Corp.,*
    247 F.3d 471 (3d Cir. 2001)........................................................................... 9

*R v. J, V, B & S,*
    [2013] EWCI (Crim) 2287
    (Court of Appeal of England and Wales Dec. 5, 2013) ........................... 13

*Richards v. Lloyd's of London,*
    135 F.3d 1289 (9th Cir. 1998) ..................................................................... 15

*Roby v. Corp. of Lloyd's,*
    996 F.2d 1353 (2d Cir. 1993)........................................................................ 15

*Rogers-Dabbs Chevrolet-Hummer, Inc. v. Blakeney,*
    950 So. 2d 170 (Miss. 2007).......................................................................... 11

*Russello v. United States,*
    464 U.S. 16, 26 (1983).................................................................................... 12

*Sec. Watch, Inc. v. Sentinel Sys., Inc.,*
    176 F.3d 369 (6th Cir. 1999) ....................................................................... 10

*Shearson/Am. Exp., Inc. v. McMahon,*
    482 U.S. 220 (1987)........................................................................................ 12

*Silec Cable S.A.S. v. Alcoa Fjardaal SF,*
    No. 12-01392, 2012 WL 5906535 (W.D. Pa. Nov. 26, 2012)........................... 5, 6

*Smith v. Normandy Props., LLC,*
    No. 07-351, 2007 WL 3072240 (W.D. Pa. Oct. 19, 2007) ...................................... 4

*The Knit With v. Knitting Fever, Inc.,*
    Nos. 08-4221, 2009 WL 3427054 (E.D. Pa. Oct. 20, 2009)................................... 12

*Turi v. Main Street Adoption Servs., LLP,*
    633 F.3d 496 (6th Cir. 2011) ........................................................................ 5

*Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer,*
    515 U.S. 528 (1995)........................................................................................ 14

*Westmoreland v. Sadoux,*
    299 F.3d 462 (5th Cir. 2002) ....................................................................... 8

I.       __INTRODUCTION__

Victor Dahdaleh's motion to compel arbitration arrogates to himself rights he does not possess and advocates for transfer of this suit to a forum which is impotent to give the relief sought in this proceeding.  He again moves for dismissal (despite this Court's earlier refusal to do so) or, alternatively, for yet another stay despite the unfair prejudice to Plaintiff who filed this action six years ago.

This is a case originally filed on February 27, 2008 in which Aluminium Bahrain B.S.C. ("Alba" or "Plaintiff"), has pled and will prove that Defendant Victor Dahdaleh ("Dahdaleh") is the same person designated as "Consultant A" in the criminal Information presented to this Court on January 9, 2014,[1] and that together with Alcoa, he engaged in the unlawful conduct and caused the harm described therein.[2]

As the Trial Judge is aware, the papers of the United States Department of Justice ("DOJ") tracked Alba's Complaint, as amended, and its RICO Case Statement.  In the Information and Statement of Facts, DOJ averred that Consultant A had central involvement in a corrupt international enterprise where, as middleman, he used shell companies to aid and abet Alcoa in maintaining Alba's business while buying cooperation and silence with huge bribes, all done surreptitiously via gross overcharges for alumina.

---

[1] The criminal information was a proceeding under The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, et seq., brought against Alcoa's subsidiary and styled *United States of America v. Alcoa World Alumina LLC*, Criminal No. 14-7.  The guilty plea taken by this Court resulted in a $209 million fine and a $14 million administrative forfeiture.  In a parallel action, the Securities and Exchange Commission brought a cease and desist proceeding against Alcoa, Inc. under the Securities Exchange Act of 1934 which resulted in a $175 million disgorgement.  The $384 million settlement is the fourth largest in FCPA history.  Although they are distinct corporate entities, for ease of reference herein, unless context requires otherwise, Alcoa, Inc., Alcoa World Alumina LLC and Alcoa of Australia are simply referred to as "Alcoa."

[2] Alba has estimated its damages resulting from this criminal activity to be in excess of $1 billion.  *See, e.g.*, RICO Case Statement at p. 54.

Dahdaleh belatedly asks that Alba's case be dismissed or stayed and sent to arbitration in London per (i) the 1990 contract between Alba and Alcoa of Australia – to which he never was a party and (ii) the 2005 contract with AAAC, one of his dummy companies – a written document in which Dahdaleh is carefully concealed, being neither a named party nor a signatory.[3] However, neither Alcoa of Australia nor AAAC are parties in this suit, and that is absolutely fatal to his motion. Assuming arguendo Dahdaleh was an agent to these signatories, he was an agent to entities not sued here. Alba sued Alcoa, Inc. and Alcoa World Alumina, neither of which had a written contractual relationship with Alba.

As a non-signatory, Dahdaleh can claim no benefit from the 1990 and 2005 contracts with non-parties to this litigation. His secret bank accounts, dummy companies and concealed payments depict a life lived in the shadows. Nothing compels the conclusion that Dahdaleh can suddenly emerge to rearrange the architecture of this case and assert rights under these contracts *as if* they were parties. Moreover, by the teachings of the Third Circuit, any rights (if they ever existed) were irrevocably waived.[4]

The arbitration Dahdaleh seeks applies the law of England and Wales, a legal system which possesses no equivalent to RICO. In that forum, he would undoubtedly assert the English defense of consent of principal, a concept antithetical to the notion of RICO liability. In his criminal proceedings, Dahdaleh asserted that because the payments at the core of Alba's case allegedly were consented to by high government officials who he claimed were relevant principals (and who also received bribes from Dahdaleh), there was no corruption or impropriety.

