## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALUMINIUM BAHRAIN B.S.C.,    )
                              )
            Plaintiff,        )
                              )
      v.                      )
                              )    Civ. No. 8-299
VICTOR DAHDALEH               )
                              )
            Defendant.        )

AMBROSE, Senior U.S. District Judge

## OPINION

### and

## ORDER OF COURT

Pending before me is Defendant Victor Dahdaleh's Motion to Dismiss the Amended Complaint without prejudice in favor of arbitration or, alternatively, to stay the action and compel mandatory arbitration. ECF No. [157]. Currently, discovery in this case is stayed because Mr. Dahdaleh was being prosecuted in the United Kingdom for offenses involving facts and allegations similar to those before me. At Mr. Dahdaleh's request, I stayed discovery until the resolution of his U.K. trial to avoid prejudicing his criminal case. ECF No. [155]. Mr. Dahdaleh's U.K. case resolved in December 2013 and now, he seeks the dismissal of Plaintiff Aluminum Bahrain B.S.C.'s ("Alba") First Amended Complaint without prejudice or, in the alternative, asks me to stay this case, and compel mandatory arbitration. Def.'s Br., ECF No. [158], 2. Both sides filed briefs in support of their positions. ECF No. [158] (Mr. Dahdaleh's

Brief in Support); ECF No. [160] (Alba's Opposition); ECF No. [161] (Mr. Dahdaleh's Reply). After careful consideration, Defendant's motion is granted.

## I. Background

The case before me arises out of Mr. Dahdaleh's involvement in Alba's procurement of alumina, a raw material necessary for its production of aluminum, starting in 1990. *See* First Amend. Compl. ("AC"), ECF No. [64], ¶ 21. The extensive background of this case is well known to the parties. Distilled to its essence, Alba alleges that Mr. Dahdaleh participated in a criminal scheme to defraud it by establishing shell companies and paying *quid pro quo* bribes to induce Alba to overpay for alumina. AC ¶¶ 23-25.

Alba, a Bahraini entity, is one of the world's largest aluminum producers and is majority owned by the Government of Bahrain. AC ¶ 17. Alcoa Inc. is a Pennsylvania corporation and the majority owner of Alcoa World Alumina LLC and Alcoa of Australia Ltd. AC ¶¶ 5-6, 12 (collectively "Alcoa").[1] Mr. Dahdaleh owned several entities involved in providing alumina to Alba. AC ¶¶ 14-15. Those entities included Alumet Limited, Kwinalum Trading Pte Limited, Alumet Asia Pte Limited, and three companies named AA Alumina & Chemicals ("AAAC-1," "AAAC-2," and "AAAC-3"). *Id.* Alumina, the "principal raw input" for the production of aluminum, constitutes 80% of Alba's raw material costs. AC ¶ 18.

Alba alleges that that Mr. Dahdaleh helped Alcoa operate a criminal scheme wherein Alcoa and its senior U.S executives illegally profited by overcharging Alba for the alumina that Alba purchased from Alcoa and its subsidiaries. AC ¶¶ 21-30. Under the scheme, Alcoa's illegal profits were also used to pay *quid pro quo* bribes to senior executives of Alba and the Government of Bahrain to induce Alba to enter into economically disadvantageous contracts

---

[1] Alcoa Inc., Alcoa World Alumina LLC, and Alcoa of Australia are distinct corporate entities. I collectively refer to them as "Alcoa" for ease of reference.

with Alcoa.  AC ¶¶ 23-26.  Alba alleges that, in furtherance of the criminal scheme, Mr. Dahdaleh established a series of offshore shell companies and convinced Alba to deal with the shell companies as subsidiaries and affiliates of Alcoa.  AC ¶ 24.  Alba claims that: (1) the shell companies added no legitimate economic value to the transactions in which they were involved; (2) their true purpose and role was to purchase alumina from Alcoa at market rates and then to resell the very same alumina to Alba at inflated prices; and (3) these offshore shell companies were also a vehicle for funneling the *quid pro quo* bribes to Alba's senior executives and the Bahraini government and for distributing the illegal proceeds among the participants involved in the scheme.  AC ¶¶ 26, 39-42; *see also* Alba's RICO Case Statement ("RCS"), ECF No. [66], 13-15.

During the relevant time period, Alba entered into two contracts for the procurement of alumina: (1) the 1990 contract with Alcoa of Australia (an Alcoa subsidiary) and (2) the 2005 contract with AAAC-3.  AC ¶¶ 38 & 142.  Alba alleges that the alumina prices under the 1990 contract included the cost of "commissions" or money paid to Mr. Dahdaleh by Alcoa of Australia through a series of Agency Agreements.  AC ¶ 19.  Mr. Dahdaleh purportedly used portions of this money to bribe senior Alba and Bahraini government officials.  AC ¶ 42. According to Alba, Alcoa of Australia fulfilled its alumina supply obligations under the 1990 contract by assigning it to Mr. Dahdaleh's shell companies.  RCS 7-9.