---

[3] Dahdaleh's claim of alter ego status is a matter of evidentiary proof. At present, said claim is simply a naked assertion.

[4] As later addressed, even if Dahdaleh had standing under the 2005 agreement (which he does not), any right to arbitration has also been waived. Moreover, applicable law holds that an arbitration under the 2005 Agreement would be limited to acts committed from and after 2005, thus impermissibly splitting Alba's causes of action.

2

Dahdaleh's present motion is a variation on the theme established in his earlier unsuccessful attempt to avoid answering in this Court for his personal involvement in a criminal enterprise operated out of Pittsburgh, Pennsylvania.  For the reasons that follow, his motion should be denied.

## II.    PROCEDURAL BACKGROUND

Alba's Complaint was filed on February 27, 2008.  On March 27, 2008, this Court permitted the United States to intervene and granted its request to stay all discovery pending criminal investigation.  That stay continued until November 8, 2011, when the Court reopened the case, imposing certain procedures to safeguard the DOJ's ongoing investigation.  Alba filed a First Amended Complaint ("Complaint") on November 28, 2011 and its RICO Case Statement one month later.  Alcoa and Dahdaleh filed Motions to Dismiss[5] that were denied June 11, 2012. After Alcoa settled with Alba in October 2012, this Court directed Dahdaleh to mediate with Alba.  On October 25, 2012, this Court granted Dahdaleh's motion for certification of interlocutory appeal and to stay discovery.  On January 25, 2013, the Third Circuit Court of Appeals denied his petition for permission to appeal.  Dahdaleh sought and received a continued stay of discovery in June 2013 until the conclusion of criminal proceedings in England.  His motion to dismiss, or for a stay and arbitration order, was filed January 16, 2014.

## III.    FACTUAL BACKGROUND

The facts necessary to disposition are set forth in Alba's First Amended Complaint, its RICO Case Statement and attached Declaration.  Additionally, Alba incorporates by reference and adopts the facts contained in the following:  (i) the criminal information filed on January 9, 2014 by the United States against Alcoa World Alumina LLC, Criminal No. 14-7; (ii) the Plea

---

[5] For purposes of the waiver argument, *infra*, it is important to recall that Dahdaleh's motion challenged not only personal jurisdiction, but also extraterritorial application of RICO, and the legal sufficiency of the RICO and state law claims.

Agreement including Exhibit 3, Statement of Facts; and (iii) the Order of the Securities and

Exchange Commission Instituting Cease-And-Desist Proceedings In the Matter of Alcoa, Inc.

## IV.   LEGAL ARGUMENT

### A.   Legal Standard

Contrary to Dahdaleh's brief,[6] a motion to dismiss a complaint and compel arbitration

can be subject to Rule 12(b)(6) *or* Rule 56, depending on the circumstances.  *Guidotti v. Legal*

*Helpers Debt Resolution, LLC*, 716 F.3d 764 (3d Cir. 2013)[7]; *see also Smith v. Normandy*

*Props., LLC*, No. 07-351, 2007 WL 3072240, *1 (W.D. Pa. Oct. 19, 2007) (analyzing motion to

compel arbitration pursuant to Rule 56).  Rule 12(b)(6) applies only when it is apparent *on the*

*face of the complaint* that a party's claims are subject to arbitration.  *Guidotti*, 716 F.3d at 771.

If a motion "does not have as its predicate a complaint with the requisite clarity" to establish that

the parties agreed to arbitrate, or where a non-movant comes forward with evidence to place the

question at issue, the motion is held to the summary judgment standard.  *Id.* at 774; *see also*

*Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 620 (3d Cir. 2009) ("A district court decides a

motion to compel arbitration under the same standard it applies to a motion for summary

judgment.");  *Great Am. Lines, Inc. v. Sanovi-Aventis U.S., LLC*, No. 2:12-cv-0988, 2013 WL

596421, *2 (W.D. Pa. Jan. 22, 2013) (same).  The moving party bears the burden of

demonstrating the absence of any genuine issues of material fact, and the party opposing

arbitration "is entitled to the benefit of all reasonable doubts and inferences that may arise."

*Smith*, 2007 WL 3072240, at *2; *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156,

159 (3d Cir. 2009).

Here, Rule 56 is the appropriate standard to apply to Dahdaleh's motion.

---

[6] *See* Dahdaleh Brief at p. 1 n. 1.
[7] In fact, the *Guidotti* decision that Dahdaleh cites to support his claim that Rule 12(b) governs actually applies Rule 56 to a motion to compel arbitration.  *Id.* at 779.