The 1990 contract, following several extensions and an amendment, remained in effect through 2004.  RCS 8.  Alba alleges that it then was induced to enter into a new ten-year alumina supply agreement with a Dahdaleh-owned shell company, AAAC-3.  RCS 9.  Alba claims that Mr. Dahdaleh had a side agreement with Alcoa to purchase and re-sell alumina to Alba at an inflated price.  *Id.*  Alba alleges that this agreement also granted Mr. Dahdaleh use of Alcoa's

3

logo and trademarks in order to deceive Alba into thinking that it was dealing with a legitimate Alcoa affiliate. *Id.*

Prior to negotiation of the 2005 contract, Alba alleges that Alcoa attempted to acquire a stake in Alba at a depressed price. RCS 10. Alba claims that Mr. Dahdaleh acted as, and was held out to be, an authorized agent and representative of Alcoa during the share sale negotiations that ultimately fell through. AC ¶¶ 113 & 115.

Both the 1990 and 2005 contracts contain clauses requiring arbitration of "[a]ny dispute, controversy or claim arising under or in connection with" the agreements. Def.'s Br. 4 (citing Article 13.1 of both the 1990 and 2005 contracts). Mr. Dahdaleh asks me to dismiss or stay the case in favor of arbitration pursuant to these contractual provisions. Def.'s Br. 5, 10-11.

## II.    Standard

The parties disagree on the standard that I should use to review Mr. Dahdaleh's motion. Mr. Dahdaleh requests that I apply Rule 12(b)(6) because his motion merely attacks "the legal significance of Alba's pleadings and the allegations in them." Def.'s Br. 1. Alba contends that Rule 56 is the appropriate legal standard. Pl.'s Br. 4. The standard for motions to compel arbitration depends on the circumstances. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774-76 (3d Cir. 2013). "[W]hen it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'" *Id.* at 776. However, limited discovery and review of a renewed motion under a summary judgment standard is appropriate where the validity of the arbitration agreement is at issue. *Id.* at 774. Here, Alba does not contest the validity of the arbitration agreements or deny that it intended to be bound by them. Rather, Alba

4

contests that Dahdaleh is not a party who can enforce the arbitration agreements and that the agreements cannot be enforced for various policy reasons. Therefore, I apply a Rule 12(b)(6) standard.

A court may compel arbitration only where there is "no genuine issue of fact concerning the formation of the agreement" to arbitrate and, in making this decision, a court must give "the party opposing arbitration 'the benefit of all reasonable doubts and inferences that may arise.'" *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 158 (3d Cir. 2009) (citing *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)). Under a 12(b)(6) standard, a court must "accept all factual allegations in the complaints and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiffs." *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993). In so doing, I will not consider any conclusory allegations in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007): "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (internal citations and alterations omitted).

In a civil RICO case, the RICO case statement is part of the pleadings. *See id.* Additionally, a court may look "to matters of public record, including court files and records, and documents referenced in the complaint or are essential to a plaintiff's claim which are attached to a defendant's motion." *Colbert v. Mercy Behavioral Health*, 845 F. Supp. 633, 637 (W.D. Pa. 2012) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192 (3d Cir. 1993)).

## III.    Analysis

The parties do not dispute that the arbitration agreements are governed by the Federal Arbitration Act ("FAA"). 9 U.S.C. § 1 *et seq.* The FAA "establishes a 'federal policy favoring arbitration." *McMahon*, 482 U.S. at 226 (quoting *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)).[2] "This duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights." *Id.* "The strong federal policy favoring arbitration, however, does not lead automatically to the submission of a dispute to arbitration upon the demand of a party to the dispute." *Invista S.A.R.L.*, 625 F.3d at 84. Before compelling a party to arbitrate pursuant to the FAA, a court must first determine whether there is an agreement to arbitrate. *Id.* "Because an arbitrator's authority derives solely from the parties' agreement to submit their disputes to arbitration, a party cannot be compelled to submit a dispute to arbitration unless it has agreed to do so." *Id.* (internal citations omitted).

### A.  Whether Mr. Dahdaleh May Enforce the Arbitration Agreements

Alba asserts that Mr. Dahdaleh cannot enforce the arbitration agreements because he was not a party to them. Pl.'s Br. 7-10. When asked to enforce an arbitration agreement, the Third Circuit instructs courts to apply traditional principles of contract and agency law. *E.I. Dupont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Interm, S.A.S.*, 269 F.3d 187, 194-95 (3d Cir. 2001). Mr. Dahdaleh submits several contractual theories under which he can enforce the arbitration agreements as a non-signatory: (1) agency, (2) alter ego, and (3) equitable estoppel.

---

[2] The FAA incorporates the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), 21 U.S.T. 2517. *See* 9 U.S.C. § 201. "[T]he principal purpose underling American adoption and implementation of [the New York Convention], was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed . . . ." *China Minmetals Materials Import and Export Co., Ltd. V. Chi Mei Corp.*, 334 F.3d 274, 282 (3d Cir. 2003).

Def.'s Br. 15-16. All of Mr. Dahdaleh's theories for enforcing the arbitration agreements are recognized principles of contract and agency law. I consider them in turn.