4

B.  __This Court Must Decide Issues of Arbitrability, Scope, and Waiver__.

The federal policy favoring arbitration "does not lead automatically to the submission of a dispute to arbitration upon the demand of a party." *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 84 (3d Cir. 2010).  Instead, every federal court faced with a motion to compel arbitration must determine (1) whether the parties entered into a valid arbitration agreement, and (2) whether the plaintiff's claims fall within its scope.[8]  *BDO Seidman, LLP v. Kirschner*, No. 09-634, 2009 WL 2168765, *2 (W.D. Pa. July 16, 2009); *MacDonald v. Unisys Corp.*, No. 12-1705, 2013 WL 2626929, *3 (E.D. Pa. June 12, 2013).  Thus, courts ultimately retain claims not subject to a valid arbitration agreement, or beyond its scope.  *Turi v. Main Street Adoption Servs., LLP*, 633 F.3d 496, 507 (6th Cir. 2011); *Kirschner*, 2009 WL 2168765, at *2.  Courts must also assess whether any federal statute or policy renders the dispute nonarbitrable.  *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-28 & n. 19 (1985).

This Court must also address Alba's contention that Dahdaleh has waived any right he may have had to request arbitration.  "Waiver of the right to arbitration based on litigation conduct remains presumptively an issue for the court to decide."  *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 221 (3d Cir. 2007); *see also Gray Holdco, Inc. v. Cassady*, No. 09-1519, 2010 WL 4687744, *2 (W.D. Pa. Nov. 10, 2010)) (stating that "whether a party has waived its right to arbitrate is for the court to decide"), *aff'd*, 654 F.3d 444 (3d Cir. 2011).

Dahdaleh's reliance on *Silec Cable* is misplaced.  *See* Dahdaleh Brief at pp. 10-11.  In *Silec Cable*, Alcoa Fjardaal commenced arbitration (in Pittsburgh, subject to Pennsylvania law) to determine whether an explosion at its site was caused by Silec's product.  *Silec Cable S.A.S. v. Alcoa Fjardaal SF*, No. 12-01392, 2012 WL 5906535, *1-2 (W.D. Pa. Nov. 26, 2012).  Some

---

[8] Dahdaleh's claim that a party's request for ICC arbitration automatically strips a court of the ability to assess arbitrability misstates the law.  *See* Dahdaleh Brief at pp. 10-11 & fn. 6.

five weeks into the arbitration, Silec filed a separate court action seeking a declaration of non-arbitrability.  *Id.*  The court concluded that it could not determine arbitrability because neither party had challenged the enforceability of the relevant arbitration provision.  *Id.* at *15.

The situation here is starkly different:  Alba *is* challenging the enforceability of the arbitration provisions with entities not sued here, based on their scope and Dahdaleh's non-signatory status; this action predates by six years the first request for arbitration; and even if the arbitration clause once was enforceable, it has long since been waived.  Moreover, a stay together with an order compelling arbitration would create the risk of inconsistent results, suspend this proceeding for an unknown amount of time and prejudicially delay Alba's longstanding RICO claims.  As a result, *Silec Cable* is of no controlling force and effect.  *See generally Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287 (3d Cir. 1996) (deciding arbitrability even though the relevant contract involved the ICC Rules of Arbitration).

### C.     The 1990 and 2005 Arbitration Provisions Do Not Apply to Dahdaleh.

Six years after this case was filed, Dahdaleh again[9] seeks to evade this Court's jurisdiction by demanding arbitration of Alba's claims in London under the law of England and Wales.[10]  Under well-settled law in the United States, there are two contract-based barriers to his request.  For this Court to compel arbitration, it must first conclude that:  (1) there is an enforceable agreement to arbitrate between Alba and Dahdaleh, and (2) Alba's claims against Dahdaleh fall within the scope of that agreement.  *Invista S.A.R.L.*, 625 F.3d at 84 (internal citations omitted).  Neither conclusion is warranted here.  There is no enforceable agreement to arbitrate between Alba and Dahdaleh, as he cannot enforce arbitration provisions in contracts with entities not present in this lawsuit.  Even if those provisions were to apply to Dahdaleh,

[9] He first attempted to avoid jurisdiction with his motion to dismiss, which this Court denied in June 2012.
[10] As discussed below, his delay serves to waive any ability he may have had to demand arbitration.

6

Alba's claims fall well outside the scope of those contracts.  And in any event, as is later addressed at length, any right to request arbitration has been waived.

### 1.    No Agreement Exists Between Alba and Dahdaleh.

None of Alba's claims against Dahdaleh – for RICO, conspiracy to violate RICO, civil conspiracy, and fraud – require the existence of a contract.[11]  Because Alba could maintain all of its causes of action against Dahdaleh without reference to the 1990 and 2005 contracts, Dahdaleh's extended contract-based analysis in his brief is disingenuous.

Dahdaleh's contract-based arguments fail because he was not a signatory to any relevant contract and because he cannot claim the benefit of any contract through agency, estoppel, or alter ego theories.  His name appears nowhere in either of the relevant contracts or their amendments.  Alba entered into the 1990 contract with Alcoa of Australia, and Alba entered into the 2005 contract with a company called AAAC; neither is a party here and Dahdaleh has no license to pretend that they are.  Dahdaleh argues that he should get the benefit of the arbitration provisions in those two contracts, even though he signed neither.  In Pennsylvania, however, "the presumption of arbitrability has never been extended to claims by or against non-signatories." *Miron v. BDO Seidman*, *LLP*, 342 F. Supp. 2d 324, 332 (E.D. Pa. 2004).  This is because arbitration is a matter of contract "and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit."  *Id.* at 328; *see also Howsam v. Dean Witter*, 537 U.S. 79, 83 (2002).  As a result, "exceptional circumstances must apply before a court will