### 1. Agency

"Traditional principles of agency law may bind a non-signatory to an arbitration agreement." *Rhone*, 269 F.3d at 198 (citing *Thomson-CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir. 1995)); *see also Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1122 (3d Cir. 1993) (citing *Isidor Paiewonsky Assoc., Inc. v. Sharp Properties, Inc.*, 998 F.2d 145 (3d Cir. 1993): "Agency logic has been applied to bind non-signatory business entities to arbitration agreements."). "[A]rbitration agreements may be upheld against non-parties where the interests of such parties are directly related to, if not congruent with, those of a signatory." *Pritzker*, 7 F.3d at 1122 (citing *Sharp Properties*, 998 F.2d at 155). "In examining agency, 'it is the essence of the actual relationship which governs whether or not an agency is created.'" *Reibstein v. CEDU/Rocky Mountain Academy*, Civ. A. No. 00-1781, 2000 WL 1858718 at \*9 (E.D. Pa. Dec, 19, 2000).

Here, taking Alba's allegations as true, I find Mr. Dahdaleh was an agent who may enforce the arbitration agreements in both the 1990 and 2005 contracts. While the relevant law turns on the facts of each case, I find this case more analogous to *Pritzker*, 7 F.3d at 1122 (binding a non-signatory business entity to the arbitration agreement of its corporate sister where the non-signatory entity's interests directly related to that of the signatory's) than *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 332-33 (E.D. Pa. 2004) (declining to apply agency theory to bind a non-signatory to an arbitration agreement where the relationship arose solely from allegations of conspiracy) or *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287 (3d Cir. 1996) (declining to apply agency theory to compel a non-signatory to arbitrate where the relationship

7

between the signatories and the non-signatory was based solely on a parent-subsidiary corporate structure).

In its Amended Complaint, Alba states: "Throughout the scheme, Defendants falsely identified Dahdaleh as a legitimate agent of or consultant to Alcoa and the Dahdaleh-owned shell companies as affiliates or subsidiaries of Alcoa – all to induce Alba to overpay for alumina and continue doing business with the Defendants." AC ¶ 53.  Throughout its Amended Complaint, Alba calls Mr. Dahdaleh Alcoa's agent. *See, e.g.,* AC ¶¶ 8, 18, & 96.  Alba's RICO Case Statement ("RCS") reiterates: "Throughout the conspiracy, Defendants falsely represented to Alba that the Dahdaleh-owned shell companies were legitimate businesses that were controlled by, affiliated with, and authorized to act on behalf of Alcoa and its subsidiaries." ECF No. 64 at ¶ 24.  Alba cannot retreat from its own pleadings.  I am not persuaded that Alba's use of the term "agent" in reference to Mr. Dahdaleh was merely a synonym for "criminal accomplice" or "co-conspirator." Pl.'s Br. 13.  Because Alba alleges that Mr. Dahdaleh held himself out as an agent of Alcoa and its subsidiaries, this is not a situation where agency is based solely on allegations of civil conspiracy.  Accordingly, Mr. Dahdaleh can enforce the arbitration agreements pursuant to an agency theory. *See, e.g.,* AC ¶¶ 8, 18, 24, 96, 106, 109, & 118; s*ee Miron*, 342 F. Supp. 2d at 332-33.

### 2.  Equitable Estoppel

Additionally, Mr. Dahdaleh, a non-signatory, asks me to apply an equitable estoppel theory to estop Alba, a signatory, from avoiding arbitration. Def.'s Br. 16-17.  Under an equitable estoppel theory, "courts have bound a signatory to arbitrate with a non-signatory at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the

contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *Rhone*, 269 F.3d at 199 (citing *Thomson-CSF, S.A. v. Amer. Arbitration Assoc.*, 64 F.3d 773, 778 (2d Cir. 1995) and quoting *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993)) (internal quotation marks omitted). "Estoppel can bind a non-signatory to an arbitration clause when that non-signatory has reaped the benefits of a contract containing an arbitration clause." *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 85 (3d Cir. 2010) (citing *Thomson-CSF, S.A.*, 64 F.3d at 778). "The purpose of the [estoppel] doctrine is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from relying on the contract when it works to his advantage by establishing the claim, and repudiating it when it works to his disadvantage by requiring arbitration." *In re Humana Inc.*, 285 F.3d 971 (11th Cir. 2002), *rev'd on other grounds by Pacificare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 (2003) (internal citations and alterations omitted).

Here, I find there is a close relationship between the entities involved because Alba, as a signatory, entered into a written arbitration agreement with affiliates of the non-signatory party asserting the arbitration. Even if Alba did not know until 2007 that the affiliate it contracted with in 2005 was controlled by Mr. Dahdaleh, I find there is an "obvious and close nexus" between the non-signatory and the contracting parties because (i) Mr. Dahdaleh previously had participated in negotiations between Alba and Alcoa, AC ¶¶ 113, 158; RCS 15, (ii) Alba knew Mr. Dahdaleh "as a legitimate agent of or consultant to Alcoa," RCS 15 & 53; AC ¶¶ 115-16, 121, & 168(e), (iii) Alba believed it had contracted with Alcoa affiliates under the 1990 contracts, including the assignments, and the 2005 agreement. AC ¶¶ 24, 26(b), 62, 85, 88, 100(b), 101, 138, 147, 154, 168; *see also Miron*, 342 F. Supp. 2d at 333 (articulating the test for estoppel asserted by a non-signatory to an arbitration clause).