---

[11] The "factual background" in Dahdaleh's brief paints a grossly misleading picture of this case as merely a contractual dispute between the parties.  Dahdaleh's facile statement that Alba's allegations are at their core breach of contract claims ignores Alba's descriptions of Dahdaleh's criminal misdeeds and overlooks the fact that Alba pleads no contract-based claims against him. *See* Dahdaleh Brief at pp. 5, 13.  From the first paragraph of its Complaint, Alba makes clear that this action "arises from a *criminal* scheme perpetrated by [Defendants] to defraud [Alba] of hundreds of millions of dollars through a *conspiracy of illegal bribery and other criminal acts*." *See* Complaint at p. 1 (emphasis added).  Among other things, Alba seeks damages in excess of $1 billion, including punitive damages, for Defendants' "massive, outrageous fraud."  *See* Complaint at p. 2.  This is not hyperbole; Alcoa has admitted this all occurred.

impose a contractual agreement to arbitrate on a non-contracting party." *Devon Robotics v. Deviedma*, No. 09-cv-3552, 2009 WL 4362822, *4 (E.D. Pa. Nov. 30, 2009).

Dahdaleh says that he can compel arbitration as an "agent" of Alcoa of Australia. Dahdaleh perverts the word "agent," using it in a bland commercial sense to claim alleged rights and remedies of business law, in stark contrast with Alba and the Federal Government who used "agent" in their court papers only as a synonym for "criminal accomplice," "co-conspirator" or "sham distributor." Dahdaleh was the Alcoa subsidiary's agent "for the sole purpose of facilitating and concealing their massive fraud on Alba." *See* Complaint at ¶ 21. Alba's references to Dahdaleh as an "agent" are within the context of the fraudulent scheme that the Defendants operated, and any "agency" relationship existed solely to perpetuate that scheme. Since neither Alcoa of Australia nor AAAC are parties here, their contract provisions do not control this proceeding.

There also were no real contract assignments as that term is understood in U.S. law. Alcoa continued to mine and deliver the alumina, not Dahdaleh or any of his dummy companies. Even the fake references used in the conspirators' correspondence concerning supply originating with shell companies were for only a part of the tonnage involved.

Even if Dahdaleh were deemed an agent, Pennsylvania federal courts have denied requests by non-signatory agents to enforce arbitration provisions. *See, e.g.*, *Miron*, 342 F. Supp. 2d at 332-34.[12] *Miron* illustrates the fatal weakness of Dahdaleh's attempt to compel arbitration. The *Miron* court enforced the relevant arbitration clause against the defendant signatory (BDO) for the plaintiff's RICO, civil conspiracy, and breach of contract claims. But when non-signatory defendant Deutsche Bank sought arbitration of those same claims as BDO's agent, the court denied the request because Deutsche Bank did not sign the relevant agreement and because

---

[12] Other federal courts are in agreement. *See Westmoreland v. Sadoux*, 299 F.3d 462, 466-67 (5th Cir. 2002); *McCarthy v. Azure*, 22 F.3d 351, 356-59 (1st Cir. 1994).

it was "disingenuous for [Deutsche Bank] to admit an agency relationship for the purposes of compelling arbitration while simultaneously defending against substantive charges of conspiracy." *Id.* at 332-33.  The same is true here.

The *Miron* court likewise rejected Deutsche Bank's estoppel theory (which Dahdaleh also argues) because the RICO claim was a statutory remedy independent of the underlying agreement.  *Id.* at 333.  As the court explained, a plaintiff's "actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is . . . the *sine qua non* of an appropriate situation" for estoppel.  *Id.*; *see also Denney v. Jenkins & Gilchrist*, 412 F. Supp. 2d 293, 297-99 (S.D.N.Y. 2005) (rejecting estoppel argument and denying non-signatory bank's request to arbitrate investors' RICO claims).  Here, where Alba's causes of action are independent of the 1990 and 2005 contracts, this Court should deny Dahdaleh's request for arbitration based on an estoppel theory.  *Id.* at 333-34.[13]  Even under the estoppel theory, this Court would have to engage in a fact-specific analysis of, *inter alia*, the relationship of the alleged wrongs to Dahdaleh's obligations and duties in the contract.  *Oral Cancer Prevention Int'l, Inc. v. Johnson & Johnson*, 3:11-cv-3878, 2011 WL 6130599, *5 (D.N.J. Dec. 7, 2011).

The arbitration provision in the 2005 contract is equally unavailing.  Alba entered into that contract with AAAC – *not* Dahdaleh.  The cases cited above barring non-signatories from arbitration apply with equal force to that contract.

Moreover, even if the 2005 contract could apply to Dahdaleh as a non-signatory, it can only apply to post-2005 conduct.  This is because the relevant arbitration provision covers "any dispute . . . arising under or in connection with *this Agreement*."  Courts have interpreted the

---

[13] Dahdaleh's reliance on the alter ego theory to compel arbitration is similarly without merit. He cites *Pearson v. Component Corp.*, 247 F.3d 471 (3d Cir. 2001), to support his claim for arbitration under the 1990 Contract.  *Pearson* states that veil-piercing is appropriate to *prevent* fraud, illegality, or injustice.  *Id.* at 484.  Here, Dahdaleh seeks to use the alter ego theory to *avoid* liability for his alleged criminal acts.  Moreover, whether Dahdaleh was in fact the alter ego of AAAC is a fact-specific inquiry requiring an evidentiary record.