Additionally, I find that Alba's claims are "intimately founded in and intertwined with" Mr. Dahdaleh's obligations and duties in the contract. Alba relies on *Miron* to support its position that estoppel theory is not appropriate. Pl.'s Br. 8-9. However, I do not find the facts of *Miron* analogous because, in that case, the non-signatory had no obligations nor did it receive any benefits under the contract containing the arbitration clause.[3]  342 F. Supp. 2d at 334.  Here, because (i) the basis of Alba's RICO claim is that Mr. Dahdaleh, through his shell-companies and bribes, induced Alba to purchase alumina at inflated prices, AC ¶¶ 21 & 26; RCS at 4-10, 14-15, 25-36; (ii) Alcoa subsidiaries assigned Mr. Dahdaleh's companies portions and eventually all of the 1990 contract alumina supply obligations, AC ¶ 26; RCS at 6-7, 14-15, 26-36; and (iii) Mr. Dahdaleh owned the company Alba contracted with in 2005, AC ¶ 131, it is clear that Mr. Dahdaleh both received benefits and had obligations under the contracts containing the arbitration agreements that are central to Alba's claims.[4]  Moreover, even if Alba did not fully understand Mr. Dahdaleh's involvement until 2007, estoppel is appropriate because Alba took advantage of the 2005 contract for another two years, until September 2009.  AC ¶¶ 157-58.

### 3.  Alter Ego

Mr. Dahdaleh asserts that he can enforce both the 1990 and 2005 arbitration agreements pursuant to an alter ego theory because Alba pled that the sole-purpose of the Dahdaleh-owned shell companies was to facilitate the Defendants' fraudulent scheme. Def.'s Br. 16-17; *see, e.g.,* ¶¶ 25-26.  Alba contends that Mr. Dahdaleh cannot assert the alter ego theory because he is

---

[3] I note that the *Miron* court found the Eleventh Circuit's reasoning in *In re Humana Inc. Managed Care Litig.* compelling. 342 F. Supp. 2d at 333-34 (discussing *In re Humana*, 285 F.3d 971 (11th Cir. 2002), *rev'd on other grounds by Pacificare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 (2003)). I find that the language from *In re Humana* cited by *Miron* and relied on by Alba merely underscores the point that to bind a signatory to arbitrate at the request of a non-signatory, the non-signatory's "obligations and duties" must be "intertwined" with the underlying contractual obligations. Pl.'s Br. 9 (citing *Miron* quoting *In re Humana*: "[A] plaintiff's 'actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is . . . the *sine qua non* of an appropriate situation' for estoppel"); *see also Rhone*, 269 F.3d at 199.
[4] Because I find Mr. Dahdaleh can estop Alba from avoiding the arbitration agreements in both the 1990 and 2005 contracts, I need not address Alba's concern that its claims may be split. *See* Pl.'s Br. 9-10.

seeking to avoid criminal liability and an alter ego analysis is "a fact-specific inquiry requiring an evidentiary record" that is only appropriate when courts need an equitable reason to pierce the corporate veil to prevent fraud, illegality, or injustice.  Pl.'s Br. 9, n.13.

Alter ego is a recognized contract theory for binding a non-signatory to an arbitration agreement.  *See Invista S.A.R.L*, 625 F.3d at 84.  The Third Circuit alter ego test requires the court to look at various factors such as gross undercapitalization and failure to observe corporate formalities, for example, to determine "whether the corporation is merely a façade for the operations of the dominant stockholder."  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484-85 (3d Cir. 2001).  Alter ego liability attaches only where it can be demonstrated that "in all aspects of the business, the two corporations actually functioned as a single entity and should have been treated as such."  *Id.* at 485.  "[A] subsidiary is an alter ego or instrumentality of the parent when 'the separate corporate identities . . . are a fiction and . . . the subsidiary is, in fact, being operated as a department of the parent."  *Id.*   To sufficiently plead alter ego, a plaintiff must do more than "parrot" the alter ego factors.  *Wrist Worldwide Trading GMBH v. MV Auto Banner*, Civ. No. 10-2326, 2011 WL 5414307, at \*6 (D.N.J. Nov. 4, 2011).  Because Alba's pleadings do not address any of the alter ego factors,[5] I find the pleadings lack sufficient facts from which Mr. Dahdaleh could assert alter ego to enforce the arbitration contracts as a non-signatory.

### B.  Whether This is the Type of RICO Case that May Be Arbitrated

Alba argues that this case is an atypical RICO case against organized crime and that compelled arbitration in the forum stipulated by the arbitration agreements (England and Wales) would deprive Alba of its statutory rights.  Pl.'s Br. 11-12 (stating that Alba's allegations are

---

[5] Moreover, alter ego is not the basis pursuant to which I exercised personal jurisdiction over Mr. Dahdaleh.  *See* Op. and Order of Court, ECF No. 99 (exercising personal jurisdiction based on the absent co-conspirator doctrine).