9

"this Agreement" language to apply only to claims arising *after* the agreement was signed –

which in this case was June 2005.  *See Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372

(6th Cir. 1999) (finding no retroactivity in arbitration clause covering "all disputes . . . arising out

of or relating to the Products furnished pursuant to *this Agreement*") (emphasis added); *Choice*

*Sec. Sys., Inc. v. AT&T Corp.*, 141 F.3d 1149 (Table), 1998 WL 153254, *1 (1st Cir. Feb. 25,

1998) (same).  The vast majority of criminal conduct that Dahdaleh engaged in occurred between

1990 and mid-2005.  *See* Complaint at ¶ 20 (stating that Dahdaleh first began his illegal behavior

in 1990).  Thus, even if Dahdaleh has standing under the 2005 agreement to request arbitration,

that proceeding would be limited to acts committed and damages incurred from 2005 onwards,

which would impermissibly split Alba's causes of action.

> **2.      Alba's Claims Are Beyond the Scope of Either Arbitration
> Provision.**

When a plaintiff alleges that a defendant has engaged in criminal activity or unlawful

conduct that no plaintiff could reasonably foresee at the time the contract was executed,

arbitration is inappropriate.  *See Hemispherx Biopharma, Inc. v. Johannesburg Consol. Inv.*, 553

F.3d 1351, 1366-67 (11th Cir. 2008) (affirming denial of arbitration request because it was not

"reasonably foreseeable" that defendants would make misrepresentations to plaintiff when the

relevant agreement was executed); *Ford v. NYLCare Health Plans of the Gulf Coast, Inc.*, 141

F.3d 243, 250 (5th Cir. 1998) (holding that a doctor's false advertising claim against HMO was

not sufficiently related to his medical services agreement to be subject to that agreement's

arbitration clause); *Rogers-Dabbs Chevrolet-Hummer, Inc. v. Blakeney*, 950 So. 2d 170, 178

(Miss. 2007) (finding that car buyer did not agree to arbitrate claims arising from dealership's sale of stolen cars when he signed relevant purchase agreement).[14]

To determine whether a plaintiff's claims fall within the scope of an arbitration agreement, courts often ask whether the action could be maintained without reference to the contract at issue. *See Ford*, 141 F.3d at 250-251 ("[C]ourts look at the facts giving rise to the action and to whether the action '*could be* maintained without reference to the contract'") (internal citations omitted); *see also Hemispherx Biopharma*, 553 F.3d at 1367. Alba's claims against Dahdaleh are entirely independent from the 1990 and 2005 contracts, and could easily be maintained even if the contracts did not exist. Alba needs no contractual relationship with Dahdaleh to establish its claims, and in fact, no such relationship existed. As a result, Alba's claims are well beyond the scope of the contracts and are not subject to arbitration. *See Kirschner*, 2009 WL 2168765, at *2 (denying a request for arbitration because plaintiff's claim regarding defendants' post-mediation conduct "did not . . . arise in connection with the performance" of the contract at issue); *MacDonald*, 2013 WL 2626929, at *3 (denying request for arbitration where claim fell outside scope of arbitration agreement).

D.     **An English Arbitration Is Not Comparable to This Proceeding**.

England and Wales have no statutory equivalent to RICO. Granting Dahdaleh's motion would thereby allow him to evade the jurisdiction and established laws of this country aimed at providing a forum for private litigants to combat criminal conspiracies. The Supreme Court has warned against this very situation, and in similar circumstances courts have not enforced arbitration clauses that would strip plaintiffs of their statutory rights.

---

[14] *See also Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1219 (11th Cir. 2011) (denying arbitration of plaintiff's allegations of false imprisonment, intentional infliction of emotional distress, and other torts following her alleged rape because they "do not arise from, do not relate to, and are not connected with" her services agreement with defendant).

11

That is of particular concern here, where Alba does not plead an ordinary civil RICO claim but instead makes allegations akin to those made "against the archetypal, intimidating mobster." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 242 (1987).  In *Shearson*, the Supreme Court distinguished between "run-of-the-mill civil RICO claims brought against legitimate enterprises," which could be arbitrated on the one hand, and the more exceptional RICO cases "against organized crime" on the other.  *Id.*  Alba's case is very clearly of the latter sort; its original Complaint set in motion numerous criminal investigations across the globe that have resulted in guilty plea agreements, a cease and desist order, and massive criminal fines.

To grant Dahdaleh's motion would ignore the reasoning in *Shearson* and effectively terminate Alba's RICO case.[15]  This is because there is no statutory analogue to RICO in England or Wales.  This foreign law cannot provide Alba with remedies comparable to those in RICO, such as treble damages and the recovery of Alba's significant attorneys' fees.

Staying this matter during pendency of a UK arbitration would constitute unfair prejudice to Alba.  This action was filed six years ago and is based upon events that extend back twenty years.  Some key witnesses have retired; others are increasingly difficult to trace.  Although Alba has never sought a stay, it has been precluded from using the federal discovery tools since 2008.  Each passing day makes prosecution of its claims that much harder.