"akin to those made against the archetypal, intimidating mobster") (citation omitted). Specifically, Alba contends that application of this foreign law deprives it of RICO's remedies of treble damages and attorney fees. *Id.* at 12.

Unless a RICO case involves "allegations of criminal activity normally associated with professional criminals" involved in organized crime, RICO claims may be submitted to arbitration. *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 242 (1987) (quoting Justice Marshall's dissent in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 105 S. Ct. 3292, 3286 (1985) to explain that RICO cases rarely involve allegations of organized crime). Here, the allegations are not of the type normally associated with organized crime. Alba does not allege that Mr. Dahdaleh and his co-conspirators used traditional organized crime techniques of violence and intimidation to further its illegal business interests. Although this case has triggered criminal investigations within several countries, I disagree that the international context of this case demonstrates that it is the "exceptional" RICO case targeting organized crime. *See Sedima*, 1-5 S. Ct. at 3299-3301 (Marshall, J., dissenting) (discussing how the legislative history reveals that RICO was enacted to protect legitimate business owners from the "physical brutality, fear and corruption" utilized by organized criminals "to intimidate competitors and customers to achieve increased sales and profits" and "to fashion new remedies to deal with the infiltration of organized crime into legitimate organizations operating in interstate commerce") (citations and emphasis omitted). Because this case is more analogous to the "run-of-the-mill civil RICO claims brought against legitimate enterprises," I find it arbitrable. *See McMahon*, 482 U.S. at 242.

Additionally, Alba argues that this RICO case should not go to arbitration because, under the applicable foreign law, Mr. Dahdaleh will be able to assert a defense that is unavailable to

12

him in the United States—the consent of principal defense. Pl.'s Br. 13-15. Alba states that, in the United Kingdom, when a principal has consented to bribery, the consent of the principal defense allows the person who actually pays the bribes to escape liability. Pl.'s Br. 13 (citing *R v. J, V, B & S,* [2013] EWCI (Crim) 2287 (Court of Appeal of England and Wales Dec. 5, 2013).[6] Alba argues that I should apply the effective vindication doctrine to prevent Mr. Dahdaleh from evoking the consent of the principal defense. *Id.* at 14-15.

The effective vindication doctrine is an exception to the general rule favoring arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 636-37 (1985). The doctrine was born out of the Supreme Court's "willingness to invalidate, on 'public policy' grounds, arbitration agreements that operate as a prospective waiver of a party's right to pursue statutory remedies."[7] *American Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (quoting *Mitsubishi Motors*, 473 U.S. at 637, n.19) (internal alterations and emphasis omitted). I decline to apply the effective vindication doctrine to invalidate the arbitration agreements at issue here.

First, the application of foreign law is not a barrier to the arbitration of RICO claims. *See Italian Colors Rest.*, 133 S. Ct. at 2310-11; *McMahon*, 482 U.S. at 240. Application of foreign law by an international tribunal does not *ipso facto* deprive Alba of its statutory rights. As the Supreme Court explained in *Mitsubishi*:

> There is no reason to assume at the outset . . . that international arbitration will not provide an adequate mechanism. . . . The tribunal [] is bound to effectuate the intentions of the parties. Where the parties have agreed that the arbitral body is to decide a defined set of claims . . . the tribunal therefore should be bound to decide that dispute in accord with the national law giving rise to the claim.

---

[6] On appeal from the Crown Court, the Court of Appeal considered the consent of principal defense within the context of a principal/agent relationship where payment was made to the agent for the purpose of influencing his principal's affairs. *R v. J, V, B & S*, [2013] EWCI (Crim) 2287 at ¶ 8.

[7] In *Italian Colors*, writing for the majority, Justice Scalia states that the language giving rise to the effective vindication doctrine in *Mitsubishi Motors* was dicta.

*Mitsubishi Motor Corp.*, 473 U.S. at 636.  Moreover, the principle of international comity

instructs me to "be most cautious before interpreting [] domestic legislation in such manner as to

violate international agreements." *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515

U.S. 528, 539 (1995).  Additionally, "[t]he strong federal policy favoring arbitration applies with

special force in the field of international commerce." *Invista S.A.R.L.*, 625 F.3d at 84 (citation

omitted in original).  Alba agreed to arbitration governed by English law and ICC Rules and,

even if Alba now feels that the agreement it made is unfair, I must respect the intentions of the

parties as memorialized in the signed contracts.  As Mr. Dahdaleh points out:

> Alba could have selected U.S. law or a U.S. forum in its agreements; but it did
> not.  In a case involving a Bahraini company suing a U.K. citizen concerning
> international contracts with Swiss and Australian entities, the prospect of an
> arbitration in London governed by U.K. law cannot be viewed as unusual or
> unfair.

Def.'s Reply 5.