---

[15] Dahdaleh's characterization of Alba's RICO claims as dressed-up contract claims obfuscates the facts of this case and ignores RICO's purpose.  RICO's legislative history demonstrates that it "was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots."  *Russello v. United States*, 464 U.S. 16, 26 (1983).  In fact, a Pennsylvania federal court specifically rejected the argument that RICO claims sound in contract, noting that "[t]he source of the duties in a RICO action flow from neither a contract between the parties nor social policy/mutual consensus, but rather from federally imposed legislation designed to 'quell the potence and persistence of organized crime.'"  *The Knit With v. Knitting Fever, Inc.*, Nos. 08-4221, 08-4775, 2009 WL 3427054, *6 (E.D. Pa. Oct. 20, 2009) (internal citations omitted).

### 1.      Dahdaleh Will Assert the Consent of Principal Defense in England.

Dahdaleh does not disclose here that an English proceeding could allow him to utilize the defense of "consent of principal," which is not a defense to RICO.  According to that defense, when a principal has consented to bribery, the person who actually pays the bribes is free from liability.  *See R v. J, V, B & S*, [2013] EWCI (Crim) 2287 (Court of Appeal of England and Wales Dec. 5, 2013) (describing the defense), attached as Exhibit A.  Dahdaleh has taken the position that the consent of a powerful Bahraini government representative, who approved every bribe, affords him a complete defense.  *See* Statement by Dahdaleh's counsel at May 7, 2013 Bail Hearing, attached as Exhibit B, at 49:17-24 (stating that "at the heart of this case is the issue whether or not . . . everything that took place was with the consent or agreement of the principal").

Consent of principal is antithetical to RICO.  No United States court, for example, would countenance a defense that an accused could walk free if he could show that company or governmental officials were willing to accept and approve bribes.  The availability of this defense in the law of England and Wales ensures that, even if Alba could plead RICO claims at a London arbitration, those claims could be subject to a defense that would not be entertained in an American court.[16]

---

[16] Only in our court system, and by application of the Federal Rules of Civil Procedure and Evidence, are parties given the full panoply of litigation discovery tools to uncover relevant facts.  Nor should our common language cause anyone to believe that the U.S. and U.K. legal systems are comparable.  For example, in England, Section I of the Civil Evidence Act of 1995 states that "evidence shall not be excluded on the ground that it is hearsay" in civil cases.  *See* Christopher Allen, Practical Guide to Evidence, p. 25 (Cavendish 1998); Colin Tapper, Cross & Tapper on Evidence, p. 563 (Butterworths 1999).  And discovery is restricted there in a way not tolerated here.  Worse yet, the ICC Rules leave it to the parties to agree on the extent of discovery, which given the contentiousness of this case is most unlikely.

**2.     The Effective Vindication Doctrine Applies to This Case.**

The effective vindication doctrine provides another basis to keep this case here.  The doctrine, originated by the Supreme Court in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), has evolved into a recognized exception to the general policy in favor of arbitration.  The doctrine is applied when, as here, arbitration would serve to substantially deprive a party of rights and remedies otherwise available.  *Id.* at 637 n. 19.

The Supreme Court in *Mitsubishi* observed that in certain circumstances, it would refuse to enforce arbitration agreements on public policy grounds.  As the Court stated, "In the event the choice-of-forum and choice-of-law clauses operate in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the [arbitration] agreement as against public policy."  *Id.*; *see also Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 540 (1995) (reiterating effective vindication exception); *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) (citing *Mitsubishi* and describing as unenforceable arbitration agreements involving the substantive waiver of a party's statutory rights).

Courts have subsequently invalidated arbitration clauses that would strip parties of their right to pursue statutory remedies.  *See, e.g.*, *Paladino v. Avnet Computer Tech., Inc.*, 134 F.3d 1054, 1060 (11th Cir. 1998) (refusing to enforce arbitration agreement depicted as "fundamentally at odds with the purposes of Title VII"); *Graham Oil Co. v. Arco Prods. Co.*, 43 F.3d 1244, 1248 (9th Cir. 1995) (severing arbitration clause from contract because it violated the Petroleum Marketing Practices Act by compelling franchisee to surrender important statutory rights); *Cent. Nat'l-Gottesman, Inc. v. M.V. "Gertrude Oldendorff,"* 204 F. Supp. 2d 675, 679 (S.D.N.Y. 2002) (finding that forum selection clause "operates as a prospective waiver" of plaintiff's statutory rights).

14

A London arbitration panel obliged to apply the law of England and Wales could not hear Alba's federal RICO claims.  Even if a panel were to allow Alba to plead RICO, the consent of principal defense could be interposed to defeat those claims.  Granting the motion to dismiss and remanding to arbitration would make it impossible for Alba to prosecute its rights under RICO.  This is exactly what concerned the Supreme Court in *Mitsubishi*.  Because this case falls squarely within the effective vindication doctrine, the Motion should be denied.[17]

### E.     Dahdaleh Has Waived His Right to Seek Arbitration.

Under controlling Third Circuit authority, Dahdaleh's motion cannot succeed because his litigation conduct since 2008 unmistakably waives any right he may have had to arbitration under either the 1990 Contract or the 2005 Contract.