Most importantly, since we do not know how the arbitrator will construe the arbitration

agreements vis-à-vis RICO, it is speculative for me to decide that Alba cannot effectuate its

statutory remedies.[8]  *See Pacificare Health Sys.*, 538 U.S. at 1535-36 (compelling arbitration

where arbitrator's interpretation of RICO's treble damages provision was unknown).  As the

Supreme Court recently clarified, although it would be willing "to invalidate, on 'public policy'

grounds, arbitration agreements that 'operate as a prospective waiver of a party's *right to pursue*

statutory remedies,'" the proper inquiry focuses on whether a party has a "right to pursue"

statutory remedies.  *Italian Colors*, 133 S. Ct. at 2310 (quoting *Mitsubishi Motors*, 473 U.S. at

637) (emphasis in *Italian Colors*) (internal alterations omitted).  Here, because I do not know

how the arbitrator will construe the treble damages and attorney fees provisions of RICO,

---

[8] I note that in *Pacificare*, the Supreme Court underscored that the treble damages RICO provision is remedial in nature.  538 U.S. at 1535.

whether Mr. Dahdaleh will assert a consent of the principal defense, and if he does, whether the arbitrator will accept it, I must compel arbitration.[9] *See Pacificare Health Sys.*, 538 U.S. at 1535-36.

## C. Arbitrability and Scope

Alba submits that even if Mr. Dahdaleh can assert the arbitration agreements, I must still determine issues of arbitrability and scope. Pl.'s Br. 5. Mr. Dahdaleh argues that the arbitrators should determine arbitrability because Alba agreed to arbitrate all aspects of disputes arising in connection with the contracts, "including the issues of *whether* it is required to arbitrate and *which disputes* are arbitrable." Def.'s Br. 10.

When a party asks a court to compel arbitration, according to the FAA, a district court "must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Invista S.A.R.L.*, 625 F.3d at 84. As discussed, *supra*, I find that there is an agreement to arbitrate between Alba and Mr. Dahdaleh. *See supra* at III.A. "In determining whether the particular dispute falls within a valid arbitration agreement's scope, "there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Century Idem. Co. v.*

---

[9] In the case cited by Alba, the Lord Chief Justice of England and Wales considered the issue of when an agent is charged with conspiracy under the United Kingdom's Prevention of Corruption Act 1906, whether the prosecution must show evidence of the informed consent of the agent's principal to prove that the payment made by the agent for the prohibited purpose was made "corruptly," a requirement of the U.K. statue. *R v. J, V, B & S*, [2013] EWCI (Crim) 2287 at ¶ 8. Asserting the consent of the principal defense, the defendants argued 'corruptly' connoted 'secrecy' and where the agent had the consent of the principal to receive the payment, the act was not 'corrupt' because it was not secret. *Id.* at ¶ 8, ii. The Lord Chief Justice found that the term "corruptly" in the Act has an ordinary meaning and does not require that the payment has to be made in secret or without the knowledge and informed consent of the principle. *Id.* at ¶ 25. He held: "The prosecution need do no more than prove that the payment made for the prohibited purpose was made corruptly . . . [that evidence] may or may not be material or highly material depending on the facts of the case." *Id.* at ¶ 44-45. Accordingly, the consent of the principal defense may go to the heart of whether a payment made to an agent as an inducement or reward was done corruptly pursuant to the U.K.'s Prevention of Corruption Act 1906. However, I cannot posit how or whether an arbitrator might construe the defense vis-à-vis RICO.

*Underwrites at Lloyd's, London, subscribing to Retrocessional Agmt. Nos. 950548, 950646*, 584

F.3d 513, 524 (3d Cir. 2009) (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S.

643, 650 (1986)). "Such a presumption is particularly applicable where the clause is [] broad . . .

." *AT&T Techs., Inc.*, 475 U.S. at 650. Courts "should not assume that the parties agreed to

arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Silec*

*Cable S.A.S. v. Alcoa Fjardaal SF*, Civ. No. 12-01392, 2012 WL 5906535, at *16 (W.D. Pa.

Nov. 26, 2012) (quoting *First Options of Chicago, Inc. v. Kaplan et al.*, 514 U.S. 938, 945

(1995)) (internal citations omitted).   Accordingly, I must look to the parties' contract to

effectuate their intent as to arbitrability and scope.

The arbitration agreements of the applicable contracts (the 1990 and 2005 alumina supply

contracts) contain substantively similar clauses requiring arbitration in London of any dispute

arising "in connection with" the agreements. *See* Def.'s Br. 4. The 1990 arbitration agreement

states at Art. 13.1.a:

> Any dispute, controversy or claim arising under or in connection with this
> Agreement shall be referred at the instance of either Party for final determination
> under the Rules of Conciliation and Arbitration of the International Chamber of
> Commerce by three arbitrators (unless otherwise agreed) who shall be appointed
> in accordance with the said Rules and shall sit in London. Both Parties to the
> Agreement submit to the jurisdiction of the said arbitrators and to the said Rules.
> Arbitration proceedings shall be held in English and the award shall be final and
> binding on both Parties.