"The right to arbitrate [is] waived where a sufficient showing of prejudice has been made by the party seeking to avoid arbitration."  *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 208 (3d Cir. 2010).  Prejudice results "from the unnecessary delay and expense incurred by the plaintiffs as a result of the defendants' belated invocation of their right to arbitrate."  *In re Pharmacy Benefit Managers Antitrust Litig.*, 700 F.3d 109, 121 (3d Cir. 2012).  Parties opposing arbitration

---

[17] The cases cited in footnote 8 of Dahdaleh's brief are distinguishable.  They all involve suits against Lloyd's of London and apply Rule 12(b) to assess choice-of-law and forum selection clauses.  *See Richards v. Lloyd's of London*, 135 F.3d 1289, 1290 (9th Cir. 1998); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1290 (11th Cir. 1998).  In each case, the court found that adequate remedies were available to plaintiffs litigating in England, which is not true here due to the consent of principal defense.  Importantly, each court focused its discussion on the viability of securities claims overseas, *not* on RICO claims – in fact, the discussion of RICO is virtually non-existent.  *See Bonny v. Soc'y of Lloyd's*, 3 F.3d 156 (7th Cir. 1993) (no discussion of RICO); *Lipcon*, 148 F.3d at 1287 (framing the key issue on appeal as "whether . . . the United States securities laws preclude enforcement of . . . forum-selection clauses in international agreements"); *Richards*, 135 F.3d at 1296 (same).  The courts also addressed whether arbitration would run afoul of *Mitsubishi* footnote 19, and noted that if a plaintiff could show – as Alba does here – that available remedies in England were insufficient, they "would not hesitate to condemn the . . . arbitration clauses as against public policy."  *See Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361, 1365 (2d Cir. 1993) (noting also that "if the substance of [plaintiffs'] claims . . . does not fall within the scope of the [arbitration clauses], the clauses cannot apply").

suffer prejudice where they have "invested considerable time and expense in litigating their case, and would be required to duplicate [their] efforts . . . if the case were now to proceed in the arbitral forum." *Id.* (citing *Ehleiter v. Grapetree Shores,* 482 F.3d 207, 224 (3d Cir. 2007)). "Arbitration is meant to streamline proceedings, reduce costs, and conserve resources, and none of these purposes are served when a party actively litigates a case for an extended period only to belatedly assert that the dispute should have been arbitrated, not litigated, in the first place." *Id.* (internal citations omitted).

In *Pharmacy Benefit Managers Antitrust Litigation* ("*PBM*"), 700 F.3d 109 (3d Cir. 2012), the Third Circuit addressed a situation nearly identical to the present case.  After ten months of defending an antitrust class action *but before discovery had begun*, the defendant sought to enforce a mandatory arbitration provision between itself and plaintiffs.  The district court ordered arbitration, but the Third Circuit reversed, finding waiver due to the defendant's pre-discovery litigation conduct.

In considering whether waiver had occurred, the *PBM* court analyzed six key factors:

> (1) the timeliness or lack thereof of the motion to arbitrate; (2) the extent to which the party seeking arbitration has contested the merits of the opposing party's claims; (3) whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings; (4) the extent to which a party seeking arbitration engaged in non-merits motion practice; (5) the party's acquiescence to the court's pretrial orders; and (6) the extent to which the parties have engaged in discovery.

*Id.* at 117 (citing *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992)).  Noting that "not all the factors need be present to justify a finding of waiver," the court determined that waiver was appropriate since the first five factors supported such a finding.  *Id.* at 118 (citing *Nino*, 609 F.3d at 209).

Analyzing each factor, it is clear that the case for waiver is even more compelling here.

1. <u>Timeliness of Motion</u>:  In *PBM*, the defendant's motion to compel arbitration was filed ten months after the complaint, which the court noted was "significantly longer than the cases in which we have found no waiver."  *Id.* at 119 (citing cases).  Dahdaleh filed his Motion six years after the action began and over two years after the original stay was lifted.[18]

2. <u>Extent to Which Movant Contested Merits</u>:  The *PBM* court noted that the defendant had filed thirty-eight pages of briefing on its motion to dismiss and a binder of exhibits, as well as a twelve-page motion for reconsideration after the motion was denied, which was "significantly more activity on the merits than in cases in which we found no waiver."  *Id.* at 118.  In January and March 2012, Dahdaleh filed forty-three pages of briefing on his motion to dismiss (Dkt. Nos. 73, 75, and 89), with 127 pages of exhibits (Dkt. No. 77).

3. <u>Notice</u>:  The defendant in *PBM* had given no prior indication of its intent to arbitrate, which the court found weighed in favor of finding waiver.  *Id.* at 118-19.  Here, Dahdaleh repeatedly requested stays of this case while his criminal trial was pending to allow him to "candidly participate" in discovery following that trial.  *See* Dkt. No. 136 at p. 2 and No. 146.  Dahdaleh's counsel first mentioned the intention to file a motion to compel arbitration on December 16, 2013, a month before filing the Motion, almost six years after the case began, and almost two years after the original motion to dismiss.