Def.'s Decl. Ex. 1 at 20.   The 1990 arbitration agreement was not affected by any of the

subsequent amendments. The 2005 arbitration agreement states at Art. 13.1:

> Any dispute, controversy or claim arising under or in connection with this
> Agreement shall be referred at the instance of any Party for final determination
> under the Rules of Arbitration of the International Chamber of Commerce (the
> "Rules") by three arbitrators (unless otherwise agreed) who shall be appointed in
> accordance with the Rules and shall sit in London (the "Arbitrators"). Both
> Parties submit to the jurisdiction of the Arbitrators and to the Rules. Arbitration

proceedings shall be held in English and the award shall be final and binding on both Parties.

Def.'s Decl. Ex. 3 at 10.

In interpreting these agreements, I must give the language "in connection with" its plain meaning. *See John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997). I find this language to be broad and unambiguous, encompassing any dispute that has a "logical or causal connection" to the 1990 or 2005 contracts. *See id.* (finding "arising in relation to" contractual language includes any dispute with a "logical or causal connection" to the agreements). I agree with Mr. Dahdaleh that the cases cited by Alba to show that its claims are beyond the scope of the arbitration provisions rely on different, narrower language than the arbitration agreements at issue here. *See* Def.'s Reply 2 n.3; *see also* Pl.'s Br. 10-11 ("arising out of," "arising under," and "arising in connection *with the performance*" is narrower language not analogous to the agreements at issue here).

Moreover, where contracting parties have incorporated the ICC Rules into their agreement, the parties "have necessarily agreed to the procedures set forth in those Rules which specify that the arbitrators or the International Court of Arbitration of the International Chamber of Commerce will decide the issue of the jurisdiction of the arbitrators, i.e., whether the dispute is arbitrable." *Silec Cable*, 2012 WL 5906535 at *18. The 1990 and 2005 arbitration agreements at issue here clearly incorporate the ICC Rules. Def.'s Decl. Ex. 1 at 20 & Ex. 3 at 10. Although Alba disputes the applicability of *Silec Cable*, I find Alba mistaken in its belief that the court in *Silec Cable* "could not determine arbitrability because neither party had challenged the enforceability of the relevant arbitration provision." Pl.'s Br. 6. On the contrary, like the case at hand, the court in *Silec Cable* considered the issue of whether incorporation of the ICC Rules into an arbitration agreement left arbitrability to the arbitrators *because* the parties

17

disagreed on the scope of the arbitration agreements and who would make that determination. *Silec Cable*, 2012 WL 5906535 at *15 & *17. I find *Silec Cable*'s reasoning sound and applicable "given that the ICC Rules *require* the arbitrators to determine whether a claim is arbitrable if that issue is raised by one of the parties." *Id.* (citations omitted); *see* ICC Rules art. 6(3) (2012).

Accordingly, I find that arbitrability and the scope of what claims may be arbitrated "in connection with" the 1990 and 2005 arbitration agreements are issues to be resolved by the arbitrators due to (i) the plain language of the arbitration agreements and (ii) the parties' incorporation of the ICC Rules into the agreements.

### D. Waiver

Where "a party has acted inconsistently with the right to arbitrate," a court may find that the party has waived its right to arbitrate and refuse to enforce an arbitration agreement. *In re Pharm. Benefit Managers Antitrust Litigation ("PBM")*, 700 F.3d 109, 117 (3d Cir. 2012) (internal citations and quotations omitted). "Consistent with the strong preference for arbitration in federal courts, waiver is not to be lightly inferred and will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery." *Id.* (internal citations and quotations omitted). "Prejudice is the touchstone for determining whether the right to arbitrate has been waived by litigation conduct," *id.* (quoting *Zimmer v. CopperNeff Advisors, Inc.*, 523 F.3d 224,231 (3d Cir. 2008), and the Third Circuit has established six factors (the "*Hoxworth* factors") to assist in assessing prejudice:

> (1) timeliness or lack thereof of the motion to arbitrate; (2) extent to which the party seeking arbitration has contested the merits of the opposing party's claims; (3) whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings; (4) the extent to which a party seeking arbitration engaged in non-merits motion practice; (5)

the party's acquiescence to the court's pretrial orders; and (6) the extent to which the parties have engaged in discovery.

*Id.* (citing *Hoxworth v. blinder, Robinson & Co., Inc.*, 980 F.2d 912, 926-27 (3d Cir. 1992)).