4. <u>Extent of Non-Merits Motions Practice</u>:  The *PBM* Court found that the defendant's motions for admission *pro hac vice*, for leave to file a reply brief, to continue a pretrial conference, and for certification of interlocutory appeal weighed in favor of finding waiver.  *Id.* at 119.  Dahdaleh has engaged in much more extensive motions practice:  two motions to stay discovery (Dkt. Nos. 108, 136), three briefs in support of those motions (Dkt. Nos. 110, 126, 146), one declaration in support (Dkt. No. 109), a motion for certification of interlocutory appeal

---

[18] Moreover, this case was actively litigated for eleven months in 2011 and 2012 in between stays.

(Dkt. No. 111), two briefs in support of same (Dkt. Nos. 112, 127), a motion for leave to file a reply brief (Dkt. No. 123), a motion for leave to file documents under seal (Dkt. No. 144), a motion for oral argument (Dkt. No. 93), three requests for extensions of time in which to respond (Dkt. Nos. 81, 103, 115), a stipulation on page limits for briefing (Dkt. No. 68), four motions for admission *pro hac vice* (Dkt. Nos. 42, 43, 147, 148), four notices of appearance (Dkt. Nos. 30, 40, 41, 149), and a motion to withdraw his original counsel of record (Dkt. No. 152).  After this Court granted his motion for certificate of appealability, Dahdaleh filed with the Third Circuit a petition for permission to appeal and five notices of appearance in November 2012 in the matter captioned *Aluminum Bahrain B.S.C. v. Alcoa, Inc.* (No. 12-8104).

5.  <u>Acquiescence to Pretrial Orders</u>:  In *PBM*, the defendant participated in a hearing on a motion to dismiss and complied with scheduling orders.  *Id.* at 120.  Here, Dahdaleh participated in every hearing and Court conference, abided by the Court's scheduling orders, and submitted a mediation statement when the Court ordered mediation.  The Court, in granting his request for a stay of discovery, noted that "a stay until the conclusion of Defendant's criminal trial will streamline discovery and preserve judicial economy because Defendant will be able to candidly participate in the discovery process following his criminal trial."  Dkt. No. 133 at p. 3.  Dahdaleh embraced this Court's reasoning, referring to it both in his request for an extension of the stay and in a reply in support of that request.  *See* Dkt. No. 136 at p. 2 and No. 146.

6.  <u>Extent of Discovery</u>:  No discovery had taken place in *PBM*, but the court still found waiver had occurred and noted that other Circuits had found waiver even in the absence of discovery.  *Id.* at 120 (citing *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156 (2d Cir. 2010) and *Khan v. Parsons Global Servs., Ltd.*, 521 F.3d 421 (D.C. Cir. 2008)).  Thus, the fact that no discovery has occurred here (especially considering

Dahdaleh's repeated requests that discovery be stayed) does not preclude this Court from finding waiver.

The *PBM* decision is controlling authority and directly on point. Having found that the *PBM* plaintiffs prevailed on five of the six factors, the Third Circuit found that waiver had occurred and stated that the defendant "should not be allowed to delay its demand for arbitration and use federal court proceedings to test the water before taking a swim." *PBM*, 700 F.3d. at 122.

As the Court is aware, Alba commenced this action six years ago (February 2008) and Dahdaleh first raised the matter of arbitration in December 2013.[19] Having tested the waters of this Court, he now seeks to change the forum and force Alba to lose statutory rights (dismissal) and to incur duplicative litigation costs (stay). Dahdaleh's delay is particularly prejudicial where Alba has spent more than $1 million litigating here. *See* Declaration of Connor Mullin, attached as Exhibit C, at ¶ 2. Since 2008, the DOJ's stay has come and gone; Alba has defeated three motions to dismiss; and Dahdaleh's criminal trial, with its own extended postponement due to his alleged witness tampering, has concluded. That entire time, Alba understood and reasonably expected that this dispute would be resolved by a jury trial in this Court. Given the unfair prejudice to Alba, Dahdaleh has waived the right to arbitrate.

---

[19] Dahdaleh's citation to *PaineWebber Inc. v. Faragalli*, 61 F.3d 1063 (3d Cir. 1995), a case decided seventeen years before *PBM*, does not help his cause. *See* Dahdaleh brief at 18-19. The court there determined that the *less than two month* period between the filing of Plaintiff's complaint and the defendant's motion to compel arbitration, where there had been *no briefing on the merits*, did not constitute waiver. *Id.* at 1068-69. The "five-year period" that Dahdaleh mentions in his brief constituted the time that the plaintiff's petition for writ of summons was on file in state court without him taking *any action whatsoever* on it. In other words, *Faragalli* is not on point in any sense.

## CONCLUSION

For the reasons set forth herein, Dahdaleh's motion should be denied.


Dated:  February 21, 2014                    Respectfully submitted,


                                             /s/ Charles B. Gibbons
                                             Charles B. Gibbons
                                             Christopher A. Amar
                                             Mackenzie A. Baird
                                             BUCHANAN INGERSOLL & ROONEY PC
                                             One Oxford Centre
                                             301 Grant Street, 20th Floor
                                             Pittsburgh, PA  15219-1410
                                             (412) 562-8800

                                             Mark J. MacDougall
                                             W. Randolph Teslik
                                             Kristine L. Sendek-Smith
                                             AKIN GUMP STRAUSS HAUER & FELD LLP
                                             1333 New Hampshire Avenue, NW
                                             Washington, DC  20036
                                             (202) 887-4000

                                             *Counsel for Plaintiff Aluminium Bahrain B.S.C.*