Upon a careful review of the *Hoxworth* factors, there is not prejudice sufficient for me to find that Mr. Dahdaleh waived his right to enforce the arbitration agreements. First, although Alba initiated this case on February 27, 2008 and Mr. Dahdaleh did not mention his intent to file a motion to compel arbitration until December 16, 2013, the delay is not as prejudicial as Alba argues given that the case was stayed for the greater part of its existence: (i) Alba consented to a stay of approximately three and half years (from March 27, 2008 to November 9, 2011) to permit the U.S. government to intervene without the interference of ongoing civil litigation; (ii) the case was actively litigated for approximately eleven months (from November 9, 2011 to October 25, 2012) until I again stayed the case to allow Mr. Dahdaleh the freedom to defend his U.K. criminal charges without the potential limitations posed by ongoing, related civil discovery; and (iii) Mr. Dahdaleh's U.K. case concluded on December 10, 2013, and Mr. Dahdaleh informed Alba of his request to compel arbitration during a telephone conference with the court six days later. Second, during the time the parties actively engaged in litigation, Mr. Dahdaleh primarily concentrated on attacking my jurisdiction. *See* ECF No. 74 & 75 (arguing, *inter alia*, no personal jurisdiction); ECF No. 111 & 112 (motion for certification of interlocutory appeal re finding of personal jurisdiction based on co-conspirator doctrine). Mr. Dahdaleh's additional non-merits motions practice was principally in pursuit of obtaining a stay of discovery during the pendency of his U.K. criminal trial, which I granted. ECF No. 108 & 110 (first motion to stay discovery and brief); ECF No. 136 (motion to extend discovery stay). Because of the numerous stays and the fact that Mr. Dahdaleh's motions practice, on the whole, was non-merits based, I

19

find that Mr. Dahdaleh's acquiescence to my pretrial orders is at the low end of the level of acquiescence that would cut in favor of finding waiver.

Moreover, although no one *Hoxworth* factor is determinative, courts in the Third Circuit "have arguably placed special emphasis" on the factor weighing the extent to which the parties have engaged in discovery. *PBM*, 700 F.3d at 120 (internal citations omitted). "Our cases [in the Third Circuit] finding waiver have uniformly featured significant discovery activity in the district court." *Id.* While Alba may feel prejudiced by the delay in the start of discovery in terms of its inability to obtain a timely resolution and the increased difficulties in gathering discovery, any such prejudice is not the result of Mr. Dahdaleh's request for arbitration. Additionally, these considerations are distinct from my analysis of whether Mr. Dahdaleh's belated invocation of his right to arbitrate compromised Alba's position by causing Alba to unfairly expend time and money on litigation costs. *See id.* (citing *Ehleiter* v. *Grapetree Shores, Inc.*, 482 F.3d 207, 224 (3d Cir. 2007)). "This is because arbitration is meant to streamline proceedings, reduce costs, and conserve resources, and none of these purposes are served 'when a party actively litigates a case for an extended period only to belatedly assert that the dispute should have been arbitrated, not litigated, in the first place.'" *Id.* (citing *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 209 (3d Cir. 2010)). Although Mr. Dahdaleh requested the additional stays to insulate his U.K. criminal defense from the intrusion of civil discovery, I stayed discovery, in part, to streamline the process once the case resumed and to preserve judicial economy. Because Mr. Dahdaleh requested an order compelling arbitration nearly contemporaneous to the resolution of his U.K. case, no discovery has ever occurred in this civil action. In fact, Mr. Dahdaleh has yet to answer Alba's First Amended Complaint. Therefore, it cannot be said that

Mr. Dahdaleh's arbitration request prejudices Alba in terms of the time and expense incurred in litigating the case.  For all of the foregoing reasons, I find no waiver.

IV.  **Conclusion**

In summary, I applied a Rule 12(b)(6) standard in my review of Mr. Dahdaleh's motion to compel arbitration.  I find that Mr. Dahdaleh, a non-signatory, may enforce both the 1990 and 2005 arbitration agreements with Alba via the contract principles of agency and equitable estoppel.  Additionally, I find that this RICO case is of the type that may be submitted to arbitration.  Moreover, because Alba has a "right to pursue" its RICO statutory remedies during arbitration, and I do not know how the arbitrators will construe RICO when applying English law, at this juncture, it would be inappropriate for me to invalidate the arbitration agreements due to policy concerns about Alba's ability to effectuate its statutory rights.  I further find that because the plain language of the arbitration agreements incorporates the ICC Rules, issues of arbitrability and scope are for the arbitrators.  Lastly, I find that Mr. Dahdaleh did not waive his right to seek arbitration.

Because all of the claims in this dispute are subject to the arbitration agreements (even if their arbitrability is to be decided by the arbitrators), I grant Mr. Dahdaleh's motion.  I will dismiss the action against Mr. Dahdaleh, without prejudice, in favor of arbitration.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ALUMINIUM BAHRAIN B.S.C.,          )
                                   )
                Plaintiff,         )
                                   )
        v.                         )
                                   )        Civ. No. 8-299
VICTOR DAHDALEH                    )
                                   )
                Defendant.         )

AMBROSE, Senior U.S. District Judge

## ORDER

AND NOW on this _28th_ day of April, 2014, upon consideration of Defendant Victor Dahdaleh's Motion to Dismiss the Amended Complaint, or in the Alternative for a Stay and Order Compelling Mandatory Arbitration, the motion is Granted.  It is Ordered that the First Amended Complaint is dismissed without prejudice.  It is further Ordered that should Plaintiff Aluminum Bahrain B.S.C. choose to pursue its claims against Mr. Dahdaleh, it may do so only in arbitration.

BY THE COURT:


_Donetta F. Ambrose_
Donetta W. Ambrose, Sr. U.S. Dist. Judge

22